UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARQUETTE COUNTY MEDICAL CARE FACILITY,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

Case No. 2:25-cv-00135-JMB-SJB

Hon. Jane M. Beckering

# JOINT STATEMENT OF UNDISPUTED FACTS

Pursuant to the Court's procedures, the parties jointly submit the following statement of undisputed facts.[1]

## A. Plaintiff's Employee Retention Credit Claim for the First Quarter of 2021

1. Plaintiff is a skilled nursing facility and an instrumentality of Marquette County, Michigan. ECF No. 15, PageID.74, ¶ 33.

2. Plaintiff's principal purpose is to provide medical care. *Id.*, PageID.64-65, ¶ 1.

3. Plaintiff is a 140-bed facility that provides care to long-term and short-term residents. Perry Tr. 12:24; 36:4-5.

4. Thirty of those 140 beds comprise the Special Needs Unit, twenty of which have a "certificate of need," meaning a resident must have a dementia diagnosis to fill that bed. *Id.* at 34:13-35:8.

[1] The parties agree to the facts herein but do not agree that all of them are material to the outcome of the legal issues in dispute. The parties will address the relevance of these facts as necessary in their briefs. Exhibits with numerical designations were marked for purposes of depositions. Any gaps in numbering are intentional. Additional exhibits have alphabetical designations.

5. Plaintiff's long-term residents typically have cognitive impairment or need assistance with activities of daily living. *Id.* at 36:13-17. Long-term residents ordinarily stay at the facility for the remainder of their lives. *Id.* at 37:1-4.

6. Plaintiff's short-term residents typically have an illness or injury and require skilled therapy to return to their prior level of functioning. *Id.* at 39:14-17. Plaintiff's potential candidate pool for short-term residents includes individuals recovering from elective or required procedures. *Id.* at 153:10-14.

7. Plaintiff's principal source of revenue is resident room and board reimbursement. *Id.* at 91:22-23. Room and board includes, but is not limited to, resident living space, standard medical equipment, medical and wound treatment, meals, and on-site group activities. *Id.* at 52:7-54:24.

8. Plaintiff had fewer than 500 full-time employees at all times in 2019. Filibeck Tr. at 18:3-9.

9. On July 17, 2022, Plaintiff timely filed a refund claim seeking the employee retention credit ("ERC") in the amount of $1,460,043.78 for the first quarter of 2021. *See* ECF No. 7-1, PageID.36-40.

10. The IRS denied Plaintiff's ERC claim for the first quarter of 2021. ECF No. 15, PageID.80, ¶ 63.

11. The denial was less than two years before Plaintiff filed the present suit. *Id.*, ¶ 64.

**B. Relevant Orders Issued by Governmental Authorities**

*i. Orders Pertaining to COVID Relief Facilities*

12. On October 22, 2020, Michigan Governor Gretchen Whitmer signed Senate Bill 1094. *See* Press Release, Governor Whitmer Signs Bipartisan Bills Protecting Workers and

Businesses that do their Part to Protect Michiganders from COVID (Oct. 22, 2020), *available at* https://www.michigan.gov/whitmer/news/press-releases/2020/10/22/governor-whitmer-signs-bipartisan-bills-protecting-workers-and-businesses-that-do-their-part-to-pro (Ex. 3).

13. Pursuant to Senate Bill 1094, "[a]n individual shall not be admitted or retained for care in a nursing home" if the "individual has tested positive for coronavirus," subject to exceptions. Ex. 3; ECF No. 26-1, PageID.145.

14. The Bill directed the Michigan Department of Health and Human Services ("MDHHS") to create a process by November 15, 2020, by which nursing homes could admit or retain an individual who tested positive for COVID-19 "in designated areas within nursing homes for individuals who test positive for coronavirus." *Id*. at PageID.144. If MDHHS did not create that process by November 15, 2020, nursing homes could admit or retain an individual who tested positive for COVID-19 until the date MDHHS implemented a process and for up to 30 days thereafter. *Id*. at PageID.145.

15. Plaintiff is a nursing home within the meaning of Senate Bill 1094.

16. As relevant, a nursing home could retain existing COVID-positive residents if it could "demonstrate[] to the department of health and human services that it meets the requirements described in section 5145(1)(e) to accept an individual who has tested positive for coronavirus within the approved designated area of the nursing home." *Id.*

17. MDHHS was instructed to "require a nursing home seeking to establish a designated area within its facility to apply to [MDHHS]" and meet certain criteria, including having the "physical plant capacity to designate a distinct area within the nursing home for individuals who have tested positive for coronavirus." *Id.*

18. On November 16, 2020, MDHHS issued MSA 20-73, a bulletin entitled "COVID-19 Response: Policy for COVID Relief (CR) Facilities to Treat COVID-19 Residents Requiring Nursing Facility Care in Limited Circumstances." The bulletin had an effective date of December 1, 2020, and it remained in effect through the first three quarters of 2021, as supplemented by MSA 20-78. Ex. 1; ECF No. 26-1, PageID.135.

19. MSA 20-73 implemented Senate Bill 1094 by requiring facilities seeking to retain residents who tested positive for COVID or accept new residents with COVID to become COVID Relief Facilities ("CRFs"). Among the "minimum participation criteria" for CRF approval was to have a "designated COVID-positive area (designated area can include a portion of a unit, wing, or separate building)." *Id.* MSA 20-73 contained no requirements regarding the size of the designated area, but stated that the area could include "a fully dedicated or a portion of a floor, unit, wing, separate building, or group of rooms at the end of a unit." *Id*. at PageID.136.

20. On November 30, 2020, MDHHS issued MSA 20-78, a bulletin entitled "COVID-19 Response: Update to Bulletin 20-73." The bulletin had an effective date of December 15, 2020, and it remained in effect through the first three quarters of 2021. Ex. 2; ECF No. 26-1, PageID.140.

21. Like MSA 20-73, MSA 20-78 contained a requirement for a CRF to have a "designated COVID-positive area (designated area can include a portion of a unit, wing, or separate building)," and contained no requirements regarding the size of the designated area. *Id.*

22. Both MSA 20-73 and MSA 20-78 provided that facilities that did not apply or were denied CRF designation "must transfer any COVID-positive residents to an alternate location as soon as practicable." Ex. 1; Ex. 2; ECF No. 26-1, PageID.138, 141.

23. Under MSA 20-73 and MSA 20-78, facilities had three options: (1) do not become a CRF that retains or accepts COVID positive residents, (2) become a CRF that retains COVID

positive residents, or (3) become a CRF that retains COVID positive residents and accepts new COVID positive residents. Ex. 1; Ex. 2.

*ii. Orders Pertaining to Visitation, Social Distancing, and Group Activities*

24. On December 8, 2020, MDHHS issued an order entitled "Emergency Order Under MCL 333.2253—Requirements for Residential Care Facilities—Recission of October 21, 2020 Order," which was effective until March 2, 2021. Ex. 8; ECF No. 26-1, PageID.182.

25. For purposes of the December 8 order and other MDHHS orders described below, Plaintiff is a residential care facility.

26. The December 8 order provided for criminal penalties and fines in the event of noncompliance. Ex. 8; ECF No. 26-1, PageID.188.

27. The December 8 MDHHS order provided: "Except as otherwise provided in this or any subsequent orders, facilities must prohibit visitors from entering their facilities." Ex. 8; ECF No. 26-1, PageID.184. Under the December 8 MDHHS order, facilities could allow indoor visitation if (1) the facility had no new COVID-19 cases in the prior 14 days, (2) the county COVID-19 positive rate was at a low, A, B, C, or D risk level, (3) the local health department did not prohibit visitation at that facility, and (4) visitors followed testing requirements. *Id*.

28. MDHHS categorized county positivity rates as Low (<3%), A (3-7%), B (7-10%), C (10-15%), D (15-20%), or E (≥ 20%). Ex. 8; Michigan Safe Start Map [Archived], https://www.mistartmap.info/ (MIStartMap Risk Levels [Archived]) (archive accessed on August 18, 2026). Counties could also be placed into particular levels based on the concentration of COVID within the counties even if they did not meet the relevant positivity thresholds.

29. Under the December 8 order, certain visitors were always permitted even when visitation would otherwise not be. Ex. 8; ECF No. 26-1, PageID.186. These included: guardians

of residents under 21 years old; visits supporting activities of daily living or that were necessary to ensure effective communications with residents with hearing, vision, or speech impairment; visits by clergy visiting end-of-life patients; medical service providers; non-medical service providers (*e.g.*, hairdressers, cosmetologists, and providers of religious or spiritual services) when it is determined by a qualified medical professional that there will be an actual or potential negative impact on the resident when the service is not provided, and the resident will not benefit from remote service delivery; and volunteers trained in infection control measures who were supporting visitation. *Id*. Window visits were also always permitted. *Id*.

30. The December 8 order stated that residential care facilities "shall…[l]imit communal dining and internal and external group activities consistent with the Center for Medicare and Medicaid Services ["CMS"] guidance included in QSO-20-39-NH (issued on September 17, 2020)." *Id.* at PageID.183.

31. The September 17, 2020 version of QSO-20-39-NH in turn allowed communal dining and activities with "[s]ocial distancing at least six feet between persons." Ex. 12; ECF No. 26-1, PageID.214. Examples of acceptable activities under QSO-20-39 included exercise, bingo, book clubs, movies, and crafts. *Id*. at PageID.218.

32. The September 17, 2020 version of QSO-20-39 stated, "We believe the guidance [herein] represents reasonable ways a nursing home can facilitate in-person visitation. Except for on-going use of virtual visits, facilities may still restrict visitation due to the COVID-19 county positivity rate, the facility's COVID-19 status, a resident's COVID-19 status, visitor symptoms, lack of adherence to proper infection control practices, or other relevant factor related to the COVID-19 PHE. However, facilities may not restrict visitation without a reasonable clinical or safety cause, consistent with §483.10(f)(4)(v). For example, if a facility has had no COVID-19

cases in the last 14 days and its county positivity rate is low or medium, a nursing home **must** facilitate in-person visitation consistent with the regulations, which can be done by applying the guidance stated above. Failure to facilitate visitation, without adequate reason related to clinical necessity or resident safety, would constitute a potential violation of 42 CFR 483.10(f)(4), and the facility would be subject to citation and enforcement actions."

33. The September 17, 2020 version of QSO-20-39 invited facilities to apply for CMP funds to support in-person visitation. Ex. 12.

34. Under the December 8 order, if there was a positive COVID case among residents or staff in a facility, that facility was required to "[p]ost a notice in a visible and obvious place near the main entrance of the facility indicating the presence of a confirmed COVID-19 positive employee or resident. The notice must continue to be displayed until 14 days after the last positive COVID-19 test result for an employee or resident in the facility." *Id.*, PageID.183.

35. On March 2, 2021, MDHHS issued an order entitled "March 2, 2021 Requirements for Residential Care Facilities—Rescission of December 8, 2020 Order." Ex. 9; ECF No. 26-1, PageID.190.

36. The March 2 order provided for criminal penalties and fines in the event of noncompliance. Ex. 9; ECF No. 26-1, PageID.199.

37. The March 2 order kept the social distancing requirements for communal dining and group activities and required facilities to "[m]ake efforts to allow communal dining and group activities" for residents who did not have COVID and were not quarantining. Ex. 9; ECF No. 26-1, PageID.203.

38. The March 2 order permitted visitation when the facility had no new COVID-19 cases in 14 days, the local health department or MDHHS had not prohibited visitation, and the

facility complied with COVID-19 testing requirements for visitors over the age of 13. Ex. 9; ECF No. 26-1, PageID.195. The order stated that "facilities must support and accommodate residents receiving visitors." *Id.* at PageID.194.

39. Under the March 2 order, if there was a positive COVID case among residents or staff in a facility, that facility was required to "[p]ost a notice in a visible and obvious place near the main entrance of the facility indicating the presence of a confirmed COVID-19 positive employee or resident. The notice must continue to be displayed until 14 days after the last positive COVID-19 test result for an employee or resident in the facility." *Id.*

40. On March 17, 2021, MDHHS issued an order entitled "March 17—Requirements for Residential Care Facilities—Rescission of March 2, 2021 Order." Ex. 10; ECF No. 26-1, PageID.201.

41. The March 17 order provided for criminal penalties and fines in the event of noncompliance. Ex. 10; ECF No. 26-1, PageID.205.

42. The March 17 order kept the social distancing requirements for communal dining and group activities but did not include the prohibition on visitation in the 14 days following a positive COVID case. Ex. 10; ECF No. 26-1, PageID.203.

43. Under the March 17 order, if there was a positive COVID case among residents or staff in a facility, that facility was required to "[p]ost a notice in a visible and obvious place near the main entrance of the facility indicating the presence of a confirmed COVID-19 positive employee or resident. The notice must continue to be displayed until 14 days after the last positive COVID-19 test result for an employee or resident in the facility." Ex. 10; ECF No. 26-1, PageID.204.

44. The March 17 order directed that facilities "shall comply" with the March 10, 2021 updated version of CMS's guidance included in QSO-20-39-NH. *Id.* at PageID.203.

45. The March 10 version of QSO-20-39-NH provided updated guidance based on the introduction of the COVID-19 vaccine. Ex. 13. It maintained the social distancing language from the September 17, 2020 version.

46. The March 10 version of QSO-20-39-NH stated that "[f]acilities should allow indoor visitation at all times and for all residents (regardless of vaccination status), except for a few circumstances when visitation should be limited due to a high risk of COVID-19 transmission." *Id.* at PageID.222. Those circumstances included limiting indoor visitation for: unvaccinated residents if the county COVID-19 positive rate was greater than 10 percent and less than 70 percent of residents were fully vaccinated; residents with a confirmed case of COVID-19 until they met criteria to discontinue Transmission-Based Precautions; and residents in quarantine. *Id*.

47. The March 10 version of QSO-20-39-NH updated visitation guidelines in the event of a new COVID case in a facility. *Id.* at PageID.223. Following a COVID case, facilities were instructed to suspend all visitation until one round of facility-wide testing was complete. *Id*. If the testing did not reveal additional COVID cases in other units of the facility, visitation could continue for those units. *Id*. If the testing did reveal additional COVID cases in other units, visitation was to be suspended until the facility met the criteria to discontinue outbreak testing. *Id*. The March 10 version of QSO-20-39-NH generally prohibited indoor visitation for residents in quarantine. *Id*. at PageID.222.

48. Under the March 10 version of QSO-20-39-NH, compassionate care visits were always allowed, including during a COVID outbreak. *Id.* at PageID.224. And fully vaccinated

residents were no longer required to socially distance from their visitors if they wore a face covering. *Id*.

49. CMS further updated QSO-20-39-NH on April 27, 2021. Ex. 14; ECF No. 26-1, PageID.228. The April 27 version contained the same visitation guidelines identified above from the March 10 order. Ex. 14; ECF No. 26-1, PageID.230-231.

50. The April 27, 2021 version of QSO-20-39-NH eliminated social distancing requirements for group activities and dining if all participating residents were fully vaccinated. *Id.* at PageID.234.

51. On May 21, 2021, MDHHS issued an order entitled "May 21, 2021 Requirements for Residential Care Facilities—Rescission of March 17, 2021 [Order]." Ex. 11; ECF No. 26-1, PageID.206.

52. The May 21 order provided for criminal penalties and fines in the event of noncompliance. Ex. 11; ECF No. 26-1, PageID.211.

53. The May 21 order stated that facilities shall "[m]ake efforts to allow communal dining and group activities to occur" for residents not in isolation or under observation for COVID symptoms. *Id.* at PageID.210. The order permitted communal dining and group activities without social distancing unless there was at least one resident present who was not fully vaccinated. *Id.*

54. The May 21 order retained the requirement to "comply with the Center[s] for Medicare and Medicaid Services guidance included in QSO-20-39-NH." *Id.*

55. Under the May 21 order, if there was a positive COVID case among residents or staff in a facility, that facility was required to "[p]ost a notice in a visible and obvious place near the main entrance of the facility indicating the presence of a confirmed COVID-19 positive

employee or resident. The notice must continue to be displayed until 14 days after the last positive COVID-19 test result for an employee or resident in the facility." *Id.*

56. The May 21 order remained in effect through the third quarter of 2021.

*iii. Orders Pertaining to Quarantining and Infection Control*

57. The Michigan Department of Licensing and Regulatory Affairs ("MDLARA") throughout the first three quarters of 2021 stated that a facility's infection prevention and control program "must be based on an accepted national standard." Ex. 4; ECF No. 26-1, PageID.146.

58. The "likely national standard" was the recommendations provided by the Centers for Disease Control and Prevention ("CDC"). *Id.*

59. MDLARA stated that "[o]nce a provider adopts a national set of standards, these standards are viewed as required, and no longer just recommendations." *Id.*

60. Plaintiff had an infection prevention and control program in place before 2020. Perry Tr. 219:6-8. Before and during COVID, Plaintiff followed the CDC's infection prevention and control guidance. Perry Tr. 216:23-218:19.

61. The CDC published a document entitled "Responding to Coronavirus (COVID-19) in Nursing Homes" on April 30, 2020. Ex. 5; ECF No. 26-1, PageID.153. That document remained in effect until March 29, 2021.

62. The April 30 document contained provisions for new admissions or readmissions; for new admissions and readmissions whose COVID status is unknown, "[o]ptions include[d] placement in a single room or in a separate observation area" for 14 days. *Id.* at PageID.154.

63. The April 30 document required facilities, in the event of an actual or suspected COVID case among residents, to "[c]onsider temporarily halting admissions to the facility, at least

until the extent of transmission can be clarified and interventions can be implemented." Ex. 5; ECF No. 26-1, PageID.155.

64. In a March 29, 2021 update titled "Interim Infection Prevention and Control Recommendations to Prevent SARS-CoV-2 Spread in Nursing Homes," the CDC exempted certain categories of residents, including those who were fully vaccinated and residents leaving the facility for less than 24 hours who do not have close contact with someone with COVID, from the quarantine requirement but left it in place for non-exempt admissions and readmissions. Ex. 6; ECF No. 26-1, PageID.167. There was an exception that allowed for "risk-based" decisions on quarantining for facilities that were in "areas with minimal to no community transmission." *Id.*

65. The March 29 update provided that a "single new case" of COVID among employees or residents "should be evaluated as a potential outbreak," with the statement that residents should "generally be restricted to their rooms." *Id.* at PageID.168.

66. The March 29 update contained provisions regarding exclusion from work of certain employees who had COVID symptoms or exposure. *Id.* at PageID.164.

67. In a September 10, 2021 update, which remained in effect through the end of the third quarter of 2021, the CDC continued to state that a "single new case" of COVID among employees or residents "should be evaluated as a potential outbreak," with unvaccinated residents generally required to remain in their rooms. Ex. 7; ECF No. 26-1, PageID.178. Fully vaccinated residents without COVID symptoms generally did not need to quarantine or remain in their rooms unless they were diagnosed with COVID. *Id.* at PageID.179.

68. The September 10 update contained provisions regarding exclusion from work of certain employees who had COVID symptoms or exposure. *Id.* at PageID.178.

69. The September 10 update left in place the procedure for quarantining unvaccinated residents upon admission or readmission, subject to an ability to make "risk-based" decisions on quarantining for facilities that were in "counties with low community transmission." Ex. 7; ECF No. 26-1, PageID.177.

70. Marquette County, Michigan had the following COVID-19 positive rates during 2021:




Ex. 28.

*iv. Characterizing the Orders*

71. All of the MDHHS, MDLARA, CMS, and CDC orders above were issued by governmental authorities, as was Senate Bill 1094.

72. All of the MDHHS, MDLARA, CMS, and CDC orders above contain provisions limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes), as does Senate Bill 1094.

73. All of the MDHHS, MDLARA, CMS, and CDC orders above imposed at least some of those limitations due to COVID, as did Senate Bill 1094.

## C. COVID Cases at Plaintiff's Facility

74. Plaintiff reported one staff positivity case to MDHHS on or about each of the following dates in the first three quarters of 2021: January 6, April 7, April 14, August 25, September 8, September 15, and September 22. Ex. A. at MAR_000015 – MAR_000016.

75. Additionally, a staff member tested positive on a rapid test on March 15, prompting the cancellation of visitation and activities. Ex. 28 at 31.

76. Following the positive staff member cases in April, resident group activities were cancelled on the 500 and 600 wings and continued on all other wings after the first round of testing. Ex. B at MAR_118. Visitation was allowed during this time. Ex. 28 at 24-28.

77. Group activities and dining were cancelled for the facility on March 17 and August 25, 2021, following positive COVID cases. Ex. 28 at 5, 7, 31.

78. Visitation was allowed following the positive case in August. Ex. 28 ("Visits are going well").

79. Following the positive staff member cases in September, Plaintiff cancelled visitation on the 400 wing for two weeks. Ex. 28 at 5.

80. Cancellations were generally for 14-day periods. *See, e.g.*, Ex. 8.

81. Plaintiff reported one resident positivity case to MDHHS on or about January 11, 2021. Ex. C. at MAR_000102.

82. Following the positive case involving the resident, Plaintiff could not admit new residents for two weeks. Ex. 28 at 38.

## D. Plaintiff's Operations During the First Three Quarters of 2021

### *i. Census and Admissions*

83. Plaintiff has 140 licensed beds.

84. Apart from married couples, residents sharing bathrooms need to be the same gender. Perry Tr. at 135:11-12.

85. Plaintiff's census, which is a measure of occupancy, is calculated by adding up the number of residents in the facility each day across a set period.

86. In the first quarter of 2019, Plaintiff had a total census of 11,124. Ex. D. at MAR_001995 – MAR_002011; Ex. E at MAR_001970 – MAR_001987; Ex. F at MAR_002067 – MAR_002084.

87. In the first quarter of 2021, Plaintiff had a total census of 9,499. Ex. G at MAR_000153 – MAR_000169; Ex. H at MAR_000170 – MAR_000186; Ex. I at MAR_000187 – MAR_000203.

88. Plaintiff's census in the first quarter of 2021 declined by 14.6 percent, as compared to the first quarter of 2019.

89. In the second quarter of 2019, Plaintiff had a total census of 11,241. Ex. J at MAR_001898 – MAR_001915, Ex. K at MAR_002092 – MAR_002109; Ex. L at MAR_002043 – MAR_002059.

90. In the second quarter of 2021, Plaintiff had a total census of 10,236. Ex. M at MAR_000204 – MAR_000220; Ex. N at MAR_000221 – MAR_000238; Ex. O at MAR_000239 – MAR_000255.

91. Plaintiff's census in the second quarter of 2021 declined by 8.9 percent, as compared to the second quarter of 2019.

92. In the third quarter of 2019, Plaintiff had a total census of 11,025. Ex. P at MAR_002019 – MAR_002035; Ex. Q at MAR_001924 – MAR_001942; Ex. R at MAR_002153 – MAR_002170.

93. In the third quarter of 2021, Plaintiff had a total census of 10,903. Ex. S. at MAR_000256 – MAR_000273, Ex. T at MAR_000274 – MAR_000291; Ex. U at MAR_00092 – MAR_000307.

94. Plaintiff's census in the third quarter of 2021 declined by 1.1 percent, as compared to the third quarter of 2019.

95. Plaintiff tracks the following categories regarding its census: new admission, discharge, discharge with a return expected, expired (deceased), returning admission, hospital leave, and therapeutic leave. *Id.*; Perry Tr. 126:19-127:13.

96. Plaintiff recorded the following during the first three quarters of 2019 and 2021:

| Period | New Admission | Discharge | Discharge Return Expected | Expired | Returning Admission | Hospital Leave | Therapeutic Leave |
|---|---|---|---|---|---|---|---|
| 2019 (Q1) | 39 | 20 | 10 | 22 | 11 | 0 | 1 |
| 2021 (Q1) | 29 | 18 | 6 | 8 | 6 | 0 | 0 |
| 2019 (Q2) | 42 | 35 | 16 | 16 | 20 | 0 | 2 |
| 2021 (Q2) | 34 | 19 | 11 | 9 | 15 | 1 | 3 |
| 2019 (Q3) | 60 | 28 | 15 | 24 | 18 | 0 | 4 |
| 2021 (Q3) | 37 | 17 | 4 | 15 | 8 | 1 | 3 |

MAR_001894-97, 1916-23, 1942-45, 1966-69, 1988-91, 1992-94, 2012-18, 2036-42, 2060-66, 2085-91, 2110-13, 2149-52, 2171-73.

97. Plaintiff's new and returning admissions decreased by 30 percent in the first quarter of 2021, as compared to the first quarter in 2019.

98. The number of residents leaving the facility through discharge or expiration decreased by 38 percent in the first quarter of 2021, as compared to the first quarter in 2019.

99. Plaintiff's new and returning admissions decreased by 21 percent in the second quarter of 2021, as compared to the second quarter of 2019.

100. The number of residents leaving the facility through discharge or expiration decreased by 42 percent in the second quarter of 2021, as compared to the second quarter in 2019.

101. Plaintiff's new and returning admissions declined by 42 percent in the third quarter of 2021, as compared to the third quarter of 2019.

102. The number of residents leaving the facility through discharge or expiration decreased by 46 percent in the third quarter of 2021, as compared to the third quarter in 2019.

*ii. Vaccinations*

103. Plaintiff began offering COVID-19 vaccines to residents and staff in January 2021. Ex. 28 at 43-44.

104. By March 2021, 80 percent of staff and 90 percent of residents were fully vaccinated. Ex. 28 at 32.

105. By April 28, 2021, over 85 percent of employees and 95 percent of residents were vaccinated. Ex. 28 at 24.

106. Between June and September 2021, between 97 and 98 percent of residents were fully vaccinated. Ex. V. at MAR_000023 – MAR_000024.

107. About three of Plaintiff's residents chose not to get vaccinated. Perry Tr. at 179:3-7.

*iii. Therapy Services*

108. Plaintiff was an essential business during the COVID-19 pandemic, meaning Plaintiff had to continue providing essential services to its residents during the pandemic. *Id.* at 141:15-142:2.

109. A third-party contractor, UP Rehab, provided skilled therapy services to Plaintiff's residents in both 2019 and 2021. *Id.* at 56:17-57:3.

110. Prior to the pandemic, UP Rehab therapists would work with multiple residents in a gym at the same time to provide physical and occupational therapy. *Id.* at 73:4-25. The residents completed their exercises independently from other residents, and the therapist oversaw them simultaneously. *Id*.

111. In 2020, skilled therapy was not occurring in a group setting at Plaintiff's facility. Residents typically received therapy services in their rooms. Perry Tr. 197:13-19.

112. In 2021, UP Rehab began offering socially distanced skilled therapy at Plaintiff's facility for residents that were not in quarantine or experiencing COVID symptoms. Perry Tr. 195:16-25, 196:23-25. At the beginning of 2021, Plaintiff required residents to be from the same unit to attend group therapy together. *Id*.

113. Plaintiff had yearly net operating losses of $1,913,846, $2,909,178, $2,491,851, and $3,340,801 in 2019, 2020, 2021, and 2022 respectively. Ex. 41.

114. In the first quarter of 2019, UP Rehab conducted 43,933 minutes of physical therapy, 38,843 minutes of occupational therapy, and 5,057 minutes of speech therapy, for a total of 87,833 minutes of therapy for Plaintiff's residents. Ex. X at MAR_002188 – MAR_002189. These minutes, and the minutes that follow, are not broken down between group and individual therapy. Perry Tr. 80:1-25.

115. In the first quarter of 2021, UP Rehab conducted 35,014 minutes of physical therapy, 30,918 minutes of occupational therapy, and 4,548 minutes of speech therapy, for a total of 70,480 minutes of therapy for Plaintiff's residents. Ex. Y at MAR_002194 – MAR_002195.

116. UP Rehab's minutes of therapy decreased by 19.8 percent in the first quarter of 2021, as compared to the first quarter of 2019.

117. In the second quarter of 2019, UP Rehab conducted 53,647 minutes of physical therapy, 48,138 minutes of occupational therapy, and 6,160 minutes of speech therapy, for a total of 107,945 minutes of therapy for Plaintiff's residents. Ex. Z at MAR_002190 – MAR_002191.

118. In the second quarter of 2021, UP Rehab conducted 39,653 minutes of physical therapy, 33,205 minutes of occupational therapy, and 3,227 minutes of speech therapy, for a total of 76,085 minutes of therapy for Plaintiff's residents. Ex. AA at MAR_002196 – MAR_002197.

119. UP Rehab's minutes of therapy decreased by 29.5 percent in the second quarter of 2021, as compared to the second quarter of 2019.

120. In the third quarter of 2019, UP Rehab conducted 61,571 minutes of physical therapy, 53,889 minutes of occupational therapy, and 7,200 minutes of speech therapy, for a total of 122,660 minutes of therapy for Plaintiff's residents. Ex. BB at MAR_002192 – MAR_002193.

121. In the third quarter of 2021, UP Rehab conducted 33,373 minutes of physical therapy, 28,657 minutes of occupational therapy, and 3,494 minutes of speech therapy, for a total of 65,524 minutes of therapy for Plaintiff's residents. Ex. CC at MAR_002198.

122. UP Rehab's minutes of therapy decreased by 46.6 percent in the third quarter of 2021, as compared to the third quarter of 2019.

*iv. Use of 700 Wing*

123. Plaintiff's 700 wing is its short-term rehabilitation wing. Perry Tr. at 42:20-23.

124. Plaintiff began construction on the 700 wing in late 2017 or early 2018. *Id.* at 84:1-2.

125. In 2017, to prepare for construction of the 700 wing, Plaintiff began holding admissions. Perry Tr. 83:11-25. At least since then, Plaintiff has not had a full census, meaning that not all 140 beds are filled. *Id*.

126. In 2018, Plaintiff retrofitted twelve double beds on the 100 wing into private beds to allow for 12 new beds to open on the 700 wing without changing Plaintiff's 140-bed capacity. *Id.* at 137:19-22.

127. Plaintiff retrofitted the 12 beds on the 100 wing before the 700 wing opened. *Id.* at 137:15-22.

128. Thus, between 2018 and when the 700 wing opened in March 2019, Plaintiff's bed capacity was around 130. *Id.* at 137:15-18.

129. Plaintiff's 700 wing was under construction until March 2019. It had its first residents on March 18, 2019. Ex. F at MAR_002080.

130. The 700 wing was designed to attract new residents with short-term rehabilitation needs. Perry Tr. at 42:20-43:15.

131. The 700 wing is a separate unit with its own air system. Perry Tr. at 151:4-10

132. Short-term rehabilitation has higher reimbursement rates than long-term stays. *Id.* at 247:15-20.

133. Plaintiff typically has more long-term residents than short-term residents. *Id.* at 42:2-3.

134. Plaintiff applied for, and obtained from MDHHS, permission to operate as a CRF that retains COVID positive residents. Plaintiff's CRF status was in effect throughout the first three quarters of 2021. Ex. DD at MAR_000001.

135. Throughout the first quarter of 2021, Plaintiff used the 700 wing, which consisted of 12 beds, for its CRF requirements and to quarantine new admissions and readmissions. Exs. B, G-I.

136. Plaintiff designated two of those 12 beds for staff to use when taking off and putting on protective equipment. Perry Tr. 172:3-25.

137. In May 2021, Plaintiff placed at least some residents on the 700 wing for short-term rehabilitation, which was the original purpose of the 700 wing. Perry Tr. 241:12-24; Ex. 28 at 21 (MAR_82).

138. In May 2021, Plaintiff planned to leave four rooms open on the 700 wing for COVID purposes and use the remaining eight rooms for short-term rehabilitation residents. Ex. 28 at 19. COVID-19 meeting minutes from June 9, 2021 state: "The 700/Rehab Wing is back to normal. We have no residents in quarantine. There are rooms saved on the wing if a resident will need to quarantine. There may be 2 possible admissions that will need to quarantine when admitted. This will cause COVID Precautions on the Wing." Ex. 28 at 16.

139. In the third quarter of 2021, Plaintiff closed the 700 wing entirely, with the understanding that it could be reopened and restaffed if any residents tested positive for COVID. Perry Tr. at 151:14-20; 167:6-12. The beds in the 700 wing therefore remained available for CRF purposes. *Id.*

140. The 12 beds in the 700 wing comprise 8.6 percent of Plaintiff's 140 licensed beds. The 10 beds on the 700 wing that were not dedicated to staff comprise 7.1 percent of Plaintiff's 140 licensed beds.

141. Residents who were in the 700 wing for quarantining and/or CRF purposes needed to have another room available for them after their isolation ended. Perry Tr. at 181:2-15.

142. As a result, for every occupied bed in the 700 wing for CRF or quarantining purposes, another bed needed to be held open in another part of the facility. *Id.*

143. The March 29, 2021 CDC update eliminated the "two bed concept" for vaccinated residents wherein a resident is quarantining in a quarantine bed while their regular room is being held. Perry Tr. 150:12-151:3; 152:15-17. Residents with a confirmed case of COVID-19, as well as unvaccinated new admissions or readmissions, were still required to quarantine.

144. The occupancy rate for the 700 wing was 91.39 percent in April 2019, as compared to 87.68 percent for the facility as a whole (including the 700 wing). Ex. J at MAR_001898 – MAR_001915.

145. The occupancy rate for the 700 wing was 93.28 percent in May 2019, as compared to 87.71 percent for the facility as a whole (including the 700 wing). Ex. K at MAR_002092 – MAR_002109.

146. The occupancy rate for the 700 wing was 83.33 percent in June 2019, as compared to 86.52 percent for the facility as a whole (including the 700 wing). Ex. L at MAR_002043 – MAR_002059.

147. The occupancy rate for the 700 wing was 67.47 percent in July 2019, as compared to 83.68 percent for the facility as a whole (including the 700 wing). Ex. P at MAR_002019 – MAR_002035.

148. The occupancy rate for the 700 wing was 63.44 percent in August 2019, as compared to 85.04 percent for the facility as a whole (including the 700 wing). Ex. Q at MAR_001924 – MAR_001942.

149. The occupancy rate for the 700 wing was 91.67 percent in September 2019, as compared to 86.83 percent for the facility as a whole (including the 700 wing). Ex. R at MAR_002153 – MAR_002170.

150. The occupancy rate for the 700 wing was 97.31 percent in October 2019, as compared to 90.09 percent for the facility as a whole (including the 700 wing). Ex. EE at MAR_002131 – MAR_002148.

151. The occupancy rate for the 700 wing was 70 percent in November 2019, as compared to 84.50 percent for the facility as a whole (including the 700 wing). Ex. FF at MAR_002114 – MAR_002130.

152. The occupancy rate for the 700 wing was 81.72 percent in December 2019, as compared to 87.27 percent for the facility as a whole (including the 700 wing). Ex. GG at MAR_001946 – MAR_001965.

153. The occupancy rate for the 700 wing was 45.97 percent in January 2021, as compared to 76.15 percent for the facility as a whole (including the 700 wing). Ex. G at MAR_000153 – MAR_000169.

154. The occupancy rate for the 700 wing was 50.89 percent in February 2021, as compared to 74.41 percent for the facility as a whole (including the 700 wing). Ex. H at MAR_000170 – MAR_000186.

155. The occupancy rate for the 700 wing was 48.12 percent in March 2021, as compared to 74.96 percent for the facility as a whole (including the 700 wing). Ex. I at MAR_000187 – MAR_000203.

156. The occupancy rate for the 700 wing was 55 percent in April 2021, as compared to 79.71 percent for the facility as a whole (including the 700 wing). Ex. M at MAR_000204 – MAR_000220.

157. The occupancy rate for the 700 wing was 45.97 percent in May 2021, as compared to 80.28 percent for the facility as a whole (including the 700 wing). Ex. N at MAR_000221 – MAR_000238.

158. The occupancy rate for the 700 wing was 49.45 percent in June 2021, as compared to 80.12 percent for the facility as a whole (including the 700 wing). Ex. O at MAR_000239 – MAR_000255.

159. The occupancy rate for the 700 wing was 0 percent in July 2021, as compared to 82.72 percent for the facility as a whole (including the 700 wing). Ex. S at MAR_000256 – MAR_000273.

160. The occupancy rate for the 700 wing was 0 percent in August 2021, as compared to 84.61 percent for the facility as a whole (including the 700 wing). Ex. T at MAR_000274 – MAR_000291.

161. The occupancy rate for the 700 wing was 0 percent in September 2021, as compared to 86.12 percent for the facility as a whole (including the 700 wing). Ex. U at MAR_00092 – MAR_000307.

*v. Visitation and Activities*

162. Plaintiff's dining staff serves three meals and three snacks to residents daily. Perry Tr. 65:15-16.

163. After the 700 wing opened in March 2019, Plaintiff had two dining rooms: one on the 700 wing and one in the central corridor. The residents on the Special Needs Unit ate at two large tables located on their own wing. *Id.* at 69:8-25, 72:1-24.

164. Residents could choose to eat in one of the dining rooms or privately in their own room. *Id.* at 70:6-9.

165. During the COVID-19 pandemic, Plaintiff closed its dining rooms to group dining until May 27, 2021, after which it remained subject to closure depending on the COVID positivity status in the facility. Ex. 28 at 19.

166. Beginning in the first quarter of 2021, Plaintiff allowed residents to dine together at smaller tables on their units. Perry Tr. 237:23-238:17. At that time, residents on the Special Needs Unit also resumed dining together. *Id.* at 238:22-239:4. Such small group dining was subject to cancellation based on the COVID status in the facility.

167. Based on the December 8 order, Plaintiff was not permitted to offer indoor visitation between January 11, 2021 and at least January 25, 2021. Ex. B at MAR_000110.

168. Plaintiff began facilitating scheduled indoor visitation for residents starting on February 16, 2021. Ex. 28 at 35; Perry Tr. 231:2-16.

169. Virtual and window visitation was also available to residents throughout 2021. Perry Tr. 204:14-205:25.

170. Plaintiff was also required to facilitate compassionate care visits. Ex. 12; Ex. 13. Compassionate care visits were available for residents nearing the end of their life or suffering an impact on their psychosocial wellbeing, for example, from isolation. Perry Tr. 206:5-10.

171. Plaintiff began offering outdoor visitation in May 2021 when the weather improved. *Id.* at 240:8-11.

172. In the first quarter of 2021, Plaintiff began offering small, socially distanced group activities like bingo; this contrasted with 2020, when virtually no activities were occurring. *Id.* at 192:15-194:14.

173. Plaintiff began the process of restarting group activities like church services in March 2021, and certain activities resumed at least as of April 2021, subject to the requirement to cancel them based on the COVID status in the building. Ex. 28 at 24, 32.

*vi. Increased Expenses*

174. Plaintiff's nursing expenses during the first three quarters of 2021 were $6,485,284.24, as compared to $5,625,050 during the first three quarters of 2019. Ex. HH at MAR_000322 – MAR_000328; Ex. W at MAR_000342 – MAR_000348. That represents an increase of 15.3 percent.

175. The nursing expenses during the first three quarters of 2021 included $136,110.76 in COVID supplies, including protective equipment, that Plaintiff purchased in compliance with the CDC's infection control standards that were in place throughout the first three quarters of 2021. Ex. W at MAR_000342 – MAR_000348. In particular, the CDC required "[u]niversal [u]se of [p]ersonal [p]rotective [e]quipment." *See, e.g.*, ECF No. 26-1, PageID.162.

176. The CDC also required eye protection during certain resident encounters. *See, e.g.*, *id.*, PageID.179.

177. Staff attrition meant that Plaintiff was forced to turn to higher-costing contract nurses. In particular, expenses for travel nurses and aides rose from $230,445 in 2019 to $418,154.50 in 2021, an increase of 81.5 percent. Ex. 38.

178. Additionally, Plaintiff's general and administration expenses during the first three quarters of 2021 were $3,105,619.68, as compared to $2,775,224.59 during the first three quarters

of 2019. Ex. HH at MAR_000322 – MAR_000328; Ex. W at MAR_000342 – MAR_000348. That represents an increase of 11.9 percent.

179. Among the increases in general and administration expenses during the first three quarters of 2021 was $245,307.29 in COVID test expenses. Ex. W at MAR_000342 – MAR_000348. These expenses were required to comply with the testing obligations imposed by governmental orders. *See, e.g.*, ECF No. 26-1, PageID.214.

180. Plaintiff received $1,092,968.96 in COVID reimbursement from governmental sources in the first three quarters of 2021. Ex. W at MAR_000344, Perry Tr. 108:2-109:5. Among the uses for those funds was personal protective equipment and other COVID-related equipment. *Id*.

Dated: August 28, 2026


*/s/ Robert S. Silverblatt*
Robert S. Silverblatt
DC Bar No. 1020748
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9132
Facsimile: (202) 778-9100
Rob.Silverblatt@klgates.com

*Counsel for Plaintiff Marquette County Medical Care Facility*

*/s/ Paige M. Brigham*
Paige M. Brigham
Kimberly Parke
Trial Attorneys
Tax Litigation Branch
Civil Division, Department of Justice
P.O. Box 55
Washington, DC 20044
Telephone: (202) 598-7808
Fax: (202) 514-5238
Paige.Brigham@usdoj.gov
Kimberly.Parke@usdoj.gov

*Counsel for Defendant United States*