Planet Depos

# Transcript of Denise Laverne Perry, corporate Designee

**Date:** June 23, 2026
**Case:** Marquette County Medical Care Facility -v- United States of America

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

MARQUETTE COUNTY MEDICAL CARE FACILITY,

Plaintiff,

Case No. 2:25-cv-00135

V

HON. JANE M. BECKERING

UNITED STATES OF AMERICA,

Defendant.

_______________________________/

DEPOSITION OF DENISE LAVERNE PERRY

Taken by the Defendant on the 23rd day of June, 2026, at 200 Saginaw Street, Ishpeming, Michigan, at 9:30 a.m.

APPEARANCES:

For the Plaintiff: ROBERT S. SILVERBLATT
K&L Gates
1601 K Street, NW
Washington, DC 20006
(202) 778-9132
rob.silverblatt@klgates.com

For the Defendant: PAIGE M. BRIGHAM
U.S. Department of Justice, Tax Division
1275 First Street, NE, Room 9715
Washington, DC 20002
(202) 307-6588
paige.brigham@usdoj.com

and

KIMBERLY RAE PARKE
U.S. Department of Justice, Tax Division
Post Office Box 55
Washington, DC 20044
(202) 353-0300
kimberly.parke@usdoj.com

REPORTED BY: Pamela Rankinen, CER 4532
Certified Electronic Reporter
North Coast Reporting LLC
(906) 360-6625

TABLE OF CONTENTS

| | PAGE |
|---|---|
| Examination by Ms. Brigham | 5 |

EXHIBIT INDEX

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | MSA 20-73 by MDHHS, 11/16/2020 | N/A |
| Exhibit 2 | MSA 20-78 by MDHHS, 11/30/2020 | N/A |
| Exhibit 3 | Senate Bill 1094, 10/22/2020 | 160 |
| Exhibit 4 | Infection Control Scenarios by MDLRA, 11/10/2020 | 216 |
| Exhibit 5 | CDC Guidance, 4/30/2020 | N/A |
| Exhibit 6 | CDC Guidance, 3/29/2021 | N/A |
| Exhibit 7 | CDC Guidance, 9/10/2021 | N/A |
| Exhibit 8 | Requirements for Residential Facilities by MDHHS, 12/8/2020 | 227 |
| Exhibit 9 | Requirements for Residential Facilities by MDHHS, 3/2/2021 | 228 |
| Exhibit 10 | Requirements for Residential Facilities by MDHHS, 3/17/2021 | N/A |
| Exhibit 11 | Requirements for Residential Facilities by MDHHS, 5/21/2021 | N/A |
| Exhibit 12 | QSO 20-39 by CMS, 9/17/2020 | N/A |
| Exhibit 13 | QSO 20-39 by CMS, 3/10/2021 | 212 |
| Exhibit 14 | QSO 20-39 by CMS, 4/27/2021 | N/A |
| Exhibit 15 | MAR 308 - 3/31/2019 Statement of Operations | 90 |
| Exhibit 16 | MAR 329 - 3/31/2021 Statement of Operations | 107 |
| Exhibit 17 | MAR 349 - ERC Worksheet | 110 |
| Exhibit 18 | MAR 350 - ERC Worksheet | 110 |

| | | |
|---|---|---|
| Exhibit 19 | MAR 351 - ERC Worksheet | N/A |
| Exhibit 20 | MAR 791 - Premium Money Market Account | 112 |
| Exhibit 21 | MAR 743 - Payroll Account Statements 2021 | 114 |
| Exhibit 22 | MAR 1002 - 2019 Balance Sheet | 118 |
| Exhibit 23 | MAR 943 - 2021 Balance Sheet | N/A |
| Exhibit 24 | MAR 1208 - Self-Funded Health Insurance | 124 |
| Exhibit 25 | MAR 2036 - Admit/Discharge Report | 125 |
| Exhibit 26 | COVID Wing Layout | 163 |
| Exhibit 27 | MAR 1995 - Census Report | 130 |
| Exhibit 28 | MAR 62 - COVID Meeting Minutes | 182 |
| Exhibit 29 | MAR 424 - Suspension Analysis Excel Sheet | 171 |
| Exhibit 30 | Marquette Novel Coronavirus Prevention and Response Policy and Visitation Policy | 220 |
| Exhibit 31 | MAR 2198 - 2021 Q3 Therapy Chart | 80 |
| Exhibit 32 | MAR 2192 - 2019 Q3 Therapy Chart | 80 |
| Exhibit 33 | MAR 152 - 6/9/2021 Memo Re: 700 Wing | 244 |
| Exhibit 34 | MAR 106 - HAI 2021 Notes | 245 |
| Exhibit 35 | MCMCF Millage Renewal | 251 |
| Exhibit 36 | 2019 Payer Rate and 2021 Rate Increase | 253 |
| Exhibit 37 | Quarterly Employee Counts Email, 2019-2021 | 254 |
| Exhibit 38 | Travel Aide/Nurse Cost Email, 2019-2022 | 256 |
| Exhibit 39 | Occupancy Percentage Email, 2019-2022 | 257 |
| Exhibit 40 | Revenue Comparison to Calculate Operating Loss | 258 |
| Exhibit 41 | Statement of Revenue, Expenses and Changes in Net Position, 2018-2022 and Handwritten Note | 260 |

Ishpeming, Michigan
Tuesday, June 23, 2026 - 9:34 a.m.

THE REPORTER: All right. We are on the record on June 23rd, 2026, at 9:34 a.m.

MS. BRIGHAM: Okay. My name is Paige Brigham. I, along with my co-counsel, Kim Parke, represent the United States in this matter, Marquette County Medical Care Facility versus United States of America, case number 2:25-CV-135 in the US District Court for the Western District of Michigan, in which Marquette County Medical Care Facility is seeking a refund of federal income taxes for quarters one, two and three of 2021, due to claimed entitlement to employee retention credits. And I will be taking your deposition today.

Just for ease I'm going to refer to Marquette County Medical Facility as Marquette so that I don't have to say that every time. If I'm referring to the county, I'll just say Marquette County, and I'll make it clear when I'm referring to something different. Okay?

MS. PERRY: That's great.

THE REPORTER: And could you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you're about to give shall be the whole truth?

MS. PERRY: Yes, I do.

DENISE LAVERNE PERRY

having been called by the Defendant United States and sworn:

EXAMINATION

BY MS. BRIGHAM:

Q Can you state your name for the record, please?
A Denise Laverne Perry.
Q And do you have any -- have or go by any other names?
A I mean, most people that work here call me Dee, but I mean, like, no, I don't go by anything legally.
Q Are you represented by counsel in this proceeding?
A Yes.

MS. BRIGHAM: And can you, please, enter your appearance?

MR. SILVERBLATT: Rob Silverblatt, K&L Gates on behalf of plaintiff.

MS. BRIGHAM: Thank you. And Kim, do you want to introduce?

MR. PARKE: Yes. Kimberly Parke, also for Defendant United States.

BY MS. BRIGHAM:

Q So I'm just going to go through some ground rules before we get started. This deposition is being taken pursuant to the federal rules of civil procedure. Okay? You are under oath. Do you understand that you're under oath?
A Yes.

Q And do you understand that you must tell the truth today?
A Yes.
Q And you will do that?
A Yes.
Q Okay. If you answer a question, I'm going to assume that you understood it. Okay?
A (Nodding head in affirmative).
Q And so another thing is I see you're nodding when you answer.
A I didn't know if you were looking for an answer right then or if you were --
Q Yes.
A And that's why. I know not to nod because I know you need to hear it, but I wasn't sure if there was -- if you were looking for the answer at the moment.
Q No. Yes, I understand; yeah. So our court reporter is transcribing so just make sure you give clear yeses and noes and avoid head shakes, head nods, avoid uh-huh or unh-unh just so it's easier for our court reporter to transcribe what we're saying. And for the same reason, we shouldn't talk over one another just to make our court reporter's job easier. Okay?
A Yes.
Q So if I ever ask a question that you don't understand, please, let me know, and I'll try to rephrase it. Okay?
A Yes.
Q We'll take breaks about once every hour or two, and we'll also

take a lunch break. But if you need a break sooner than that, just let me know. We'll just finish the line of questioning that we're on, and then we can take a break. Okay?
A Yes.
Q Is there any reason, medical or otherwise, that prevents you from giving truthful, complete and accurate testimony today?
A No.
Q Okay. And if that ever changes just let me know. Okay?
A Yes.
Q Have you ever been deposed before?
A No.
Q Okay. Have you ever testified in court under oath before?
A No.
Q All right. And do you understand that you are here to testify in your capacity as a designee under federal rule of civil procedure 30(b)(6), testifying for Marquette County Medical Care Facility and not in your capacity as an individual?
A Yes.
Q What is your role at Marquette?
A I am the administrator.
Q Okay. So now I'm just going to ask you how you prepared for today. So what did you do to prepare for this deposition?
A I reviewed the documentation that counsel provided.
Q And what documentation was that?
MR. SILVERBLATT: Objection as to work product.

BY MS. BRIGHAM:
Q You can answer.
MR. SILVERBLATT: No. The witness is not going to identify documents provided by counsel.
BY MS. BRIGHAM:
Q Did you review the documents that counsel produced in this case to the United States?
A I'm uncertain if I understand the question. Anything that he provided to you, like as --
Q Right.
A Okay. Yes.
Q Do you know if you reviewed documents other than what was provided to the United States in this matter?
A Not that I'm aware of.
Q Okay. How long did you prepare for the deposition today?
A Well, we received the 30(b)(6) notification Monday of last week, so I started preparing based on those specific 23 designations at that point.
Q Okay. And did you speak to anybody about this deposition?
A I mean, only to let my team know not to disrupt me, and then I -- my counsel, yes. I'm sorry. Yes, my -- I did speak with Rob about it.
Q Okay. Did you or anyone else create any documents in preparation for this deposition?
A Having never been under a deposition before, I'm just, like,

making sure I understand. So, you know, Rob provided me with exhibits that we had already submitted that then, I'm assuming, are in this binder, and that was primarily what we prepared with so I don't know. There was no creation of anything that I'm -- that I'm unaware has been provided to you.

Q Okay. Yeah. I'm not asking -- if the answer is no, that is fine.

A Okay. Okay. I just want to make sure. You know, I take being honest seriously.

Q No, that's fine. I appreciate that. Is anyone paying you for your time deposed -- being deposed here today?

A I'm on the clock. I didn't -- like, for work. I didn't realize. Maybe I'm not supposed to be.

Q Oh. And that's not what I'm implying, just asking.

A Okay.

MR. SILVERBLATT: I think you mean other than your -- her employment here?

MS. BRIGHAM: Right.

THE WITNESS: Oh, no, no.

BY MS. BRIGHAM:

Q Did you do anything else to prepare for the deposition today other than talk to counsel and review documents?

A No.

Q Okay. Did you bring any additional documents with you today

for the purpose of the deposition?
A No.
Q And where do you currently live?
A 210 Bussone Drive in Ishpeming, Michigan.
Q Okay. I'm just going to ask some educational and job background questions now. So starting after high school, did you go to a college or a university?
A I went to Northern Michigan University after I graduated high school in -- in 1994 for a short period of time. I then did not attend school for several years. I obtained my associate degree RN from Bay College then pursued my bachelor's of nursing from Northern Michigan University and completed my nursing home administrator license through Ferris State University.
Q Okay. So starting with the associate's degree, when did you get that?
A I want to say 2007.
Q Okay. And then the bachelor degree was next; correct?
A Correct.
Q And when, roughly, was that? An estimate is fine.
A I would -- it was pre-COVID but probably just pre-COVID. So 2018 I'm going to guess.
Q Okay. And then --
A I can find, though, if you need me to.
Q And then the last one was the --

A Just a nursing home administrator license. And so I became the administrator September of 2022, so it must have been 2021 -- late 2020, early 2021 that I obtained my license in order to be able to apply for the role.
Q Okay. Any other degrees or technical training?
A None.
Q Okay. So when did you start working at Marquette?
A It'll be 20 years in February so that is February of '07.
Q So that was basically right after you got your associate's degree?
A I actually missed -- I'm very -- I apologize. I actually missed that. I was an LPN for a year before then. So I was an LPN in 2006, started here as an LPN for just several months and finished my degree -- RN degree in '07. I apologize.
Q Okay. No, that's okay.
A So that actually made that timeline make more sense to me as well.
Q Okay. So you were an LPN at Marquette?
A Yes.
Q Okay. And then you got your associate's degree?
A Right. Within those first few months of employment.
Q Okay. And then once you got your associate's degree, did you continue as an LPN, or did you switch to a different role?
A I did not switch to a different role because the role can be an LPN or RN role here, the role I was in at the time, which

was medication pass. But I was, then, employed as an RN once I obtained my -- so I would have graduated in April of 2007. So my licensure probably came through June -- late June, early July of 2007. But my role did not change until 2008, I think.
Q Okay. And when you were an LPN and RN during that time before 2008, what did your job look like?
A I took care of -- I was a direct care nurse, so I passed medications, you know; once I became an RN, assessed residents, spoke with physicians when there was any concerns that I might need to escalate if there was no charge nurse here. Sometimes I was the charge nurse, but primarily medication pass, if somebody fell, you know, taking care of them. Any -- any direct care needs in the skilled nursing facility, treating wounds.
Q And when -- sorry.
A I'm sorry. Treating wounds. So, like, if somebody had a laceration on their leg, you know, making sure that their skin is approximated and it's bandaged. That's a common thing in a skilled nursing.
Q And when you say "medication pass," what is -- what do you mean by that?
A So in most nurse -- skilled nursing facilities there's what we call, like, four heavy times that residents get medications. So we are 140-bed facility. The units have up to, at that time, 28 residents on each unit. So during day shift or

afternoon shift, which are the shifts that I worked in that duration of time, I was assigned up to 28 residents that I provided daily medication for, meaning we have a cart that rolls down the hall and you have, at that time, a paper medication record that you flip through and you pass the medications as were ordered by the physician. Now it's on electronic health record.

Q Okay. So then in 2008 your role changed at Marquette?

A So I became a nursing supervisor, an RN nursing supervisor which is, you know, you're always a charge nurse. So it's a rarity that I would be doing medication pass, in particular. It's still a direct care role, but you're doing more of the handling of ill residents that are acutely ill or the dying resident in this setting, in particular. So the only time I would be handling medication in that situation would typically be if it was IV administration or if it's end of life and somebody requires really frequent medication administration. Again, that's in 2008. So there's different ways to administer those kinds of medication now, but at that time, that was a primary part of my role as to be present at the bed of somebody dying.

Q Okay. So you were doing in 2008 sort of some of the same things as your previous role, but maybe with residents who are in -- have more severe needs?

A Correct.

Q Okay. Did your job change in any other way at that point?
A I would be doing evaluations of staff at that time. I would say that's probably the only other unique thing that comes with that role at that period of time. Also, in both roles as an RN, you do draw blood and start IV's whether you are a floor nurse or a nursing supervisor, just more often as a nursing supervisor. But that's an RN-specific role in this facility.
Q Okay. And how long were you in that role?
A I was in that role, I would say, about two years, and then I ran -- and why I say "about two years," is at one point our staff development person resigned and they blended my role.
Q Okay. So what does staff development involve?
A Staff development -- or it used to be called the in-service coordinator at the time -- does a lot of -- new hire education is probably the most important bulk of that role, recognizing when procedures need to be changed and escalating those to, you know, the director of nursing or administrator at the time and, depending on the specific, you know, what that situation might be but not developing policy. You know, I was not developing policy, just recognizing there -- you know, there's been an industry change or there's been just a functional change in how the building operates. So kind of keeping track of those.
But the large majority of the work was when a new

hire comes in, you spend the first -- minimum two days with that person. If they were in a nursing capacity it would be longer. If they were in a non-nursing capacity, such as, you know, dietary, it would be shorter because the department heads would kind of take over training at that point.

Staff development is -- is really heavy on the nursing side of responsibility because we're a skilled nursing facility. Therefore, the majority of our staff are clinically based somehow.

So I also taught nurse aide class at the time. We no longer do that in this building, but I was -- I had to go to, like, a train-the-trainer course. I don't think you wouldn't call it, like, a license or anything, but it actually would rec- -- like, if you were to look me up on the LARA website and my license number, at that point of time, it would have said train-the-trainer certified.

I no longer have that, but that allowed me to teach nurse aide class, not to test them out -- that's always done by a third party -- but to teach the Michigan-required curriculum.

Q Okay. Can you just clarify what you mean when you say "LARA"?

A Oh, I'm sorry. Licensing and Regulatory Affairs, the State of Michigan Licensing and Regulatory Affairs Bureau office.

Q Thank you. Okay. So you were -- you started this additional staff development role around 2010?

A Yep.
Q And then how long were you doing this RN supervisor/staff development?
A I have to do some math subtractions. So I've been doing this role since 2022. Then I was the assistant director of super -- so in -- around 2017. So I kept that role for a number of years. Around 2017, I became the assistant director of nursing. Again, I apologize that I am -- I am not certain on the exact years.
Q That's okay. Estimate is okay. And what did you do in that role?
A So the assistant director of nursing does hiring of nurse aides, firing of nurse aides, disciplinary action, performance evaluation, and performance remediation, I guess I'll call it, you know.
Q So you're essentially supervising and overseeing the nurse --
A Nurse aides. And then in the absence of the director of nursing, taking on all of the director of nursing responsibilities.
Q And what would that entail?
A I -- I hate to say it this simplistic, but putting out fires. I mean, it could be a number of things. In the assistant director of nursing role, too, I did report facility-related incidents or what Michigan calls FRI's -- the state of Michigan calls FRI's, so facility-reported incidents under

abuse and neglect. So -- and then when you're filling in for the director of nursing, you're doing even more of that, especially at that space of time when I was the assistant director of nursing.

Some of, again, those regulations have changed so in today's present time might -- that role might look a little different. But a lot of it was, you know, managing nurses, of course, in the director of nursing's absence because that's kind of the division of labor and the clinical setting for us, as the director of nursing handles the nurses and the assistant director of nursing handles -- handles the nurse aides.

The director of nursing also oversees a number of department -- clinical department heads. So in the event that there would have been trouble there, I would have had to intervene. Truthfully, we had really strong department heads at the time, so I've never really had to experience that responsibility, but the responsibility would have been mine.

Q Okay. And was that the last role you held before your current role?

A Another important part of the assistant director of nursing role at the time, was that you were the infection preventionist up until 2019, which is a really crucial time shift in the rest of our conversation.

Q Okay. But that -- was that your last role --

A Yes, yes.
Q Until your current role?
A Yes.
Q And you became -- you're currently the administrator?
A Correct.
Q And that was -- you became administrator in 2022, you said?
A September 14th of 2022. That date I know because it is on our licensing for the facility itself. So that date's more significant.
Q Okay. And what are your duties and responsibilities as administrator?
A So ultimately, I handle the day-to-day decisions that the department heads feel they need my input. We need -- that sounds very, like, wishy washy. The primary responsibility, of course, is the leadership in the building, so that can look different every day. I mean, every day I'm handling financial decisions that impact us while trying to provide the best outcomes for residents. So that balancing act is a large portion of my job. I do oversee and evaluate the nonclinical department heads. I do hire and fire a number of those department heads. Again, typically the nonclinical ones outside the director of nursing. The director of nursing does report to me while I report to my -- the DHHS board.
So I am often bringing policy to our monthly board meetings for evaluation. Reviewing policy, I will say that

the more majority of the time that it's more policy review than revision. Unless there's regulatory change or like a functional change moving to an electronic health record, most of our policy stays fairly stagnant. I am dealing with both our AFSCME and Teamsters Unions and their concerns. I would say in the last five years, that's become a big part of the assistant director of nursing, director of nursing and my role along with human resources. So then I am the -- I'm going to use the wrong word. I'm, like, the lead negotiator at collective bargaining time for the -- for the employer side, obviously.

Q Okay. I have a couple follow-up questions there. When you say "DHHS" --

A Department of Health and Human Services.

Q And that's the state of Michigan department?

A So we -- there is a little bit of difference there. So we have a local DHHS board, Department of Health and Human Services Board, which is what I report to. So Michigan DHHS, of course, sets a lot of regulatory tone and rule for us. But my specific local board, one person is assigned by the governor and the other two persons are assigned by the Marquette County Board of Commissioners. So they are my direct oversight. Like, I don't have any direct oversight from the commissioners.

A liaison -- commissioner liaison is present at our

board meetings, but she doesn't have any voting power. Again regulatory-wise, of course, the Michigan DHHS has a lot of say so in what we just do in our day, but not in oversight of our day-to-day operations, like, in any voting power or, you know, any interaction with me.
Q Okay. So are you referring to the -- I want to make sure that I say it correctly -- the Marquette County Department of Health and Human Services Board?
A Correct; correct.
Q Okay. And you mentioned voting power on that board. Who has voting power on that board?
A Would you like me to use names or roles?
Q Let's start with roles.
A Okay. So, again, there's three -- the three persons, the two assigned by the board of -- the county commissioners, and the one assigned by the governor. They all have voting power. We do have a board chair that gets elected, I want to say, every two years, but I could be wrong in the timeframe of that. It hasn't changed in the 20 years I've been here.
The board itself has changed, but not our chairperson, you know, so -- or at least in the time that I've been involved in the board. I shouldn't say that. My first few years I was very unaware of what the board was doing. So yeah, they all have voting power.
Q And is the board chair one of the -- one of the three people

that you referred to?
A Correct; correct.
Q Okay. I'll come back to the board in a little bit. But just going back to your role as an administrator, you referred to the different department heads. So would it be fair to say there are different departments with department heads, and you over- -- you're kind of at the top overseeing them?
A I would agree. Even for the -- yes. Even for the department heads that another manager -- let me call them a manager, such as the director of nursing -- would oversee. I would still -- if there was a problem that the director of nursing was not comfortable with, it would be a problem that I would handle alongside or in place of, depending on what the situation was.
Q Okay. And you referred to nonclinical department heads. Could you clarify who -- what the clinical departments are and what the nonclinical departments are?
A So I oversee the physical plant manager and the activities coordinator, the special needs unit coordinator, our social worker, human resources, our assistant administrator, and our food and nutrition department. Clinical overseas restorative nursing; MDS, which is the minimum dataset team, and the treatment department, which is wounds.
Q What is minimum dataset?
A So the MDS is what we have to supply to Medicare. It's, you know, the requirement of data. There's all -- many, many

sections of it that are assigned to different personnel depending on what the topic is. But it's -- there's admission assessments; quarterly assessments; significant change assessments, if a resident has had a significant improvement in condition or decline in condition.

Q Okay. And just to be clear, you've held the administrator position from 2022 through the present?

A Correct.

Q Okay. Have you received any on-the-job training at Marquette?

A When our previous administrator, Jerry -- Jerome Hubbard, was leaving, I did spend a few months, I would say, alongside of him. I should reference that our board was looking for a different personality. So some of the responsibilities changed particularly when it came to -- he had a finance background, and I have a clinical background. So his ability to train me for his role was limited because they were wanting somebody that could focus more on the clinical outcomes of the building.

Q Okay. Have you ever been a federal tax return preparer?

A For the building, no.

Q Or elsewhere?

A No.

Q Okay.

A I mean, I did a 1040EZ when I was 21 for myself.

Q When was Marquette founded or open?

A In the 1950's. I apologize that I'm not certain of the exact year.
Q That's okay. And did the county open it?
A As far as I know, the county opened it. There's a -- there was this -- what they called the "poor farm phenomenon," where counties were developing institutions for the orphaned, the mentally ill, the indigent, and they eventually evolved to skilled nursing. I have a limited understanding of what that space and time was.
That's just the historical presentation I've been provided by, you know, education from the prior administrator or other MCF medical care facilities. We all -- we always call ourselves MCF's because there is a difference -- several differences in a private nursing home and a medical care facility.
Q And what are those differences?
A So some of those differences are reimbursement-related more than anything. So there's tier three and tier one facilities. As far as I understand, medical care facilities are required to be duly eligible meaning you have to accept Medicare and Medicaid. You can't be a Medicare only facility.
Again, I've never -- that's what I've been told. I've not looked for the resource that tells me, I believe that to be fact, and, therefore, there's a higher rate of reimbursement for medical care facilities because they are

expected to essentially take some more expensive, more complex residents.

We, as a facility, not every MCF, have an operating millage, which is common amongst MCF's, but it's not an absolute and some of those operating millages are defined for specific reasons.

Q Can you explain what an operating millage is?

A Right. So we have 0.55 mills. That's based on your property taxes. So .55 mills -- this is where I'm not certain because it's, like, a county clerk type of question, but .55 mills of every $1000 is collected by the county themselves. So we don't hold those funds. I'm assuming we'll get to some funds questions and there are some mixed answers there. But they hold those funds for what's called our "maintenance of effort."

So maintenance of effort is another -- there's several systems in place for nursing homes, that one particularly for medical care facilities, not for every nursing home -- but there's several mechanisms in place that are reimbursement-driven where you provide X amount of dollars, but you receive Y amount of dollars. And what that calculation is, often depends on several measures, a lot of them being quality related. So they change every year.

So you -- it's not an absolute, like, formula that I could explain to say, you know, we put in X and Y is always

this. There is -- there's variability there. So, again, that's -- they hold our maintenance of effort money. They provide the maintenance of effort expense to the state, and they also provide us one million dollars a year out of that fund, and that's where the operating side of that comes. We can use it for any operating expense, that one million dollars.

Q When you say "they," are you referring to --

A I'm sorry. Marquette County provides us out of that fund, the one million dollars. Anything in excess over the maintenance of effort cost and that one million dollars, they have -- they keep at this time and they -- they -- Marquette County -- I'm sorry -- earns the interest on that. There have been times where there's been something that comes up, and we go to the board of commissioners for access to those funds.

So some examples are -- and I don't -- I wish this -- I wish I would remember the year, but Jerry, Jerome Hubbard, our previous administrator had to go and increase that annual amount we were recouping. It used to be even less than that. And I apologize. I don't know exactly how much because I wasn't in the role, but significantly less than that that we accessed and because we were having some financial struggles within his last few years, he asked -- asked for more access.

Some other things that we are allowed to do, and we

have -- I under- -- I have not done, but I understand have been done in the past with that money, is made pension contributions. You know, like, large sum pension -- pension contributions to keep our percentage of funding appropriate. But that's where the commissioners -- I don't want to say necessarily they have say so, but they have access to input on what those funds are used for outside of that amount that we are given and the maintenance of effort itself cost.

Q Okay. Okay. So I will come back to the funding a little bit later. I just want to focus now on kind of how Marquette operates just more generally. So we talked about the board a little bit. So they have voting power. What kind of things do they -- do they vote on?

A So we meet monthly. The majority of action items are surrounding anything financial over $5000 other than our daily requirements to do business. So what I mean by that is every day we need food. Every day we need incontinent products. Every day we need medications. Every day we need, you know, the basic things that come along with taking care of a resident.

But I'll give you some examples of recent action items. So we are going to be opening up two office spaces to make it one. You know, they are involved in obviously any sealed bid process and choosing who is going to be doing that work. Even if I want to buy a piece of equipment that we use

routinely.

So when you talk about, like, depreciation expense and, you know, high-dollar pieces of equipment, such as our we -- call them EasyStands, but they're mechanical lifts we use for our residents daily -- if that's over, I'll bring that to the board.

If there are, like, for example, last night's meeting, we had to consider a wage increase because we weren't -- for non-bargaining so outside of a collective bargaining agreement -- we're not being competitive in kind of the change in the landscape we've seen, I'll be honest, post-COVID, in incomes. So that went to them. I wouldn't make a salary decision that wasn't, you know, outside of a very small one, without them having input to that.

The only person they truly hire is the administrator role, though. You know, we hire as department heads. All my departments take my input if I'm concerned about something. Oftentimes I don't even know who they're interviewing. But let -- let's say we had a repeat hire that would always -- you know, they'd address that with me before we do that. But oftentimes the board, outside of me just giving them a report of kind of where our staffing is at, have nothing to do with the hiring, firing of outside of myself.

If we have significant problems or grievances within the unions, I oftentimes am informing them, or if I am

concerned that a situation could become volatile for whatever reason, that's something I, again, typically let them know. But the day-to-day policy review and policy approval, that's, you know, a big part of any governing boards responsibility. But the day-to-day operational decisions, you know, fall within the department heads and myself and sometimes the medical director. I guess I should say sometimes the medical director as well.
Q So the board, two are appointed by the --
A Board of commissioners.
Q Board of commissioners? And one is appointed by the governor?
A Correct.
Q Once they're appointed, is there any difference between those two?
A Not at all.
Q Okay. So day-to-day operations such as purchasing food or everyday medical equipment, you don't need board approval for?
A Correct.
Q But if you were changing an internal policy, you would need board approval?
A Correct.
Q Okay. Are there --
A I will -- I will say with that in emergencies, you know, the board gives me leniency to be, like, if you have to make it -- let's say it's a policy decision and, you know, it's going to

affect clinical outcomes or even psychosocial outcomes, even budgetary outcomes, they allow me to change the policy until the next board meeting. And we can always revise and review, if necessary. So there are decisions that I'm making. Those policies would not be held if there was some sense of urgency to them.

We founded the Open Meetings Act, so it's not as simple as me saying, "Hey, you know, Caroline -- my board chair -- is this okay?" That wouldn't be -- that wouldn't fall under the Open Meetings Act. So I will do what I need to do. In that timeframe I might FYI them without any, you know, any -- under what I can do in the Open Meetings Act as far as email. And there are some things that happen quickly because they need to happen quickly.

Q Okay. In order to file this lawsuit, was board approval required?

A I would have to -- this -- yes. I was thinking maybe you were saying about filing the ERC itself. So I apologize. The lawsuit, yes.

Q For the ERC, was there also board approval acquired?

A I would have to go back and look at minutes. I mean, I know they were notified. Was it a formal action item? I would be unaware, because I wouldn't have been in the space at that time. So I would have to go back to minutes to see if it was an action item that was formally approved to pursue the ERC,

but to pursue the lawsuit, yes.
Q Okay. So when Marquette files tax returns, does the board review them?
A So, you know, the tax return comment is confusing me a little bit because, of course, we're government-owned, so our tax situation is different.
Q That's fair. When Marquette files something, like, a tax refund like the ERC, does the board review that?
A Yes.
Q And do they approve that?
A You know, I'm going to have to say I assume so because under an act, you know, I would -- I would -- if that was presented to me today, I would seek it as an action item, not an informational item. And so without reviewing minutes, I'd be -- I would be -- I would have to go back and review those minutes to make sure it was an action item and not an informational item. But regardless, the board would have had the knowledge to intervene if they felt appropriate.
Q Right? Okay. And the person at that time who would have taken it to the board was Jerome Hubbard; correct?
A Correct.
Q Okay. Are there other -- I believe you called them MCF county-operated facilities like Marquette? Are there other ones like that located in Marquette County?
A No.

Q Okay. So Marquette is the only one?
A The only medical care facility. We have other competing private nursing homes, but no other medical care facility. I don't know of any county that has more than one medical care facility.
Q Okay. And so the board that we're talking about only oversees this facility?
A As a skilled nursing facility, this is the only facility they oversee. Jamie Lemay from DHHS -- and I don't know enough to answer any of the questions -- but she comes to our board meetings every month. But her oversight is primarily with the state of Michigan. She does, like, child protective services and, like, foster placement and Medicaid assistance. I just don't know her role because it's not mine to know.
Like, she provides her own minutes and all of that, and she's usually here for about five minutes because, again, regulatory-wise, the state of Michigan sets all the -- even policy for her, where my board sets mine, you know. So it's -- I don't really understand the relationship, but she is here.
Q Okay. But other than her, the board is only setting policy for Marquette's facility?
A Correct.
Q Okay. Does Marquette ever meet with other, similar, county-run facilities in Michigan?

A As a board or just in general?
Q Not as a board, just in general?
A Often.
Q And what does that look like? Are there, like, monthly meetings?
A So I attend, at minimum, two a year, and that's spring management and fall financial. Oftentimes I'll even -- have in the past gone to the director of nursing, assistant director of nursing. I think there's around 34 medical care facilities in the state of Michigan, and the majority of us belong to two associations; HCAM, which is the Healthcare Association of Michigan, and the MCMCFC group, which is the Michigan County for Medical Care Facilities Council or something like that. My acronym might be a little bit off.
They help us kind of, you know, ride the regulatory waves, I will say, and help us kind of communicate with the state when there are things that are not clear to us. Sometimes they've even done lobbying on our behalf for our maintenance of effort because that right now is in a sunset situation. So our maintenance of effort isn't -- I don't know if you'd call it law or whatever, but it's not permanent. It sunsets, and they have to lobby for -- we have to, you know, get it to pass every handful of years. I think it's five years, so they help us with that.
I mean they -- we have a very strong administrator

group who supports each other during our surveys, during, "Hey, you know, AI is a big thing right now. What's everybody doing with AI? How are you handling it?" Very, very strong communication mechanisms in those within that group.
Q Okay. So you meet and share ideas?
A Right. About all kinds of things, though, oftentimes staffing and regulatory changes and, you know, financial structuring changes. Those are probably the biggest three topics that are always, you know, something we're focusing on. Obviously, resident care, too.
Q Are there usually, like, meeting minutes from those?
A I wouldn't say from those because there are typically educational opportunities involved in them, too, and then they set up some networking. So I'm not aware of any minutes that are in those. There are district meetings. In fact, I previously was the district one rep up until this year for the MCMCFC. But that's not a very active group, so most of them weren't having any kind of meeting minutes.
You know, we -- our administrator kind of emails us supporting each other and the district meetings were kind of a flop, to be honest.
Q And do these other facilities operate similarly?
A As far as I know. Not all of them have operating millages, you know, but as far as I know -- I mean, we all have a little bit of different structure, but especially when it comes to

regulatory requirements, we're all pretty consistent. And that's, again, where sometimes if there's gray space, we're helping each other get the right answers because sometimes one voice just isn't strong enough for CMS, you know, Center for Medicare and Medicaid -- Center for Medicare Services or Medicaid themselves, and DHHS, all of those governing bodies, to answer us if it's one voice. Sometimes, if you get six phone calls about the same subject matter, it provides a quicker answer.

Q Right. Okay. So I just want to ask about Marquette on a more, like, day-to-day level now. So what kind of facility would you say Marquette is?

A We're a skilled nursing facility.

Q And what --

A What do I mean by that?

Q What is that meaning to you, yeah?

A So we, you know, accept both long-term placement and -- you know, skilled nursing is typically somebody requiring physical therapy, speech therapy, or occupational therapy. Meaning we can -- again, we're duly certified, so 140 of our beds fall under either of those options. The only certificate of need we have is for our special needs unit, which is a 30-bed unit.

We are a 140-bed unit. Thirty of those beds are on the special needs unit and 20 of those 30 beds require that some somebody have a dementia diagnosis, which is not a

challenge here because I would say 50 percent of our residents, up to sometimes 70, depending on just acuity changes, have dementia. But it's the only specific certificate of need within our building, so that's why I felt it was important to add.

Q And what is certificate of need?

A So the certificate of need is something where it's specifically designated by the state that you, you know, have the eligibility to -- it can be for so many things. So let's say I was even going to get more beds. We are a 140-bed facility, and I said, "Hey, let's build five new beds." They would have to do a market study to say, "Does it" -- the state of Michigan -- to say, "Do you really have a need for five more beds in the facility?" So at the time when that was done -- I'm assuming in 2000, because that unit opened in 2001. And again, those are just assumptions on my part. They must have applied to the state. They looked at, yes, dementia-specific beds make sense.

I'm not really certain what difference that makes in our building because oftentimes people are confused when we say we have a dementia unit. Because there is something called a "locked dementia unit." We are not licensed for that. Meaning if you maintain pressure for 15 seconds on any door, you're getting out of this building. Locked units are truly locked units, which have different fire safety measures.

So I'm not sure what the goal of that was because it doesn't change reimbursement. It doesn't -- I don't -- I don't know why that was put in place.
Q Okay. So there's long-term and short-term stays?
A Correct.
Q As so what would a typical -- I'm sure typical is -- it's hard to generalize. I'm sure everything is different, but what would a typical long-term stay be for?
A The majority of long-term stays -- so there's something called "level of care" with our long-term stays. And we even do a level of care -- level of care determination, LOCD, required by the Michigan Medicaid system. We do those on all residents that are being admitted. But there's certain doors and the majority of residents here for long stays are here for one of two reasons; cognitive impairment or assist with ADL's, meaning activities of daily living.
And those are some pretty hard measures to make -- like, to meet as far as ADL's, like, you would think that if somebody couldn't toilet themselves because they couldn't provide peri hygiene, they'd meet level of care. They won't. It means more, like, you need assist with transfers and not -- not where, like, home or -- like, home health couldn't come in and provide those needs. You need them more frequently. But those are the primary reasons that you'll see somebody be long stay.

Q Okay. And are they typically -- when they're coming for a long stay, are they typically coming for the remainder of their life?
A Correct.
Q Okay. And what kind of treatment are they typically receiving?
A So at admission, in particular -- and always we are looking to improve or maintain functional ability. So you'll see the majority of our residents besides be, you know, being provided medications as needed, providing nutrition as needed, receive, or at least be offered some amount of restorative therapy. So that's not skilled therapy. Well, it could be because it could be Medicare Part B depending on the situation, but it's usually not enough hours. We can get into that later.
But they'll receive some amount of restorative therapy; always medications, always food and nutrition, you know, room and board, all the basics that you need and then, you know, assistance as required.
They would have physician oversight that would drive all of these decisions and orders that would, even as far as how we transfer someone, meaning what level of assist do you require? You know, that's a physician order oftentimes based on the nursing assessment.
Q Okay. What do you mean by "restorative therapy"?
A So restorative therapy is kind of just like the word sounds.

We're trying to restore as much function as you can have, not necessarily improve, you know, that's where skilled therapy really -- and it's not the intensity and duration that skilled therapy is. We're just trying to make sure that people are mobile. And there's a lot of reasons why that's important, you know. Mobility affects GI motility, which people are wheelchair bound, so they have a lot of, you know, GI complications. Mobility affects bone health, so we're trying to do that as much as we can.

Then, unfortunately, there usually comes a stage where they can't participate, or sometimes for behavioral reasons, don't want to participate. That's, you know, dementia oftentimes. And then you will see that group not. But on admission, we are typically encouraging that, especially if somebody has had any amount of falls in the past.

Q And so, like, could you explain the difference between restorative and skilled therapy?

A Oh, I'm sorry, yes. Restorative therapy is provided by nurse aides, the nurse aides that have a little bit of extra training now, special certification, or anything. Skilled nursing is provided by, you know, people with special licensing, so physical therapists, occupational therapists, speech therapists, or PT aides, OT aides. But, again, that's special education and licensing, you know.

Q So restorative therapy, is that more, like, we're just trying to get you moving?
A Yeah, ball bounces.
Q Right.
A You know, sit to stands, ambulating with assist, some pretty basic stuff.
Q And what is -- so we're talking about long-term stay contrast with short-term stay. What do those typically look like?
A So short-term stay -- so we built a new unit in 2019 specifically dedicated to short-term rehab, but it does not have a certificate of need that states that. So we could change it tomorrow if we felt like it. There's nothing tying us to that, but that was the development for it.
The majority of people coming for short-term have had an exacerbation of illness or, again, knee replacement, joint replacement, where skilled therapy really is returning them to their prior level of function. We call -- we talk about that all the time, PLOF, prior level of function, and wanting to return them to the least restrictive setting.
So that might have been assisted living but the majority of the time it's home. You know, I shouldn't say that. All of a sudden I feel like I'm getting a lot of assisted living short-term placements that have gone back to assisted living, but traditionally home. And so the skilled therapists work with them, you know, a large amount of hours

and typically five days a week to get them back to their prior level of function where they can return home.

Oftentimes in a short-term placement situation, there is a home eval done even, you know, to try to set up the home for the appropriate measures and safety to return. We do see some of our short-term turn into long-term, but it's oftentimes, you know, some cognitive changes that we recognize once they're here.

Q Okay. I was going to ask that.

A Okay.

Q And for those who don't turn into long-term, how long are they typically here for?

A That's extremely variable based on the fact of Advantage Medicare plans.

Q Okay. Can you explain that?

A Yeah. So traditionally, I would say -- you know, my timing might be off -- but say 20 years ago, the majority of people had what we call "straight Medicare." You have up to a 100 days of eligibility for skilled therapy. Really no authorization is required within that. You need to meet, like, the requirements of needing it which used to be, back in the day, like, two types of therapy for X amount of time, you know. And you had up to a hundred days, and it was up to the therapist to determine, okay you've either plateaued, we can't do more for you, or you've returned to your prior level of

function. We're going to discharge you.

And then the Advantage plans came on the forefront, and they were money savings for -- especially pharmacy coverage for the -- for the consumer, and I'm assuming money savings for the CMS in some way, shape or form, although I'm unaware of the mechanism of that. And so you have your consumers looking at what their immediate need is, which is typically pharmacy, because you're at home when you're deciding what Medicare plan you want.

And so they'll go for, say, Humana. That's a recent challenge for us. And we try to get authorization for Humana, and they give us very -- three to five days. And then at five days, you have to recertify, and they give you another three to five days. And then they want people out with home health or something before they're really necessary.

So we spend a lot of time repeating that and our physician's trying to argue that, but stays have become much shorter if you have an Advantage plan. But we're seeing, unfortunately, poor outcomes meaning they are returning to the emergency room and sometimes having to be readmitted for those reasons.

Q Okay. So the stay is determined less based on resident need and more based on Medicare plan?

A Yes, now.

Q Or Medicare or Medicaid?

A Yeah.
Q Do you typically have more long-term or short-term patients?
A We typically have more long-term patients.
Q And do you track that?
A We do track that. Could I give you numbers off the top of my head? Absolutely not. It's been extremely variable. When we built the new unit -- here's a really key example. When we built the new unit, we opened, we had one physical therapist. It got so busy because they are beautiful, private rooms, their beautiful own gym. We had to hire three full-time physical therapists. And then COVID hit, and we're back down to our one.
Q Okay.
A So we weren't able to keep that skilled momentum up.
Q Are there, like, different areas designated for short versus long-term residents?
A Overall -- overall, yes. So do you mean the gyms in particular or the residents in particular or both.
Q Both.
A Okay. So our 700 unit, we remained 140 beds, but in 2019, we retrofitted our 100 unit to private beds and made the 12 new beds over on the 700 unit, which is our short-term rehab unit. And so we tried to house the majority of them on that unit. In 2019, when we opened, we had to use the 100 unit for overflow because we were -- had so many of them. And then

again you know, COVID changed that, which I'm sure we'll get to later. So now the 100 has not typically had to be used for overflow because we've really not maximized those 12 beds since then. They have their own gym, their own dining room in that space.

Q In the 700?

A Seven hundred space. But it doesn't mean that our residents couldn't use that space. So what happens is -- it's just a big, beautiful, new space. Never -- it's exciting for all the residents, especially when they live here, and this -- and this building has been here since 1980-something. So, you know, it attracts with the brightness. And if you walk down there it just looks different. They're all welcome to use the dining area. There's a gathering room with a beautiful fireplace. You know, they're all welcome to use that area.

The skilled gym is down there so only skilled people go down there, but long-stay can have skilled coverage under Medicare B. So what I mean by that is we might have a resident who is ambulatory. You know, we really haven't had any hiccups with their mobility. All of a sudden they have three falls in one week, and you're, like, you know, what's going on? This just isn't -- this doesn't make sense. Would some skilled therapy help them improve their balance or whatever that might be?

So those long-stay residents, under that

Medicare B -- anybody receiving skilled therapy ends up in the skilled therapy gym, although 85 or 90 percent of that, of course, is our short-term people.

Our restorative gym, which is just more to the -- close to where we are currently -- is all just for restorative therapy, and it's -- there are no skilled therapists in that space. It is our restorative nurse aides, along with our department head, who's an RN, who does any assessments that would be necessary, although there's not typically assessments necessary in the gym. They're usually made prior to them coming to the gym.

Q And you said "the restorative gym is near where we are now." Just for the record, could you --

A I'm sorry.

Q No, you're fine. Like, what wing are we in?

A So we are in the boardroom, kind of in what we call our "central corridor." And that is also where the restorative gym is just behind us in the central corridor. So we're actually not on a resident unit right now, where the skilled therapy gym is on a resident unit, and that's the 700 unit.

Q Okay. Gotcha. Does it make a difference in operations at all depending on if there's more long-term patients versus more short-term patients?

A Financially, yes. Day-to-day operations, yes. As far as how many therapists we require and again, our reimbursement rate

for short-term just traditionally is better, so we do have -- you know, financially there's a pretty significant impact. And, again, the -- our therapists are subcontracted. I should be clear about that. So UP Rehab provides our therapy service, but they definitely need to adjust their day-to-day operations depending on the volume down there.

Also, because we are continuing to use our 700 unit for short-term when we've had census reduction down there, just because we just don't have the candidates, that affects our staffing every day and what we do with the nurse that typically is down there and the two nurse aides that are typically down there. They get displaced when the -- low census.

Q And so when you say it affects therapy, depending on that, there's more therapy needed the more short-term?

A There's more therapists needed, yes, the more short-term.

Q Sorry. Yes. Okay. Thank you. So you mentioned, I think, earlier that residents are assessed when they're admitted?

A Correct.

Q Right. And so at that point is that when, like, a treatment plan would be developed or whatever you might call it?

A Care plan; correct.

Q Care plan?

A So we would call it a care plan. There's, I would say, probably three key assessments upon admission that's by the

therapists. Oftentimes even if someone -- not all the time, but oftentimes even if somebody's coming in not for skilled therapy, the therapist will do an evaluation -- like, an evaluation only and not continue therapy, just to make sure that the transfer status from the hospital makes sense for safety for the resident.

You know, can they feed themselves, occupational therapy, those kinds of things. That assessment happens. Of course, an RN nursing assessment is key with med reconcil- -- medication reconciliation. Meaning, were the medications at the hospital reconciled with what we understood to be ordered, and then we typically try to reconcile that -- reconcile that with either the family or the resident, depending on the cognitive level of the -- of function. And then thirdly, we always do a skin assessment.

So those assessments are all complete within the first, typically, four hours the person is here, but always within the first 24 hours. And a baseline care plan is developed from that, which is a requirement within the first 24 hours. And that dictates how we would take care of the essentials.

Our dietitian typically follows the orders from the hospital. We don't have a lot of hiccups there, so she will see them within the 24 hours. But those other three things I mentioned are -- there's always need for change to take the

best care of a resident. It seems, like, we're at least on a level playing field with the diet when they're coming from the hospital. We use IDDSI, where they don't use the international standard, but we can convert easily.
Q What is IDDS?
A So it's, like, International Diet -- oh, gosh. I'd have to look up what the acronym is. But it's supposed to be, like, if you were in, you know, Japan, you'd understand that versus -- there's lots of pictures, and it provides five textures where the old system only provides three textures. But I'd have to look up the acronym. I promise I can't remember.
Q No, that's okay. And then so their care plan would have what therapy is needed and when?
A Correct.
Q Okay. And does every resident receive therapy?
A No.
Q Okay.
A Every resident coming in on Medicare gets -- receives therapy because it's a Medicare requirement, or you wouldn't be coming under a Medicare benefit.
Q That's what I --
A You'd be coming under private pay, you know, nursing home coverage or Medicaid is our biggest one. But it's -- in case that affects later questions. You have to be participating in

skilled therapy to have a Medicare benefit, but you don't have to have Medicare to come here.
Q Okay. So we already talked a little bit about the separation and the different wings for different purposes. So the short-term rehab unit, that opened in 2019?
A Yes.
Q And do you know when in 2019 that was?
A I can -- without certainty, but confidently say March of 2019. I could get an exact date, but I feel relatively confident in that.
Q Okay. And so you mentioned the bed capacity is 140; correct?
A For the total facility and 12 beds for the -- that specific new unit.
Q Okay. And so you touched a little on this: You said the beds were repurposed or something?
A Retrofitted.
Q Yeah. Can you explain what you meant by that?
A Absolutely. So, you know, we were a 140-bed facility the entirety of the time that I have worked here. And so when our previous administrator decided that a skilled nursing unit -- or short-term -- I'm sorry -- short-term unit, would make sense, we did not add to our census. So that -- you had to get those beds from somewhere.
And obviously the goal for anybody who has to be in a nursing home, who never had the goal to be in a nursing

home, would be in a private room, and we had very few private rooms. So when they built those 12 beds over on 700, they were able to take other semi-private rooms and make them to private rooms. So then the 100 wing became all private rooms.

Our typical bed setup is not ideal. Our typical bed setup -- but the majority of our rooms -- especially prior to the 700 wing being built -- is a quad style room. So what I mean by that is there's two residents on one side, an A bed and B bed and two residents. On the other side an A bed and B bed, and they share a bathroom. So you have four residents to a bathroom, so it's, like, poor dorm living.

Q So capacity was 140 before the short-term rehab opened?
A Correct.
Q And after?
A Correct.

MS. BRIGHAM: Okay. I'm going to switch gears, so if we want to take a break.

THE WITNESS: Even if I could just get some water and use the restroom that would be phenomenal.

MR. SILVERBLATT: Let's take five.

THE REPORTER: Okay. Off the record.

(Off the record)

THE REPORTER: Okay. We are back on the record.

BY MS. BRIGHAM:
Q Okay. So could you talk a little bit about how Marquette is

funded?
A We have resident reimbursement that's provided by whatever the payer source is. Again, the large majority of our payer source is Michigan Medicaid. Then our better -- our best payment system is typically any kind of Medicare and the little bit of private pay that we receive. We also have the operating millage to which we receive a million dollars a year. We --
Q And that -- sorry. Go ahead.
A -- at times have received other funding, May it be grant, may it be, you know, at one time COVID-related funding. But the primary resources that we have are -- are, you know, resident revenue and our operating millage.
Q And the one million millage, that comes from the county?
A Correct.
Q And so are residents paying room and board?
A Residents have a patient pay depending on what the circumstance is.
Q Okay.
A That's a really long conversation. I'll give you the short version. If you're covered by Medicare, after day 20, you have a copay. It depends on which kind of Medicare you have. If you have Medicaid, which is our other primary payer, if -- you are only allowed $60 a month. It's been that way for, like, 40 years. It needs to change. So if your pension is

$2000, you pay us $1940 and Medicaid pays the rest and you get your little $60. If your pension is $9000, you pay us eight thousand -- whatever the math is.

So our private pay rate, as it stands today is 400 -- it's changing right now. That's why it's about $450 a day. Our private pay rate has to be higher than our Medicaid rate, or we will not be reimbursed the highest because we'll be reimbursed the, you know, lesser of the two. So if we set our private pay rate lower than our Medicaid rate, all of our Medicaid would be adjusted to that rate.

Q So is a resident -- essentially Medicaid is -- you're getting reimbursed from Medicaid, and it's sort of just one pot of money that isn't separated out into, like, room and board and therapy?

A That's the room and board that I'm talking about specifically.

Q Okay. Okay.

A I'm sorry. So if you -- if you wanted therapy, that's all different depending, again, on payer source. Again, the majority of people cover some -- carry some kind of Medicare coverage. I want to say it's, like, railroad retirees or something odd that don't get that kind of coverage. Or, unfortunately, there are some people who have chose not to pay for their Medicare B expense, you know, at Medicare eligibility, and they are not eligible. Then you would have to private pay for therapy, which is nearly unheard of because

of the expense.

So if there's any true, skilled therapy, it's, the large majority of time, under a Medicare benefit. We have seen significant auto accidents or liability coverage, but, again, we're talking small, small percentages. The very large majority is Medicare for skilled therapy.

Q Okay. So when we're talking about the fee for room and board, other than the bed they're staying in, what does that include?

A It's very inclusive. Room and board is very inclusive. You know, any kind of just standard equipment that somebody would need, their medications -- again, unless their Part D coverage requires something else. Then the large -- any stock medications, meaning, like, Tylenol, over-the-counter things, the basic treatment, or wound necessities.

You know, if -- if you need a wound vac, that's billable under Medicare. But, you know, if you had a laceration and needed skin glue and needed, you know, a bandage for three months because you're diabetic and it's not healing, those are all covered.

We do provide dentistry to a cost of the facility, which is not part of room and board. It's just a bad choice -- life choice that we've made. So if they don't have dental coverage, we just absorb the cost.

I'm trying to think of other things people need. Let's say you want -- I'm a Diet Coke girlie. If you don't

want Shasta Cola and you want Diet Coke, you've got to buy it yourself. We will provide Shasta Cola. So there's some of those, like, preference things that aren't included in room and board.

Your clothing is not. I mean, I guess if you want to wear a hospital gown all the time or a facility gown all the time, it would be included, but we -- that's not technically included. We get plenty of donations. Not a problem, but not technically included.

But let -- even let's say you needed some part -- some rather expensive adaptive equipment. The large majority we're required to provide under room and board unless it's truly exceptional, you know, and more of an elective-type thing. But if it's -- let's say you needed an ankle-foot orthotic that is customized and is $700, you know, some of that stuff is billable depending on payer, but otherwise it's just a cost that we absorb. We're not really reimbursed for it, but it's part of our directive under room and board.

Q Are meals included?
A Yes. Again, unless you want preferences, we have some -- you know.
Q What about group activities?
A Yes. The only activities that would not be included are outings typically. So, you know, we do take residents to Red Lobster or shopping, or we do a lot of fundraisers, but it's

not included in room and board.

Q Okay. And so if a resident needs to just go to the doctor for a routine checkup, would they do that here, or would they go off site?

A You have to designate. It's a requirement for you to designate a physician to provide emergency care for you. So the majority of a routine visit would be provided here. This goes back to short stay, though. We only have, right now, four providers who provide care here. I'm only going to be here for two months, so I don't want you to take away my primary care doctor who is going to follow me later. So we usually will provide the transportation there and just kind of FYI the doctor covering here.

We provide the majority of transportation for visits to the point where it requires, you know, three full-time staff members for how many people are going out for typically specialty visits or consulting visits, not primary care visits.

Q Okay. And so the doctor visits that occur here, is that included in the room and board?

A Yes. The physician is able to bill for it independently for their services, but the resident receives no charge for it.

Q Okay. Gotcha. So the main cost that a resident would be billed for, separate from room and board, would be skilled therapy?

A Correct.
Q And is restorative therapy also billed separately, or is --
A Not that I'm aware of. That's a -- not that I'm aware of. It's just, again, a service provided.
Q What about, like, lab tests? Are those done offsite?
A We draw our own blood, and then we just run it to the hospital so we're not paying for any kind of phlebotomy charge. We -- yeah, we just don't. I think under the room and board regulations, we're not required to do that. We're just providing the service. So there might be extra reimbursement available for us for -- but I think it's -- by the time we bill it out, it's -- it's such a nominal payment it's not worth our biller's time. It's not cost effective.
(Off the record interruption)
BY MS. BRIGHAM:
Q Excuse me. So the doctors that are here on site, are they Marquette facility employees or are they contractors?
A No. And they don't -- they're not -- they only visit once a month.
Q No, they're not Marquette employees?
A They are not Marquette employees.
Q Okay.
A And they only visit once a month. So, like, I don't always have a physician inhouse.
Q Okay. And so when they come here and perform services at

Marquette, who is paying them?
A Their offices are independently billing for the visits that are allowable. At times there's some unallowable visits, just because of frequencies and stuff, but our physicians are just hometown physicians. So I think they just aren't getting paid for those services. We have no -- the only physician we pay is our medical director and our dentist. Again, like I mentioned before, we absorb those costs.
Q And the medical director -- does the medical director see patients?
A Not at this time.
Q Okay. So what does the medical director do?
A He oversees our QAPI. He helps us with policy revision when necessary. He --
Q If you don't know, that's okay. You can say you don't know.
A He isn't very involved. He isn't very involved.
Q Okay. That's fine. And so when you mentioned that the skilled therapy -- skilled therapists that come, they are subcontractors; correct?
A Correct.
Q And what company?
A UP Rehab Services.
Q Okay. And when did they -- when did you start contracting with them?
A I -- I don't remember a time we didn't, so, I mean, a minimum

of ten years. I just -- maybe in my earlier role, it might have different -- been a different company. I just wasn't aware but a minimum of ten years.

Q And are they -- are they also independently billing the same way that the visiting doctors are?

A I would have a tough time explaining that because I think that can be payer dependent. I know there is some exchange of money, you know, for things that -- this is the easiest way to explain it. Medicare is a -- can be a bundled payment system. So they can't always independently bill, and we have to exchange the -- those, you know, fees for service under the bundled payment system. So we are paying them directly in some capacities.

So a bundled payment is -- you know, you come out because -- of the hospital because you had an a exacerbation of congestive heart failure. And they're going to pay X amount of dollars for your services, and so, you know, those X amount of dollars come to the nursing home to carve out for what services are provided.

So I know specifically under bundled payment and probably other situations because we write a big check to UP Rehab all the time. So I would -- if you needed some specifics, I'd have to get some education specifically on that billing process.

Q Okay. Do you have, like, annual contracts with them?

A It auto renews at this point, but yes, we have a contract with them. That kind of sets the rates, et cetera, yes. So then we are billing for some of their services. I don't honestly know if they bill for any of their services independently like the -- like a doctor does. Does that answer your question better?
Q It's probably revealing my ignorance of how the healthcare system works more than anything.
A So I would say it's opposite a physician. We're probably billing for more of their services where the physician -- like, we -- I don't even know what they bill. I don't know how much they're reimbursed. It's completely separate. They know what the rules and regulations are for billable services.
We know what the rules and regulations are for required visits, and we don't -- those two don't mix. And we're doing the majority of, you know, exchanging money based on our rates on our contract to the therapy services and then billing for them.
Q Okay. Okay. Switching gears a little bit. Who, other than you, are the individuals at Marquette with supervisory roles?
A Currently or in 2021?
Q Let's start with 2019 actually.
A With 2019?
Q If you can remember. If not, it's okay.
A So with what kind of roles? I'm sorry. Could you repeat the

actual role?
Q With supervisory roles.
A Supervisory roles? Okay. So let me -- I think Joe Morris was still physical plant manager. If not, it was Dennis Henson. That would have been right around that time. Nick Kangas would have been the activity or diversional therapy coordinator. We call it activity, but some people call it diversional therapy.
Rosemary Aho would have been food and nutrition. She's no longer here. Jerry Hubbard would have been the administrator. He's no longer here. Tina Nelson would have been the director of nursing. She has since stepped back, but she is here. Krystal Heikkinen would've been infection preventionist. So basically Tina and Krystal currently have switched roles. What departments am I missing? Jolynn Tuomikoski would have been in -- managed kind of the restorative nursing department.
Our MDS nurses would have been the same, not really supervisory capacity, though. I would have been the assistant director of nursing, as we discussed earlier. Danielle Taseris would have been in human resources. So if you're talking, like, hiring and firing, Danielle Taseris would been here in 2019. She's no longer here. Dr. Wayne Carlson has been our medical director the entire time I've been here, so over, I would say, at minimum 20 years.

Our board in 2019 would have been different than it is now. So it would have been Brad Cory, who has since passed away; Cindy Adams, who was Cindy D'Agostino in 2019, same person, married since then; and Caroline Bridges. And the majority of those people would have been in those roles in 2019 and in 2021. I can't think of anybody who changed. There's just some people who, in current capacity, like, if -- you know, as of today, are different.

Q And do all of those people have decision-making power within their own department?

A Limited in some capacities. The reason I say supervisory is they do, you know, hire their own staff, discipline with the direction of human resources their own staff, and if a termination is required, participate in that termination alongside human resources.

But as far as policy, like, making really big policy decisions, that's going to come to the director of nursing, myself, the medical director and board, depending on what level of decision making that is. But if it's a true, you know, kind of functional change, it's not going to be made at those levels of supervisors.

Q Okay. And just to confirm, this facility that we're in, which is -- correct me if I'm wrong -- 200 Saginaw Street, Ishpeming, Michigan, is the only location that this -- that Marquette has?

A Correct.
Q Okay.
A The building itself is owned by the county, not that they upkeep it or even would know anything about it, but they do own the property.
Q Okay. Gotcha. So now I'm just going to ask about Marquette's day-to-day operation. So I know there are a lot of different categories of employees or different divisions. So maybe we could just take them one by one and talk about sort of the day-to-day what it looks like. So maybe if you want to start with the nurse nursing staff?
A Sure. So we have seven units. We have the 100, 200, 300, 400, 500, and 600, that's our -- that's our seven units. On days and afternoons they all have their own nurse. And they typically have, on day shift, between, you know, four to five nurse aides on those units, depending on their -- the amount of residents they have on those halls. We always have -- above and beyond those nurses.
We have nursing supervisors. Our nursing supervisors work 365 days a year on day shift. But typically on the weekdays we also have afternoon shift nursing supervisors. On the weekdays, there's a large amount of management nurses, day shift weekdays. But we provide both nurses and nurse aides around the clock.
Q And what is the difference in the nurse aides and the nurses,

the difference in their duties?
A So, you know, licensure, of course. To become a certified nurse's aide, you just need a minimum of 75 hours in the state of Michigan, of education and then to pass the state test. It's both a practical and a written exam. Nurses, we have both LPN's and RN's that provide the same role when it comes to that kind of medication pass nurse. So, you know, nurse aides do not handle medications whatsoever.
There is something called the medication aide program in the state of Michigan that just now became a thing. Wouldn't have been in this time, but we don't use that regardless.
So the nurse aides are assisting with eating. They're assisting with toileting. They're assisting with transfers. You know, they're providing daily cares. And the nurses are providing medications as their primary role and assessments when needed.
But 140 residents, some are stable, they don't need an assessment every day, depending on what's going on. But they need medication every day, and they need to be taken care of every day. So will nurses transfer residents? Yes. Will nurses assist with eating? Yes. But CNA's will never do what nurses do but nurses sometimes will do what CNA's do, depending on what the need is at the time.
Q And are there -- are all of the nurses and nurse aides, are

they all full-time employees?
A No.
Q Okay. About how many are full- versus part-time?
A That's a tougher answer to -- question to answer post-COVID. We had a lot of staff that did not want to work full-time during that space of time, so we ended up going to our union and changing a lot of our postings to part-time for just this reason.

So this was an answer in 2019. I could have told you, hands down, exact numbers, and I just would really have to reference that. I would say the majority of our staff are -- outside of management -- are part-time. Is it the vast majority? Not the vast majority, but the majority are part time. We do also have some on-call, meaning that they work a minimum amount of hours per month. It depends what union you're in what that minimum amount is.
Q And how do you define part-time here?
A So we look at, you know, ten shifts in a pay period. So if you're .6, you work six shifts. If you're a .8, you work eight shifts. As far as rate of pay, it's the exact same.

As far as benefit package, you know, your health insurance is more expensive if you work less, but I mean as far as seniority in choice of space you go, especially in day-to-day operations during COVID, you couldn't, what we call bump, going to your preferred unit, especially if you're on

the CRF space. So that affects it because full-times get to choose first. I don't know of any significant difference.
Q So is anyone who works less than ten shifts considered part-time?
A One of our CBA, collective bargaining agreements, states 72 hours, but we don't actually have a posting that's 72 hours. So, yes, I'm going to answer your question yes just because the situation does not exist.
Q Seventy-two hours within --
A In a pay period. Scheduled hours. There's a lot of our nurse -- nurses and nurse aides who pick up because there's some incentives financially for that. But if you are scheduled, awarded to, you know, be guaranteed a minimum of six shifts or eight shifts, that's what I'm referencing.
Q Okay. And I know you might not know because you were not in the administrator role at the time, but do you know how Marquette determined the amount of full-time employees for purposes of the employee retention credit?
A I do not know the answer with certainty. If you asked me to get that information for you, it would be very easy because payroll reports would tell us because, you know, they're classified certain ways within our Canopy system -- it's just the brand name -- that would let us sort that out relatively easily.
Q Okay. Okay. So we talked about nursing. So you also talked

about dietary staff; correct?
A Correct.
Q So what does their day-to-day look like?
A We serve three meals: Breakfast, lunch, and dinner. We serve them from portable steam tables where you, you know, push them along the hall. Outside of COVID we serve in two dining room spaces, but we didn't have communal dining the majority of 2021. They come in, they prepare the food. The majority of the time that food is built on a recipe that can be from scratch.

I would say in 2021, we were using more of Gordon Food Service products, though, where it might have been pre- -- you know, frozen and you just had to throw in the oven, a lot to do to staffing.

So we provided the three main meals, and we provide 10:00 o'clock and 2:00 o'clock and 8:00 o'clock snacks. And they're doing dishes, and they're cleaning their own space. Like I say, they directly serve the residents right now, not during COVID because we were trying to limit the dietary. You know, staff that didn't need to be in that space we kept out of that space. When I say "serving," you know, just mean giving the plate. You know, only nurse aides assist with eating if you need assistance.
Q Okay.
A Or dining assistants. We have -- there's a paid dining

assistant program in the state if Michigan that we use, too.
Q And then you also mentioned the physical plant staff?
A So we have -- kind of -- the majority of our units have somebody assigned to them, meaning, like, outside of the nurses, outside of the CNA's, there's a housekeeper that, you know, primarily works on 100. There's a social worker that divides the building between 1-, 2- and 500. There's restorative nurse coordinator that gets 1-, 2- and 500. There's a -- you know, like -- so we kind of have this, like, team division. So outside of dietary, everybody kind of knows their space.
Even our laundry crew, like, I might be the person who brings out the 300 clean laundry on a day. I mean, obviously if someone calls in, that might change, but normally I'm the 300 gal, you know, so we try to keep it consistent. Main reason for that is people with cognitive impairment. The familiarity when somebody's in and out of your closet, in and out of your space becomes pretty important to them, and that's the basis for how that system is built.
But -- so physical plant oversees laundry, maintenance, and housekeeping. Maintenance is just gentlemen that go over the building depending on what the work orders are. You know, it's two people in the afternoons, three people on days, one person on nights. But laundry, again, is kind of as they -- once they wash all together and dry

everything, then they're assignment is to deliver to the housekeepers, primarily stays on their unit.

We have a float housekeeper that does the central areas that are not resident wings or assists with a resident room move. So again, during COVID, that was super important because we were moving people from unit to unit providing, you know, extra personal protective equipment and disinfecting even more so than we are now. So we had -- had to change that staffing plan a little bit at that space of time.

Q Okay. Okay. So nursing staff, dietary staff, physical plant. We talked already about managerial staff. Are there any other groups that I'm missing?

A Activity staff. I mentioned them briefly, you know, but, yeah.

Q What does their day-to-day look like?

A So they -- they come in in shifts. They do assist in the dining room. Again, that's relative to today, not relative to the time we're talking about. Relative to the time we're talking about, they would have been, again, assigned to each unit, to try not to move residents. But some -- right now, the big focus, the big quality of life factor for residents is large group activities, especially bingo. So they're providing those kinds of one-on-one to residents but a lot of large group activity.

Q So are they planning the activity in that now?

A Nick Kangas, our activities director, does the majority of the planning of activities. And he then also holds resident council monthly for the residents to have input on what those activities are. And I -- I hold community council. The families can come in quarterly and give input to those as well. This is such a quality of life driver.
Q Okay. So Nick plans the activity and then the activity staff is responsible for working at those events?
A Exactly.
Q Okay. And all of the categories of employees we just talked about, are those -- are any of them contractors?
A No. We've only employed 1099 staff, like, in a resignation space or something like that where we're trying to fill it in short -- for short term.
Q Okay. And what --
A I take that back. Our outside active -- like, let's say, you know, Billie Sings -- because he sings at every nursing home. He is not employed by us. He comes in to sing, and we pay him directly as, like, a contract staff. So maybe -- maybe I misspoke.
Q Okay. So he's, like, a guest performer basically?
A Right; right.
Q Okay. Do you have volunteers?
A Not currently. I would say about good seven years since we've had a good volunteer group.

Q Okay. And so the day-to-day operations that we were just discussing, is that sort of how Marquette had operated in 2019 as well?
A Yes, yes.
Q Before COVID?
A Yes. I just wanted to think to make sure I wasn't misspeaking.
Q And so in 2019, when there was communal dining, what did that look like?
A In 2019, the new unit would have been open so -- and I say this because there's multiple communal dining spaces. So the 700 wing and the 100 wing would have primarily used that space. The majority of the residents enjoyed that space and liked getting out.
Then there would have been another dining room space in our central corridor that primarily served residents who need assist with eating. We just did not attract the independent people to that dining room for whatever reason. It has served it over the years, but not in 2019. That population just didn't want to go there.
And then our special needs unit is the 30 residents on what we call "the pod." They always eat family style, so there's two big, long dining tables that they eat at. And so that's they're dining space. The other residents I mentioned, kind of the independent people, what we call our main

building, which is 100, 200, 300 and 400, chose to eat in their rooms in 2019. That wasn't a large amount of people.

You know, the dining room served a large amount of people, but there were residents who just, for whatever reason, their choice was to eat in their room.

Q So you didn't -- in 2019, you didn't have to eat in the dining area?

A No. Never in the time I've been here, did you have to eat in the dining room. On the special needs unit we do everything we can to encourage people. It's just a different setting over there, and I think it's very, like, helpful for people with, psych social needs. So it's rare that -- that somebody eats in their room over there.

Q So we talked about the dietary staff who prepare the meals, and you mentioned that the nurse aides served the meals; correct?

A Yes and no. So again, we use a portable cart. So sometimes if you have just -- I hate to say, but a motivated, good food nutrition staff, they will help serve. And then the -- if you -- let's say they'll -- they'll serve me. And I can eat on my own so I just start eating. But if I need assist with eating, then a nurse aide or a paid dining assistant will come along and assist me with eating.

So there's times where the dietary staff was truly serving. Again, not in this space of time because we didn't

allow them to in 2021, but in 2019, they would have been.
Q Okay. And so --
A That's actually their job. They just don't do it very often.
Q Okay. And so when residents are eating in the communal dining room in 2019, there were staff in addition to the dietary staff that were staffing?
A Correct; correct.
Q The dining? And that's -- that was typically nurse aides?
A Correct.
Q And they're there to help with -- help monitor residents' health and help with residents who need extra help eating?
A Correct.
Q Okay. And how long are meals typically when they're in one of the dining rooms?
A So in 2019, we actually had two dining rooms, like, two dining room times because we could attract a small group of those independent people. So for that reason, it lasted a good hour and a half to two hours. Again, that has kind of faded off. We never really got that gumption back, so now it's about an hour in each dining room.
Q And do you still stagger the time in the different dining rooms?
A Not really. We tried to just to allow opportunity for a longer period of time. And people just chose not to, so it wasn't a good use of staff.

Q So 2018 there was -- correct me if I'm wrong -- there was two dining rooms and then March 2019, you opened the third one on the 700 wing?
A So in 2018 we actually used our solarium a little bit for dining, too. That's not a dining space at all. It just was because in 2018, for some reason, the independent people really liked eating in the dining room. We just didn't have enough space and they were overlapping. We were pushing them out, and so it was just a functional difference, you know.
So 2018 just looked different because our independent people loved the -- loved the communal dining situation. It wasn't -- it was just the ebb and flow of the type of resident we had, you know.
Q Okay. What was the solarium used for?
A The solarium normally is this -- it's this beautiful family space that is used for large group activities and for families to get together. And that's one reason we tried to pull away from having dining in there at all is because I -- we felt, like, it was affecting kind of that dynamic, too. But we just had to because you have to serve the resident population at the time, you know, what they require.
Q So when the dining room on the 700 opened, you stopped using that one?
A Exactly.
Q Okay. And then in 2019, what kind of group therapy was being

offered?

A Are you talking about physical therapy?

Q So any kind of group therapy.

A I only asked because activities can be considered diversional therapy. So I want to make sure you weren't talking about activities. So that's -- so when we're -- when we're talking about physical therapy, a physical therapist might be in a room, and he is taking care of, you know, the person to their right and whatever exercise they need to do is a duration of ten minutes.

So he turns the attention to the person who needs the duration of ten minutes and gets them started. They start, let's say, pedaling their bike or whatever it might be. Then he starts getting the next, you know, person next to him you know, rowing the rowing machine. And I'm making these up. We don't have a rowing machine -- but rowing the rowing machine.

And so, you know, it's not -- they're not doing the same exercise, I guess is what I'm trying to explain. And they might have been initiated at different specific times. You know, his ten minutes started at 8:00 o'clock and this person's ten minutes started at 8:05. So this person is going to finish before this person. So it's -- it's -- you know, but you are able to oversee multiple people in a gym and get multiple people going.

And so same with what I'll say is diversional therapy. What CMS calls it for activities is, you know, you bring in people to play cribbage. You bring in people to do knitting or do manicures or all kinds of things, church services. And they are able to interact with one another and, you know, see something different than the four walls of their room. And so that's -- you know, I would say the majority of activities are group based.

There is one person that traditionally has been assigned what we call one-on-one activity for somebody who chooses not to participate in group activities. No matter what we offer, they just choose not to, and we get concerned. And this is as long as I can remember being here. We get concerned about the, you know, potential for depression. So there -- I should mention that there has been a staff that always has maintained that.

Q Okay. So if someone wanted to do individual physical therapy instead of group therapy, they could opt to do that?

A Yeah.

Q Okay. And so starting with the group physical therapy, that was held in a communal space. And the residents weren't necessarily doing the therapy together, they were just overseen by the same person at the same time?

A Correct.

Q Okay. And where was that typically held?

A In what year? I'm sorry.
Q Sorry. Where in the building was that typically held?
A In what year?
Q Oh, I'm sorry. In 2019.
A In 2019?
Q Yes.
A We would have had the new units. So the majority of skilled therapy would have been in the 700 gym.
Q Okay. And where -- before the 700 unit opened, where was it?
A We used the restorative gym, which is in this common corridor, and so restorative residents and skilled residents were all in the very same squishy space.
Q Okay. And the restorative therapy or -- I'm sorry -- diversion therapy.
A I'm confusing this. Diversional therapy is activities, but it's considered therapy under CMS, so that's why I didn't want to get -- I'm not trying to get in the weeds, but I'm also trying to make ure I'm not missing something.
Q No. I appreciate you being specific about that.
A And then so restorative therapies, those residents who just need, like, some small exercises to keep their --
Q Right.
A -- you know, like, body moving. So that is what has always been held typically in group settings. I'll be doing a ball bounce with you while the other CNA is doing a pedal -- pedal

bike with, you know, Rob. And so it's very much a group setting. Even in ambulation -- I should say except for -- not even in -- except for ambulation, because you want more distance.

So you're typically in the hall with just the CNA to assist with ambulation. But almost all of the restorative therapy, the sits to stands, we have SciFits. They're little kind of bikes. You can use wheelchairs. Those are always traditionally done in a group setting.

Q And where in 2019 was that typically held?

A And so that was in the restorative gym in the common corridor.

Q Okay. And then the diversion therapy?

A Is activities, and that was held all over the building, depending on what it was. Some big groups were in our solarium or our dining room. Small groups were in the activity room. When I say "small groups," I mean, like, cribbage, or we've had people come in to present on historical things that just haven't drawn a large crowd.

But the majority of, like, our church services, our music services, our bingo, those were held in the solarium or the dining room.

Q Okay. Now, I'm going to ask you to open this big binder.

A Okay.

Q And I apologize. They're premarked so that we're going to go a little out of order.

A Okay.
Q If you could turn to the tab marked 31. It's at the very end. Do you recognize this document?
A I would not have recognized it prior to this, you know, lawsuit because it's not typically my role that I would review. But I do recognize it based on this lawsuit.
Q Okay. And what is this document?
A So this is telling us how many minutes or units of physical therapy, occupational therapy, speech therapy, somebody received in the range July 1st, 2021, to September 30th, 2021.
Q Okay. Thank you. I'm just going to ask some questions just so I understand how to read this. So what is this document typically used for?
A So this appears to me to be only specifically skilled therapy. So we're not talking diversional therapy or not talking restorative therapy. This is typically a Medicare benefits skilled therapy and so, you know, for example, the code must be a procedural code that they're using on the left-hand side where -- I'll give the example -- it says, "92507 -- so -- treatment of speech, language, voice, communication, and/or auditory processing, individual." The minutes that they spent in this time with speech in that -- within that specific modality looks like it was 1446 minutes.
Q And where does that code come from?
A I think it's called the International Coding -- I don't

remember what the acronym is, but it -- you know, is something set by, you know, the coding industry as to what code they would use for these.

Q Is it used for, like, Medicaid/Medicare purposes?

A Correct.

Q Okay. And what does -- what does Marquette use these types of forms for?

A I mean specifically, I don't know. I've not -- I've not been exposed to this form specifically. So, like, Polly Wasilewski, who is from UP Rehab, sends me a lot of comparisons of, like, minutes used, et cetera, for me to kind of just project some financial situations. I'm -- I am not certain that's the exact form, but the information on this form would be used to help us bill for the services.

Q Okay.

A I don't know that's this specific form, but the information on the form would allow us to, you know, bill for those services as far as how many minutes, et cetera.

Q Okay. And can you just clarify what the acronyms at the top are, PT first?

A PT is physical therapy, OT is occupational therapy, ST is speech therapy.

Q Okay. Thank you. And can you clarify what minutes means, that category?

A The minutes spent doing that specific modality. So what I

mean by modality is, again, you look at the description and it tells you, you know, therapeutic exercises. I'll use it as an example because that's a fairly generic general term. And it will tell you that there is, you know, 24,856 minutes spent on that. Obviously, that's amongst many residents in the duration of 7/1 through 9/30.

Q And can you clarify what units means?

A I honestly cannot clarify what units means. I would have to ask one of my therapists specifically how they determine units. My knowledge of units is limited, but it would be like in a modality you are going to perform -- I'll -- again, I'll use an example, a therapeutic exercise, and you expect that that lasts five minutes. So, you know, you'd take your minutes divided by five, and that's how many units you would get out of it. Again, limited knowledge, so I would need to clarify if you need that answer.

Q Okay. And does this -- would this document tell you how many residents were receiving any specific type of therapy?

A I do not see how that document would tell me what specific resident, the number of residents, just the total number of minutes in that quarter.

Q Okay. And that would be -- this would be the therapy services provided by UP --

A -- Rehab; correct.

MS. BRIGHAM: Okay. And I'm sorry. For the record,

this is Exhibit 31. I just realized I didn't tell you that.
THE REPORTER: Thank you.
(Defendant's Exhibit 31 marked)
MR. SILVERBLATT: And we're going to keep these numbers? Fine either way.
MS. BRIGHAM: Sure.
BY MS. BRIGHAM:
Q And this document would also -- would it -- it wouldn't tell me if this was group versus individual therapy, would it?
A It's unlikely that we bill for what you'd see as a billable true group therapy because, as I explained, we're doing it in a group setting, but we're not doing the exact same exercise at the same time. So the majority of our therapy is not billed as group therapy. So maybe if there was group -- the reason I answer that way -- if there was group therapy, I might be able to identify on it. But it's a rare thing that we are charging for.
Q Okay. Gotcha.
A We're providing therapy in the group, not what qualifies as group therapy.
Q I see.
MS. BRIGHAM: Would you mind turning to Exhibit 32, and this is Bates stamped -- Bates stamped Marquette 2192.
(Defendant's Exhibit 32 marked)
BY MS. BRIGHAM:

Q Do you recognize this document?
A It appears to be a similar document, but the date ranges from 7/1 of 2019 to 9/30 of 2019.
Q So if you could flip to the second page, which is Bates stamp 21 -- Marquette 2193?
A Okay.
Q Do you see the code -- the last code that is G0283?
A Yes.
Q And if we look back at Exhibit 31, that code is not on Exhibit 31?
A Correct.
Q So why is it that there are sometimes codes that are on one date range and not another?
A So E-stim is an actual device. Like, it's a -- it's a of equipment that just isn't appropriate for everyone. So it's a limited use piece of equipment so -- that only our therapists can provide that specific type of therapy. So if you look at 2193, it's a limited amount of minutes even that it was used. It looks like, you know, a total of 35 minutes in that space. So to my best knowledge, I would say that there was just no one who required that in 2021.
The other issue would be with any equipment that our -- our, you know, E-stim would be something used for multiple residents. So it would require some pretty significant cleaning to disinfect -- disinfecting during

COVID. So I'm not saying that anyone made a choice, but there was considerations to -- to use a piece of equipment that you have to use for multiple people in the space of COVID as well.

Q Okay. So basically there could be certain therapy services that are needed in some months based on resident needs but that aren't needed in another?

A Correct; correct.

Q Okay. That's it for that document. So we talked about the different kind of therapies, the group activities, the communal dining. Were there any other kind of group activities in 2019 that occurred at Marquette that we didn't talk about?

A I mean, when you talk about activities, just in general, a lot of those were provided by families through visits, you know. So that's the only thing -- other thing I can think of that we may not have touched on that would, you know, be relative to this conversation.

Q Okay. And what did visitation look like in 2019?

A It was open 24/7. We don't have visiting hours. We don't have visiting limitations. On occasion you might find a family to be disruptive just by pure numbers of toddlers that attend, and you'd have to provide some education. But it was -- there was zero restriction.

Q Okay. And were residents free to come and go as they pleased in 2019?

A Under their direct durable power of attorneys directive, yes. So, you know, there's always the family dynamic where Suzie shouldn't pick up Joanie because it's not safe. And, you know, we'd have to deal with that. But as a general rule, yes.
Q So would you say Marquette's main source of revenue is the reimbursements from what we've called this kind of bundled fee for room and board?
A The majority of our -- resident revenue is the majority of our reimbursement.
Q Okay. And in 2019, Marquette had had 140 beds; correct?
A Correct.
Q And were all of those beds full?
A They were not.
Q Okay. Is it typical for all beds to be full?
A There was a very unique dynamic that created a little bit of a census change for us and that being building that new unit. We couldn't house residents in the units where there's construction. So during the year 2017 to prepare, we, you know, held admissions a little bit to keep those spaces safe, and then we were just rebuilding that in 2019. So we haven't had a full census of 140, I would say -- I mean, prior to 2016 with certainty, we would have a handful of beds open. The first ten years I worked here we were full all the time. But that dynamic was created by the construction.

Q So it sounds like construction started in 2017?
A I think we broke ground in, you know, late 2017, early 2018. I can't be certain. And then we were -- you know, we opened in 2019 with resounding success, and then that's when COVID happened.
Q Okay.
A So our occupancy rates are probably the easiest way to, you know, answer that question. We were in the, I feel, like, high 80's and maybe mid to high 80's in 2019. I would have to look at a reference point. And it just kept going down from there. I want to say in 2021 we were just at 80 percent, which is a real impact to us financially because under 85 percent, you end up having a significant financial impact. So we tried to stay over that 85 percent mark.
It not only affects us as a facility if we are less than 85 percent, it affects something called the "variable cost limit," which is part of rate setting for all of Michigan nursing homes if you don't meet that 85 percent mark.
Q So what is -- can you explain more the effect of being under 85 percent?
A I can try to. It's pretty -- it's pretty complicated, honestly. So if you have a 140-bed facility and so whatever 140 beds is times 365 days, you have the maximum amount of census days that you possibly could have. And so if you have less than 85 percent occupancy, that's when you say your

denominator really impact, like, what your cost per bed is.

Again, I'm not a mathematician. So this is, like, a very low level version of the explanation. But then when the state sets the variable cost limit, they kind of look at what's an industry standard. So when you just diluted your, you know, return on investment, I guess I'll call it, because you have all these open beds and all these available census days, that's really affected what your cost per day is.

And then the variable cost limits set, I think, like, on an average or maybe it's the top ten percent. Again, I'm not -- I don't -- you know, that's the state taking care of that, but that's looking at all the industry. So when you don't meet that 85 percent mark, that's a huge, huge marker we tried to meet.

Particularly in 2021, when the CRF beds came out, we were all informed that those beds would not count against our census. Then unfortunately, it came to cost report time the state made their decision that the CRF beds would count against our census. So there was a large majority of who didn't -- of us that did not meet the 85 percent requirement because we had all done our calculations based on being able to use those CRF beds in that fashion.

Q And is this 85 percent that comes from the state?

A Correct.

Q And do you know where I can find that?

A The best resource probably would be somebody at Plante Moran to give you a, you know, higher level explanation of what I'm saying. Typically, for me, that's Jon Lanczak at Plante Moran, who, you know, does our cost report prep, or Victoria Thompson. Not necessarily our auditing side of Plante Moran.

I'm guessing a fairly quick Google search might even give you -- I mean, I'm just guessing -- you know, might give you a little better explanation than I'm explaining it. It's just been really something drilled into our heads as administrators, like, you've got to meet that 85 percent mark or the financial hit is so significant, and it's not just yours.

Q Okay. Gotcha. So Plante Moran, they handle the finances here?

A They handle -- we have a -- we have a financial officer, Allecia, but they do our high level financing, so our cost report preparation. So what a cost report is is that's how our rate setting happens, meaning what our Medicaid daily rate for room and board will be. It's a prospective payment system where they look at, you know, your allocated costs per bucket and do some sort of calculation that drives what that might be every year.

And they -- we also use them for our auditing services. There's not many facilities who do their own cost report preparation, but I'm sure there are. So there might be

somebody who could give you a better finite explanation of the 85 percent rule.

Q Okay. So they -- Plante Moran does cost report preparation. They set the daily rate. They do auditing. Do they do anything else?

A The state sets the daily rate.

Q Oh, I'm sorry.

A But they provide the information that allows law us to do that. They were the ones who also prepared -- looked at our eligibility for the ERC and prepared the documents required for that eligibility. But they were the ones who analyzed if we were eligible.

Q Okay. And what information were they provided to make that determination?

A Payroll information, you know, the income statement --

MR. SILVERBLATT: You're asking about ERC?

MS. BRIGHAM: Yes.

THE WITNESS: I'm sorry?

MR. SILVERBLATT: You can go ahead. I was just clarifying that the question related to the ERC.

THE WITNESS: Yeah. So a lot of the information they probably already had, to be completely honest, because of what they do for us. But additional payroll information, Allecia provided it. Allecia Filibeck, the assistant administrator, who also would be what -- her title is not

this, but she essentially would be the chief financial officer -- did the majority of the work for this. So I'm uncertain of the exact documents but, you know, a lot of payroll income statements again, things they have for -- from us for auditing purposes. That's why it made sense to use them for consideration of whether we would meet the requirement.

BY MS. BRIGHAM:

Q Do they handle payroll, or is that done inhouse?

A Payroll is done here by Barb Duquette. So she does our routine IRS reporting. The -- it's, like, 914 or 941 or something that needed to be redone for this. That was prepared by Plante Moran.

Q Do you know what type of accounting software is used for payroll?

A For payroll, our scheduling systems is Attendance -- Attendance on Demand, but I don't know that that's what generates our payroll. You know, it says ESS, when we get our -- when I log on, but I honestly don't know what the actual vendor is.

Q That's fine. So it's processed inhouse by Barb and is she -- she's an employee of Marquette?

A Correct. She has been prior to 2019 and continuous.

Q And how is payroll tracked? How is time tracked? Do employees --

A We have timecards that you, you know, punch a time clock.
Q And everyone does that?
A I'm the only truly salaried person in the building, but I still punch a time clock, too.
Q Okay. Does a supervisor or a manager have to sign off on timesheets --
A Correct.
Q Sorry. Go ahead.
A Yes; correct.
MR. SILVERBLATT: Ladies, just for Pam's benefit, just let Paige finish the questions.
BY MS. BRIGHAM:
Q And is that, like, each -- each department head signs off on their division employees' timesheets?
A Yes.
Q Okay. And do you know what time period Marquette uses to keep track of finances? Like, is it the calendar year, or is it a different type of --
A It is the calendar year.
Q Okay. Now I'm going to ask you about some documents and I apologize, this is going to be very boring.
MS. BRIGHAM: If you could turn to Exhibit 15, please.
MR. SILVERBLATT: And are we just on a default assumption that if you're showing her an exhibit you want it

attached?

MS. BRIGHAM: Attached?

MR. SILVERBLATT: To the transcript.

MS. BRIGHAM: What do you think?

MR. PARKE: Yes.

MS. BRIGHAM: Sure, yes.

(Defendant's Exhibit 15 marked)

BY MS. BRIGHAM:

Q So I am showing you what's marked Exhibit 15, and this is also marked as Marquette -- Bates number Marquette 308. Do you recognize this document?

A Yes.

Q How do you recognize it?

A It was prepared in preparation for this lawsuit. It's -- I recognize the statement of operations in general, but it does appear this is from 2019, which I wouldn't have reviewed it at that time because I wouldn't have been in my current role. But I'm familiar with the statement of operations in general.

Q Okay. And what kind of information does this document contain?

A It includes our operating income divided by different types of payer sources as well as other revenue, and then our operating expenses. It looks like the current activity would reflect a quarter where the year-to-date would do that, you know, reflect the year-to-date -- unless it's by month. This one

specifically -- because March would have been a quarter, so that must be by the month. And then the year-to-date would be the quarter because it's -- if -- it looks like it was generated from March 31st.

And our expenses are divided by department, and so it does give you an overall look at total expenses and -- and at this point, net income or loss.

Q Okay. So these big headings where it says "Medicare A," "Private Certified," et cetera, is that -- that's the payment source?

A That's the -- all the types of payers. So yeah, Medicare A is straight Medicaid. ICO Medicare is, I think, MI Health Link, it's called, but not real exciting. Medicaid greater than 90 days, Medicaid less than 90 days, then there is your managed care.

Q Okay. So if we could just go through under -- we'll just use Medicare A as an example.

A Okay.

Q And just go through -- if you could just tell me what does -- what is -- if you could just tell me what room and board, what that line means?

A So room and board is, again, the majority of where our reimbursement is going to come from under resident revenue because it covers whatever your daily rate is under that, you know, insurer. And that's what covers, basically, our

overall -- you know, what you need in your stay day-to-day.

Then you go to medical supplies. That could be something, like, an unu- -- a unique treatment situation for a wound. Unfortunately, that's a little bit of a very general one, medical supplies.

Pharmacy is going to be what we could bill out for the prescription medications. The person received oxygen would be -- we have a wall oxygen system where, you know, it's piped into the building and there are certain amounts of that that are billable. Unfortunately, it's a low reimbursement area, and some insurance companies don't provide reimbursement for it. So when you go to other ones where it says zero -- the reason I mentioned that is it might not be that they didn't have oxygen, it's just that wasn't reimbursable under that insurance.

Physical therapy is, you know, the amount of money that we received for physical therapy because we're, again, under income at this point; same with occupational therapy. The amount we received for occupational therapy and speech therapy.

So x-ray -- when it says you know, x-ray, we don't provide x-ray here. But, again, there's the bundled payment services where if we had either mobile x-ray come in -- which I don't recall if we had mobile x-ray in 2019 -- we've had contracts -- sometimes in rural health, it's hard to get that.

So some years we've had contracts. Sometimes we've had -- not had contracts. But because of bundled payment, we're paying them for that service. So we divide out of their bundled payment what that was for x-ray.

Physician care, you know, again, only in those bundled payment situations would I think we'd see anything under that.

Lab is the processing of the lab that we had to, you know, typically pay, let's say, UP Health Systems for. So when we were reimbursed for that under their Medicare stay, we don't actually charge for the poke, but for the lab processing itself.

Contractual adjustments are just that, you know, we might have contracts with different providers of, you know, our normal daily rate is $200, but we agree to accept $180. And that's what the contractual adjustment is.

And the sequencing adjustment is related to if you have more than one payer and their rates are different, you have to set the rate at whatever happens first, whoever is going first. And then if there's a rate change, there's some sequencing adjustment because of that.

Q Okay. For the contractual adjustment, is that, like, we're agreeing to a different rate, we're going to give you money back, or we're just --

A Writing it off.

Q Okay. Gotcha. And then so as far as the skilled therapy, you're receiving reimbursement from Medicaid, and then you're paying that to UP Rehab Services?
A So just to -- just to clarify, the one you asked me about specifically is Medicare, but it, you know --
Q Oh, I'm sorry.
A Medicaid typically wouldn't be paying for skilled therapy, it would typically be Medicare paying for skilled therapy because Medicaid has very limited skilled therapy benefit. So most of the time we are talking about skilled therapy, it's going to be Medicare. But you are correct in saying that is money we received for providing that service.
We are not necessarily paying them the exact amount we took in because our contract would state what our rates might be. And there might be a discrepancy. There might be situations where we gain money there, and there might be situations where we lose money, depends on the payer and what our contract states.
Q Okay. So going back to the top where it says "operating income," why are the totals zero for that?
A Bed hold. Where it says "operating income, census, bed hold," that zero?
Q Sorry -- no.
MR. SILVERBLATT: Right here (indicating).
BY MS. BRIGHAM:

Q On the bottom where it says "total."
A I'm sorry. I guess I -- I don't have an answer for you there specifically. I would need Allecia to clarify that for me.
Q Is it typically zero, or is it just that's how this month was?
A I don't -- this is not the monthly specific form I look -- I get. You know, we generated specifically for this, and I must have missed that when I reviewed that it was it was zero. I was making sure I could explain specifically what each bucket is. So I just, unfortunately, don't have an answer to that.
Q Okay.
A I could get you one and provide you one if that's helpful.
Q So what is the difference between Medicare A and ICO Medicare A?
A So just -- it's just a managed care, you know, ICO is managed right now by the Upper Peninsula Health Plan. That just happens to be who is awarded the contract, but that's our ICO right now, is UPHP.
Q Okay. So they're both -- they're both Medicare?
A They are just -- both Medicare. They just have slightly different rates and slightly different, you know, systems of payment.
Q Okay. And is that the same for Medicare B and ICO Medicare B?
A So Medicare A and Medicare B are different. So, you know, Medicare A is paying for your room and board when you're here under a skilled stay, as well as your therapy or whatever.

Medicare B is when you're just getting therapy, but you're typically a long-stay resident, so your room and board payer source is not Medicare. You've exhausted that part of your benefit, but there is some extra skilled therapy benefit, and that's where Medicare B plays apart.

Q Okay. Gotcha. Okay. And what are the differences between Medicaid certified -- ICO Medicaid greater than 90 and ICO less than 90?

A So typically any time you'll see a greater than 90 or less than 90, it's, like, what we thought your length of stay would be; greater than 90 days, less than 90 days. You probably will see it in some other reports, too.

The managed care certified is just, like we must have -- it could've been Humana, it could've been Aetna, all these managed cares that are lumped into one group. It just depends on what the individual had as a payer at the time. My guess in this space of time is it would have been Humana. We no longer participate with them.

Q And then what are -- if you look at what's Bates stamped MAR 309, what is managed care certified?

A So, again, just another, you know, managed care payer that was typically certified, meaning a skilled stay eligibility. But it's just -- Matrix is our electronic health record and our accounts payable system and our financial system. So when we don't have a high volume of these other payers, it just kind

of buckets it into whatever we choose.

So, like, managed care could be four different managed care type payers. You know, like, again, that could be, you know, Provident, that could be all kinds of insurance companies that are -- that's just kind of an umbrella term.

Q Okay. So unless it specifically says, like, on the first page marked MAR 308, where it says private certified?

A That -- private certified was likely private pay. Somebody was private paying for their room and board.

Q Okay. And so unless it specifically says that all these other ones are --

A They're all just different insurance companies, insurance types.

Q Okay.

A Hospice is -- are you -- hospice is an organization that treats people that are expected to have less than six months to live. And the way the system works is hospice, once they come on board, does provide us the room and board payment, and they get the rate from whoever the insurance provider is. So it's kind of an exchange of money there.

Q Okay. So if you look at what's Bates stamped MAR 310 under dental -- we talked a little bit about dental services earlier. So you mentioned that Marquette absorbs the cost of dental services, so is this just -- is this --

A Not -- not the entirety. There are -- there are limited payer

sources that provide some dental. So you'll see, you know, like, there was some positive amount there, $2249 under current activity. UPHP is one of those payers that did -- at least currently provides dental payments. I'm going to hope that I'm accurate in 2019, but I'm not certain. But then you see the majority of them are, you know, losses for us where we are just accounting for the fact that there wasn't any payment for those services.

Q Okay. So you'll get some reimbursement and then cover the difference?

A Correct. Write off the difference.

Q Okay. And then if you look right below that under other revenue, what is the interest income?

A Although I couldn't say with certainty there is -- it's -- there is going to be interest income on multiple accounts for us. I'm not sure how Allecia has them set up. I know she'll meet with Nicolet Bank on occasion to say, you know, where's -- where's the best place to have this money to generate interest.

We receive interest income for our MERS pension plan, but I don't know that it's reflected here. I would need to clarify with Allecia any specifics of where -- what specific interest income that is.

Q Okay. And you mentioned earlier that interest goes to the county; is that right?

A Oh, so we get some interest, and they get some interest. So if it's money collected from our millage, they're going to see the interest on that outside the money they give to us. They -- they keep that. Like, currently it's, you know, in the millions, low millions of dollars that they -- they have, and they see the interest on that.

You know, we have some operating accounts that are individually ours that we -- I see -- I would assume see small amounts of interest because they're constantly moving the -- you know, the balances are shifting, et cetera. And then we get interest income from our, you know, our MERS pension plan.
Q Okay. So a couple of lines below that, there's a transfer from county, and it's current activity, 25,000; year-to-date, 75,000. Is that the millage that you're referring to?
A That should be the millage that I'm referring to.
Q And that will end up being a total of one million?
A Yes.
Q Okay. And is that provided in monthly installments of 25,000?
A I -- you know, that's -- I'm, you know, questioning myself a little bit on that because I -- I see the monthly total, and so the transfer, that seems like an unusual amount to me. So I may have -- we don't receive any other money from them, you know, outside the millage. So I -- the only thing I can think of is there's a transfer for payroll. I can't explain the exact dynamics of it.

Again, that would be more of an Allecia thing. That wouldn't make sense for 25,000, either. So maybe specifically we don't -- you know, I might see the monthly total and maybe she specifically, you know, gets it in a different format.

Again, this is not -- I get, like, a little bit different format that includes the majority of this information monthly. But we don't get any other income outside of that millage from them.

Q Okay. And then moving on to expenses. That's MAR 310.
A Okay.
Q It's at the bottom of that. So there's nonunion salary and wages and there's union salary and wages. So which employees are union and which employees are nonunion?
A So that looks like it's particularly under the activities bucket. Like, you'll see operating expenses, and it says activities. So then nonunion would be our department head, and then that union would be all the nurse aides within that department.
Q Okay. And is that consistent across the board?
A Yeah.
Q Managers are nonunion and all other employees are union?
A Correct.
Q Okay. So I'm just going to go through these expenses and just ask what they are. So you just told me what those two are. What is FICA expense?

A That's just the federal income expense that -- I can't -- is it federal? I don't -- I don't know what FICA -- but payroll tax kind of situation.
Q Okay. And then turning to the next page, MAR 311, what would supplies typically be for?
A So that's, again, under activity. So that might be puzzles, coloring books, you know, printer ink. It could be pretty variable in that department in particular.
Q And what about miscellaneous expense?
A So things that would fall under miscellaneous expenses is if there was an outing and we -- so a nurse aide takes a resident to Red Lobster. And we don't expect the nurse aide to pay for their own meal, then, you know, that might be something that falls under miscellaneous expense. If there was any kind of -- like, if Nick would have gone to any education outside of the building, that might have been miscellaneous expense. Miscellaneous expenses is pretty variable.
Q Okay. For beauty and barber, does a Marquette employee provide those services?
A No.
Q Okay. Is that, like, a contractor?
A A contractor, yes.
Q Okay. And what -- is that the same company usually?
A In 2019, it was the same person, and now it's somebody separate. It's just an individual. It's not a company, a

license cosmetologist. Up until 2026, it was a zero revenue -- like, she would -- they billed for their services, and then we take that money out of the resident trusts. We do not provide any kind of reim- -- like, we -- up until 2026.

It's different now, you know, it was just basically an exchange of funds. Your haircut was $12. I take 12 out of your trust. Yours was $13. I take $13 out of your trust, and I gave her a check for $25. We were just the conduit of that money.

Q What is the resident trust?

A The resident trust is required for residents to have access to their money. There is a calculation on -- depending on how many residents we have, what our trust balance has to be. Not everybody is -- our immediate, like, cash part of the trust needs to be. Not everybody is required to have a trust, but the majority of residents do.

I mentioned earlier that they get $60 a month. That typically is in their trust. They can spend that on the Diet Coke instead of the Shasta Cola or on the Red Lobster or to give a gift card to -- not employees, but, you know, their grandchild when they graduate or those kinds of things.

Q And who is paying into that?

A Residents -- resident's families. Sometimes we gift residents money for Christmas, lots of sources. I should say we as individuals, not we as a facility, gift money to residents for

Christmas.
Q So moving down under nursing, there's an expense for oxygen. Is that just the regular oxygen that the residents would use?
A Correct.
Q Okay. What would nonreimbursable nursing expenses be? That's right under oxygen.
A Yeah. It's just there's quite a bit. So I'm trying to think of what we -- what nonreimbursable is most often, you know. So it might be a resident needed a glove because they use a wheelchair to propel, and they often get, like, you know, sores or callouses. So we buy gloves and, you know, that's not reimbursable. It's just something we're providing.
It could be that a resident needs some form of, you know, adaptive equipment. I had mentioned before that might be a brace of some sort because the have carpal tunnel. Those are not reimbursed. They're just things that we provide.
Q And is Marquette paying for that?
A Correct.
Q Okay. And is other nursing supplies just a catch-all for things that are needed?
A You are right.
Q And moving on further down, what is other consultants?
A Other consultants in -- under nursing is likely going to be -- we use nurse consultants for, like, complicated situations through Lebenbom and Rothman. It's been pretty consistent.

Her name is Vickie Burlew. So I'm assuming that's where her charges go. Or let's say that in the past we have struggled to organize our food nutrition staff, we will have -- this is again under nursing. So the food nutrition is a bad example, but we'll have somebody come in and try to help us, you know, streamline things for success.

So we do use consultants in various departments on occasion outside of that Lebenbom and Rothman group I mentioned. We use them routinely. We also use Warner, Norcross, Judd for labor-related concerns, and so if we would have called them with a question specifically on the labor-related concern, that very well could have fallen -- I don't see here anywhere else where that would have -- where that bucket would be classified. So that could be a under there as well.

Q What about business mileage?

A So we -- whether it be transporting residents or I have to go to a meeting at the courthouse, there's, you know, different mileage involved in bringing residents and ourselves places.

Q And what is the difference between business mileage and travel nursing?

A Well, travel nursing is complete -- oh, I'm sorry. I looked at that wrong. I was thinking that travel -- we think of travel nurses as these travel nurses that come and stay with us. So the travel for nursing was probably, like, your hotel

expense while you're traveling, not the actual mileage.
Q Okay. Gotcha.
A The education is probably the conference itself.
Q And so moving to the next page, MAR 312, under plant and maintenance where it says, like, gasoline, heat, electric, water, and sewer, is that, like, the -- just the utility bills for the building?
A The gasoline would be the gasoline in our vehicles otherwise, it is utilities.
Q Okay. The rest is utilities?
A Correct.
Q Okay. And for vehicle repairs and insurance, are those, like, vehicles that the -- that Marquette uses?
A Correct.
Q Okay. So if you turn to the next page, which is marked MAR 313, under physical therapy, so if the skilled therapists are contractors, why is Marquette paying union salary wages for that?
A I would have to -- I'm sorry. I shouldn't have started.
Q Oh, no. You're okay.
A I would have to clarify this, but previously before we separated out, like, our gyms, we just kind of called that all the therapy gym. And I think this is in reference to our CNA's that work in restorative. I'm not certain, but I think we're just trying to classify that out because they're not the

direct care nurse aides. And that, like, kind of makes sense as far as even the math total, but I would have to make sure.
Q Okay. So that likely includes non-skilled therapy?
A Correct.
Q Okay. And then just turning to the last page, which is marked MAR 314, just to make sure I'm reading this correctly. At the very last line where it says "net income, current activity," does that mean that Marquette had made $44,100.32 in profit for this period that we're looking at?
A Correct.
Q Okay. And then for year-to-date, it would be $11,794.40 at a loss?
A At a loss; correct.
Q So when Marquette makes a profit, what happens with that money?
A It just sits there. I haven't made a profit in my -- I haven't made a year-end profit in the time I've been here. So I don't know. I would have to ask Allecia if at the year-end when you're kind of resolving everything, if some money goes back to the county. But we've been operating at a loss for -- since 2019. So I want to know that answer at some time in my career.
Q And so what happens when you're operating at a loss?
A So lots of times it's an audited loss, so it's not that we don't enough cash on hand to, like, you know, deal with life.

And that's, again, where we went and asked for extra access to millage money when we were realizing that our cash on hand was becoming a problem, and we were kind of under that 100-day mark. Even during some periods, you know, post 2020 to 2022, we dipped to, like, 89 days cash on hand, but we were getting a little bit you know, what do we need to do about this?

But we've been kind of focused on that 100 days cash on hand if we can do that. We were used to be able to fund our own capital projects. Now we have to look at our depreciation fund to do that. So we've had to kind of pivot a bit on how we do things but we've managed.

MS. BRIGHAM: Okay. All right. So I am done with this document if everyone wants to take a break.

MR. SILVERBLATT: Sure.

MR. PARKE: Or a lunch break? I don't know what you guys want to --

THE WITNESS: I mean, a lunch break probably makes sense at this time.

MR. PARKE: Sounds good.

MR. SILVERBLATT: Okay.

(Off the record)

THE REPORTER: Okay. Back on the record.

MS. BRIGHAM: Okay. So before we took a break we were looking at Exhibit 15. If you could turn to Exhibit 16?

(Deposition Exhibit 16 marked)

BY MS. BRIGHAM:
Q So I'm showing you what is marked Exhibit 16, and it's Bates stamped MAR 329 at the bottom. Do you recognize this?
A Similar document to what we just reviewed for a different time period.
Q And how do you recognize this?
A So it's a -- it's the statement operations, which will show us both our operating income and our expenses, and then, of course, if we have a net profit or loss in that time period.
Q So if you turn to the fourth page, which is Bates stamped MAR 331, and you look under other revenue, at the bottom it says "COVID reimbursement." What is that for?
MR. SILVERBLATT: Sorry. Which page are you on?
MS. BRIGHAM: Sorry. Exhibit 16, MAR 331.
MR. SILVERBLATT: Okay. Got it.
THE WITNESS: So COVID reimbursement, we were -- we did -- we did not receive any, like, PPP loans, but we did reserve -- received just some basic COVID funding that has since been audited and determined for appropriate use. If I recall correctly, all the uses were the additional, like, personal protective equipment, disinfecting products, and all of those things that were required. Some air filtrations systems we were able to purchase to put right in our air handler.
BY MS. BRIGHAM:

Q And where did that money come from?
A I don't know if it was state or federal government, but it was a governmental, you know, availability. I just don't recall if it was state or federal. I want to say it was given by the feds, allocated by the state if my memory serves me correct.
Q And so throughout this document, for example, if you just go down one to operating expenses, activities -- activities and then it says "C-19 wages." And it says that -- it says that C-19 wages throughout this document. What does that mean?
A So there's a wage passthrough for direct care workers that the state supplies. And it's been variable amounts of money depending on the year. And so what that is is, let's say I make $5 an hour, the state gives an hour 85 cents an hour to give to that direct care worker, and then we are reimbursed directly that amount of money. It is for hours worked, not hours paid, so it's, you know, not on all paid time. It would be only on work time.
Q So does that -- where it says C-19 wages, is that the amount reimbursed?
A Correct. I mean -- well, it's -- this is on the expense side, but that's amount we'd expect to be reimbursed. So this is how much it costs us, but we'd expect to be reimbursed 100 percent of that expense.
Q And you said that was from the state?
A Yeah, in the wage pass-through. Again, whether they use

federal funds to do that, I'm unsure. That's a Michigan-specific thing.
MS. BRIGHAM: Okay. Could you, please, turn to Exhibit 17?
(Defendant's Exhibit 17 marked)
BY MS. BRIGHAM:
Q I'm showing you what's marked as Exhibit 17, and it's Bates stamped MAR 349. Do you recognize this?
A Yes. I'm not very knowledgeable on it, but I have seen it.
Q And how do you recognize it?
A If I recall correctly, this is what was part of the worksheet that Plante Moran used to determine our eligibility for it, for the employer retention tax credit. But I would not be able to explain it well for you.
Q Do you know who prepared this?
A I was under the understanding that Plante Moran prepared it, but I would have to confirm that information.
Q And so would Plante Moran have verified the numbers on it?
A Correct.
Q And do you know if this was a draft or if this was a final document submitted to the IRS?
A I am not certain.
Q Okay. That's fine.
MS. BRIGHAM: Could you turn to Exhibit 18, please?
(Defendant's Exhibit 18 marked)

BY MS. BRIGHAM:
Q I'm showing you what's marked as Exhibit 18, Bates stamped MAR 350. Do you recognize this document?
A It doesn't look much different from the previous one. Just -- okay -- so, yes.
Q And how do you recognize it?
A It was provided to me in prepar -- well, it was provided to me at the time I became the administrator with all the other ERC documents. And, you know, I've reviewed it over the past couple of years once or twice.
Q And so this document, Exhibit 18, and Exhibit 17 that we just looked at, would they have been prepared by the same person?
A That is my understanding that they would have been prepared by the same person, but I don't have an intimate knowledge about these documents.
Q Okay. And so if you compare Exhibit 18 that we're looking at to Exhibit 17 that we just looked at, do you see the time period at the top?
A Right. I was expecting it to be different, but it's the same, yet the values are different.
Q Yeah. Do you know why the values are different?
A I do not.
Q Okay.
MS. BRIGHAM: Okay. If you could, please, turn to Exhibit 20.

(Defendant's Exhibit 20 marked)

BY MS. BRIGHAM:

Q I'm showing you what's marked as Exhibit 20 and what is Bates stamped as MAR 791. Do you recognize this document?

A Not the specific document. It was likely provided, to whomever needed it, by Allecia Filibeck, our CFO. I'm familiar with our mBank statements, but I don't know that I have reviewed this specific time period, to be honest.

Q So could you tell us what we're looking at?

A Absolutely. So mBank, which is currently Nicolet Bank, is who holds our, you know, operating accounts, our trust accounts, you know, does most of our banking with, they just have changed names. So we are looking at the statement ending 1/29/21 from, it looks like, our premium money market account. I see there's other accounts included in here. This only is for -- majority of one account is what I'm seeing.

Q Yeah. I'm sorry. Exhibit 20 that we're looking at is just one account different -- different statements.

A Okay.

Q So are you familiar with these sort of bank statements that Marquette gets?

A Yes.

Q And do you know what the purpose of this specific account is?

A That would be an Allecia question. I'm sorry. She does all the resolving of our accounts and managing of our accounts.

And I do some of our daily deposits, but I oftentimes don't see it balances outside of income statements.
Q So is Allecia the person in charge of this account?
A Correct.
Q Okay. If you turn to the next page, which is marked MAR 792, do you know -- so under where it says "electronic credits," do you know what these credits would be for?
A Yeah. I think I would know the majority of them. So it looks that Blue Cross Blue Shield claim payments is the first line. The majority of Blue Cross Blue Shield, it must, you know, probably stay in alphabetical order somewhat -- so it looks like MNS is a third-party group who used to oversee one of our managed care systems. We no longer participate with them, but we did at that time. So that's where MNS comes in.
And then NGS, which I mean, you don't see it all, but it says, like, H claim payment, national government. NGS is our Medicare payments, then, or, like, straight -- nonmanaged Medicare -- Medicare payments.
Our Medicaid, if I recall at this time period, was -- still came via good old-fashioned check.
Q Okay. And so would these be just the regular resident reimbursements that we've been talking about?
A Yes.
Q Okay. And under electronic debits, do you know what those entries are?

A I unfortunately do not. I don't know -- you know, Peninsula Bank, if they hold the accounts that Allecia has to transfer back and forth to. I'm not even sure if that is same mechanism that's in place today. But I don't handle those transfers at all, so I don't know what the banking system -- where that kind of mixed money situation happens is.

MS. BRIGHAM: Okay. Could you turn to Exhibit 21, please?

(Defendant's Exhibit 21 marked)

BY MS. BRIGHAM:

Q I'm showing you what's marked as Exhibit 21 and --

MR. SILVERBLATT: Looks like the Bates got cut off.

MS. BRIGHAM: Yeah.

BY MS. BRIGHAM:

Q So I'm showing you what's marked as Exhibit 21. Do you recognize this?

A Similarly, it's not a specific statement that I've ever seen. I am familiar with, you know, banking statements themselves, but I wouldn't be able to tell you what the use of this is outside -- I see, like, some payroll credits. So I'm assuming it has something to do with our -- our, you know, payroll account.

Q Okay. So you don't know what the specific purpose of this account is?

A My education, you know, would -- or, you know, my experience,

I guess, would tell me it's going to be payroll because there's so much that is IRS tax and, you know, the ACH that we use and you know, mentions payroll as well. So -- but I don't have specific knowledge of this statement itself.
Q Okay. And because this looks like it might be a payroll-related account, would Allecia still be in charge of that?
A Correct.
Q Or would Barb be in charge of it?
A Well, they both would have access, but, like, there -- there's certain accounts that Barb can't write checks for just, you know, is double-check systems. So they both would have access, but not necessarily able to draft from it, and I would have -- I have the information, but I have to look at the specific accounts, who is on which.
Rebecca Grove is a signer on all accounts. She's one of our billers, but she doesn't necessarily make any kind of, you know, transactional situation that would allow for any kind of embezzlement, et cetera. I am -- I am a signer on most accounts but it's just as a matter of default not typically functional use.
Q And sorry. Who is Rebecca Grove?
A Rebecca Grove is our biller. To be honest, she does all of our, you know, medical billing collecting, payment collecting.
Q And is she -- she is a Marquette employee?

A Employee, yes.
Q Back to Exhibit 21 under electronic credits, do you know what those entries are for?
A So I do know that there's -- like I said, I think I'd mentioned earlier today, too, some reasons that we transfer money back and forth for payroll through the county, you know. And so this looks like a set account. So I -- I don't understand the mechanism of exactly why that happens. I just know there is, like, our operating account and our, you know, balance, we can handle. But with payroll there is some transfer back and forth to the county.
Q So the payroll transfers back and forth between the county. How does that work?
A Allecia manages those. It's just done by a, you know, like, a transfer form that she fills out. And I don't know if she submits it to the bank or the county themselves, and then, you know, the money gets moved as needed to cover payroll. I don't -- I think -- I think, big on the think, that they don't like a large volume of money sitting in the payroll account. So it must get moved around for whatever it makes sense for, whether it be auditing reasons or interest-earning reasons. I'm not honestly certain.
Q So basically if -- for a certain period, Allecia will ask for X amount of money to be transferred from the county to cover the payroll?

A But it's our money. That's the weird part, you know. Like, so I said, we don't get any extra money outside of millage. It's money that we are transferring back and forth for -- and I apologize. I don't understand the mechanism of it, but that's just how it's always been.
Q Okay. And so that's just sitting in some county account until it's transferred?
A Correct.
Q Okay. I apologize because the Bates numbers got cut off, but if you could turn -- we're still looking at Exhibit 21.
A Okay.
Q If you could turn to -- and this is in chronological order. So if you could just turn to the one that starts -- at the top, it says "statement ending 4/30/2021."
A Okay.
Q And do you see under other credits at the bottom of the page, there's an entry for April 28th, 2021, and it says, "Internet banking transfer from premium MMKT MUN to cover" --
A So premium, yeah --
Q -- I assume that means payroll?
A Yeah. Premium money market account. That's the municipal account that we referenced earlier. So if you look at -- maybe it was 20.
MR. SILVERBLATT: Twenty.
THE WITNESS: That's going to be that 0873 account,

the money market account, there was a transfer from that specific account to cover payroll.

BY MS. BRIGHAM:

Q Okay. And is that the transfer -- type of transfer we were just talking about, or is that something different?

A I'm not specifically certain. I mean, I know it came from that account, obviously, because it's reflected there. But I'm not sure if there is -- if she would take from that account up to amount -- a certain amount first before she asked the county to transfer from other account. I apologize. I'm a little naive to where all that mixed money, you know, happens.

Q Okay. That's fine. Excuse me.

MS. BRIGHAM: Could you please turn to Exhibit 22?

(Defendant's Exhibit 22 marked)

BY MS. BRIGHAM:

Q I'm showing you what's marked as Exhibit 22 and Bates stamped MAR 1002. Do you recognize this document?

A Again, it's one that Allecia directly provided, but I recognize this type of document. I just don't know that I've seen it for this specific time period.

Q Okay. So you're familiar with it?

A Correct.

Q And what is this document?

A So, I mean, it's our balance sheet for period ending 1/31/19.

So it goes over, you know, what our balance is in cash and depreciation, in retirement interest, you know, land improvements, all are from the beginning balance to now the current balance. So, you know where, you might have seen gains and losses as well as our liabilities.
Q And who is in charge of creating this balance sheet?
A Allecia.
Q What purpose is this balance sheet kept for?
A I mean, whatever accounting principles we use require a balance sheet.
Q So, again, I'm just going to ask you to walk me through what the lines mean to the extent you're able. So just starting from the top, what does cash mean?
A Cash would mean, like, liquid, you know, cash available. Cash fiscal year adjustments, that's not typically on the balance sheet I currently get. So I don't know if there was a fiscal year adjustment specifically to 2019 that needed to be accounted for where maybe we either received money after the fiscal year was closed or something. Because that's typically where you would see a fiscal year adjustment is when there was some post calendar date adjustment.
Depreciation is, you know, cash that we set aside for depreciation of equipment, building, et cetera, so that we can use it for depreciated -- just those things that are depreciating whether it be a vehicle or, you know, the

building, et cetera.

Cash restricted fiscal year adjustments. Again, I'm not -- I think that has to be something specific to an adjustment that needed to happen at that time. So our retirement account looks like there is zero cash in that.

Impressed cash. I'm not familiar with impressed cash. Accounts receivable is just those accounts that we, you know, have not collected on yet that. You know, we typically have about a 30 days accounts receivable, but it's just -- there's always a running balance just because you're providing a service every day. So the census days are adding up every day.

Estimated uncollectible accounts is just that, that's the auditing measure that they look at the percentage of what we've had to right off over the last year -- handful of years, and even to this date. We had our audit presentation, and our estimated uncollectible account, it remains at 200,000 because we've always been able to stay under it.

Miscellaneous accounts receivable. Oftentimes we, you know, don't know that we're going to have miscellaneous accounts receivable, hence the zero.

Prepaid expenses. We do actually use prepaid expenses a little bit more now in the current situation. So prepaid expenses might be, like, longevity bonuses or things

of that insurance, in lieu of bonuses that we know that we're going to have to pay at some point. So we set that money aside every month so it's easier to, you know, recognize that instead of having, like, a big, you know, change in your balance sheet, you know, the one month that you're paying it out.

Land improvements. Basically, you know, as it states. Buildings, what are your value in buildings. Fixed mobile equipment, so that might be -- I'm trying to think of an example of fixed mobile equipment. I was going to say our garage, but that might fall under buildings. So fixed mobile equipment might be, like, our tractor.

Accumulated depreciation. There's an appreciate -- depreciation schedule that the, you know, GASB accounting principles puts out that we look at all the kinds of things that we have under that. And it's just -- we follow that schedule to get that number.

Construction in progress. Obviously in 2019, that was something probably very specific to things that are refinishing -- finished in the construction. We don't always have construction in progress in our net pension benefit so I'm uncertain if that was the pension -- assumed pension gain, interest gain. That's the one thing I wouldn't be absolutely certain of.

If you look at your liabilities, obviously, accounts

payables, all kinds of things, you know, whether we owe vendors --

MR. SILVERBLATT: And just -- I'm sorry. Do you want to know about liabilities?

MS. BRIGHAM: Yes, please.

MR. SILVERBLATT: Okay.

THE WITNESS: Okay. Accounts payable would be just that, you know, paying vendors, majority accrued wages payable. So, again, that's, you know, she's making sure that we look at what wages we anticipate to accrue and have to pay those out.

Accrued leave, time pay. So we have a really generous paid time off as a county organization. And so that's actually a liability for how much time off you carry and what that has to be paid out at. So that's what that is.

Other liabilities. There -- there's so many things that could fall under other liabilities. I don't know. I can't think of a specific example.

Post-employment benefit. So that might be somebody resigned and they still had a vacation payout or they, you know, still had something coming back to them for whatever reason.

Net pension liability. That's what we assume our pension liability for the -- to be for the year, and deferred revenue, you know, again, something that you had expected to

receive but didn't -- there's not always going to be anything there -- your fund, and then, obviously, you have all your totals.
BY MS. BRIGHAM:
Q So accounts payable, is that typically, like, the -- something, like, the skilled therapy that -- or --
A I doubt it because these look like GL accounts to me, like, they are GL numbers. And so I -- I would think that therapy has a very specific GL number. So I would have to look at that GL to see what it includes I would be guessing, especially them, and maybe it's all included. But I would be thinking more other vendors, like, you know, supplies and -- and that we have. But I would have to double-check that GL account to know for certain what's underneath that.
Q Okay. So if you turn to the next page which is Bates stamped MAR 1003, there's charges for services. Would that be, like, for therapy services?
A I'm not as familiar with this report, but it's under revenue, so charges for services makes sense that it would be all services provided -- other revenues, interest -- so I would -- I would have to garnish a guess that therapy is included in that but I would be uncertain.
Q And what fiscal year are you -- or is the -- is the fiscal year for this regular calendar year?
A Yes. The biggest difference for us that -- you know, when you

talk about calendar year -- is our Medicaid rate is set 10/1 typically. So we have to adjust all of our rates that we charge typically 10/1, but we run on a calendar year for our accounting purposes.

Q Okay. Gotcha.

A For everything that I'm aware of.

MS. BRIGHAM: Okay. Can you please turn to Exhibit 24?

(Defendant's Exhibit 24 marked)

BY MS. BRIGHAM:

Q So I'm showing you what's marked Exhibit 24, and it's Bates stamped MAR 1208. Are you familiar with this?

A Similarly, I have, you know, not looked at banking statements from 2019, so I'm not familiar with what would be the trust account. It's hard because I know what the account numbers are under Nicolet Bank now, and they are different under mBank. So I would be able to tell -- like, if this was 1416, I would know it's the trust account. And I don't know what the previous -- I don't know what 0563 means in 2019 once Nicolet bought it out. So that's what's really challenging me here.

Q So this is labeled self-funded health insurance account.

A Okay.

Q What kind of -- what kind of account is that?

A So self-funded health insurance account? We had self-funded

pharmacy probably back in 2019. We have traditional healthcare coverage now, both health -- you know, medical and pharmacy. But at one time we were under a self-funded pharmacy coverage. Meaning as an employee, if you went and got a prescription for, you know, Lasix and it costs $16, we paid $16, you know, for that. It was truly self-funded. 44North -- or I think they're Acrisure now -- oversaw it, so I don't know if they set a separate account for that in 2019. I truly don't know.

Q And Allecia would have been in charge of this account?

A Yes.

MS. BRIGHAM: Okay. Can you turn to Exhibit 25, please?

(Defendant's Exhibit 25 marked)

BY MS. BRIGHAM:

Q I'm showing you what's marked as Exhibit 25 and Bates stamped MAR 2036. Do you recognize this?

A It's the admit discharge report, so, yes.

MR. SILVERBLATT: And I'm sorry, the Bates are hole punched through. What did you say it starts at?

MS. BRIGHAM: 2036.

BY MS. BRIGHAM:

Q Okay. What kind of document is this?

A This was an admit discharge report for the period of 7/1/21 through 7/31.21. So it reflects all of our admissions and

discharges for that month.
Q And do you keep these for each month?
A I don't keep them because we can access them at any time. I'm sure they're run for different auditing purposes, but we don't, you know, keep, like, a hard copy of them. They're generated by our --
Q Sorry. To rephrase, are they generated for each month?
A Yes.
Q Okay. And how are they generated?
A Through our electronic health record.
Q Okay. So, like, a computer generates them basically?
A Computer software, yes. Matrix is the computer software.
Q If you turn to the last page, which is Bates stamped MAR 2038, do you see under status where there are different categories?
A Status?
Q On the bottom.
A Oh, okay. I'm sorry. Okay. Yep.
Q Can you just explain what each of those means?
A So admission would be just somebody, you know, that was admitted to the facility. Discharge would be discharged where we do not expect them to return. Discharged RE means discharge return expected. So they had a situation where they had to go out to the hospital and received care. We are expecting them to return. Expired means passed away.
Hospital leave means that, you know, they've truly

been admit- -- so discharge return expected is lots of times used when they haven't been truly admitted to the hospital yet. So they went to the ER, and they are, you know, in observation, et cetera. And hospital leave means that they're actually using their skilled days for, you know, the hospital stay. So then it goes under hospital leave.

And return is, like, somebody that wasn't a new admission to us, they returned to us for some reason or other. That could be from the hospital. It honestly could be from home setting when we have these short stays that end up coming right back to us. And therapeutic leave is, like, an overnight leave of absence to a home or something. It's not typically to any kind of medical setting.

Q So in which of these scenarios, if any, would you -- where a resident is leaving the facility, would you keep their bed for them?

A The maj- -- I mean, in discharge turn expected we would keep their bed. And in hospital, we would keep their bed. The reason I pause is -- and therapeutic leave we would keep their bed. There's a state standard of bed hold where you can actually charge for that bed you're keeping, but you're census has to be at a high enough amount. And during this period, we wouldn't have been high enough to charge for the bed hold. So we would just be keeping them as basically a, you know, policy decision that you return your residents to where they came

from.
Q And how long would you hold the bed for them?
A We've never turned away anybody in that situation. Our policy states at ten days we would evaluate the situation and, you know, reach out to the family. But it's a county-owned facility. That's a -- that's a hard sell to tell them no. There better be a real good reason.
Q So does the amount of residents that are being discharged or leaving the facility each month affect the amount of residents you're able to admit?
A I just want to make sure I'm understanding you right. So if our census was truly 140, the answer is absolutely yes because you'd have to wait for somebody to leave to able to admit somebody. In 2021, in the period that we're talking, 7/1 through 7/31, we had open beds, but they were being reserved for other things at points of time. So the answer is yes still, but a different kind of yes. I didn't -- I'm not trying to be complicated here.
Q So did you rely on these reports when you were determining whether your business was suspended for purposes of the employee retention?
MR. SILVERBLATT: Objection to the extent it calls for a legal conclusion. You can answer.
THE WITNESS: I don't know about this specific report. We look at reports similar to this every single day

in evaluating our census and what we can do and what we can't do. So I don't know specifically what census reports they would have used to evaluate the eligibility for the employer tax credit because there's so many, and they were supplied by Jerry and Allecia to Plante Moran, that I just don't want to speak to the exact report. But it would have been with similar information.

BY MS. BRIGHAM:

Q To rephrase, I guess, was resident admission something that you considered when determining whether your business was suspended during 2021?

A Yes. Absolutely, yes.

Q And as part of that, did you also consider how many residents were leaving the facility or did you only look at admissions?

A It's so hard to speak for somebody who the -- you know, I would -- I wasn't making decisions at that exact time, so I -- it would only make sense that they would be looking at it all. But, I mean, I know I was spoken to because I was in a capacity about how our admissions were affected and how that qualified us for the ERC. I don't recall conversations that specifically talked about discharge, because you're still talking about how many beds you have left and how many census days are being impacted.

So was the conversation specifically to discharges? No. But was the quantifier still the same? Yes. And, again,

I'm not trying to give you a convoluted answer. I'm just trying to give an answer that I'm confident is -- reflects the knowledge I have.

MS. BRIGHAM: Can you turn to Exhibit 27, please?

(Defendant's Exhibit 27 marked)

BY MS. BRIGHAM:

Q So I am showing you what's marked as Exhibit 27 and Bates stamped MAR 2095. Do you recognize this?

A Yes.

Q And how do you recognize it?

A So it's a census daily detail by -- well, at least this first page is by unit. So what it does is it looks like -- it looks at every bed and how many days somebody was in it. So, you know, first line says "bed 101," and you can see where the calendar dates are listed across the top. And it tells you when there was somebody in that bed. So, for example, room 103, it looks like on the 22nd through the 30th, there wasn't somebody in that bed. But if you look at the first line where it says 101, it says, you know, I's in every single column, meaning the total was 31 days.

I'm not exactly certain what the HTP stands for, if it's hospital therapeutic or -- I'm guessing it's -- you know, like, if they were on leave, hospital therapeutic. I'm not sure what the P would -- oh, it says on the top here -- hey? -- "preadmission." I don't know. That's not a census

thing we use very often, preadmission, so I'm not -- that's why I wasn't familiar with it.
Q So is this also generated by computer software?
A Correct.
Q And if you had questions about it, who would be the person to talk to?
A I'm -- I'm pretty familiar with, you know, this form in particular. I mean, it's just if somebody was in that bed that day. How that's -- how that report is driven is, you know, Suzie Smith is a resident here, and we never have to touch the census report unless she leaves. And once you characterize on that previous thing, whether she's at therapeutic leave, whether she's, you know, hospital leave or whatever, it's going to all affect this report. It's not, like, it's something that has to be manually generated. It's just looking at census days. So it's something I'm pretty comfortable with.
Q So on the -- still looking at the first page of this where it says "100 wing," so let's say -- well, first, where it says the number 101, for example, is that a bed or is that a room?
A Room.
Q So if there were multiple beds in a room, would that differentiate how many people are in that?
A So it would say 101A and then instead of where it says 103, it would say 101B, and then it would go -- so there would be two

separate lines, but there would be an A bed and a B bed. These are -- 100 wing is private rooms. So the reason 107 is listed three times, it was likely three different residents. I see it's redacted, but they would have showed you what day Suzie Smith was in there and what days Fred Jones was in there, too. And it might have been a couple, because I see that there's multiple people there, so sometimes we have couples in beds that share rooms.

Q So just to make sure I'm understanding this correctly, there's the numbers across the top 1 through 31, and that stands for each day of the month?

A Correct.

Q And then if you go down, if it says I, that means on that day there was someone in --

A Current.

Q -- the corresponding bed on that day?

A Correct; correct.

Q If you could turn to the second page, which is MAR 2096. So under where it says occupancy percentage by day, is that -- so, for example, January 1st, 2019, says 64 percent. Is that telling me that 64 percent of the 100 wing was occupied on that day?

MR. SILVERBLATT: And you're asking specifically about which page?

MS. BRIGHAM: MAR 2096.

THE WITNESS: I'm just trying to calculate if that -- because I'm trying to see if -- so when you see the census daily detailed by unit and it says "all units," do you see that at the top there?

BY MS. BRIGHAM:

Q Which page are you looking at?

A On either one, it says "all units," and then we're looking at the 100 wing. Because this report was generated for all units, one thing I can't recall about this report is that it breaks down that information by page for that unit.

Q So I'm going to ask about that, too. So maybe if we just turn to that page it'll help you answer.

A Okay. I could do some of that quick math, but my nerves are not allowing me to.

Q So if you turn to -- if you turn to --

A It's, like, maybe nine -- eight, even.

Q -- what's Bates stamped as 2008. I apologize if those are hole stamped -- if those are hole punched, I mean.

A Okay. Yeah, so -- so then this --

Q So if you can see that dividing line, how I read it, and correct me if I'm wrong, is that above that dividing line, it's telling me the percentage by wing. And below that it's for the entire facility; is that --

MR. SILVERBLATT: If you go back a page.

THE WITNESS: Yes, yes. And that makes sense, too,

when you look at inhouse days versus total inhouse days. Like, each wing had -- this wing had to have 459, but you add them all, and that's going to be the -- your 3923.

BY MS. BRIGHAM:

Q So is that the correct reading? This bottom portion is for the entire facility?

A Correct. And that's what I was looking for was that calculation. I couldn't remember what printed on that report.

Q And so just to clarify, then, when we're looking at occupancy percentage by day and you look at -- for example, when we're looking at the entire facility, on January 1st, 2019, where it says 90.71, that means the entire facility. The beds in the entire facility were 90.71 percent occupied?

A Correct.

Q On that day? Okay. And so if you flip back just a page to MAR 2007 -- and you can flip through the whole thing just to confirm. But so the last wing listed is the 600 wing. And so I didn't see the 700 wing on this census. Is that because it wasn't open at this time in 2019?

A There must have been nobody --

MR. SILVERBLATT: We're looking at January.

THE WITNESS: Oh, January, yeah. Correct.

BY MS. BRIGHAM:

Q Okay.

A Mid-March is where you should start to see some admissions

there.

Q And so while this 700 wing was being built, was the capacity still 140 for the entire facility?

A Not really. What -- I mean, we couldn't have put, like -- because 100 was retrofitted, I don't know where you would have put people like, you know, if the bed wasn't ready -- there's only so many -- there's only -- there's a square foot requirement to double up a bed. So we could have got creative and probably got close, but that would have been very invasive to residents.

And then you're trying to match males to males even in that quad for four males to a bathroom. So that would have been -- that would have been difficult by probably six beds, not -- you know, not hugely impactful, but that would have been difficult by a number of beds.

Q So in those first three months before the 700 wing was open -- sorry. To back up, there were 12 beds in the 700 wing; is that right?

A Right. But we have -- so when we created that 140 number, we actually have more -- or when we -- you know, the 140 bed capacity, we actually have two more rooms than that because of accommodating couples at times. So we have a 142 rooms -- or I shouldn't say -- a 142 beds, not rooms, definitely not rooms. But we are only licensed for 140.

So it gives you a tiny bit of flexibility in, you

know, you get a couple and they want the same room, or you get someone passing away -- we call it a serenity room -- they can move to that. So that's where I say about the room requirement -- you know, the space requirement. We probably could have got really close to capacity, and I wish I had the exact number for you. It might only be four, but there was -- there would be a few people that we would have struggled until that 700 occupancy was allowed to get at max capacity.

Q Okay. So during this time in 2019 before the 700 wing was open, was your bed capacity closer to, like, 128?

A So 130 is 92 percent, so, yeah -- yes. We're at 130 today, 92 percent, that's why I know that one.

MR. SILVERBLATT: Sorry. Are you asking if before those 12 beds were added, the maximum that they could have had comfortably in 2019 was --

MS. BRIGHAM: Yes.

MR. SILVERBLATT: Okay. Did you understand?

THE WITNESS: I don't -- I don't know that that -- I mean, I would have to go back to give you the exact number. I thought you were just saying, like, could we have that -- you know, could we have the capacity of 128, you know. And so we easily could have the capacity of 128, but we may have been able to go over that by using those two extra rooms.

So we could have probably -- because they would've had 12 beds down there; right? So that's where you get to the

128. So we still have those two extra rooms. So we really wouldn't need them, we could have gotten to 130. And that's why I was guessing the six beds, because then some of the rooms on 100, on the left-hand side of 100, were retrofitted to a private room that can accommodate a couple, meaning the square footage, you could choose to be in that room by yourself because they didn't get as large of bathrooms.

And on the right-hand side, you could never accommodate two people, except in a state of emergency, because the square footage does not allow it. So I'd have to go and do all that math calculation to say exactly where we could get. So we could get higher than 128. I misunderstood the question.

BY MS. BRIGHAM:

Q Okay. So between the time that the 100 wing was retrofitted and the time the 700 wing opened, capacity was somewhere between under 140, maybe around 130?

A That's what we could have handled, yes.

Q Okay. And when were the beds retrofitted on the 100 wing?

A That would have been, you know, late 20- you know, late 2018. So I couldn't give you an exact amount of exact space of time. I apologize.

Q Okay. So how did Marquette learn about the employee retention credit?

A The first I recall hearing of it was when Jerry was just

mentioning it. At one point we weren't eligible for it. It must have been just conversation through channels that he received, likely from either Plante Moran or -- I would likely say from Plante Moran, maybe from the MCMCFC group. And then that was kind of the end of the conversation.

He had at one time talked about PPP loans and not wanting to pursue those because he wasn't sure what our economic situation would be post-COVID and the ability to pay those back. Obviously that dynamic changed, but -- so we never got those. And then he came to us several months later, knowing that he was planning on retiring, and I am relatively certain he said Plante Moran had reached out to him saying that the eligibility for governmental services was being reevaluated and that there would be a potential that we would, you know, be able to request it.

And then I think that -- I don't know if it was Jon Lanczak at Plante Moran or whomever, you know, did say, "It does look like this is really an option. Do you want us to run the numbers and see if there's quarters you're eligible for?" So Jerry actually came to me at that point. I don't know that I was -- myself and Allecia because, truth be told, we both applied for this job. And I think he knew that no matter what the outcome is, it would be postretirement end story, endgame for him.

So he had asked us, "Is this something that you --

either of you would like to consider based on the fact that it'll be you ball of wax to deal with?" And we both said, well, you know, we aren't -- we aren't -- we don't have all the details. That's a pretty superficial question. That's why we pay Plante Moran what we pay them is to determine their eligibility and if we're eligible, especially with the economic impact COVID had to us, we would be neglectful in not trying to recoup them money.

Q And I'm going to start asking about the effects of COVID. So just broadly and let's start first with 2020. When did -- when did the effects of COVID first hit Marquette?

A May 20 of '20, I recall that -- I mean, like, I know February, it was, like, in the news and stuff, and we were all just kind of learning about it. But I recall having a meeting with our AFSCME Union, in particular, about their fear in May of 2020. And it stands out to me because they came to me particularly as the assistant director of nursing, not the director of nursing, because our director of nursing had chosen to go on vacation to -- I don't know -- Mexico or something. They were all up in arms about it.

And I was supposed to go to Mexico, like, the following week, and I didn't go. And they were like, you know, basically giving me kudos. This is why I don't -- it sticks in my brain. I was, like, I probably would have went but with -- Tina was able to go a week earlier before the

world stopped turning, and unfortunately, the world stopped turning the week I was supposed to go.

So I remember that kind of being, like, the -- the, like, start of really having to say, "How is this going to affect our facility," and starting to have some staff that were a little bit fearful. And we lost, like, a, you know, handful of staff in that -- those first few months before even COVID had really had an impact on our building. Was it a huge amount? No, it was not a huge amount, but we had a handful of people.

My son was -- graduated high school that year. So it sticks out in my brain, too. He was working here as a seasonal worker, and he was our first staff COVID-positive. Come to find out it was a bad test -- we won't get into that.

But that's when we first -- the whole building had to first start quarantining, myself included, obviously, because my son lived with me -- and, you know, figure out what we were going to do about the fact that what did this mean.

How are we going to staff the building, and how are we going to move residents around that were -- luckily he mowed the lawn, so he didn't really impact any residents. But once those residents had made contact with the outside world, when visitation was still allowed, and what that quarantining meant, would have been, you know, that basically Q2 of 2020.

Q Okay. So that's in 2020, and in 2020, did you have to lay off

any employees?
A We did not lay off anyone, no.
Q Okay. Not in 2021 either?
A No.
Q Okay.
A We had plenty of people leave us. I mean, again, I'm not trying to say it's large amounts, but we are -- skilled nursing facilities are always looking for staff, so when you even lose a little, it really impacts you. So even as we were minimizing what was going on here, the only position we eliminated was our night shift RN supervisor, and I can't even tell you what year that was. That was more from the economic impact of COVID than COVID itself, but it's an expensive position, so it's one that we did choose to eliminate.
Q And did you ever have to close down at any point during the COVID-19 pandemic?
A Like the whole, entire building?
Q Yes.
A I don't even know how we would do that, because we would have to find safe care for what was probably 120 residents at the time. So it was never even entertained.
Q Was Marquette considered an essential business?
A Yes.
Q And what does that mean to be an essential business?
A Our understanding of essential business is that you, you know,

had to provide goods or services to sustain life for the residents that were here and care in that situation.

Q So Marquette was open. Which portion of Marquette's business, from your perspective, were stopped?

A So our -- you know, our hairdresser no longer came in. Our dentist no longer came in. At the time I think we had a podiatrist, so a foot doctor; they know longer came in. At some point, although I can't tell you exactly when visitation stopped -- I know when it restarted -- but visitation stopped. You know, families were having to make window visits to people. You know, at certain points, you know, dying, not necessarily out of -- from COVID, but just dying for whatever reason, they had to make window visits to their mom, you know, through the window to say goodbye to them.

We had to start using agency staffing because we couldn't staff our buildings. We were spending hundreds of thousands of dollars in agency staffing as opposed to our staff. We -- the quality of life of residents was just significantly impacted because -- again, I'm not trying to bring the emotional side of this -- but nobody wants to -- nobody says, "Let's live at MCMCF when we get older." But then you start to live at MCMCF and you don't even get to have activities or communal dining. You see the four walls of your space.

And everybody that worked here had to wear eye

protection, not even masks. Everybody says the masks were fatiguing. For my staff, I don't think it was the masks. We got used to that. It was the eye protection where you breathe and they fog up and you couldn't even see. And we had eye protection for a huge amount of time. So the burden to staff from overtime -- because we had lower staff -- was significant. And I think the emotional burden to watch what it was doing to residents and watch what it was doing to families and feeling, like, you didn't have any control because you had orders from every different direction that oftentimes were conflicting. You'd look for clarification and the system was overwhelmed, so you couldn't get the answers.

Q So you mentioned that the hairdresser had to stop. Do you remember when? Like what period that was?

A I mean, all of 2020. I mean, she came back, like, Q4 2021, but all of 2021. You can -- you know, I remember, like, glimmers of hope in 2021 where we'd be like, oh, we're going to have the hairdresser come back. And then we'd have staff outbreak and the health department would say, you know, we couldn't have the hairdresser back or we couldn't have group activities. So we'd get all excited.

I mean, I think it was even, like, we'd laugh that we'd write it down in, like, our minutes that something was happening, and then the health department would change things on us when we -- because our biggest problem, honestly at that

point, was staff outbreak. But they would consider that an outbreak, and they'd want us to do everything. You know, do all the routine testing, you know, contact trace as appropriate, quarantine those residents that, you know, might have an impact, make sure they're not going outside of their room because obviously if they even when outside of their room -- and what -- they -- I was exposed to the staff member as resident A but you weren't exposed to the staff member as resident B. They definitely didn't want resident A and resident B mixing, you know. I'm sorry. I'm getting off topic here.

Q That's okay. So you mentioned you had to go to an agency for staffing. What did you mean by that?

A So when we were in crisis staffing, we reached out to MNA and Lake Superior Nursing. They are just two companies. Now, I know I mentioned MNS earlier. That is a different situation. That's a third-party payer for us, but MNA is just a travel staffing company they supply nurse aides and nurses and Lake Superior Nursing as well supplied nurse aides and nurses, and that helped us staff our building.

So we were paying about one -- about 50 percent greater costs than we would for our own staff. And I say that relatively in an about manner because certain -- you know, when you look at the RN's, it was a really super inflated rate of pay. The LPN's were a little bit more reasonable. You

know, one CNA group was really expensive, but really available and really reliable. The other CNA group was a little less expensive but less reliable and less available.
Q And when you had to start going to these agencies to staff -- to staff Marquette, did that start in 2020?
A For sure we had -- I'm -- I'm relatively certain that this started in 2020 and was heavy in 2021. I think we provided a document that might actually give you the figures that -- of what the expenditures for travel staffing was in that space of time.
Q About how many of these agency-staffed people did you have to bring in?
A I think at one point we had, like, 13 nurse aides and a couple nurses, which I mean, that doesn't sound like a huge number of people, but when you look at what we -- our total -- I mean, we carry about a 250-employee count, but, you know, half of them are not nurse aides. So, you know, the percentage-wise was really shocking to us.
And it affected how we did business because we didn't like when a -- we didn't like two travel nurse aides to work together just because our nurse aides knew our building better and knew our residents better. And so to provide the safest environment, we felt strongly that our travel nurse aides should be paired with a minimum of at least one employee here.

Q So in -- the effects of the COVID-19 pandemic in 2020 on Marquette versus 2021, were there any differences?

A I think that the fear subsided and that we had better clarification for what our expectations were in 2021. But we started seeing more staff positive in 2021. So the impacts weren't -- I don't want to say they were lesser or greater either year. They were different. And, again, I know I'm focusing on staff because, unfortunately for the residents, prior to vaccination, the amount of isolation and quarantine was hugely significant.

So in 2021 -- or in 2020, prior to vaccination being available, you know, the -- late 2020, once we got all the orders, I would say by, you know, early Q3, late Q2, the isolation-type situation and, you know, holding admissions and trying to figure out spaces if, in the event this did happen, what we were going to do, really that, you know, ball started rolling, and you saw the immediate impact to residents that didn't really resolve until some amount of vaccination was allowed.

But then you even talk about vaccination, and I'll give you an example: Communal dining. It took us forever for communal dining because the expectation was that you had vaccinated residents in a space that, you know, weren't as concerned about social distancing. But you weren't allowed to, basically, scarlet letter those who were unvaccinated. So

how do you set up a communal activity situation? How do you set up a communal dining situation without saying, "Rob is the person who's unvaccinated, so Rob needs to sit in the corner."

We social distanced our entire group because the psychosocial impact to the unvaccinated person was so significant. So we didn't really make any gains until -- I mean, small gains. And then you had the public health unwinding in May of '22 where you really saw some change there, you know.

Q Okay. And so you mentioned vaccinations. Did Marquette offer the COVID-19 vaccination?

A Absolutely.

Q And when did that start getting offered?

A Late Q1 and then, of course, it depended on what the choice of vaccination was and what the duration was to be fully vaccinated because there were certain ones where it was a series of two, two weeks, and certain ones it was, you know, a series of one, six weeks. So, you know, we offered vaccinations, but people didn't really become fully vaccinated until closer to midyear 2021.

Q And was it offered to residents and staff?

A Absolutely.

Q I know you mentioned not everyone chose to get vaccinated. Did you have success with the vaccinations?

A I mean, with residents it -- there were some tough sells

because, you know, family members had had vaccinations and, you know, some people had some pretty significant 48-hour side effects from the vaccination. And then you think about the elderly population, you know, undergoing that, and -- but there was still some fear. So it -- there was a handful, and I couldn't give you a number. We had resounding success overall with vaccinations as compared to, you know, some of our downstate counterparts.

But we -- it still, you know, that's -- we had to have them in private rooms and the unvaccinated had to be admitted in a different capacity. And then when it came to staff, of course, there was the potential vaccine mandate, and we had to get through -- go through unions and ADA accommodations and, you know, exemptions and what were appropriate.

And, you know, how do you determine what's appropriate while still doing business because you're drowning as it is, and now you're trying to argue a religious exemption who in 2019 told you they're an atheist, you know.

Q So you mentioned a vaccine mandate for staff. What was --

A Initially the CMS had stated -- you know, the national government had stated there might be a vaccine mandate. So we were expecting that that vaccine mandate impact us, and, then, of course, that never came to fruition. So there was no mandation here. But we were operating under the guise for

months thinking that we had to work towards that or come up with some other solution.

Q Okay. And so once residents started getting vaccinations, did that affect operations?

A It affected the quality of life. It was still difficult for it to really improve our admission situation or our bringing in the hairdresser, bringing in group activities, because we still, in 2021, had -- kept having staff outbreaks.

And so outbreak testing initiated in our health department because oftentimes, you know, you look at the requirements from LARA, you look at the requirements from CMS, you look at the requirements from CDC, you talk to your medical director. You're trying to get clarification, like the example I gave you. Yes, you know, vaccinated residents can have communal dining, but that means you have -- you can't exclude an unvaccinated resident, and you can't put them in a psychosocial state where they're, you know, sitting in the corner.

So a lot of when we reached out to IPRAT -- which I don't know if you're familiar with IPRAT -- but that was our mechanism of communication with the state of Michigan. And we'd say, "What should we do in X situation?" They'd say, "Reach out to your local health department, you know, they have authority in this situation."

So we would reach out to our local health

department, and they -- understandably so -- did not want to be responsible for anyone's death. So they, our health department, in particular, always took a severely conservative approach in everything.

So anytime we had a staff contact tracing -- you know, I'm Suzie taking care of Joanie, and Joanie has had contact within 40 hours of initiation of my symptoms. That means that she is now quarantined, you know. So then the residents were impacted, again, just by staff. And vaccinations were effective in some manner of speaking, but people were still getting COVID.

Q Did the vaccinations affect the quarantining requirements at all?

A Yes.

Q How so?

A So, you know, for -- you'll look at, you know, Q1, Q2 of 2021 where we were using quarantine beds because people weren't vaccinated yet. The hard thing, it was almost holding up two beds because we want -- we treated them, like, they could be potentially COVID-positive to protect every -- the other 100 residents here.

So we put them all on one unit for 14 days, but we'd be having to hold their bed on 300 knowing they needed to come off this unit because that's going to be our COVID unit, especially in the event that we have, you know positive COVID.

So now they are -- that person that's unvaccinated is essentially taking up two beds. So once they were fully vaccinated, that two-bed concept was able to go away.

Unfortunately, we still weren't recovering from staffing at this point. So once we could get away from that two-bed concept and really feel like we absolutely, you know, have to have them in different air handling -- because that was the beauty of our addition is our -- because it was an addition, it had completely separate air handling from our main building.

It seemed like the obvious choice to use that to not spread the illness because you can still look and, you know, half of the group is telling us airborne and the other half is telling us droplet, you know, transmission. So then we were, like, okay, we are screaming for staff. We need to close a unit.

So we ended up unstaffing -- once we didn't have that requirement, we ended up unstaffing our 700 unit to use it in the event of COVID. But that helped us with our staffing problems. So it still helped our residents. They were -- again, that improved quality of life. But our bed -- ability to take admissions was still severely affected, because now we're looking at the hundreds of thousands of dollars that we chose to pay because we were required to quarantine. You know, so we had to. I don't even want to say

chose. That was probably a bad choice of words. And now at least we don't have that obligation.

So now we have to look at what this financial impact is. You know, you look at this simply, and if you look at 2019 to 2021, there's, like, 2750 bed days. And we had an increased Medicaid rate of, like, I want to say, around $25 a day. Medicaid is our worst payer. If you would have just taken that 27 -- 2750 bed days we lost and multiplied at the lowest possible reimbursement we had for 2021, that's a million dollars.

So if you would have taken it by our highest reimbursement we could have had, which is almost a $150 more than I quoted to you -- I didn't even do the math because I don't want to know.

Q So you mentioned that quarantining was required in some scenarios?

A Prior to vaccination.

Q Prior to vaccination? And what required that quarantining?

A Our understanding from the orders was that, you know, you -- a new admission was considered unknown. You know, you didn't know at their 48 hour -- you don't know what their exposures were prior to here. So you treat them like they've been exposed to COVID. And so that's a 14-day quarantine.

And we'd quarantine them all on a separate unit, that had separate staff that weren't allowed to move around

the building. They even had separate dining areas. They had separate smoking areas. They -- you know, they weren't even allowed to break with the rest of the staff, which is not a real good way to retain staff. You know, they had separate exits, separate parking. They used time sheets instead of time clocks because we didn't have a time clock down there. It was -- it was honestly nothing I want to relive.

So, again, vaccinations started changing that, but our actual ability to do business as usual -- you know, again, look at -- you look at simple things. And you look at the amount of -- the amount that COVID impacted the hospital where elective surgeries weren't being done, and that's where we were seeing a lot of our higher reimbursement and our short term residents.

You know, you look at just the pure minutes of therapy that were provided in 2019 compared to 2021, there's a quarter where it's half the volume. And, again, that's our highest reimbursement, and the, you know, financial impacts I gave you is our lowest reimbursement.

Q So you mentioned that orders require the quarantining prevaccination. Do you know what orders those were?

A So, you know, we had Medicaid bulletins and the MDHHS. It was, like, in November 2020. I feel, like, the date was November 2020, but I would have to refer back to them to find that specific thing. You know, we had one -- again, I'm not

trying to get off top, but I'm trying to answer your question succinctly here so that you know.

[redacted] But under the orders -- the state orders, we were not allowed to do any involuntary discharge for nonpayment.

MS. BRIGHAM: This would be -- if you need a break, this would be a good time for a break.

MR. SILVERBLATT: Do you want to take five?

THE WITNESS: Sure.

THE REPORTER: Off the record.

(Off the record)

THE REPORTER: Okay. We are back on the record.

BY MS. BRIGHAM:

Q Okay. So Marquette applied to become a COVID relief facility, otherwise known as a CR facility; is that right?

A Correct.

Q And when did Marquette do that?

A I'm not -- I'm not sure of the exact date. There was an

unusual thing within the state that they had us apply, you know, towards the end of 2020, early 2021. And we were able to pick our date for effectiveness. I know that sounds really bizarre, but I think it was just the chaos of the system at the time. So we reflected it as December 1st, 2020 -- December 1st, 2020.
Q And what was that process of applying to be a CR facility? What was that like?
A It was a -- it was a letter that we received that said, you know, basically what the requirements would be meaning, you know, are you setting aside a separate area? Is it -- is it going to be contained well. You know, there was questions that spoke to that containment, meaning, you know, are -- are you going to have a separate staff area, are you -- basically how are you able to accommodate kind of keeping a -- the COVID unit out from the milieu of mixing in with the other -- other residents.
And then you had to provide a facility map and answer, honestly, not that many questions. It was a little online form. It wasn't that many questions, and then you would get a letter back if you were approved. Like I said, the first one, unfortunately, didn't have a date on it, and that cost a lot -- a lot of grief for a lot of people. And then from their fourth, you'd get, like, a pretty official letter that gave you the date range.

Q And so you put your start date as December 1, 2020. Were you approved prior to that date?
A I don't -- we couldn't find the actual record of the first approval because it came electronically. Again, I think a lot of facilities, especially under audit reasons, got kind of burnt on the way the state had the -- us submit them. We couldn't reflect what date we actually submitted it. So I honestly am uncertain and nobody else would be able to provide that information either because we've done a deep dive for it.
Q But do you -- do you remember that you were approved and able to start being a CR facility on December?
A Yes, yes, yes.
Q Okay. And so who did you apply to when you applied to become a CR facility?
A It was the state of Michigan. I don't remember if there was a specific, like, entity.
Q And are you aware if other of the county-run facilities in Michigan applied to be CR facilities?
A I assume so. At this point of time, we were actually engaging much more with our private nursing homes and what we were doing locally and how our health department was impacting our orders. And so we -- and how rural healthcare had a diff- -- how we viewed it as a different impact because we felt, for a multitude of reasons, we didn't have a choice in being a CR facility. There was two tiers of CR facilities. One where

you could retain your residents and one where you could admit other residents with COVID. And for a multitude of reasons, we decided to do, you know, our retain only.

Thoughts on that, if we didn't retain them, we were losing the census number regardless. If we didn't retain them, again, as a county facility, we feel strongly about meeting the community's needs, even it's if -- it's the more difficult road. But we didn't apply to get other residents because we still felt to introduce the illness to our -- our stable, trusted group that trusts us already, wasn't the best decision. And honestly, we had to retain because nobody was willing to take them in the UP, and there was no ambulance service willing to transport them downstate.

Q So could you admit new residents if they didn't have COVID?

A Oh, yes, yes. I'm sorry.

Q And so once you were approved to be a CR facility, what did you have to do?

A So then we had to -- we had to designate space that was used for COVID purposes. And that is when we designated our 700 unit. We felt that that was -- especially with criteria of trying to, you know, keep it as separate as possible. It had a separate dining room. It had a separate gym, had a separate entrance, not a separate time clock, you know, a separate space that we could utilize for staff breaks. It wasn't set up for that, but we visqueened and made it set up for that so

we felt that that was the right choice for us.
Q Are there any other reasons you chose that unit?
A I mean air handling and separation were the biggest reasons.
Q Could you clarify what you mean by "air handling"?
A So because it was a new unit, the air handling was separate to that unit. It didn't filter into the main building. So initially when -- again, they were sure -- unsure whether the transmission was primary droplet or primary airborne. Not even, you know, the power -- not even the most important people in the US could give us guidance on what the transmission was at that point when we had to make that decision. So we felt like cutting off the air handling in case it could get into the rest of the building was our smartest decision.
Q Okay. And who made the decision to use that space, the 700 wing?
A The decision makers at the time that would have been highly involved would have been, you know, Jerry Hubbard, Tina Nelson, Krystal Heikkinen, Dr. Carlson -- although I don't know that he would have specifically -- he would have been advised, probably not -- you know -- and then the DHHS board.
So during COVID there was some forgiveness as far as your board meetings, and some things could be handled remotely. I don't know how much Jerry -- I'd have to go back to board meeting minutes to see exactly how much he had action

items for situations such as this. I don't think -- again, it would be one of those things that you needed to do quickly, so I don't think it would have -- the board would have been informed, but it would not have been an action item for them to approve.

Even nowadays, I don't know that specifically that's something that they would approve. They trust us as administrators to make those decisions. But weekly, Jerry provided input, not only to our board with updates, but also to our survey manager. It's John Woodcox now. I can't remember what her name was. It was her at the time so, you know, they knew all of -- all of our choices as we were moving along with this via email.

Q What is a survey manager?

A Oh, so we are -- our oversight is, you know, the lic- -- LARA, the licensing and regulatory affairs. And the survey manager is the person who sends out the surveyors to, you know, look at if you're in compliance to all of their guidelines. And because there was a lot of, you know, mixed messages that first year, we felt strongly that the more transparent we could be, the better served we would be.

Q So sorry. To back up, before you applied to become a CR facility, was that decision to apply, was that decision approved by the board?

A To apply to be the CRF? I would have to refer to minutes to

know for certain if it was.
Q Okay. And was Marquette required to become a CR facility?
MR. SILVERBLATT: Objection as to form. And we have agreed just to put on the record that form objections will be sufficient for these purposes; correct?
MS. BRIGHAM: Yeah. You can still answer.
THE WITNESS: So can you repeat the question now because I got lost.
BY MS. BRIGHAM:
Q Yeah. Was Marquette required to become a CR facility?
A I -- I don't know who would require us to do that. But if I -- as the administrator, the requirement to be able to provide service to our residents would mean that we'd have to be a CRF facility or we would, you know, lose those residents.
MS. BRIGHAM: Okay. Could you turn to Exhibit 3, please?
THE WITNESS: Absolutely.
(Defendant's Exhibit 3 marked)
BY MS. BRIGHAM:
Q So I'm showing you what's marked as Exhibit 3, and this does not have Bates stamps on it.
MS. BRIGHAM: Just for the record, it does say Exhibit C at the bottom because it was provided as an exhibit to request for admission.
BY MS. BRIGHAM:

Q Have you seen this before?
A Yes.
Q And do you know what it is?
A I mean, they were acts in relationship to health policy in COVID-19, in particular. As I read it, it appears that it addresses outdoor visits, communal dining, indoor visitation, small group opt-in.
MR. SILVERBLATT: Is there a particular part of it you want to direct her attention to?
MS. BRIGHAM: Yeah, I was just letting her look at it first.
BY MS. BRIGHAM:
Q So if you turn to the second page, and if you go to the bottom where there's a subsection E. And if you just want to read down through --
A By November 15th --
Q -- subpart A, and then I'll ask my question.
A Okay.
Q So where it says that a nursing home must have operational capacity in terms of being a COVID facility, do you know what operational capacity means?
A I'm -- I would be speaking for -- you know, the -- Senator Lucido apparently in saying this -- but we interpreted operational capacity as are you able to function within the requirements of infection prevention programs and provide the

services to this guideline? Meaning dedicated staffing, adequate testing abilities, supply personal protective equipment, and would that affect -- are you limited by any of those things to be able to provide care to that resident.
Q And did Marquette have the operational capacity to be a CR facility during 2021?
A Yes, yes.
Q Okay. So as a CR facility, you were required to create this separate area. Was there anything else that you were required to do?
A I mean, we had to have, like, within the separate area, there had to be separate spaces, you know. So you had to be able to keep a space where, say, whoever is giving direct care could don and doff their personal protective equipment to where, you know -- again, I apologize for being redundant -- but they had separate break spaces, you know, separate entrances, you know. Do you have -- I don't think -- actually I take that back. I don't that separate entrance were required, but you were trying to limit the cross of staff that were working that unit and the staff that were not working that unit.
For us it was probably a luxury that it had a separate entrance, but they did have to, you know, basically have separate spaces for them to do whatever they need to do during the day, and that would include breaks.
Q Okay. You explain what you mean by "don and doff"?

A Oh, I'm sorry. So be able to put on and off their personal protective equipment in a manner where there wasn't potential to cross-contaminate. So such as you took care of a resident who has COVID, and they coughed. And now you -- you know, touch your mask because you're human and you forget and you don't have a -- you have to have a place to then sanitize and get rid of that so that it's not going to cross-contaminate, nor are you going to cross-contaminate by touching something else.

Q So you mentioned the COVID area was on the 700 wing?

A Correct.

MS. BRIGHAM: Could you turn to Exhibit 26, please?

(Defendant's Exhibit 26 marked)

BY MS. BRIGHAM:

Q So I'm showing you what's marked as Exhibit 26, and it's Bates stamped MAR 8. Do you recognize this?

A Yes.

Q And how do you recognize it?

A It's a facility map that we use for all sorts of things.

Q Okay. And is this -- is this how the facility looked in 2021?

A I'm just double-checking a few things that have changed to make sure I -- I'm not speaking out of turn. But yes, it looks like it would have been 2021.

Q And in 2019 -- in January 2019, before the 700 wing was built, what would have looked different about this layout?

A So I mean, of course, in even in early 2019, January 2019, the the footprint looked just like this, but the certificate of occupancy hadn't been issued for 700 yet. You know, it was -- that was built in, basically, 2018, and then the certificate of occupancy was obtained in 2019. So that's -- prior to that 7- -- the left-hand side where it says "COVID unit being built," it would have just ended after that room 116 and 117, and those would all been semiprivate rooms instead of private.
Q Okay. If you could just flip the page to what's Bates stamped as MAR 9. So is this an accurate depiction of what the COVID wing looked like during 2021?
A The only thing that I do not see is we did, at points, have to have plastic up to separate areas, again, to like, adhere to the PPE requirements. And it doesn't look like they reflected that on here. That would have just been kind of across from 701 and 702, but the permanent structure is very much the same.
Q Okay. And if you could describe -- sorry. I know it's kind of hard to describe on a map, but could you describe where the dining room on the 700 wing is?
A Absolutely. So as you -- it's says "staff break area," kind of, like, mid left of -- of the page there.
Q Uh-huh.
A That's, like, a fireplace area here (indicating). And there is this -- I don't -- like, corner, what we call Mom's

Kitchen. It's kind of rounded there. And so the dining area for 700 right now is a bunch of tables there. But during -- anybody who was on the quarantine wing had to eat in their rooms. So during 2021, there wasn't the communal dining, so they were eating in their rooms.
Q And --
A So that allowed staff to break in that fireplace area.
Q Okay. And there's a -- like, gym of some sort on this wing?
A Yep. Yeah, it's not labeled, though.
Q Where is that?
A So when it says "700 wing main entrance," kind of like, you know, mid page there, that large, unlabeled box is the gym.
Q The one right above 702?
A Exactly. Which worked well because it had multiple entrances. So ones we could close off where we needed to and still access it where we needed to.
Q And was use of this specific space required, or was this just that this spaced worked best for Marquette?
A This is the space that worked best and actually made the most potential for us, too, because it's only 12 beds. You know, so it's 12 beds with private bathrooms. If you would have used, let's say, 100, you would have had 17 beds. So we tried to limit until we needed them. Unfortunately, in 2022, we had to rewrite the book because we needed more than 12 beds, but that's a different story.

Q And during quarters 1 through 3 of 2021, was the 700 wing ever used for non-COVID purposes?
A The quarters of --
Q The first three quarters of 2021. So January through September of 2021.
A I think in Q3, once vaccinations were -- towards the end of Q3, when everybody was fully vaccinated, I start -- so in June we closed it. When did -- so I'm just trying to think timeframe. So January, February, March, April, May, June. It might have been for a short time in May. I feel, like, there's one or two residents that before we closed it in 6 of '21, we might have had a space where we were hoping to allow it to -- we were hoping to -- for it to regain its original glory.
And I want to say in May -- I'm uncertain but I want to say in May we might have had two residents down there that we were hoping to be down there for the regular purposes, not -- not for quarantine. We were still able to meet our CRF requirement because we had those Serenity spaces in the other rooms, and we could move them immediately if we needed them.
And the back half always had Visqueen because we were hoping we'd never have more than four residents at a time. So we always had that immediately available if you had even four residents that were positive, so it gave you some time to adjust.

Q When you say it "closed in June," what do you mean by that?
A So again once we had -- unfortunately once we recognized that we could not quarantine people and, you know, use this as a CRF as only if we had positive, we were able to kind of say, "Hey, this staffing is really impacting us. What do we do?"
You know, we were staffing it with extreme measures, again, using agency staff. And even that was a -- at some times a stretch. Management nursing was working the floor, myself included, and so once we were, like, "Okay. We don't have to have that quarantine unit, what do we do?" And we're, like, "We'll staff it if it's COVID-positive." So we stopped staffing it.
Q And by "it," you mean the 700 wing?
A The 700 wing. I'm sorry.
Q So were the -- and there were 12 beds, COVID beds, designated on the 700 wing?
A Correct.
Q In June were there no longer 12 beds designated for COVID?
A There were -- they were still designated. We just didn't have any positive. So let's -- let's say, you know, July 1st came and somebody was positive, we'd be like, "Okay. We have to staff that unit," where it was already. We just -- no residents over there because -- we looked at our quarantine residents, Q1, Q2, as when they were coming in. They're positive because we don't know their history; right?

So that's -- we put them over in our COVID wing. They would stay there for the 14 days. We'd make sure they had no signs, symptoms, you know, positive by rapid antigen or PCR or whatever we were doing at that time, and we'd move them to whatever unit they were going too long term because we felt that that was meeting the requirements the best way we could.

Once people were more vaccinated and we didn't have that requirement of quarantining the majority of people, because the majority of people coming in were vaccinated, we're like, okay. Something has got to give with our staffing. Now we are able to put those admissions directly into the main building so we can't keep stretching our staff thin.

And at this point, it's going to just be a CRF. We're not going to staff it. Once COVID happens, if it happens, we will come up with a staffing plan, and we have a contingency staffing plan in our emergency preparedness plan but -- and that's when we'll open it if there's people that are COVID-positive.

Q Okay. So to make sure I'm understanding, from January to June, you were quarantining residents on the 700 wing. And then in June you decided, "We don't need to staff this wing anymore unless a case arises and we can quarantine people in the non-700 wings"?

A Because quarantine really wasn't much required anymore because

people were back -- coming in vaccinated at that point. Early 2021, they weren't coming in vaccinated. So you still had your 14-day required quarantine.

Q Okay. Yeah.

A So the big change for us to evaluate staffing was the fact that admissions were now coming in vaccinated. So you didn't have that 14-day requirement.

Q And at that time were you able to reopen the -- the gym in the 700 wing?

A Yes, we did.

MR. SILVERBLATT: During which time?

THE WITNESS: Oh. I'm sorry.

BY MS. BRIGHAM:

Q Sorry. In June 2021?

A So in June 2021, the 700 gym still was -- or it became a gym. We still had -- no, that would have been May. I'm sorry. I'm just trying to get a timeline in my -- in my head because at one point we were using the dining room for even skilled therapy because even with skilled people, some people had therapy in their room. It depended on, you know, the situation, but -- what could be provided.

But at the end of the day, they would let people come in one at a time in the gym. But once people became vaccinated, which would, you know, again been the May-ish, June-ish space, we combined. The two skilled gyms, being in

the dining room and 700, came back to 700 in June, and then the restorative gym was where they always have been, you know.

So, yes then the residents traveled to the unit, you know, from this -- they don't have to go down the unit. There's a completely separate hallway. If you come from 100 and turn left. You don't have to go near the unit. You can come directly into the gym. And that's what they used, you know, in June for any skilled therapy group was in there.

Q Okay. And was -- did the dining room open at that time?

A The dining room still didn't open for a couple of months because we were still having staff outbreaks, and our recommendation was to not start that quite yet, you know. We kept getting hopeful, you know, like I said you can even -- I'm sure you can -- because it was a running joke that we could look at our minutes and as soon as we put it in writing that something was going to happen, we'd have a staff outbreak, and it would be undone.

Q Okay. And so you designated 12 beds to the COVID area on the 700 wing. Why was 12 -- why were 12 beds chosen?

A That's just the whole unit, honestly. At some point -- I don't think it was in 2021 -- I want to say it was in 2022, but I couldn't tell you. I mean, there was -- there was a reduction made at some point once we -- and then an increase made. You know, we tried to be as fluid as we could, but we were still kind of living in the -- even though it was a year

in, we were still kind of living in the unknown of what this was going to mean when we had a true resident outbreak. And that's when '22 came, and we really -- really did.

Q And who chose -- would it be the same people who decided to designate the 700 wing, who chose to designate all 12 beds?

A Correct.

Q Okay. And so my understanding is there were two beds designated for donning and doffing for staff as well on the 700 wing? I can refer you to an exhibit if that will help?

A Okay. That would be great, because I remember what you're saying, but I'm trying to wrap my brain around it a little bit.

Q One minute. I know I've seen it in other places, but if you turn to -- this is upsidedown, I was, like, why are my numbers like -- if you turn to Exhibit 29.

(Defendant's Exhibit 29 marked)

BY MS. BRIGHAM:

Q So I'm showing you what's marked as Exhibit 29. And this is -- this would be Bates stamped MAR 44. It's not on there because it's an Excel sheet. Do you recognize this document?

A Not at all.

Q Okay. So if you look down under partial suspension issue one, and it says "COVID relief facility unit." And if you go over to where it says "12" --

A The 12 private bed, tier one. Is that what you're talking

about?
Q Yes.
A "Unit was established, these rooms remained empty when not being utilized by positive or quarantine individuals, ten rooms for patients with two rooms for donning and doffing." Okay. So to my -- to the best of my recollection, we had tried to set that up knowing we might need to use all 12 rooms at one point. We tried to set up a donning and doffing, like, almost staging area between the nurse's station and the gym. And we felt like there was still too much staff movement there. This is like or -- late 2020, I'm talking about.
And so then in 2021, which this must be when this is reflecting it, we were, like, "Okay, this isn't working. There's too much traffic in that area," because the -- because of where the Visqueen, the plastic was. You just couldn't get around to the other exit spaces. So that's when they started using the two rooms, still recognizing that all you'd have to do is pull it back. Like, if you needed all 12 beds, all you'd have to do is pull that plastic back and go back to plan A.
So I guess I didn't recall that it was that specific timeframe because we were trying -- you know, again, in the event that we would have needed all 12 rooms, the 12 rooms were easily accessible. You know, it was all set up to make multiple adjustments at any given time with dividers of -- I

mean, it wasn't very visually appealing -- lots of Visqueen down there. But that's where that was. And I guess I didn't recall that it was in that specific period of time.

Q Okay. So you also mentioned the quarantining rooms which were separate from the COVID rooms?

A We just tried to use some of the rooms closest to the nurse's station so that in the event -- and again, in a situation where all of a sudden, okay, we're treating our brand new admission because they're unvaccinated for a 14-day quarantine, like they possibly could be, you know, contagious because we don't know. So we put them in a room as close to the nurse's station -- looks like outside of the rooms that were used for donning and doffing at this period of time -- so that in the event you have somebody positive and you have to call the health department and be, like, what do you want me to do -- you know -- I have saved a private bed on most units at that point, like 300 and 400. I'm willing to move them, but you have to do contact tracing at that point because where did -- where did this positive come from?

So I have a positive resident that came from a positive staff that exposed the resident in quarantine. In that case, the health department, in our experience, is going to tell us leave them on 700. Just put the actual positive person in the furthest away room possible. So that was our theory. Now, if that person didn't -- that staff member

didn't, you know, have contact with both that was positive and you don't think that there was any potential that the quarantined resident would become positive, they may -- we didn't have that personal experience, but, you know, they may tell us then to move him to one of those rooms we're holding on 3- or 400.

So, again, to more directly answer your question, we put the quarantined people as close to the nurse's station as possible and the COVID people as far back. Reserved rooms -- now remember in 2021 we didn't experience a lot of COVID. This is all very theoretical, but that was our plan so that we'd have time to kind of mitigate the risk and figure out what's best to do with that quarantine person, leave them there or move them somewhere else.

Q So in June '21 -- June -- sorry. June 2021, that's when you stopped staffing the 700 wing and just started using the quarantined rooms. But were those quarantined rooms established in June 2021, separate from the 700 wing, or were they already there?

A I mean, they were already there. We were -- you know, Krystal, our director -- or infection -- she's our director of nursing now -- that's why I misspeak -- our infection preventionist at the time. Our census was low enough. We typically kept a separate room on every unit for catastrophes, because it could be an illness of other sorts. You know, it

could maybe not be COVID, but it could be something else communicable. And we were just really on high alert during this period of time.

We don't do that now, you know, but we were just on high alert at the time to always have that. So there was a room available on every unit as well, not designated as CRF, just available.

Q Okay. So separate and was -- were those quarantining rooms that are separate from CRF, were those required by any government order?

A Not that I recall.

Q Do you know how many of those beds were set aside?

A So 100 had a private room, so we didn't do it on 100 because it's a, you know, it's a private room group, so we wouldn't do that there. So 200 had one, 100 had one or -- I'm sorry -- 200, 300 and 400. So there would have been three beds. That did get used occasionally, like I said, for things outside of COVID. Sometimes it would be extreme behavior management or somebody's passing away, and that's really hard to watch somebody -- literally watch somebody die when you're a roommate. So things like that, too. You know, but as soon as that would be resolved, then a room would become available again.

Q Do you know roughly when the -- those quarantine rooms were taken offline, when you stopped using them for that purpose?

A June of '21. I'm sorry. Like, when we stopped -- you know, we completely stopped using them for that purpose?
Q When you stopped designating them as these quarantine rooms?
A I mean, in -- into '22 at some point, because, like I said, we had to get an increase in our CRF numbers in '22. So I wouldn't say before '23, were they not -- were they undesignated because what happened is the state said, you just don't have to designate them anymore. It's wasn't a process of undesignating them. So there wasn't, like, any big marker. You know, it was just, like, we aren't going to require people to renew their CRF's anymore.
MR. SILVERBLATT: And sorry. Which beds are you talking about undesignating.
MS. BRIGHAM: The quarantine beds.
THE WITNESS: So the CRF beds?
BY MS. BRIGHAM:
Q No. The quarantine beds set aside on the non-700 wing.
A Oh, I'm sorry. Good thing you clarified because I misunderstood the question. So we kept those for -- again, still the same timeframe, just not the same reason for the answer, you know, well into '23.
Q And who made the decisions regarding these quarantine beds?
A Krystal.
Q Okay. So going back to Exhibit 29 that we were just looking at, do you know who created this document?

A I'm uncertain who created this document. And it may have been given to me, and I just don't recall it. I would be lying if I didn't say I read a whole lot of documents for this, and I may -- I just don't recall it.
Q And I want to just ask some questions about what's listed under partial suspension issue one on sort of the top, middle of the page.
A Okay.
Q So where it says, "One quarantine room maintained in each of the four units," are those the quarantine beds on the non-700 wing that we've been talking about?
A Correct.
Q Okay. And then it says, "Three of the four rooms were private. The fourth was dual occupancy, therefore, one bed was taken out of service." What does that mean?
A So I'm guessing this is in relationship to room 417 because room size-wise, it can be considered dual -- like, it has enough square footage to be considered dual occupancy, but as a private bathroom. So when we were choosing these rooms, we wanted them to have private bathrooms, too, and it's the only one that has enough square footage to be considered dual occupancy. The rest are small enough that you, under the occupancy rules, can only have one person in them.
So what it meant by that is because we -- it's the only choice we had with a private bathroom because on 400, we

also had an unvaccinated resident that stayed permanently until she died on the 400 wing in the room we would have normally used in these, you know, single occupancy situations. As you couldn't ever consider using that second room -- that dual side of that room because you needed to keep it in a -- in a situation where, you know, it was -- it would be private if you needed to use it.

Q If you needed to, could you have put two people who were quarantining who were in a similar condition in the same room?

A In quarantine, unless they had the same exposure, that would be a scary situation because, you know, when you look at how COVID transmits, and it's very important that you look at the 48 hours prior to the person who transmitted symptoms.

So in the event that exposure was the same, that could be a consideration, maybe if they're on the same floor. It was a consideration we tried to avoid because it would be hard to ascertain my immune system versus yours and if you were going to become positive and now infect me unless I had no other alternative.

Q And then just going down to the next line on the Exhibit 29, it says, "Two individuals remained unvaccinated during quarter one through quarter three of 2021. These individuals retained their dual occupancy rooms. This resulted in two beds being taken out of service as no other individuals could occupy the second beds." So --

A So you know, we --
Q What does that mean?
A We had multiple residents -- not a large number, obviously it was probably truly three at some point. The third one doesn't need to be on here because she was in a, you know, single occupancy room but that, you know, for whatever reason, chose not to become vaccinated. And then the rules for that resident would be different from the rules for a vaccinated resident. So you would be sacrificing the vaccinated residents flexibility if you put them in with an unvaccinated residents. And, therefore, we didn't put anybody in with unvaccinated residents.
So, like, for visitation -- like, let me give you a more concrete example. If I'm vaccinated and I'm in a private room or if I'm in with another vaccinated person, I can have visits in my room at a certain point of 2021. I can't quote you to that exact time, but if I'm unvaccinated, you know, and I risk the exposure to the -- whoever would be coming to visit, too. So those unvaccinated visitation rules were different.
Q And we talked earlier about a potential vaccine mandate for staff. I assume there was no mandate that residents had to get vaccinated; correct?
A Correct.
Q And so were these two individuals, would they have already

been in these dual occupancy rooms before the pandemic began?
A Yes. I mean from my rec- -- I remember where -- where they were so to all my recollection, yes. You know, and then we would just, as we were trying to mitigate situations, you know, moving them didn't make sense because, again, it's all about sharing bathrooms. You know, in our quad style rooms, it's not as simple as bedrooms.
And then you can't put a female who uses a bath -- bathroom in with a male on the other side who uses a bathroom and -- because that wouldn't go over well culturally, you know.
Q We already talked about the next one. So if you look just below the third row, it says, "Number of beds taken out of service, 15." What does that mean?
A So that's just the total of the -- you know, 12 -- 12 CRF beds. The two people who were in dual occupancy rooms, you had to not cancel their room out, but the dual occupancy side of their room. And then the one private room we kept that was dual occupancy because it was the one with the private bathroom. So that equals 15.
So taken out of service, we, you know, couldn't just put any admission in them. So we were, you know, basically sacrificed 15 rooms of our census routinely for the large majority of 2021.
Q And did these 15 beds stay vacant throughout the first three

quarters of 2021?
A Not all of them. So, again, easily said with certainty, is that the 12 beds in the first couple quarters of 2021 were used for quarantine. Now, the number doesn't change because -- and I know this is hard when you're not the, like, functioning person doing it, but I take an admission that I don't know their history. I put them over into -- I'm going to make up a room -- 704, you know, on the 700 wing. I put them in 704 for their 14 days, knowing after 14 days they need to go somewhere.
So for that reason, I have held 312 open the entire time. So after 14 days, this person now goes to 312, you know. So even though they were in 704, I'm having to hold 312 open. So the number didn't change. It was the space that changed.
Q So if I wanted to know when a resident was staying in the 700 wing during 2021, could I just look at the census report that we looked at earlier?
A Right. Like I said, there was at least -- you know, just to be clear, prior to us closing and getting that kind of late May full vaccination situation, there was at least -- I'm 99 percent sure I can remember the resident's name. There was a resident or two that were able to be down there for its original purpose, you know.
Q Okay. So I know we talked about the 700 wing. You stopped

staffing it at a certain point and just used it as needed.
Did you ever change the number of CRF designated beds during 2021?
A Not that I could find in 2021.
Q Okay.
A The letters that, you know, say that you were awarded, the CRF doesn't designate them on the beds on there and because it was an electronic submission, it wasn't, like, a letter we sent. It -- it appeared that the entire three quarters in question, the 12 beds were in place.
MS. BRIGHAM: So can you turn to Exhibit 28, please?
(Defendant's Exhibit 28 marked)
BY MS. BRIGHAM:
Q So I'm showing you what's marked Exhibit 28, and I apologize that the Bates stamps have been cut off. This is in chronological order. If you could turn -- sorry. First, do you recognize this document?
A Oh, definitely.
Q And how do you recognize it?
A So we had -- you know, at certain points we had COVID meeting minutes from Monday, Wednesday, and Friday of -- at some point we went to just -- we went from three times a week to twice a week to weekly. So, I mean, do I remember these exact ones? My memory is not that good, but, I mean, I've definitely been exposed to these minutes many times.

Q Okay.
A I attended most of the meetings.
Q Okay. Could you, please, turn to the meeting minutes from May 26, 2021, and I apologize that the Bates numbers are cut off.
A May -- okay. It's in reverse order.
MR. SILVERBLATT: May?
MS. BRIGHAM: May 26, 2020.
THE WITNESS: Okay.
BY MS. BRIGHAM:
Q It is Bates stamped MAR 80 which is --
MR. SILVERBLATT: We're there.
BY MS. BRIGHAM:
Q Okay. And then if you turn to the second page, do you see number ten where it says the last four rooms on the 700 wing will be left open for quarantine rooms. The rest of the wing will be open for rehab residents?
A I do see that.
Q What does that mean?
A And this is that kind of -- I even said May, I think, when I said this, like, I recalled that there was a space of time where we were going to try to get it back to its original purpose. So it means, like, they were going to attempt to use potentially 8 of the 12 rooms for rehab residents.
Q Okay. And do you know if that happened at this time?
A We never got to eight by any means. That's again -- you know,

so this was May 26th, and I think once we sat down and thought about -- we were -- this is derived from the excitement that wholly vaccinated people, again, can, you know, cohort in a different space of -- of the facility and even quarantine people other places if you need to if they're unvaccinated.

So this was our enthusiasm to think, yeah, vaccinations are benefiting us, and we're, like, it's benefiting us, but also we can't staff it and now we have alternatives. So by June, there's a certain date in June that we closed the unit completely. We never made it to eight.

Q Yeah. So if you turn to -- and that'll be turning back instead of forward because it's in chronological order -- June 9th, 2021.

A Okay.

Q And this is Bates stamped MAR 77. So if you look down, number seven says, "The 700 rehab wing is back to normal, no residents in quarantine. There are rooms saved on the wing if a resident will need to quarantine." So can you explain what is meant by that?

A Well, 700 wing being back to normal meaning, again, I -- there -- there's no residents that are remaining there in quarantine. Like, any quarantine person is either vaccinated or gone -- you know, vaccinated or gone by June 9th. There are rooms saved on the wing if a resident will need to quarantine.

To the best of my -- you know, five year old recollection, they are referring to those rooms that I have told you about, you know, on the separate wings. There may be two possible admissions that we need to quarantine when admitted. They would admit them to two separate wings in that case, then, because they'd have to go to the quarantine room specific on that wing.

Q So could you say how many beds were CRF-designated on the 700 wing at this time?

A On that specific date, I could not say how many were on that specific date.

Q And in the first three quarters of 2021, was there ever an instance where you had to turn a potential resident away because there weren't enough beds at the facility?

MR. SILVERBLATT: You're not talking about COVID-positive residents? You're just talking about the whole facility, any resident due to lack of capacity?

BY MS. BRIGHAM:

Q Right. And the admission of any resident?

A The majority of the time it wasn't due to bed capacity, it was due to restrictions such as our health department saying during staff outbreaks, you shouldn't take admissions or educating people, even when our -- and this would have been later. It was probably 2022. So my first answer is 2021 with certainty, this health department saying, during staff

outbreaks, no, don't take admissions.

But secondarily, even when we did, which was probably '22 or even '23, you tell somebody, you know, we have positive COVID, that you're coming into the building, they typically chose to go to a facility that may not have COVID at the time.

So were you saying no for COVID-related reasons, but not always specifically bed capacity? Could there have been a bed capacity involvement in that? I couldn't say confidently.

BY MS. BRIGHAM:

Q And in Marquette's Complaint, it's alleged that there were numerous instances in 2021 where would-be residents elected not to be admitted or residents elected to leave early due to government orders. Can you talk more about those instances?

A I think, you know, outside of Marquette, you would find that families tried to keep their loved ones home as -- as long as they possibly could. You know, there was people working remotely that might be able to manage it more. COVID, you know, kind of started that phenomenon, accelerate that phenomenon. And you -- in a -- in a national news I mean, COVID started in a nursing home. They got the -- they unfortunately -- media -- nursing homes got the bad rap right from the beginning with the large COVID outbreak in a nursing home.

So the amount of fear and distrust was fairly

extreme. So you, you know try to talk to family members about placing their loved one here, and they took a lot more measures to keep them home or to keep them out of a congreg- -- you know, a congregate setting than ever prior to code.

And then, you know, the adjustment to living in a nursing home where we are telling you upfront you will likely see a four -- your four walls of your room more than you'll see any activity-based entertainment or socialization with others, was just, you know, made it even a lesser attractive model to choose.

Q Did any of those resident -- potential residents or departing residents tell you that they were deciding not to stay here due to government orders?

A I mean, I had -- even as assistant director of nursing just because there was so much going on and we all had to take tough conversations on, I mean, I -- could I tell you who? No. But could I tell you confidently under oath that I had those conversations with families in 2021? Absolutely. Where they wanted a lot of information and in the end would say, I'm afraid of what this is going to do to my mom -- you know -- I was afraid to put her at a nursing home to begin with, and now she's going to be so isolated" -- is the word they would use.

You know, which isolation to us is a true, like, mechanism, but isolation to them means they weren't having the

interaction they needed. "That's going to kill my mom," you know, that's what they would say to you.

Q Would you attribute the reduction in census numbers in 2021 to fear of COVID?

A I would attribute it to, you know, the orders that restricted us the minimum of 15 beds. Right there is, you know, some amount of census reduction, and the, you know, inability to have flexibility within those beds. And, I mean, fear was a contributor as well. And so, I mean, there's lots of contributing factors, you know. Still people weren't having elective surgeries that gave us their short-term, you know, stay people.

We weren't -- we weren't -- we, you know, almost all facets of health were affected. You, you know, couldn't get consulting services to get you diagnoses to figure out what the right thing was to do for you. I mean, that -- that's a hard question to answer because I feel like I could really get off topic.

Q Just to get -- because I don't -- I don't know if there was a yes or no to this question in quarters one through three of 2021, did you have to turn away any potential residents due to the lack of bed capacity?

A I couldn't speak to, you know, exact knowledge of, you know, how bed capacity impacted any given day. I can speak to the restrictions that we had in the health department telling us

not to take admissions during staff outbreaks and that affecting our ability to take admissions, which would have built on it.

But bed capacity restrictions, I can't speak to if that played a factor at the -- exactly at the time, you know, we did not keep records that would let me say exactly that that was the case.

Q Well, was there ever a time where a resident wanted to be admitted, and you had to say, "No, we don't have enough beds to admit you"?

MR. SILVERBLATT: Objection; asked and answered. You can answer.

THE WITNESS: So I am unaware of that specific question. I'm very aware of people calling here and saying, "We can't take admissions right now."

BY MS. BRIGHAM:

Q What do you mean by that?

A Because we had a staff outbreak and the health department told us not to take admissions during staff outbreaks.

Q Okay. And so what made you conclude that there was a reduction in census numbers due to government orders specifically and not because of the general conditions and fears surrounding COVID?

MR. SILVERBLATT: Objection to form. You can answer.

THE WITNESS: I'm sorry. So can you repeat the question? I'm sorry.

BY MS. BRIGHAM:

Q Yeah. So your position is that there was a decrease in census numbers during the first three quarters of 2021 due to government orders; correct?

A Yes.

Q And what led you to believe that government orders were the cause as opposed to the general fear and conditions surrounding the COVID-19 pandemic?

MR. SILVERBLATT: Objection to form and to the extent it calls for a legal conclusion. You can answer.

THE WITNESS: So, again, just to give you a -- one simple, clear answer -- and I know I've been redundant in saying this -- it would be if you look at our 2021 staff outbreaks. And we were told to not take admissions because of restrictions and the potential congregate setting where we are spreading that illness. That limited our ability to take residents and build our census.

BY MS. BRIGHAM:

Q How many outbreaks did you have during the first three quarters of 2021?

A Staff outbreaks, at least four and those last, you know, minimum of 14 days because I get COVID. I give it to you. Now the 14 days starts over again and you give it to Rob and

the 14 days starts over again.
Q And so let's focus on when there weren't any staff outbreaks. When there weren't any staff outbreaks, you were permitted to admit residents; correct?
A Correct.
Q And during those periods when you were allowed to admit residents, was there ever a time where you had to turn residents away because there weren't enough beds?
MR. SILVERBLATT: Objection; asked and answered.
BY MS. BRIGHAM:
Q You can answer.
A Not that I'm specifically aware of.
Q And what order specifically prevented admissions during outbreaks?
A I would have to review the specific orders. You know, the -- when I was reviewing them in preparation for today, I, you know, was able to see that our health department had specifically given us directive not to take the admissions. But as far as, you know, the order that they based that decision on, I would have to, you know, read the orders again.
Q Do you remember if it was, like, a state or local order?
A There wasn't too many local orders that I -- that, you know, weren't -- didn't align with state outside. Like, our health department, you know, was -- took a conservative approach. But, you know, we were following the Medicaid bulletins, the

CMS QSO's, the MDHHS orders and, you know, any LARA survey guidance. So I apologize. I do not remember specifically which one that would be.

MS. BRIGHAM: Okay. I am going to move on to a new topic if anyone needs to take a break.

MR. SILVERBLATT: Do you want a break?

THE WITNESS: No, I'm okay. Thank you.

MS. BRIGHAM: Okay.

MR. SILVERBLATT: Let me just get some water.

MS. BRIGHAM: Yeah.

MR. SILVERBLATT: Anybody else want some?

BY MS. BRIGHAM:

Q So starting with 2020 first, how did group activities change during the COVID pandemic?

A So 2020 -- at some point of 2020, we just didn't have group activities. I don't know exactly what point that was. When we then started slowly rolling out activities, it was in, like, small group settings. So I'll give you an example. We would put residents out in their halls socially distanced, so we used to play bingo this way. And you -- and so they were, you know, six feet away from each other, meaning only a limited amount of people could play because you can have -- you can only have so much geographic space in the -- in the area.

So you'd have to allow the residents who were, you

know, really, really asking for bingo. Or we offered bingo more, so, like, Monday might be your bingo night, and Tuesday is my bingo night. And so we'd put them in the hall.

An activities bingo caller would stand at the top of the hallway, and they'd have a microphone. And they would spin the, you know, bingo -- ball, wheel -- I don't know what you call it. And they'd call out the number, and they'd be another staff member -- because 3- and 400 connect like this (indicating) with a nurse's station.

So there would be another staff member that would hear what they called, and they would then, you know, facilitate it between 3- and 400. They couldn't even see each other, you know, they're that far apart. But that's how they would do that. And then they'd do similarly on 1- and 200 on different nights, you know, so everybody kind of got their turn, you know, for bingo.

To give you an example from 2018 bingo, we used to have the -- the candy table ladies that they would rush into the dining room because this lady had the best candy. And you wanted to be at Ms. Young's table because she had the best candy and only her friends could sit there.

We had, like, an injury, like, a stam- -- a bingo stampede. I'm not exaggerating. This really happened, you know, and we had to start making our halls bring only one section of people at a time to bingo because bingo meant that

much to them. And so, you know, that's, like, one of my easy examples. Obviously we had no outside entertainers coming in at all.

The majority of -- in 2020 at some -- some point in time, the majority of activities were video chats with your family. We bought a bunch of iPads, and that's the only way you could see your family was through video chat. So we were scheduling extra staff just to facilitate that because it's the only opportunity you had to see your family's face.

Q And so when you're talking about these small group activities that restarted, when was --

A That was in 2021 that they started.

Q Okay. When in 2021?

A I would say that it was Q1 2021 that those started, then Q2 you started to see, you know, some vaccines. And this is where, you know, it's laughable, but again, I will say that we would get excited that okay, we have a good staff vaccination rate. We have a good, you know, resident vaccination rate. But there was these community transmission levels that we had to look at. I feel -- I feel, like, it was A, B, C, D, but don't quote me on that. And, like, our outbreak testing and some of our visitation rules we focused around, like, what the community risk level was.

But anyways, we'd get really excited that we could facilitate more group activities or maybe even potentially

bring the hairdresser back or potentially bring an outside activity -- you know, entertainment back. And then we'd have a staff outbreak.

So I don't think we could bring anyone back until after September. I think the first time somebody physically appeared for any outside entertainment was either the last week of September, first week of October, 2021. And then we honestly had to start paying them more because we used to be able to pay them $50 in entertainment.

And we had to pay them -- start paying them $75 an entertainer to even get them to come because then we were -- at points of times we had to test them, you know, COVID test them. And entertainers did not -- no -- no visitors liked that. We had problems with vendors and entertainers as far as during the testing phases, you know.

Q And how did group therapy change starting in 2021?

A So are we talking physical therapy? I just want to make sure.

Q Let's start with -- let's start with physical therapy.

A Okay. So physical therapy, occupational therapy, at the beginning of 2021 was still all segregated. So that means that we had a group in the dining room and a group in 700. And they had to be, you know, like, from the same unit to even -- they had to socially distance, but also be from the same units so that we'd know if, in the event that we had to contact trace there, we were limiting exposures.

So, like, Andrea, who -- well, she was on maternity leave so she's a bad -- until May of 2021, so it's a bad example. But one of the PT's would be in the dining room, and they would take 2-, 300 residents. And they would separate them significantly, and -- again, kind of back to where we started at the beginning of the day, they would start -- you know, Rob on a bike machine and watch him for five minutes and then start Pam on a rowing machine and watch her for five minutes.

And then when he was done, switch him to something else so they'd be done at different times, so you weren't having to necessarily make physical contact with them. And you could disinfect equipment in between, you know, not that you shouldn't be anyways. But extra disinfection, of course, required -- an extra space between the residents was required.

While Brandon, typically who is kind of our lead physical therapist, would be over in the skilled gym doing something similar, but again, creating more space amongst the residents. Then come May, that's when we combined those two gyms back together.

Q May of 2021?

A Late May of 2021.

Q So in 2021, group therapy was still permitted, but with more distancing?

A Yeah. So, you know, it limited the -- the volume you could

get in the room at -- at the same time, yes.
Q Okay. And then May 2021, were you still social distancing when you combined them?
A Still social distancing. Because we had some vaccinated people, you know, again, it was that whole thing, you can't call it out an unvaccinated person but luckily the therapists kind of knew that. And it was a little more individual than, like, bingo would be, so you could manipulate that a little bit better. But you still saw, obviously, a significant decrease in the minutes of therapy.
Q Okay. So that's 2021, and in 2020 was group therapy happening?
A It was separate. I don't -- I think in '20 -- the majority of 2020, what they would have done is just brought one resident into a room at a time and done as much as they could in the resident's room for therapy. So unless they needed, like, a specific piece of equipment, then they would bring that one individual in, you know, and use that piece of equipment at that time.
Q Okay. And the social distancing during group therapy was that a --
A Requirement.
Q Required by an order?
A Yes.
Q Was that a state order?

A I think that was honestly in a -- that was in multiple orders, honestly, the social distancing part of things. You could probably find that in multiple orders, the social distancing requirement. I should clarify, though, when you're asking me about therapy, the quarantined residents, those 14-day, non-positive quarantine residents, you know, they obviously would not be in a group therapy setting whatsoever.
Q Okay. Would they get individual therapy if they needed it?
A Correct.
Q And who made these decisions regarding when to -- when to resume group therapy and --
A That would have been a team decision when to resume group therapy, evaluate writing the orders, and, you know, the changes in the vaccination rate and constantly reading the pivoting requirements. And that's where, again, both HCAM and MCMCFC helped us kind of sort out what to make of some of these orders because they are hard to -- there's still some subjectivity in how a surveyor even looks at that and how they enforce it.
Q And when you say the "team," --
A I'm sorry.
Q -- who do you mean by that? That's okay.
A So, you know, Jerry, Tina, Krystal, even myself at that point would have been involved in parts of those decisions. And we talked about a lot in our weekly COVID minutes. It might not

be reflected in the minutes like the -- the decision was reflected in the minutes, maybe not the conversation about how we derived the decision.

Q Okay. And that was still being -- the therapy was still being -- skilled therapy -- sorry. It was still being conducted by UP Rehab Services during this time?

A Correct.

Q So in Marquette's Complaint, you state that the inability to conduct group therapy impacted skilled nursing revenue. Can you just explain what that means?

A So, I mean, if you look at the amount of people they could provide therapy to, because of that phenomenon of, you know, social distancing and the quarantine requirement, then you saw, you know, not only for census reduction reasons but just ability to only be so many places at once, provide those -- that care.

I mean, even Med B would have been impacted. So, again, just for a refresher, Med A is when you're coming under a skilled stay for room on board and everything typically is a new admission. But you -- we were really concerned that people were having declines because of the amount of the lack of mobility, motility, that was generated by some of these group activities. And, you know, you could only provide so many minutes of therapy when you had to keep people so separate. So we had some Med B compromise as well.

Q So just to clarify, what is skilled nursing revenue?
A So skilled nursing revenue is derived from physical therapy, occupational therapy, and speech therapy. And so, again, when they're being provided those services, Medicare pays for their room and board as well as long as they're not under Med B coverage, and those are much higher rates of reimbursement for us.
Q Okay. And so, then, shifting to dining. How did dining change during the COVID pandemic?
A So we typically used the -- you know, basically three/four dining spaces. The reason I say that is, of course, the special needs unit has always had their own dining space. And then we used the solarium at one time, which kind of moved to 700 as 700 opened, and then we've always had our normal common hall dining room.
Those immediately pretty much closed, you know, as soon as COVID became a problem mid-2020, maybe Q3 just as far as I can't remember the exact timing of that, everything really started giving us good directive, late Q2, early Q3. Those all shut down. Even the way it was delivered and who it was delivered by stopped.
So what would happen is we have a portable SuzyQ cart. It's, like, a portable steam table, and that's to try to keep the food as fresh as possible for the tray line. And so -- like, a typical tray line which is covered and you,

like, uncover it. So I would be the food nutrition department. You would be the CNA. You'd come to me. I'd hand you, you know, a plate for a resident. While you're walking that plate, I walk another plate to another resident, you know, as the food nutrition person so that it's delivered faster.

And so now in this case we had dietary not delivering any meals. They might be plating them, but they were not delivering any meals. So it slowed down, unfortunately, the pace of delivering meals, and it became our extreme challenge to assist residents with feeding because you had to keep social distancing.

So, like, normally I can -- as an RN I'm allowed to assist two residents with eating at one time. I can assist one on my right, and I can -- but my arms are so long I can't get six feet between them. So now, you know, we were really trying to figure out we have a lot of residents who need assist with eating, how do we facilitate that?

And so that became a pretty big challenge where, you know, nurses were trying to stop their med pass or change the times of their med pass to sit down and assist one resident with eating. We had, like, ancillary staff that were trained as dining assistants. You know, like, I'm an RN, so I wouldn't need dining assistant training, but let's say Allecia could. I used a bad example. She wasn't one of them, but,

you know, somebody who is nonclinical could go to the dining assistant curriculum social work and then help us out.

So we were really leaning on -- even housekeepers were nice enough to get dining assistant trained and helped out. So that's how we facilitated that but no dining rooms.

Q And why did you decide to suspend communal dining?

A Prior to vaccination, we weren't allowed to have communal dining. And once we had vaccination, again, it was the whole red scarlet letter, you know, situation. It would be the unvaccinated if we followed the guidelines.

Q And what guidelines were those?

A You know, I apologize that I can't remember specifically because most of these communal settings and the social distance were brought up in multiple, you know, orders that were given to us.

Q So when did communal dining resume?

A I feel, like, we tried late Q3 2021 and ended up with routinely -- Q4 2021 would be routinely intermittently. Between outbreaks, we might have been able to successfully have some in Q3 2021, but not consistently. I'm questioning myself now. I'm sorry. I'm trying to put my brain back in that space because the gyms went back together in May. That I'm positive about.

We tried to do communal so that -- that meant the dining room was open, obviously, to do it. Then we looked at

vaccination status, and we were concerned about the social distancing requirement and how effective that would be because now you're spreading staff even thinner to try to do that. I -- I want to say Q -- late Q3 2021.
Q And were you prevented from resuming communal dining by a government order until that time?
A For unvaccinated, yes. Not for vaccinated. It was a matter of what the social distancing requirements were and managing staff to be able to assist with eating in. So did the -- did the order directly say you can't do this? The order did not say that. Could you facilitate it under the order's requirements? That's where the staffing challenge became because so many people needed assist with eating.
You know, the easier you could get closer you'd get staff to respond, but still manage the social distancing, made residents get fed sooner.
Q Okay. Let's talk about visitation. How did visitation change during the COVID pandemic?
A So, you know, visitation wasn't allowed in, I want to say the majority of 2020 and early 2021. Again, I keep referring to this, but, you know, once vaccinations came, that's when you really started seeing some shift where we could do scheduled visitation outside of outbreaks.
So we were allowed to schedule a visitation, and so the person would be screened before they came. We would

encourage testing, and we'd have designated areas initially because there was no visitation allowed in rooms. The visitor would be required to wear a mask, and they would be required to social distance when it was initially allowed. And, like, I said, we'd have to have designated spaces, and it was scheduled.

And we were able to facilitate a reasonable amount of visitation by probably January, February, March -- I would say mid-Q2 2021 we were able to facilitate a reasonable amount of visitation. It, again, you know, stretched staffing thin because you had to have somebody escort and set up and disinfect in between. But we were able to facilitate it between outbreaks.

Q Excuse me. And was -- you touched on this a little already. Was Marquette implementing virtual visitation during this time?

A Yes.

Q And what did that look like?

A We did a lot of it, but it just wasn't effective for residents. It, you know, our activity staff, I mean, they had -- they had somebody coming in just to do that all day long, even while they're still providing all their one-on-ones. We tried to staff differently instead of somebody just running out with an iPad.

But you think about the resident population we

served, that wasn't familiar to them. Like, FaceTime is not normal for their generation. So it was more for the family outside's benefit than the resident's benefit. And so initially there was, like, this huge amount of interest in it, and we still kept doing it. But you saw the interest decrease a little bit because it wasn't facilitating what they had hoped for.
Q And were window visits allowed for -- during the entirety of the pandemic?
A I mean, I'm trying to -- I mean, there was a short, short week's period of time before they introduced the idea of window visits, you know, just in the chaos of things. But the majority of time, window visits -- closed window visits were allowed. And so you, like, had a phone on one side, a phone on the other side and that you could speak into because, again, the airborne part of opening the window.
Q And was that permitted as of January 1, 2021? Were those visits allowed?
A I recall that it was. There's challenges to that, though, with the building layout because not everybody has a window that's exposed to an access area that people can get to. So we did then, you know, try to -- not eliminate it for those people, but we had to, then, you know, get creative in using a specific space that we would clean the window, bring the next resident in, clean the window, you know.

Q Were compassionate care visits allowed during this time?
A Not initially. The timeframe of compassionate care visits being allowed, I would -- I would say happened sometime in Q1 2021.
Q And just for the record, can you explain what a compassionate care visit is?
A When you'd expect that somebody was end of life or you would expect that the isolation has had -- it had a significant impact on their psychosocial wellbeing. That's when compassionate care visits were allowed.
Q Were there any other categories of visits that were exempted from any COVID prohibitions on visitation?
A Not that I can recall. We had to follow those rules for all of them from my recollection.
Q And so when did -- I think you said this maybe already, but when did visitation more or less resume?
A Scheduled visitation, Q2 2021.
Q Okay.
A Unscheduled, I think we were into 2022 before we'd be having the unscheduled conversation.
Q And do you track visitation?
A Did we track it at that time? I mean, it was scheduled, so somewhere there's, I'm sure, some record of those visits. Initially it was Nick Kangas from activities that scheduled them, and then when we were able to garnish -- we had more

interest in it than we ended up having a secretary who primarily -- that was her primary duty was to schedule them, Sheri Hewitt.

Q So we've talked about quite a few changes in quarters one through three of 2021. Were there any other changes to group activities during that time period that we didn't talk about?

A Yeah. It was, like, I said, the small social distancing evolution in just -- in just your unit. A good portion of 2021, you know, your act- -- even your small group was only with your unit. It wasn't like you could, you know, go over to -- from 300 to 400 to visit. It was within your unit. I don't think there's anything we missed.

Q Okay. I want to talk about the outbreak scenarios. I believe that's what they're called; correct?

A Yep.

Q So when would Marquette go into an outbreak scenario?

A So we -- we had to test -- COVID test for multitudes of reasons. So the community risk level would dictate what our normal testing cadence would be, meaning, are we -- how many times a week are we testing? So sometimes we'd test and you'd have no symptoms and you'd be positive. And we'd still have to, then, do contact tracing and whether, you know, you would be out of work as a staff member, whether you were -- experienced symptoms or not.

The other situation would be you come to us with

symptoms and we test you for obvious reasons and all of the cadence starts then. So if you're an asymptomatic, positive COVID person, whether you are a resident or an employee, your day zero starts on the day of test -- positive test. If you are a symptomatic person that tested positive, your day zero starts from the first day of symptoms.

So then 14 days from then, you are, you know, quarantined out of work, whatever case it was originally. And then originally anybody who has even came into contact with you, is quarantined as well. I would say by 2021 that wasn't the case. Instead, we were using the testing cadence at day -- you know, 24 hours from exposure, day 3 from exposure, day 5 from exposure, day 7 from exposure. And, you know, making sure that you were obviously wearing an N95 mask during this time if you were an employee.

Truth be told, once we had outbreaks in 2021, everybody was wearing N95 masks and eye protection. Current situation is only the exposed person would be. But so it really didn't matter, exposed or not, we were all at that point since we had outbreak, reinitiating. We pretty much wore masks for all 2021 and then -- but sometimes it was surgical, sometimes N95. But we were able to reduce the eye protection at times when there was not an outbreak and when our community risk level met the certain requirement.

So, again, contact tracing would then mean I would

ask you as a caregiver, how many residents did you come in contact with? Did you have accumulation of 15 minutes with them or 15 minutes with them at any one given time? Because at first, most people interpreted the guideline as you had to have contact with somebody for 15 consistent minutes, and then there was some reinterpretation that said no, did you go in there 15 times for a minute at a time, and that still makes them an exposure.

So whoever those contacts were, typically residents in that case, would have to then adhere to the testing cadence of, you know, day 1, 3, 5, 7.

Q When you're talking about interpretation of those guidelines, whose interpretation are you referring to?

A I'll be honest. I mean, we leaned on a lot of people to help us because we would reach out to IPRAT or we'd reach out to the state and, again, they -- no dismiss to them -- but they didn't have time to answer the direct questions. And so oftentimes Vickie Burlew from Lebenbom and Rothman or Renee Beniak from MCMCFC would be able to speak on our behalf to their contacts. And a lot of clarification came from communication with them.

Q And what is IPRAT?

A So that was -- her name was Katie, I recall, but IPRAT was a division that the state of Michigan gave us as a resource for -- it must be infection prevention risk assessment team or

something like that. Again, my acronyms aren't great. I'm 99 percent positive her name was Katie-something, though. But then we had Kathy over at the -- Kathy Mell at the health department and Katie-something at IPRAT.

And they, again were assigned to help give us guidance, and IPRAT was our best resource within the state. But, again, it was one or two people answering everybody's question. And I'm not talking every nursing home question, I'm talking everybody's questions. So your response time sometimes wasn't prudent to make a decision on what to do next.

Q So if one single positive COVID case from either a resident or staff is an outbreak scenario; is that right?

A When you're in pandemic status, absolutely. When you're in endemic status, no. And so COVID-19 has never come out of pandemic to endemic. So one is considered an outbreak.

Q And other than the quarantining and testing, what protocols did you follow during an outbreak scenario?

A This is more staffing-related but -- okay. So anybody who worked on the 700 unit, no matter what was going on in the 700 when it was open, never got to leave the 700 unit. You could, what we call, bump onto, but you could never come off of. So that staff was dedicated to the 700 wing. So in our short staffing, oftentimes there was overtime required. So bumping means I'm a nurse on 100 wing. I've been taking care of a

resident that's just really, you know, on the call light all day long. And I have to say 16 hours, and I'm just not sure I can stay 16 hours and answer that call light 18 more times and pass meds at the same time.

So the -- so our collective bargaining agreements state that after eight hours I can go to a different unit. But if you were on the 700 unit, you couldn't -- you couldn't do that, no matter whether we're in outbreak or not. Never, you just couldn't do that. If you're in outbreak, then, nobody can bump.

So I'm that nurse on the 100 during an outbreak, and I'm stuck there for 16 because that's where I started regardless of where the outbreak is, because you're just trying to watch transmission as close as possibly as you can.

So again, it goes back to, then, even if we were in a space of time where residents were allowed to move around a little bit more, you know, towards Q3 2021, end of Q3 2021, then you're in outbreak, and now we're like, you know, closing doors of units and keeping them on their units.

Q And who developed the outbreak protocols?

A The CDC.

Q Okay. So you were following --

A Oh, very specifically.

Q -- CDC guidance?

A Absolutely.

Q I'll come back to that. Could visits still occur during an outbreak scenario?
A No, not at that point of time.
Q So was there a point in time when they -- when they could occur?
A Yes, yes.
Q And when was that?
A These are so hard because it all kind of blends together. I would say --
MS. BRIGHAM: So if you want to turn to Exhibit 13?
THE WITNESS: Okay.
(Defendant's Exhibit 13 marked)
BY MS. BRIGHAM:
Q So I'm showing you what is marked as Exhibit 13.
MS. BRIGHAM: And, Rob, this is Exhibit M of the government order attachments.
MR. SILVERBLATT: Okay.
BY MS. BRIGHAM:
Q Have you seen this before?
A Yes.
Q And what is it?
A So it's a CMS QSO letter initially dated 7 -- September 17th, 2020, with a revision on 3/10 of 2021, clearly marked with the revisions in red, QSO-20-39-NH. And it's about visitation guidance.

Q And is this the type of order that Marquette would have followed?
A Absolutely.
Q So if you turn to page four, it talks about indoor visitation during an outbreak.
A Okay.
Q So is this order when visitation would've started to be allowed during an outbreak scenario?
A If I could just read it for one second, just to --
Q Yeah. No, sorry.
A No.
Q Go ahead.
A Okay. Okay. Yes, yes. So the clarification is that after the first round of outbreak testing, the visitation can resume for the residents where there was no COVID cases. So the visitation would only have been stopped for that short period of time.
Q Okay. So let's say there's an outbreak on the 100 wing, and we're in an outbreak scenario at that point, could all of the wings, other than 100, continue with visitation?
A So, in a -- in a normal outbreak where it was isolated one person, so that's the exact scenario, yes. Towards the end of -- there's several times in 2021 where, unfortunately, that one staff member spread it to -- then there was a domino effect. But in a simplistic version, yes.

Q Okay. And so in the version you're talking about where it spread to other wings, what would happen then?

A So I am going to use your 100 wing scenario. So, you know, the 100 wing was the exposed wing. We were able to test all the rest of the wings on that first round of testing, and then everything's good for visitation on those wings after the first round of testing. Again, that -- that first round all depends on asymptomatic, symptomatic and those hours before.

So, unfortunately, then, you know, patient zero -- I'll say staff member zero, unfortunately worked with, you know, staff member one, who now is on the 300 wing and three days later test positive. Now she's been on the 300 wing so that -- the whole building has to be tested again. So now 100 still has no visitation. Three hundred still has no visitation because they're 14 days -- maybe it was 10 days -- just started, but now 2- and 4- can still have visitation.

So that's kind of how the dominos work. So 100's visitation will be open sooner than 300's visitation because their positive happened later and their direct exposure happened later.

Q And did that scenario happen during the first three quarters of 2021?

A Yes.

Q How many times?

A I have -- I want to say only three times did that scenario

happen, spread amongst -- I want to say zero in Q1 did that scenario happen, but, of course, visiting restrictions were different in Q1 anyways. You know, we -- then we get, again, to vaccinations in Q2. And I think the primary of those scenarios was late Q2, Q3 because I want to say, like, in the month of June when I was reviewing those minutes that you showed me -- I mean, it says those couple times, but I want to say three times in 2021 that would have happened.
Q And so during an outbreak scenario when we're talking about where this Exhibit 13 is in effect, when -- and when visitation could still occur during an outbreak, could group activities also still occur for those who are allowed to have visitation?
A Within their unit.
Q Right.
A Like, I don't -- yeah, yes, just not within -- not as a, you know, congregal setting within the building.
Q And what about communal dining?
A Yeah, we hadn't -- you know, I really don't think we started communal dining towards -- until the end of Q3. You know, so as far as allowed, I don't think there was -- I think it was the ability to facilitate within the restriction, not necessarily saying we weren't allowed to do it after that outbreak testing was completed. Obviously the affected unit wasn't allowed.

Q Okay. So we've talked about a couple different types of order restrictions: The CR facility, the social distancing, and the prevention of admission during a COVID-positive outbreak, I suppose. Are there any other types of orders that restricted Marquette's operations during 2021?
A I mean, I mentioned briefly just, you know, the financial impact of not being able to involuntary transfer people for nonpayment, you know. So that had typically a fairly insignificant impact because we're pretty good about collecting except for the gentleman who didn't want to sell his classic cars and then owed us over $100,000 for the year.
Q Was that a --
A State.
Q State order? Okay.
A I'm trying to think of other ones that -- because I feel like we've covered a lot of ground.
Q Yeah. If you think of any later, just feel free to interrupt me.
A Okay.
MS. BRIGHAM: Can you, please, turn to Exhibit 4?
(Defendant's Exhibit 4 marked)
BY MS. BRIGHAM:
Q I'm showing you what's marked as Exhibit 4.
MR. SILVERBLATT: And this is Exhibit D for -- Rob, for your notes.

BY MS. BRIGHAM:
Q Have you seen this before?
A Yes.
Q And what is it?
A So this is from the Michigan Department of Licensing and Regulatory Affairs, like, I was calling LARA, and it -- it describes the -- what we call F-tags that we can be cited for underneath our survey requirements in CMS. So F880, the infection prevention and control program and F838, our facility assessment that requires us to document some specifics within our code assessment.
Q Okay. And is this something that Marquette would be required to follow?
A Yes.
Q Okay. So do you know who put boxes -- green boxes on this?
A I don't know who put those on there. It might have been me.
Q Okay. So if you look at the first green box.
A Okay.
Q It says, "A provider infection prevention and control program must be based on an accepted national standard." What is an infection prevention and control program?
A So an infection prevention and control program has always been required as long as I've worked here. So, you know, they come -- there is survey- -- it used to be called infection surveillance. So you always have to be looking, again, in

this whole congregate setting for transmission of illness. And you're held to a standard of prevention of any transmission of illness. I mean, that's been a longstanding requirement.

So it's just saying a provider's infection prevention and control program must be based on an accepted national standard. So you can't just say, "I want to -- I want to prevent influenza by making you wear white cloth gloves," because you think that that's something that's going to prevent influenza. There has to be an accepted national standard that you are referring to in your prevention.

So in the large majority of healthcare institutions, not even the skilled -- not just in the skilled nursing facility, were able to follow the CDC guidelines for all types of transmissible disease. And that's what we choose to -- prior to COVID, post-COVID have chosen to follow as our standard. And once you adhere to a standard, you're expected to, you know, reference that guideline and make your decisions based on those guidelines.

Q So you said you chose to follow the CDC standard. Are there other standards -- national standards out there?

A I mean, maybe the -- I'm not familiar -- the World Health Organization might have standards you could follow, but I mean, even my hospital experience as a nurse, you just always followed the CDC. So I've not been digging for what -- that

other infection control standard that would give us enough information to make decisions on almost every transmissible disease. Because you don't want to have to be using a resource, one for shingles and another for influenza and another for COVID, you know.
Q So did you have an infection prevention and control program prior to 2020?
A Absolutely.
Q And how did that change in light of COVID?
A It became a full-time job. It used to be -- so in -- up to 2019, it was assigned to the assistant director of nursing, and then in 2019, we created a risk management position infection preventionist because of all of the facility-reported incident requirements and the time you have to report them, again, nothing related to COVID. But it's a two-hour window, so it triggers very quickly.
And it used to be a 24-hour window so you can put together people to get those answers in 24 hours, but not in two. So we had carved out this risk management position and assigned infection to that and then when COVID came, it has -- it became a full-time plus -- honestly -- I'll be honest, you know, all of us in the nursing office took parts of it. And it has continued to this day to be a full-time position.
Q And who is -- whose role is that?
A Currently it's Tina Nelson. At the time of the claim, it

would have been Krystal Heikkinen.
Q Okay. So you said you adopted CDC guidelines.
MS. BRIGHAM: Could you turn to Exhibit 30, please?
THE WITNESS: Thirty?
(Defendant's Exhibit 30 marked)
BY MS. BRIGHAM:
Q Do you recognize -- sorry. I'm showing you what's marked as Exhibit 30 and Bates stamped MAR 667. Do you recognize this document?
A It's our Marquette County Medical Care Facility response to coronavirus prevention and response policy, yes.
Q And so if you look at the last page, which is MAR 673, there are references to different CDC documents.
A Okay.
Q So are these the CDC guidelines that you would have adopted as part of your -- I don't want to say it wrong -- infection and control program?
A These would be probably not them in its entirety, but, yes.
Q Okay. Are the standard -- CDC guidelines that you infected -- sorry -- adopted as far as the -- as part of the infection and control program, would those be written down somewhere, which guidelines you specifically adopted?
A I do not think so. I'll be honest, when there's development of these policies, we did use assistance, you know, from our consulting groups as well as -- I'm trying to think what it's

called, and it's just escaped me --The Compliance Store, it's called. And so it helped us pull some of the references together to create policies, too. But do we have an all encompassing, like, list of, "Here are all of the things that we referenced," not that I'm aware of, if that's the question you're asking.

Q Okay. So sticking with Exhibit 30, who wrote these policies?

A Krystal.

Q And so the --

A I better make sure I understand the question correctly.

MR. SILVERBLATT: And because there are several policies.

MS. BRIGHAM: Yes, I was going to ask.

THE WITNESS: Okay.

BY MS. BRIGHAM:

Q Did Krystal write -- so there's multiple policies: Novel Coronavirus Prevention and Response policies. Throughout 2021, would Krystal have written all of them?

A No. So that's, again, where I say, you know, we leaned on each other to not recreate the wheel, you know, the Compliance Store provides a lot of these resources for us. And we would review and adapt and review with -- okay. So we would review the -- we would review the policy, probably multiple of us in the nursing office, myself included. We would say, "These references make sense." Krystal would go back and read the

references that even were attached at the time of the creation of policy. We would say, "Is there anything functionally that we aren't doing that we should be doing or functionally that we can't do, but maybe is not required?" Maybe is, you know, a frivolous part of the policy.

Then we would adapt it, which usually was very little change, but would take -- more than one of us would take a look at it, either, you know, Krystal initially, Tina and myself. And then we'd say, "Okay. This looks like it's really appropriate. We are going to bring it to our infection control meeting, and, you know, make sure people are educated on it."

We have this policy board and question board for COVID so that people could even anonymously ask questions. Obviously we took questions, too, but some people felt uncomfortable. So then we would advertise them on Facebook, obviously in our policy books and on that policy board. And then we actually posted our weekly minutes, too. So team approach in these, although Krystal is the one signing off on it.

Q Okay.
A And our board is aware of that.
Q And that's true for all of them?
A All infection control policies.
Q Okay.

A There might be a policy that's not specifically infection control that's in here that might either be nursing or administrative. So there's four -- there's primarily four sets of policies within our facility: Administrative, which are signed by me; nursing generic, which are signed by the director of nursing; infection specific, which are signed by the -- signed by the infection preventionist; and food-related policies that are signed by the dietary manager.
Q And so if you turn to MAR 674.
A Okay.
Q This one is a visitation policy also signed by Krystal. So did that follow the same approach where you all kind of brainstormed together and Krystal signs off on it?
A At least for the initial policy. She was having to make some adjustment as guidance would change. So I see that this was signed on 3/25/21, you know, so if -- I'll just use this policy, for example, although I'm unsure if there's a revision.
But, say, there was a major change that impacted it in 9 of '21. Then she oftentimes would just make that small adjustment and bring it to the next infection control meeting. But the -- a lot of these policies did not exist prior to COVID. So when you're talking about policy revision, the department heads will, you know, take care of that. Policy creation is usually a multiple person approach.

Q Okay. And so you said that the board was aware of these policies?
A Correct.
Q Were they just aware, or were they approving them?
A In any formal capacity they not were -- they were not approving them, you know. I mean, so annually -- we provide them policies as we go, and annually they are given opportunity to review them kind of periodically. So, like, different sets of policies at different points of time. I would be totally fibbing you if I said them my board read them every year, all of the policies. They are more -- much more interested in new policy creation.
Q And if one of these policies conflicted with a government order, which one would you follow?
MR. SILVERBLATT: Conflicted how? Like, was more restrictive, was less restrictive?
MR. PARKE: Rob --
MR. SILVERBLATT: I mean, it's -- it's a vague question.
MS. BRIGHAM: If --
MR. PARKE: Object to form, please. You're not testifying.
MR. SILVERBLATT: I'm clarifying the question, Kim.
MR. PARKE: Rob --
MS. BRIGHAM: All right. If there was --

MR. PARKE: It's improper under the Eastern District of Michigan rules.

BY MS. BRIGHAM:

Q If there was an inconsistency between one of the Marquette policies and a government order, which one would you follow?

A I would hope we'd recognize what that was and adjust our policy. So, you know, I wish I could speak to being superhuman and saying that never happened. I guess if it happened, we didn't recognize that, and so there would have to be a good reason we wouldn't follow the order.

You know, is there a specific discussion that happened that makes that order impossible within our setting, or that, you know, we can't operationalize for a reason? But, you know, I would think the order would be what dictates the majority of things to us.

Q If you could just turn to the second page of the Exhibit, it's MAR 668.

MR. SILVERBLATT: And MAR what?

MS. BRIGHAM: Six six eight.

BY MS. BRIGHAM:

Q And if you look just at the bottom and throughout this exhibit, there's highlighting. Do you know who highlighted these documents?

A Likely me.

Q Okay. And why did you highlight these specific things?

A So just when I was trying -- just when I was trying to prepare for questions that were posed to me, I wanted to be able to go back and be, like, okay, these are the key points that I think I might have actually remember because there's -- there's so much to remember. And it happened five years ago and I'm almost 50 years old and I wish I could tell you the mind of a steel trap, but I don't.

Q So that highlighted part under 5d --

A Okay.

Q It says, "Consider designated wing/unit or floor to accept new residents." So this was March 2021. Had you already established the COVID unit at that point?

A Yes, yes.

Q So is there a reason that's worded as "consider"?

A So when you're developing policy, we try to never use always, must, never. Because as things evolve, that's when you have to go back and revise your policy. So we try to use words like consider so that if the regulation changes, we are still meeting the regulation even though the regulation might stand at the time that we must.

Q Okay. Got it.

MS. BRIGHAM: Okay. So does anyone need a break?

MR. PARKE: Yes.

MS. BRIGHAM: We can take a break -- sorry.

THE REPORTER: Okay. Off the record.

(Off the record)

THE REPORTER: Okay. We're back on the record.

BY MS. BRIGHAM:

Q Okay. So I just want to get the timeline straight regarding when the different activities were stopped and then when they resumed, so --

A I feel, like, I would need to reference something to give you a better timeline.

Q Yes, I will refer you to exhibits.

MS. BRIGHAM: Okay. So could you, please, turn to Exhibit 8?

THE WITNESS: Eight?

MS. BRIGHAM: Yes.

(Defendant's Exhibit 8 marked)

BY MS. BRIGHAM:

Q So I'm showing you what's marked as Exhibit 8.

MS. BRIGHAM: And this is Exhibit H as the government exhibit attachments.

BY MS. BRIGHAM:

Q Have you seen this before?

A Yes.

Q And how do you recognize it?

A It was something we referred to, you know, often over the evolution of COVID. So it looks, like, the original one was on October 21st, and then December 8th came and rescinded some

of the October 21st orders.
Q And is this something that Marquette followed?
A To the best of our ability, yes.
Q So if you turn to the second page -- oh, I'm sorry -- and this is dated December 8th, 2020. So if you turn to the second page that addresses visitation. So if you want to take a minute and just look at that, feel free.
A To page three that addresses visitation?
Q Sorry. Yes, page three.
A Okay. Is there something specific --
Q Yeah. So did Marquette follow this visitation policy?
A Yes. This these are the, I guess, risk levels I was referencing. I couldn't remember for sure with the a, b, c, d.
Q And so is it fair to say visitation was permitted at this time if you followed the rules in this -- in this policy?
MR. SILVERBLATT: Objection to form. You can answer.
THE WITNESS: So this is where the visits started by appointment only. I would say yes. I must just have been a little bit off on my timeline because I think I said Q1 2021. It looks more, like, end of 2020.
MS. BRIGHAM: Okay. And then if you. Could flip to Exhibit 9.
(Defendant's Exhibit 9 marked)

BY MS. BRIGHAM:
Q So I'm showing you what's marked Exhibit 9.
MS. BRIGHAM: And this is -- Exhibit I is the government order attachment.
BY MS. BRIGHAM:
Q Have you seen this before?
A Yes.
Q And what is it?
A So it's the MDHHS rescinding that December 8th, 2020, order and instead instituting a March 2, 2021, requirements for residential care facilities.
Q Okay. So is it fair to say, based on this Exhibit 8, that the previous order that we -- I'm sorry -- Exhibit 9 that we're looking at -- is it fair to say that based on looking at this Exhibit 8 that we just looked at was in effect until March 2nd, 2021?
A Correct.
Q Okay. And so turning back to Exhibit 9, is this something that Marquette followed?
A Correct; correct.
Q And if you could turn to page -- to the fourth page.
A Okay.
Q And at the -- towards the bottom in bigger font, it says, "Make efforts to allow communal dining and group activities to occur for those residents who are fully recovered from

COVID-19 or are not in isolation." And then it has some requirements for dining and group activities under that.

So is it fair to say at the time this order was in effect communal dining and group activities were allowed if you followed these four requirements?

A If you had followed them, and that's -- I had mentioned we struggled to be able to facilitate following them under the adequate physical distance and still assisting residents with eating.

Q Okay. And was that for communal dining specifically?

A Right.

Q Okay. So at this point, communal dining was allowed. You just weren't able to do it based on the resources at Marquette?

A Correct.

MR. SILVERBLATT: Objection to form. You can answer.

THE WITNESS: Correct. My recollection -- my recollection would tell me that we allowed communal dining the following quarter. So, you know -- no, March, so February, March. You know, my recollection says that we -- our communal dining didn't start until Q3. And I know with certainty that we had discussions about the -- struggling to facilitate it. What I don't know with certainty, without trying to find it in our minutes, is when exactly we started it.

BY MS. BRIGHAM
Q Okay. Could you turn to Exhibit 28, please? And this is the same document we looked at earlier, the COVID meeting minutes. And if you could turn towards the back of it to February 10th, 2021?
A Okay.
MR. SILVERBLATT: Sorry. Give me the date again.
MS. BRIGHAM: February 10th, 2021, and it's -- I know you can't see it, but it's MAR 96.
MR. SILVERBLATT: Okay.
BY MS. BRIGHAM:
Q Okay. And number three says, "Marquette County is now at a Level D for risk level. This means we are able to open up for scheduled visitation for residents." So is this the timeframe that visitations were starting up again?
A Yes, yes.
Q Okay. And then if you could turn to March 10th, 2021, please? So we just looked at the Michigan order that was issued on March 2nd, 2021. So if you look at number five, it says, "The Michigan Department of Health and Human Services order regarding visitation is the same as what we have been doing the last couple of weeks." Is that in reference to the March 2nd, 2021, order that we just looked at?
A I would say it was consistent with that.
Q Okay. And so is it fair to say that that order, at this time,

didn't affect how you were conducting visitations?

MR. SILVERBLATT: Objection to form.

THE WITNESS: Visitations weren't what they were prior to COVID. They still had restrictions within those visitations -- right -- the March 2nd still was scheduled visits and all of the those things; right?

BY MS. BRIGHAM:

Q Right. But so the order was issued on March 2nd, 2021. Did it change how you were conducting visits as compared to March 1st, 2021?

A Yes.

Q How?

A I mean because it gave more flexibilities -- correct -- from the December 1 to the March -- to the March 1.

Q Okay. So what does it mean that -- where on March 10th, 2021, the minutes say that the Michigan Department of Health and Human Services order regarding visitation is the same as what we have been doing?

A So we would have had a meeting. Oh -- okay. I was thinking this was when we still had three week -- three time weekly meetings. We must have already been to weekly at this point. So when I looked at the date of March 10th, and you gave me that reference, I was, like, well, that was March 2nd. We probably made the change on Monday, because at one point our meetings were Monday, Wednesday, Friday. So I apologize.

That's why I had given you that answer. So I don't know. I mean, I remember seeing very clearly and discussing that, you know, rescission of March 8th from December -- you know, from December to the March 8. I would have to -- I'm sorry. I'm giving you wrong dates. March 2nd; right? December 8th to March 2nd?

Q Uh-huh-huh.

A I would have to go back and look at what those changes were and why we would document that there were no changes for us.

Q Okay. Excuse me. Okay. Can you flip to -- still looking at Exhibit 28.

A Okay.

Q Can you flip to March 24th, 2021, please? So if you go down to number five, it says, "Visitations are very busy. No one is being turned away." So when you say "no one is being turned away," what is meant by that?

A We were just very concerned that it was very -- you know, for housekeeping to disinfect between and for us to keep up on the scheduled visits and facilitate them to the right space so that they knew where they were going and went to the right area, that we would do what -- everything we could, no matter what it took, to make sure that anybody who wanted to schedule a visit was able to do that, you know.

And that's where it says, then, Jerry had to get some, you know, staff reinforcements to facilitate that. So

we were very concerned that if that would come up, we would -- you know, that would be a quality of life thing for a resident.
Q And so when you say "no one is being" -- or when the meeting notes say "no one is being turned away," that means everyone who want -- who isn't quarantining who wants to have a visit is able to have a visit?
A Visit. We did run into a little bit -- like, everybody wants, say, you know, 4:00 o'clock. And we had to be like, you know, there is only so much space at 4:00 o'clock, but they were all facilitated.
Q So only so much space as -- at 4:00 o'clock, what do you mean by that?
A So, you know, in order to keep residents at -- following the guidelines of social distancing, there's only so much space. So, you know, we had to just open more times, stay here later, you know, so that we could make sure that the schedule needs met the visitor's requirements more than the resident's requirements. Or needs, I don't want to say requirements. That sounded --
Q And if you look at number eight it says, "Communal dining is still being discussed as per new guideline set by MDHHS on March 17th, 2021." So communal dining is still being discussed. Do you know what is meant by that?
A So I don't want to reference a different exhibit, you know,

with -- but -- and you look at the March 10th ones that we are looking at, number seven, and it does say kind of what I was referring to earlier. Communal dining is something we'll need to look at since the solarium, which we had chose to try not to use because we want to use it for other things that need social distance, was the only place we can properly social distance for meetings for, you know, other things.

Again, if we put them in the dining room, our social distancing doesn't allow the right number of residents with the amount of assist they need. So that was -- those were the challenges we were facing. And so, yes, the order said we could do those things, but we were unable to do it within the constraints that our building provided to meet all the requirements of, you know, the code of regulations.

Q So at this point you're discussing whether it's possible to try to do this?

A Correct.

Q Could you, please, turn to April 21st, 2021?

A Absolutely.

Q So number eight says, "The salad bar will be offered a couple times a week in the cafeteria." So can you tell me about -- about that?

A I'm surprised that's even in the minutes. So during COVID, we decided as a staff benefit, we would make meals free. And the salad bar is just kind of, you know, one of those, in general,

easily transmissible illness kind of setups because it's buffet style. So for the longest time, we didn't have one. So you had to have the entree. And the staff really were advocating for a second choice.

So that's just in the staff caf, and we were saying, "Hey, we're now giving you free lunches, you know, don't take both."

Q Okay. So the salad --
A It had nothing to do with residents.
Q Sorry. Go ahead. So the salad bar wasn't communal dining? It was just --
A No, it was just, like, separately complete and in the cafeteria.
Q Okay. It was just another meal option, basically?
A Just for employees.
Q Oh, for -- okay -- for employees? Okay. And could you turn one page to April 28th, 2021, please? So number eight says, "Activities are resumed." At what -- sorry. What activities were those at that -- at that point?
A Let me check something just because I think I can give you a better answer because we were having activities at this point. I'm trying to -- you know, they were just more side of the building versus whole building things. So I was trying to look to see if there was an outbreak that we had to do one round of testing for that maybe halted them. I don't see that

reflected in here, but I have seen references to when that one round of testing is being done, like, you miss a day of whatever that might be there.

I don't think that's reflecting any significant change in what we've previously discussed, though. The only thing I can think of is because I think church was coming back around this time.

Q So I believe I saw church earlier. I remember it somewhere.

A I want to say it was on that same 10th one maybe.

Q Yes. If you look at March 10th, 2021, number seven says, "Activities and church services will be starting up."

A So I think that's when, you know, church was back in full swing. It just took us awhile to get somebody to -- actually willing to come in.

Q Okay.

A So right around April is when we were able to provide religious services.

Q And then sticking with April 28th, 2021, number nine says, "Once therapy department can get back to their main gym, we will start up more communal dining areas." So my first question is more communal dining areas, does that mean there were currently communal dining areas?

A I guess one thing I have been assuming in all of your questions is that you meant specifically the dining room as a communal setting. So prior to this, probably weeks before

this, we allowed -- so if you walked down our halls right now, we have small tables in -- within our units, two or three of them. And as soon as communal dining was allowed, and they were vaccinated, we allowed them to sit at those small tables together. You can only facilitate typically two to three residents, depending on how many need assist. You couldn't get them in a full group setting.

And I apologize that the majority of my answers were focused on large group communal dining, meaning in the dining room. So I may have misspoke in regards to that. I think of communal as, you know, more than two or three people. And that's, I guess, why I answered that way. So each unit had at least two, sometimes three, small group tables that people could sit at as soon as it was allowed.

Q And when did that start up?

A That would have been probably at -- I would say late Q1 2021 because I think that's when that order changed.

Q And about how many of these tables were there on each wing?

A So, you know, the 100 has two, the 200 has two, but I think that the 400 had three just because of how many people needed assist with eating at the time. So two, four, six, seven, eight, nine -- nine within our main building and likely the special needs unit returned to their family style because, again, it's -- you know, so they would have immediately went back to the old -- once that was allowed, they would've went

back to complete communal dining since it's only 15 people on a unit there. And they have, like, a big 15 person table. Yeah, 700, of course, still wouldn't be participating in this scenario.

Q Okay. So in number nine, that's what, "Starting up more communal dining," is referring to?

A Yeah.

Q Is referring to a big group dining room?

A Like, a big -- like, in a dining room versus in -- on your unit.

Q Yeah.

A So I apologize. I was thinking larger group communal definition.

Q Okay. "And so once therapy department can get back to their main gym," can you just clarify what that means?

A So let's see the -- that was April. So probably second rounds of vaccinations were happening right around then. So, you know, to get fully vaccinated where we could limit more of the social distancing and get in one space of the gym because of the square footage it allowed, we just had to wait for everybody to get to that 14-day mark of getting their second one.

So unfortunately, yes, vaccines might have been available earlier than that, but we had a rural setting where everybody wanted them. So it was very hard for us, and we

couldn't just give COVID vaccinations. It had to be facilitated by a specially-trained person, typically a pharmacist. So we were giving our second round right around that time. So that's the only thing I can assume was delaying them from getting back in there, is so that the majority of people were fully vaccinated. Social distancing, which was a requirement, was minimal then.

Q Okay. And could you turn to May 12th, 2021, please? So, starting with number seven, "Outdoor visitation will start on Monday," was that delayed because of the weather?

A Weather, yeah.

Q Okay. And once that started, what did outdoor visitation look like?

A It -- you know, outdoor visitation just opened up more space for us and outdoor visitation, because it was, you know, fresh air or basically under the, you know, guidelines just it -- I want to -- I'm questioning myself. I still feel, like, we were setting up tables at one point that were specifically six feet so that they could sit on one end. Was that at -- I know we were doing that at some point. I'm just trying to remember if it was at that point because it was perfect. Six foot tables, you know, gave you that six foot dimension.

No, because I feel, like, pretty soon people were allowed to eat even at theirs. So I think I'd have to refer back to orders, but I think once we were allowed with --

people would have been vaccinated, there wasn't even any social distancing required. It was just scheduled so that you could make sure you're doing all the screening that was required at that point.

Q Okay. And did outdoor visitation help relieve some of the busyness of the indoor visitation?

A Not -- I think we had more shifted area than reduced the busyness. It still required the same on the staff, if not more, because they were running inside and outside. The nice thing was you had less to clean because there was less high touch surfaces outside.

Q And so number eight says, "Visitation for the 700 residents are as follows: If here for rehab and not quarantined, they may have a visit in the main building or outside." So at this point were there non-COVID patients staying on the 700 wing?

A There was those, like, one or two that I mentioned that I think we talked about in the previous minutes, too, that were just the space of time, and then we closed it in June. You had referenced the one that said "four rooms left," and you asked what we were doing with the other eight. I think this is at the time -- the same timeframe.

Q Okay.

A So, yes. I think we were only successful with maybe one or two residents and then closed the unit, but they were there.

Q Okay. And if you could turn to June 2nd, 2021, please? So

number 10 says, "The dining room has gone well, but we must be using all available space." So at this point was communal dining --
A It must have --
Q -- in the sense of using big dining rooms, open back up?
A It must have happened. I was thinking it was more towards the end of -- I was thinking it could happen more towards the, you know, like, Q3. But it must have happened in Q2. I think there is going to be references to during outbreaks and closing that again, but it must have been happening routinely at that point.
We were just having problems with staff congregating residents who need assist at one table, and we still needed to be social distancing. So we needed to have, like, an independent resident at a table with a assist so that you could space them out further. Again, back to the wing span concept.
Q Okay. And when you -- when it says, "We must be using all available space," is that the three dining rooms?
A No. The problem was, again, staff in the dining room finally being really excited to hang out together. I would be lying if I said not to. So they all wanted to go to table one, and we needed to use all -- there was actually, I think, like, 12 at that time. We have different tables in there now, but there was, like, ten tables available, and you'd find them all

at three or four because they hadn't talked to each other in a year, you know.
Q So that's referring to using all the tables, not necessarily the dining room?
A Correct; correct.
Q Okay. And when there was an outbreak scenario for those who were on unaffected wings, were they able to still do communal dining at those smaller tables?
A And we still even, at that point, had some dining room dining. I guess I take that back when I'm saying it closed. They were closed for the affected wings. I remember we'd always have to say in the morning what wings were allowed to go to the dining room to food and nutrition at that point because then they would know who to expect.
So, you know, once that first round of testing was done, it might only be closed for a day. Because once that first round testing is done, if there is no contact tracing that put anybody else at risk, then maybe, you know, 2- and 300 were still going to the dining room.
Q Okay. Let's see. We already talked about that one. Can you turn to June 16th, 2021, please? So number five where it says, "New guidance came out on Tuesday. Only two people can visit for both indoor and outdoor visits." Was that two people per resident or the whole facility?
A No, two people per resident.

Q Okay. And do you know what guidance that was?
A I don't know what guidance. I do recall reading it, but I don't specifically -- I want to say state guidance, so MDHHS. I remember the age being a big thing because I think the age just wasn't addressed in any of them at one point, and then they had to clarify. So, like, it said something vague, like -- I don't want to say "adolescent," but, like, some word like that where we were trying to figure out what the definition was at one point, but I thought that was earlier in 2020 where that vagueness came. "No one under the age of 13 will be able to visit."
Q And was that in the same guidance as the two people limit?
A As the two people.
Q Sorry. Was that --
A Yes, yes.
Q Sorry.
A I'm sorry.
Q Thank you.
MS. BRIGHAM: Could you turn to Exhibit 33, please?
THE WITNESS: Oops, sorry. I went to 34.
(Defendant's Exhibit 33 marked)
BY MS. BRIGHAM:
Q So I'm showing you what's marked Exhibit 33 and Bates stamped MAR 152. Do you recognize this?
A Yes.

Q And how do you recognize it?
A I, you know, remember the discussion as well as the memo that Jerry put out after we discussed -- I think you can even see in the main minutes where we were trying to get an out-of-state travel nurse even to try to help us keep that wing open. And we were unable to keep the wing open. And again, once we didn't have to quarantine, we decided to just, you know, only use it for COVID-positive residents in the event that that came up.
Q Okay. So this is just memorializing what we've talked about earlier, that the 700 wing was not going to be staffed anymore unless it was needed?
A Correct; correct.
Q Okay. And when it says, "The dining area will remain open," is that the dining area on the 700 wing?
A Right. Because it -- you know, back to the math it's always been something 100 has kind of used. It's an L-shaped one, so it's just bright and beautiful compared to our old one. We needed more dining space. So they could mix if they wanted prior to COVID, but you'd almost find that the 100 people would stay on the L that's closest to the 100 wing, that part of the L. And the 700 would stay on the part that's closer to Katie's desk.
MS. BRIGHAM: Could you please turn to Exhibit 34.
(Defendant's Exhibit 34 marked)

BY MS. BRIGHAM:
Q I'm showing you what's marked Exhibit 34 and Bates stamped MAR 106. Do you recognize this document?
A Yes.
Q How do you recognize it?
A So it appears to be our monthly COVID minutes. We had weekly and then we had month- or infection. I should say COVID-specific. I'm guessing it's -- is it the COVID-specific ones? No, it's all the infections, monthly ones kind of summarizing what happened in that month.
Q Okay. That was my question. So how is this different from the COVID-specific minutes that we talked about?
A It typically shouldn't be significantly different except that it addresses other illnesses. So, like, you can see in paragraph two, it'll start to go over other healthcare-acquired infections. So that's what that HAI stands for, healthcare acquired infection, and, you know, part of our -- this has been a requirement of our infection control program the entirety of my career here. It just became so COVID focused once COVID was here.
Q Okay. So this just encompasses COVID and everything else?
A Correct.
Q Okay. And who would go to these meetings?
A Our medical director and what we call our interdisciplinary team. So our physical plant manager is there, our activities

coordinator, the director of nursing, assistant director of nursing, education coordinator. We even have union representation there all the time. Our assistant administrator, our secretary, our MDS team, the large majority of department heads or supervis- -- anybody in a supervisory capacity.

Not hugely different than our weekly meetings, but we would go over other things. You know, it was part of our -- honestly our quality assurance and performing improvement. We did use that document -- this document coincidently for that, too, so there were other conversations.

Q Okay. So shifting gears a little bit. How were Marquette's -- how was Marquette's revenue impacted during quarters one through three of 2021?

A So if you look at our -- you know, just 2019, our revenue -- I'm trying to think the simplest way to answer this. So our revenue obviously is based primarily on our room and board services. Then in addition to it, our higher reimbursement for short-term rehab, including, you know, therapy -- skilled therapy stays.

So when you look at our 2019 complete, you know, census days we had collected, it's somewhere in the 30,000's. Twenty-two's are -- is somewhere in the 40,000's, and 2021's goes back to the 30,000's. Now, of course, in early 2020, we were kind of riding the high of, you know, the 700 wing being

really successful.

And so when you look at the, you know, conservative view on this, if we were able to even capture those 2700 days that we didn't capture from 2019 to, you know, 2021 -- because, of course, it's a more conservative measure than '20 to '21 -- and multiply it by our lowest payer source, again, if my math is correct, that's $945,000, you know.

So trying to maximize our census days in 2021 was a huge challenge. We were setting aside the 15 beds no matter where they were, because, again, yes, we did use beds for quarantine on the CRF unit. Where, in the first quarter, we were obviously holding a bed somewhere else to eventually get that person to after the 14 days. You know, COVID-related challenges, once we could feel we could just use the 700 for CRF beds and just save them for if there was COVID, when we recognized our staffing challenges and couldn't even get out-of-state nurses to come, we, you know, closed that unit.

We faced economic challenges by having to, you know, get travel staff, which didn't exist prior to COVID, and -- and pay them so much more hourly, than, you know, we would have. We saw, you know, some pretty significant rate increases over those two years, both in our Medicaid and our Medicare rates.

And when COVID hit the world, not just the skilled nursing facility, you didn't see even the available people

having elective surgery such as hips and knees, and, you know, the short-term things that we were getting the high reimbursement from. People weren't having those surgeries unless they actually had to. And at one point they weren't even allowing those surgeries during COVID. So our pool to even try to facilitate getting someone into a bed, was significantly reduced.

I, you know, you look at our -- our therapy minutes and, again, I'm giving you a conservative approach as to how much money we were impacted by, but there's a quarter, I want to say Q3 is -- from '19 to '21 is, like, literally 50 percent of the minutes. And, again, is that all because of what was happening specifically in the skilled nursing facility with COVID? I think it was happening, but how COVID was affecting everybody's regulatory requirements and what you saw happening in healthcare, which, unfortunately, trickled down to -- to a significant impact for us.

It takes awhile to build your census. So even in 2020, when there was a halt to admissions, it's not, like, you can start taking admissions, and you have 15 people lined up at the door that day. That's -- that's not, especially in rural America, how that works, you know. It's -- we saw, on average, an increase of ten consistent beds over the last three years where we could be, you know, from 109 on an average census to finally 119 to finally 129.

And this year that's kind of our marker, you know, getting to that 129. We are at 130 today. I mean, we got to 136 for one day. You would have thought this place would do cartwheels. Anyway, so that has affected us significantly financially trying to build and -- and be consistent in that.

Q And would that -- would the impacts to revenue and gross receipts, would that be reflected in the balance sheets and the statement of operations that we looked at earlier?

A When there's evaluation of the ERC and your qualification for the ERC, you know, they're looking at total revenue. So, you know, if you look at our -- specifically resident revenue, like, what we were driving for that revenue and what that could have been, so we might have not seen -- you know, we might have what looks like equal revenue. But you have to recognize what we could have been seeing, you know.

So does it look like we had significant increased loss day-to-day? No, because our reimbursement rates were a little bit higher. So even with our census being lower, you don't see a huge gross impact just to the dollars and cents of things. But the impact on what would have been, without COVID -- because you could -- you could clearly see our business was growing prior to the restrictions that it placed upon us, is, you know, somewhat exponential when we were having such a great experience with the highest reimbursement system that we were getting. You know, that was unique for

us.
Q Understood. But if I -- if I just wanted to look at revenue, putting all of the other factors aside, would the statement of operations and balance sheets that we looked at earlier, would those documents give me the information I'm looking for?
A To just what our income loss -- what our net gain and loss was?
Q Correct.
A Yes.
Q Okay. I just wanted to clarify something if you could turn to Exhibit 15, please? So we looked at this document earlier, and I just wanted to make sure I understood correctly. So the column that says "current activity," is that for the first quarter of 2019, or is that for just March 2019?
A So this was run on 3/31, so the year-to-date should be as of 3/31 so current activity should be monthly.
Q Okay. And so would these -- would the statement of operations exist for January and February 2019 as well?
A Correct.
MS. BRIGHAM: Okay. Could we go off the record for a second?
THE REPORTER: Sure. Off the record.
(Off the record)
(Defendant's Exhibit 35 marked)
THE REPORTER: Okay. Back on the record.

BY MS. BRIGHAM:
Q Okay. So I'm handing you what is marked as Exhibit 35. Do you recognize this document?
A Yes.
Q And how do you recognize it?
A It's just the language that we used for our millage renewal that I had in an email.
Q And what time period is this applicable to?
A So our millage renewal was in 2024, but the .55 mills has existed as long as I can recall, but it's -- it's renewed every five years.
Q So would the -- this policy have been the same in 2021?
A It's not really a policy. It's just the language that was going to go on the ballot that the county clerk had sent me in an email. But, yes, it should have been that same volume in 2021.
Q Okay. And would it also have been the same in 2019?
A Correct.
Q Okay. And could you just, in general terms, explain what it means?
A So we have an operating millage through the tax payers where .55 mills -- 55 cents for every $1000 of taxable value on real estate -- goes to the county. Or, I mean, your -- it goes to the county eventually. In our area, at least, it's collected by maybe your township, your city, whatever, and the county

eventually has that money. That's where they pay us for -- they pay directly to the state our maintenance of effort.

They pay us directly $1,000,000 a year, at least currently. I don't remember what year that changed, but I think it was, you know, prior to 20- -- just prior to 2019. And then the rest of the money is kept in a -- an account under the county themselves where they earn the interest, and if we wanted to access more than that, we would have to go to the commissioners for approval.

(Defendant's Exhibit 36 marked)

BY MS. BRIGHAM:

Q Okay. I'm now handing you what's marked as Exhibit 36.

MS. BRIGHAM: Sorry. Rob, this is their -- this document.

MR. SILVERBLATT: Okay.

BY MS. BRIGHAM:

Q So the chart in the middle there, can you just explain what that means?

A Absolutely. So when you look at "payer type," it says "private pay." So the rate we obtained from somebody who was paying directly, had no insurance, per day in 2019 was $330, in 2021 was $350. So obviously the difference, meaning the increase was $20. So the Medicare average -- why it's an average is we are currently under what is called a PDPM model for Medicare reimbursement, and it depends on diagnosis and

ancillary therapy and quite a few things that -- so this was the average reimbursement rate for 2019, if you took all of the, you know, amounts that we got and divided it.

And then that went -- increased in 2021 to $551.89 for an increase of 64.52. Medicaid, which is our lowest for payer, but Medicaid -- between Medicaid and Medicaid ICO is our highest volume, went from 317.99 in 2019 to 343.85 in 2021 for an increase of 25.86.

Our Medicaid ICO, which is Upper Peninsula Health Plan, again, just a different -- very similar, not much different between Medicaid and that, but the rate is a little bit different, went from 323.41 and 2019 all the way to 407.56 for a difference of 84.15.

And Hospice Medicaid, which is a small group, that's for end of life. The 2019 rate was 367.51. That 2021 rate was 392.48 for an increase of 24.97.

Q And who drafted this piece of paper?

A Allecia and I talked about it together because we were just trying to summarize some of the information we gave you so we could see what the outcomes were. So I don't recall. She may have typed it while we were talking or -- or I may have.

Q And was that -- that was recently?

A Recently.

(Defendant's Exhibit 37 marked)

BY MS. BRIGHAM:

Q Okay. And now handing you what's marked as Exhibit 37, and this is the quarterly employee counts email. Have you seen this document before?
A Yes, yes.
Q And what is it?
A It's -- I know that we had submitted the employee counts at some point, and I couldn't find it in the stack of information I had. So I asked Barb from payroll on Monday, obviously June 22nd, if she could just look at those numbers really quick for me in case I -- I just wanted to put them to my head in case you asked me questions. And so it reflects both all the 2019 quarter employee totals, the 2020 and the 2021.
Q So when it says "first," that's referring to the first quarter?
A First quarter. "Second," second quarter, yes.
Q And are these all employees, or are they differentiating between full-time and part-time?
A They're all employees. All employees that are not contracts. So not UP Rehab, not the hairdresser, not the dentist.
Q Okay. And do you know how Barb got this information?
A I don't have access to payroll, so I asked -- I asked her, "Is there a simple payroll count for those quarters?" And she said yes. So I assume payroll, although, I didn't see where it was generated from.
Q So she, likely, pulled it from, like, a payroll software that

that you used?
A Correct.
(Defendant's Exhibit 38 marked)
BY MS. BRIGHAM:
Q I'm handing you what's marked Exhibit 38. This is the travel aide nurse cost email.
A So I asked Allecia if there --
Q Have --
A Oh, sorry. I thought you just wanted me to start explaining.
Q That's okay. Have you seen this before?
A Yes.
Q And what is it?
A So I had asked Allecia if there was a quick way that we could see what our expenditures and travel aides were and when they started, because I honestly couldn't remember when we started using them. And so I initially, I'll be honest, asked Barb, and she's, like, "Okay. I'll go to accounts payable and start looking under the vendors," and Allecia is, like, "Actually, I kept that under a specific GL. I'll just get it for you really quick." And then that's when she produced, this for 2019, 2020, 2021, and 2022.
So the expenses incurred reflect any travel staff, meaning both nurse aides and nurses.
Q And what do you mean by "travel staff"?
A So agency staff. So we contract with primarily MNA and Lake

Superior Nurses to provide us, you know, contract -- like, non-direct employee, non-benefited, typically 13-week rotation nurse aides and nurses.

Q So when we talked earlier about the need to go to staffing agencies for nurse aides, is that what this is referring to?

A Correct.

Q Okay. And is this -- does this just reflect the cost incurred?

A Correct.

(Defendant's Exhibit 39 marked)

BY MS. BRIGHAM:

Q Okay. I'm handing you Exhibit 39.

MS. BRIGHAM: And Rob, this is the occupancy percentage email.

MR. SILVERBLATT: Okay.

BY MS. BRIGHAM:

Q Do you recognize this?

A I do recognize this.

Q And what is it?

A So we are required for -- on our cost report to reflect what our occupancy is as part of our calculation for our daily rate. And Allecia gets sent the cost report from Plante Moran directly. So I asked her if she could find it quicker than I would be able to in our, you know, 47 printed pages of the cost report. And so she was able on June 22nd to pull the

occupancy rates for us. Again, this is where the 85 percent is, you know, hugely impactful for us.
Q And that's for -- for each year, that's for the entire year?
A Correct.
Q Okay. And could I also find that information on the census documents we looked at?
A Well, this is an average for the whole year, so I don't know that we -- you know, like you -- the ones you got were, like, month-by-month, weren't they? Or I don't know if you had one that would easily tell you for the full year without doing math.
Q If I did the math would I get these numbers?
A Oh, yes, yes, yes.
Q Okay.
A Because these reflect the true occupancy where on our cost report for at least '22, the occupancy would be higher because we used a non-available bed plan. So this is just true occupancy without that.
(Defendant's Exhibit 40 marked)
BY MS. BRIGHAM:
Q Okay. I'm handing you what's marked Exhibit 40.
MS. BRIGHAM: And this is the document.
BY MS. BRIGHAM:
Q Do you recognize this document?
A Yes.

Q And what is it?
A So this is the net resident service revenue versus the total operating revenue, which gave us our operating loss. You know, I was trying to sort out what the difference was between, kind of, revenue buckets in case that question came up. Even though we provided all the financials that get you these things in a different manner, to be able to put them better to memory, because I was afraid what -- how much I had to recall from such a long time ago.
Q And who created this?
A This -- it was either myself or Allecia. I'm sorry. We, like, divided the list and concurred. So I'm guessing this one might have been me just because the other ones were in emails from her.
Q Okay. So the last row that says "total COVID funds from CARES funding and DCW reimbursement," what is DCW reimbursement?
A Oh, I'm sorry. That's the same thing that's, like, that COVID-19 on lots of the income statements. That's where direct care worker reimbursement, we're getting reimbursed from the state for that stipend that's changed. Like, at this point, it's $3.40 an hour for staff.
Q Okay. And so there's nothing for 2019, but for the other three quarters, is that -- does any of that include CARES funding?
A Yes, yes. So that's them put together, the direct care worker

reimbursement and the CARES funding.
Q And what CARES funding is that?
A So, again, the state was allowed from the feds to allocate funds, and we could use them for, I mean, quite a few purposes. Like, we got portable air purifies. We got, like, actual systems in our air handling with some of them. We got, like, specialized PPE with some of them. They were, you know, basically anything that -- it was a pretty broad use as long as it related to infection control.
Q Okay. And so that row is combining the --
A Correct.
Q -- funding for CARES and DCW?
A Correct.
(Defendant's Exhibit 41 marked)
BY MS. BRIGHAM:
Q Okay. I'm handing you Exhibit 41, and you can flip through it first if you need to.
A I'm familiar with it.
Q Okay. And how are you familiar with it?
A This is my very -- not great penmanship on the front. And so, again, not sharing -- not knowing exactly what financial information you were going to look for, I went through our audited net positions for the last few years and just had them listed so I could try to put them to memory in case that question came up.

You know, again, the documents were provided in other forms. I was just trying to get some summary of it just to help me as my study guide since there's so much to retain.
Q So the first page with the handwritten notes, is that your writing?
A Yes.
Q And what do those numbers mean?
A So 2018, 2019, 2020, 2021, and 2022. So I went and looked at what -- you know, if you look at 2018 and you look at -- did I print the wrong page when I went to actually do this? No. Then you go and look at the operating loss, it's the $55,011. And then if you look at the 2019 on page two, they'll tell you the operating loss is that 1.913846. And, again, it was just a way for me to try to put it better to memory. Use your five senses, you know, listen, read, write.
Q Okay.
A I don't know if you can smell it.
Q And so if you flip to the first page after your handwritten note, where are -- where is this document coming from?
A The -- oh, the whole document?
Q Yeah.
A This is an audit presentation that they -- they give to the board every year based on the 47-page audit packet. And so I knew that it was really quick for me to access, so I just went to the slides instead of the actual large document.

Q And who prepares these?
A Plante Moran.
Q Okay. And is this basically just a condensed version of the balance sheet for the year?
A Correct.
Q Okay.

MS. BRIGHAM: Okay. I am -- well, I am finished for right now. Rob, did you want to do any cross?

MR. SILVERBLATT: No, I have no questions. I just wanted to note for the record that Exhibits 35 to 41 were provided in response to the question that was asked earlier about documents that the witness looked at to prepare for the deposition. They were provided during the break without any waiver of work product.

MS. BRIGHAM: Okay. Thank you. So we are going to hold the deposition open pending discussions with counsel, but otherwise, I don't have any further questions.

MR. SILVERBLATT: All right. Thank you.

THE WITNESS: Okay. Before we go off the record, can't I get your orders?

MR. PARKE: Can we get a rough whenever the normal time for that is?

THE REPORTER: Okay.

MR. PARKE: And, yeah, normal time on the transcript is -- or I mean, on the transcript is fine.

THE REPORTER: Okay. E-trans?

MR. PARKE: Yeah.

MR. SILVERBLATT: We'll do just a copy on the regular timeline.

THE REPORTER: Okay. Thank you.

(Deposition adjourned at 5:05 p.m.)

CERTIFICATE

I, Pamela Rankinen, Certified Electronic Reporter and Notary Public in and for the State of Michigan, do hereby certify that the foregoing transcript, consisting of 264 pages, is a true and accurate record of the testimony of Denise Laverne Perry taken in this matter on June 23, 2026.

I further certify that, prior to giving testimony, Ms. Perry was duly sworn to tell the truth.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of July, 2026.

*Pamela Rankinen*

________________________________
Pamela Rankinen, CER 4532
North Coast Reporting
Notary Public, State of Michigan
County of Marquette
My commission expires: 02/07/2031

**A**

**abilities**
162:2
**ability**
22:15, 37:8, 138:8, 151:22, 153:9, 189:2, 190:18, 199:15, 215:22, 228:3
**able**
11:4, 42:14, 49:3, 54:21, 73:24, 74:5, 80:16, 85:21, 107:8, 108:23, 110:14, 114:19, 115:13, 119:12, 120:18, 124:17, 128:10, 128:13, 136:23, 138:15, 139:25, 151:3, 155:2, 155:15, 156:8, 156:10, 160:12, 161:24, 162:4, 162:12, 163:1, 166:18, 167:4, 168:11, 169:8, 181:23, 186:18, 191:17, 195:9, 202:19, 203:9, 204:7, 204:9, 204:12, 206:25, 208:22, 209:19, 214:4, 216:7, 218:14, 226:2, 230:7, 230:13, 231:13, 233:23, 234:7, 237:16, 243:7, 244:11, 248:3, 257:24, 257:25, 259:7
**above**
61:18, 133:21, 165:13
**absence**
16:17, 17:8, 127:12
**absolute**
24:5, 24:24
**absolutely**
42:6, 48:18, 112:10, 121:23, 128:12, 129:12, 147:12, 147:22, 151:6, 160:17, 164:21, 187:19, 210:14, 211:25, 213:3, 219:8, 235:19, 253:19
**absorb**
52:23, 53:17, 56:8
**absorbs**
97:23
**abuse**
17:1
**accelerate**
186:19
**accept**
23:20, 34:17, 93:15, 226:10
**accepted**
217:20, 218:6, 218:10
**access**
25:15, 25:24, 26:6, 102:11, 107:1, 115:10, 115:13, 126:3, 165:15, 205:21, 253:8, 255:21, 261:24
**accessed**
25:22
**accessible**
172:24
**accidents**
52:4
**accommodate**
137:5, 137:9, 155:15
**accommodating**
135:22
**accommodations**
148:14
**account**
3:2, 3:3, 112:14, 112:16, 112:18, 112:23, 113:3, 114:22, 114:24, 115:6, 116:7, 116:9, 116:19, 117:6, 117:21, 117:22, 117:25, 118:1, 118:2, 118:7, 118:9, 118:10, 120:5, 120:17, 123:14, 124:15, 124:18, 124:22, 124:24, 124:25, 125:8, 125:10, 253:6
**accounted**
119:18
**accounting**
88:14, 98:7, 119:9, 121:14, 124:4
**accounts**
96:24, 98:15, 99:7, 112:11, 112:15, 112:25, 114:2, 115:11, 115:15, 115:16, 115:20, 120:7, 120:9, 120:13, 120:20, 120:22, 121:25, 122:7, 123:5, 123:7, 256:17
**accrue**
122:10
**accrued**
122:8, 122:12
**accumulated**
121:13
**accumulation**
209:2
**accurate**
7:6, 98:5, 164:10, 264:5
**ach**
115:2
**acquired**
29:20, 246:17
**acrisure**
125:7
**acronym**
32:14, 47:7, 47:11, 78:1
**acronyms**
78:19, 210:1
**across**
100:19, 130:15, 132:10, 164:15
**act**
18:18, 29:7, 29:10, 29:12, 30:12, 207:9
**action**
16:13, 26:14, 26:21, 29:22, 29:25, 30:13, 30:16, 158:25, 159:4
**active**
33:17, 68:16
**activities**
21:17, 36:16, 53:22, 53:23, 67:22, 68:1, 68:2, 68:4, 72:16, 73:4, 73:6, 74:2, 74:8, 74:11, 75:15, 76:13, 82:9, 82:11, 82:13, 100:14, 100:16, 109:7, 142:23, 143:21, 149:7, 192:13, 192:16, 192:17, 193:4, 194:5, 194:10, 194:25, 199:23, 206:24, 207:6, 215:12, 227:5, 229:24, 230:2, 230:4, 236:18, 236:21, 237:11, 246:25
**activity**
59:6, 59:7,

67:13, 67:24, 67:25, 68:7, 74:10, 76:16, 90:23, 98:3, 99:13, 101:6, 106:7, 147:1, 195:2, 204:20, 251:13, 251:16
**activity-based**
187:9
**acts**
161:4
**actual**
59:1, 81:14, 88:20, 105:1, 153:9, 156:3, 173:23, 260:6, 261:25
**actually**
11:11, 11:16, 15:13, 44:19, 58:22, 64:6, 71:3, 71:15, 72:4, 93:11, 120:23, 122:14, 127:5, 127:21, 135:20, 135:21, 138:20, 145:8, 156:7, 156:19, 162:17, 165:19, 222:18, 226:4, 237:13, 242:23, 249:4, 256:18, 261:10
**acuity**
35:2
**acutely**
13:13
**ada**
148:13
**adams**
60:3
**adapt**
221:22, 222:6
**adaptive**
53:11, 103:14
**add**
35:5, 48:22, 134:2
**added**
136:14
**adding**
120:11
**addition**
71:5, 151:8, 151:9, 247:18
**additional**
9:25, 15:24, 87:23, 108:20
**address**
27:20
**addressed**
244:5
**addresses**
161:6, 228:6, 228:8, 246:14
**adequate**
162:2, 230:8
**adhere**
164:13, 209:10, 218:17
**adjourned**
263:6
**adjust**
45:5, 124:2, 166:25, 225:6
**adjusted**
51:10
**adjustment**
93:16, 93:17, 93:21, 93:22, 119:17, 119:20, 119:21, 120:4, 187:6, 223:15, 223:21
**adjustments**
93:13, 119:15, 120:2, 172:25
**adl's**
36:15, 36:18
**administer**
13:19
**administration**
13:16, 13:17
**administrative**
223:3, 223:4
**administrator**
7:20, 10:13, 11:1, 11:2, 14:18, 18:4, 18:6, 18:11, 21:4, 21:19, 22:6, 22:10, 23:11, 25:18, 27:15, 32:25, 33:19, 48:20, 59:11, 64:16, 87:25, 111:8, 160:12, 247:4
**administrators**
86:10, 159:8
**admission**
22:2, 37:7, 38:14, 45:25, 126:19, 127:8, 129:9, 149:6, 152:20, 160:24, 173:9, 180:22, 181:6, 185:19, 199:20, 216:3
**admissions**
83:20, 125:25, 129:14, 129:19, 134:25, 146:14, 151:22, 168:11, 169:6, 185:4, 185:22, 186:1, 189:1, 189:2, 189:15, 189:19, 190:16, 191:13, 191:18, 249:19, 249:20
**admit**
3:7, 125:18, 125:24, 127:1, 128:10, 128:13, 157:1, 157:14, 185:5, 189:10, 191:4, 191:6
**admitted**
36:13, 45:18, 126:20, 127:2, 148:11, 185:5, 186:13, 189:9
**adolescent**
244:7
**adopted**
220:2, 220:15, 220:20, 220:22
**advantage**
40:13, 41:2, 41:18
**advertise**
222:16
**advised**
158:21
**advocating**
236:4
**aetna**
96:14
**affairs**
15:22, 15:23, 159:16, 217:6
**affect**
29:1, 128:9, 131:14, 140:5, 149:4, 150:12, 162:3, 232:1
**affected**
85:8, 129:19, 145:19, 149:5, 151:22, 188:14, 215:24, 243:11, 250:4
**affecting**
72:19, 189:2, 249:14
**affects**
38:6, 38:8, 45:9, 45:14, 47:25, 64:1, 84:15, 84:16
**affirm**
4:22
**affirmative**
6:7
**afraid**
187:21, 187:22, 259:8
**afscme**
19:5, 139:15
**after**
10:6, 10:8,

11:9, 49:14, 50:21, 119:18, 164:7, 181:9, 181:12, 195:5, 211:6, 213:13, 214:6, 215:23, 245:3, 248:13, 261:18
**afternoon**
13:1, 61:21
**afternoons**
61:14, 66:23
**against**
85:16, 85:19
**age**
244:4, 244:10
**agencies**
145:4, 257:5
**agency**
142:15, 142:17, 144:12, 167:7, 256:25
**agency-staffed**
145:11
**ago**
40:17, 226:5, 259:9
**agree**
21:8, 93:15
**agreed**
160:4
**agreeing**
93:23
**agreement**
27:10
**agreements**
64:5, 211:5
**ahead**
50:9, 87:19, 89:8, 213:12, 236:10
**aho**
59:9
**ai**
33:2, 33:3
**aide**
3:29, 15:10, 15:18, 62:3, 62:9, 70:22, 101:11, 101:12, 256:6
**aides**
16:13, 16:17, 17:12, 38:20, 38:24, 44:7, 45:11, 61:16, 61:24, 61:25, 62:8, 62:13, 62:25, 64:11, 65:22, 70:15, 71:8, 100:17, 106:1, 144:18, 144:19, 145:13, 145:17, 145:20, 145:21, 145:24, 256:14, 256:23, 257:3, 257:5
**air**
108:22, 108:23, 151:7, 151:9, 158:3, 158:4, 158:5, 158:12, 240:16, 260:5, 260:6
**airborne**
151:13, 158:8, 205:16
**alert**
175:2, 175:5
**align**
191:23
**allecia**
86:16, 87:24, 95:3, 98:16, 98:22, 100:1, 106:18, 112:6, 112:24, 113:3, 114:2, 115:6, 116:14, 116:23, 118:19, 119:7, 125:10, 129:5, 138:21, 201:24, 254:18, 256:7, 256:13, 256:18, 257:22, 259:11
**alleged**
186:11
**allocate**
260:3
**allocated**
86:20, 109:5
**allow**
29:2, 71:1, 71:23, 78:17, 115:18, 137:10, 166:12, 192:25, 229:24, 235:9
**allowable**
56:3
**allowed**
15:17, 25:25, 50:24, 136:8, 140:23, 146:19, 146:24, 152:25, 153:3, 154:3, 154:11, 165:7, 191:6, 201:13, 202:7, 203:19, 203:24, 204:2, 204:4, 205:8, 205:14, 205:18, 206:1, 206:3, 206:10, 211:16, 213:8, 215:12, 215:21, 215:23, 215:25, 230:4, 230:12, 230:19, 238:1, 238:3, 238:4, 238:14, 238:25, 239:20, 240:24, 240:25, 243:12, 260:3
**allowing**
133:14, 249:5
**allows**
87:8
**almost**
76:6, 150:18, 152:12, 172:9, 188:13, 219:2, 226:6, 245:20
**along**
4:6, 19:8, 26:19, 44:7, 65:6, 70:23, 159:13
**alongside**
21:13, 22:11, 60:15
**alphabetical**
113:11
**already**
9:2, 48:3, 67:11, 87:22, 157:10, 167:22, 174:19, 174:20, 179:25, 180:12, 204:14, 206:15, 226:11, 232:21, 243:20
**also**
5:18, 6:25, 14:4, 15:10, 17:13, 25:4, 29:20, 44:17, 45:7, 50:6, 55:2, 57:4, 61:21, 63:14, 64:25, 66:2, 68:2, 75:17, 80:8, 86:23, 87:9, 87:25, 90:9, 104:9, 129:13, 131:3, 159:9, 173:4, 178:1, 184:8, 195:23, 215:12, 223:11, 252:17, 258:5
**alternative**
178:19
**alternatives**
184:9
**although**
41:5, 44:2, 44:9, 98:14, 142:8, 158:19, 222:19, 223:17, 255:23
**always**
13:10, 15:18, 23:12, 24:25, 27:19, 29:3,

33:9, 37:7, 37:16, 46:15, 46:17, 46:25, 55:23, 57:10, 61:17, 69:22, 74:16, 75:23, 76:8, 83:2, 117:5, 120:10, 120:18, 121:20, 123:1, 141:8, 150:3, 166:21, 166:23, 170:2, 175:5, 186:8, 200:12, 200:14, 217:22, 217:25, 218:24, 226:15, 243:11, 245:16
**ambulance**
157:12
**ambulating**
39:5
**ambulation**
76:2, 76:3, 76:6
**ambulatory**
43:19
**america**
1:10, 4:8, 249:22
**amongst**
24:4, 79:5, 196:18, 215:1
**amount**
24:20, 24:21, 25:19, 26:7, 37:11, 37:15, 38:15, 39:25, 40:22, 57:17, 57:18, 61:16, 61:22, 63:15, 63:16, 64:17, 70:2, 70:3, 81:18, 84:23, 92:16, 92:19, 94:13, 98:2, 99:21, 109:15, 109:18, 109:21, 116:24, 118:9, 127:22, 128:8, 128:9, 137:21, 140:9, 143:5, 146:9, 146:18, 153:11, 186:25, 188:7, 192:22, 199:11, 199:21, 204:7, 204:9, 205:4, 235:10
**amounts**
92:9, 99:9, 109:11, 141:7, 254:3
**analysis**
3:11
**analyzed**
87:11
**ancillary**
201:22, 254:1
**andrea**
196:1
**ankle-foot**
53:14
**annual**
25:19, 57:25
**annually**
224:6, 224:7
**anonymously**
222:14
**another**
6:8, 6:20, 17:21, 21:9, 24:16, 41:13, 69:15, 74:5, 81:13, 82:6, 96:21, 179:15, 193:8, 193:10, 201:4, 219:4, 219:5, 236:14
**answer**
6:5, 6:8, 6:9, 6:14, 8:2, 9:7, 31:10, 34:7, 34:9, 58:5, 63:4, 63:9, 64:7, 64:19, 79:16, 80:15, 84:8, 95:2, 95:9, 106:21, 128:12, 128:16, 128:23, 130:1, 130:2, 133:12, 154:1, 155:19, 160:6, 174:7, 176:21, 185:24, 188:17, 189:12, 189:25, 190:12, 190:14, 191:11, 209:17, 211:3, 228:18, 230:17, 233:1, 236:21, 247:16
**answered**
189:11, 191:9, 238:12
**answering**
210:7
**answers**
24:13, 34:3, 143:12, 219:18, 238:8
**anticipate**
122:10
**antigen**
168:3
**anybody**
8:19, 44:1, 48:24, 60:6, 128:3, 165:3, 179:11, 192:11, 208:9, 210:19, 233:22, 243:18, 247:5
**anymore**
168:23, 168:25, 176:8, 176:11, 245:11
**anyone**
8:23, 9:11, 64:3, 82:1, 141:2, 192:5, 195:4, 226:22
**anyone's**
150:2
**anything**
5:9, 8:8, 9:5, 9:22, 15:13, 23:18, 25:10, 26:15, 38:21, 58:8, 61:4, 87:5, 93:6, 123:1, 162:9, 207:12, 222:2, 260:8
**anytime**
150:5
**anyway**
250:4
**anyways**
194:24, 196:14, 215:3
**anywhere**
104:13
**apart**
96:5, 193:13
**apologize**
11:11, 11:14, 16:8, 23:1, 25:20, 29:18, 76:24, 89:21, 117:4, 117:9, 118:10, 133:17, 137:22, 162:15, 182:14, 183:4, 192:2, 202:12, 232:25, 238:8, 239:12
**apparently**
161:23
**appealing**
173:1
**appear**
90:16
**appearance**
5:13
**appearances**
1:18
**appeared**
182:9, 195:6
**appears**
77:14, 81:2, 161:5, 246:6
**applicable**
252:8

**applied**
35:17, 138:22, 154:21, 156:13, 156:18, 159:22
**apply**
11:4, 155:1, 156:13, 157:8, 159:23, 159:25
**applying**
155:7
**appointed**
28:9, 28:11, 28:13
**appointment**
228:20
**appreciate**
9:11, 75:19, 121:13
**approach**
150:4, 191:24, 222:19, 223:12, 223:25, 249:9
**appropriate**
26:4, 30:18, 40:5, 81:15, 108:19, 144:4, 148:15, 148:17, 222:10
**approval**
28:3, 28:17, 28:20, 29:15, 29:20, 156:4, 253:9
**approve**
30:10, 159:5, 159:7
**approved**
29:25, 155:21, 156:2, 156:10, 157:16, 159:24
**approving**
224:4, 224:6
**approximated**
12:18
**april**
12:2, 117:17, 166:9, 235:18, 236:17, 237:16, 237:18, 239:16
**area**
43:14, 43:15, 70:7, 92:11, 155:11, 155:14, 162:9, 162:11, 163:10, 164:21, 164:24, 165:1, 165:7, 170:18, 172:9, 172:14, 192:24, 205:21, 233:21, 241:7, 245:14, 245:15, 252:24
**areas**
42:15, 67:4, 153:1, 153:2, 164:13, 204:1, 237:20, 237:21, 237:22
**aren't**
53:3, 56:5, 82:6, 139:3, 176:10, 210:1, 222:3
**argue**
41:17, 148:18
**arises**
168:23
**arms**
139:20, 201:15
**around**
15:25, 16:6, 16:7, 32:9, 59:5, 61:24, 116:20, 137:17, 140:20, 152:6, 152:25, 171:11, 172:16, 194:22, 211:16, 237:7, 237:16, 239:17, 240:3
**ascertain**
178:17
**aside**
119:22, 121:3, 155:11, 175:12, 176:17, 248:9, 251:3
**asked**
25:23, 64:19, 73:4, 94:4, 107:1, 118:10, 138:25, 189:11, 191:9, 241:20, 255:8, 255:11, 255:21, 256:7, 256:13, 256:16, 257:23, 262:11
**asking**
9:7, 9:15, 87:16, 132:23, 136:13, 139:9, 193:1, 198:4, 221:6
**assessed**
12:8, 45:18
**assessment**
37:23, 46:8, 46:9, 46:15, 62:19, 209:25, 217:10, 217:11
**assessments**
22:3, 22:4, 44:8, 44:9, 45:25, 46:16, 62:17
**assigned**
13:2, 19:20, 19:21, 20:15, 20:16, 22:1, 66:4, 67:19, 74:10, 210:5, 219:11, 219:20
**assignment**
67:1
**assist**
36:15, 36:21, 37:21, 39:5, 62:22, 65:22, 67:16, 69:17, 70:21, 70:23, 76:6, 201:11, 201:14, 201:18, 201:21, 203:9, 203:13, 235:10, 238:6, 238:21, 242:13, 242:15
**assistance**
31:13, 37:18, 65:23, 220:24
**assistant**
16:5, 16:7, 16:12, 16:22, 17:3, 17:11, 17:21, 19:7, 21:19, 32:8, 59:19, 66:1, 70:22, 87:24, 139:17, 187:15, 201:24, 202:2, 202:4, 219:11, 247:1, 247:3
**assistants**
65:25, 201:23
**assisted**
39:20, 39:23, 39:24
**assisting**
62:13, 62:14, 230:8
**assists**
67:4
**associate**
10:10
**associate's**
10:15, 11:9, 11:20, 11:22
**association**
32:12
**associations**
32:11
**assume**
6:5, 30:11, 99:8, 117:20, 122:23, 156:19, 179:22, 240:4, 255:23
**assumed**
121:22
**assuming**
9:3, 24:12, 35:15, 41:4, 104:1, 114:20,

237:23
**assumption**
89:25
**assumptions**
35:16
**assurance**
247:9
**asymptomatic**
208:2, 214:8
**atheist**
148:19
**attached**
90:1, 90:2, 222:1
**attachment**
229:4
**attachments**
212:16, 227:18
**attempt**
183:22
**attend**
10:10, 32:6, 82:22
**attendance**
88:16, 88:17
**attended**
183:2
**attention**
73:11, 161:9
**attorney**
154:10
**attorneys**
83:1
**attract**
69:17, 71:16
**attractive**
187:10
**attracts**
43:12
**attribute**
188:3, 188:5
**audit**
120:16, 156:5, 261:22, 261:23
**audited**
106:24, 108:19, 260:23
**auditing**
86:5, 86:23, 87:4, 88:5, 116:21, 120:14, 126:4
**auditory**
77:21
**authority**
149:24
**authorization**
40:20, 41:11
**auto**
52:4, 58:1
**availability**
109:3
**available**
55:11, 85:7, 119:14, 145:1, 145:3, 146:12, 166:23, 175:6, 175:7, 175:22, 239:24, 242:2, 242:19, 242:25, 248:25
**average**
85:10, 249:23, 249:25, 253:23, 253:24, 254:2, 258:7
**avoid**
6:17, 178:16
**awarded**
64:13, 95:16, 182:6
**aware**
8:14, 33:14, 55:3, 57:3, 124:6, 156:17, 189:14, 191:12, 221:5, 222:22, 224:1, 224:4
**away**
54:10, 60:3, 72:17, 126:24, 128:3, 136:2, 151:3, 151:5, 173:24, 175:19, 185:13, 188:21, 191:8, 192:21, 233:15, 233:16, 234:5
**awhile**
237:13, 249:18

**B**

**b) (6**
7:16, 8:16
**bachelor**
10:18
**bachelor's**
10:11
**back**
21:3, 21:4, 26:9, 29:21, 29:24, 30:15, 39:23, 40:1, 40:21, 42:11, 49:23, 54:8, 59:12, 68:16, 71:19, 81:9, 93:24, 94:19, 106:20, 107:22, 114:3, 116:2, 116:6, 116:11, 116:12, 117:3, 122:21, 125:1, 127:11, 133:24, 134:15, 135:17, 136:19, 138:9, 143:15, 143:18, 143:20, 153:24, 154:19, 155:21, 158:24, 159:22, 162:17, 166:21, 169:1, 170:1, 172:18, 172:19, 174:9, 176:24, 183:21, 184:11, 184:16, 184:20, 195:1, 195:2, 195:4, 196:5, 196:20, 202:21, 202:22, 211:15, 212:1, 221:25, 226:3, 226:17, 227:2, 229:18, 231:4, 233:8, 237:6, 237:12, 237:19, 238:25, 239:1, 239:14, 240:5, 240:25, 242:5, 242:16, 243:10, 245:16, 247:24, 251:25
**background**
10:6, 22:15
**bad**
52:21, 104:4, 140:14, 152:1, 186:22, 196:2, 201:25
**balance**
3:4, 3:5, 43:23, 102:13, 116:10, 118:25, 119:1, 119:3, 119:4, 119:6, 119:8, 119:10, 119:15, 120:10, 121:5, 250:7, 251:4, 262:4
**balances**
99:10, 113:2
**balancing**
18:18
**ball**
39:3, 75:24, 139:2, 146:16, 193:6
**ballot**
252:14
**bandage**
52:18
**bandaged**
12:18
**bank**
98:17, 112:10, 112:20, 114:2, 116:16, 124:16
**banking**
112:12, 114:5, 114:18, 117:18, 124:13
**bar**
235:20, 235:25, 236:10

**barb**
88:10, 88:21, 115:9, 115:11, 255:8, 255:20, 256:16
**barber**
101:18
**bargaining**
19:10, 27:10, 64:5, 211:5
**based**
8:17, 15:9, 24:8, 37:22, 40:13, 41:22, 41:23, 58:16, 74:8, 77:6, 82:5, 85:21, 139:1, 191:19, 217:20, 218:6, 218:19, 229:12, 229:14, 230:13, 247:17, 261:23
**baseline**
46:18
**basic**
26:19, 39:6, 52:14, 108:18
**basically**
11:9, 59:14, 68:21, 82:4, 91:25, 102:5, 116:23, 121:7, 126:11, 127:24, 139:23, 140:24, 146:25, 155:10, 155:14, 162:22, 164:4, 180:22, 200:10, 236:14, 240:16, 260:8, 262:3
**basics**
37:17
**basis**
66:19
**bates**
80:23, 81:4, 90:10, 96:19, 97:21, 108:2, 108:10, 110:7, 111:2, 112:3, 114:12, 117:9, 118:17, 123:15, 124:11, 125:16, 125:19, 126:13, 130:7, 133:17, 160:21, 163:15, 164:9, 171:19, 182:15, 183:4, 183:10, 184:15, 220:8, 244:23, 246:2
**bath**
180:8
**bathroom**
49:10, 49:11, 135:12, 177:19, 177:25, 180:9, 180:20
**bathrooms**
137:7, 165:21, 177:20, 180:6
**bay**
10:11
**beautiful**
42:9, 42:10, 43:9, 43:14, 72:15, 245:18
**beauty**
101:18, 151:8
**became**
11:1, 12:8, 13:9, 16:7, 18:4, 18:6, 49:4, 62:10, 111:8, 169:15, 169:23, 200:17, 201:10, 201:19, 203:12, 219:10, 219:21, 246:19
**beckering**
1:9
**become**
19:6, 28:1, 41:17, 62:2, 147:19, 154:21, 156:13, 159:22, 160:2, 160:10, 174:3, 175:22, 178:18, 179:7
**becomes**
66:18
**becoming**
107:3
**bed**
12:24, 13:20, 34:22, 34:23, 35:10, 48:11, 48:18, 49:5, 49:8, 49:9, 49:10, 52:8, 84:22, 85:1, 94:21, 127:15, 127:18, 127:20, 127:21, 127:23, 128:2, 130:13, 130:14, 130:16, 130:18, 131:8, 131:20, 132:1, 132:16, 135:6, 135:8, 135:20, 136:10, 150:23, 151:21, 152:5, 152:8, 171:25, 173:16, 177:14, 185:20, 186:8, 186:9, 188:22, 188:24, 189:4, 248:12, 249:6, 258:17
**bedrooms**
180:7
**beds**
34:20, 34:23, 34:24, 35:10, 35:11, 35:14, 35:18, 42:20, 42:21, 42:22, 43:3, 48:12, 48:14, 48:23, 49:2, 83:11, 83:13, 83:15, 83:23, 84:23, 85:7, 85:15, 85:16, 85:18, 85:22, 128:15, 129:22, 131:22, 132:8, 134:12, 135:13, 135:15, 135:17, 135:23, 136:14, 136:25, 137:3, 137:19, 150:17, 150:19, 151:2, 165:20, 165:21, 165:22, 165:24, 167:15, 167:18, 170:18, 170:19, 171:5, 171:7, 172:18, 175:12, 175:16, 176:12, 176:14, 176:15, 176:17, 176:22, 177:10, 178:23, 178:25, 180:13, 180:16, 180:25, 181:3, 182:2, 182:7, 182:10, 185:8, 185:14, 188:6, 188:8, 189:9, 191:8, 248:9, 248:10, 248:15, 249:23
**before**
5:21, 7:10, 7:12, 8:25, 11:12, 12:5, 17:19, 27:20, 41:15, 49:12, 56:8, 69:5, 73:23, 75:9, 103:14, 105:21, 107:23, 118:9, 135:16, 136:9, 136:13, 139:25, 140:7, 159:22, 161:1, 163:24, 166:11, 176:6, 180:1, 203:25, 205:11, 206:19, 212:19, 214:8, 217:2, 227:20, 229:6, 237:25,

255:3, 256:10, 262:19
**began**
180:1
**begin**
187:22
**beginning**
119:3, 186:23, 195:20, 196:6
**behalf**
5:15, 32:18, 209:19
**behavior**
175:18
**behavioral**
38:11
**behind**
44:18
**being**
5:22, 9:10, 9:12, 24:23, 27:10, 36:13, 37:9, 49:7, 72:25, 74:13, 75:19, 83:17, 84:19, 85:21, 99:16, 128:8, 128:15, 129:23, 135:2, 138:13, 140:3, 146:11, 153:12, 156:11, 156:24, 161:20, 162:15, 164:6, 169:25, 172:4, 178:23, 184:20, 199:4, 199:5, 200:4, 206:3, 216:7, 225:7, 233:15, 234:4, 234:5, 234:22, 234:23, 237:2, 242:21, 244:4, 247:25, 250:18
**believe**
23:23, 30:22, 190:8, 207:13, 237:8
**belong**
32:11
**below**
98:12, 99:12, 133:22, 180:13
**benefit**
47:21, 48:1, 52:3, 63:21, 89:10, 94:9, 96:4, 121:21, 122:19, 205:3, 235:24
**benefiting**
184:7, 184:8
**benefits**
77:16
**beniak**
209:19
**besides**
37:9
**best**
18:17, 47:1, 50:4, 81:20, 86:1, 98:18, 157:10, 165:18, 165:19, 168:6, 172:6, 174:13, 185:1, 193:19, 193:20, 210:6, 228:3
**better**
45:1, 50:4, 58:6, 86:8, 87:1, 128:7, 145:22, 146:3, 159:21, 197:9, 221:10, 227:8, 236:21, 259:8, 261:14
**between**
28:13, 38:17, 61:15, 66:7, 95:12, 96:6, 104:20, 116:12, 137:15, 137:17, 172:9, 193:12, 196:13, 196:15, 201:16, 202:19, 204:12, 204:13, 225:4, 233:18, 254:6, 254:11, 255:17, 259:5
**beyond**
61:18
**bid**
26:24
**big**
19:6, 28:4, 33:2, 43:9, 57:21, 60:16, 67:21, 69:23, 76:14, 76:22, 91:8, 116:18, 121:4, 169:5, 176:9, 201:19, 239:2, 239:8, 239:9, 242:5, 244:4
**bigger**
229:23
**biggest**
33:8, 47:24, 123:25, 143:25, 158:3
**bike**
73:13, 76:1, 196:7
**bikes**
76:8
**bill**
2:8, 54:21, 55:12, 57:10, 58:4, 58:11, 78:14, 78:17, 80:10, 92:6
**billable**
52:16, 53:16, 58:13, 80:10, 92:10
**billed**
54:24, 55:2, 80:14, 102:2
**biller**
115:23
**biller's**
55:13
**billers**
115:17
**billie**
68:17
**billing**
56:2, 57:4, 57:24, 58:3, 58:10, 58:18, 115:24
**bills**
105:6
**binder**
9:3, 76:22
**bingo**
67:22, 76:20, 192:20, 193:1, 193:2, 193:3, 193:4, 193:6, 193:16, 193:17, 193:22, 193:25, 197:8
**bit**
19:16, 21:3, 26:9, 26:12, 30:5, 32:14, 33:25, 38:20, 48:3, 49:25, 50:6, 58:19, 67:9, 72:4, 83:16, 83:20, 92:4, 97:22, 99:20, 100:5, 103:7, 107:6, 107:11, 120:24, 135:25, 140:6, 144:25, 171:12, 197:9, 205:6, 211:17, 228:21, 234:8, 247:12, 250:18, 254:12
**bizarre**
155:4
**blended**
14:12
**blends**
212:8
**blood**
14:5, 55:6
**blue**
113:9, 113:10

**board**
18:23, 18:24, 19:17, 19:18, 19:20, 19:22, 20:1, 20:8, 20:10, 20:11, 20:15, 20:17, 20:20, 20:22, 20:23, 20:25, 21:3, 22:12, 25:15, 26:11, 27:6, 27:21, 28:9, 28:10, 28:11, 28:17, 28:20, 28:24, 29:3, 29:8, 29:15, 29:20, 30:2, 30:8, 30:17, 30:20, 31:6, 31:10, 31:18, 31:21, 32:1, 32:2, 37:17, 50:16, 51:13, 51:15, 52:7, 52:9, 52:21, 53:4, 53:12, 53:18, 54:1, 54:20, 54:24, 55:8, 60:1, 60:18, 83:8, 86:19, 91:20, 91:22, 95:24, 96:2, 97:9, 97:18, 100:19, 158:21, 158:23, 158:25, 159:3, 159:9, 159:24, 199:19, 200:5, 222:13, 222:17, 222:22, 224:1, 224:10, 247:17, 261:23
**boardroom**
44:16
**boards**
28:4
**bodies**
34:6
**body**
75:23
**bone**
38:8
**bonuses**
120:25, 121:1
**book**
165:24
**books**
101:7, 222:17
**boring**
89:21
**both**
14:4, 19:4, 34:17, 42:18, 42:19, 61:23, 62:5, 62:6, 95:18, 95:19, 108:8, 115:10, 115:12, 125:2, 138:22, 139:2, 174:1, 198:15, 236:7, 243:23, 248:22, 255:11, 256:23
**bottom**
95:1, 100:11, 108:3, 108:11, 117:16, 126:16, 134:5, 160:23, 161:13, 225:21, 229:23
**bought**
124:20, 194:6
**bounce**
75:25
**bounces**
39:3
**bound**
38:7
**box**
1:37, 165:12, 217:17
**boxes**
217:15
**brace**
103:15
**brad**
60:2
**brain**
139:24, 140:12, 171:11, 202:21
**brainstormed**
223:13
**brand**
64:23, 173:8
**brandon**
196:16
**break**
7:1, 7:3, 49:17, 107:13, 107:15, 107:17, 107:23, 153:3, 154:13, 154:14, 162:16, 164:21, 165:7, 192:5, 192:6, 226:22, 226:24, 262:13
**breakfast**
65:4
**breaks**
6:25, 133:10, 157:24, 162:24
**breathe**
143:3
**bridges**
60:4
**briefly**
67:13, 216:6
**brigham@usdoj**
1:31
**bright**
245:18
**brightness**
43:12
**bring**
9:25, 27:5, 74:3, 142:20, 145:12, 193:24, 195:1, 195:4, 197:17, 205:24, 222:10, 223:21
**bringing**
18:24, 104:19, 149:6, 149:7
**brings**
66:13
**broad**
260:8
**broadly**
139:10
**broke**
84:2
**brought**
197:14, 202:14
**bucket**
86:20, 95:8, 100:15, 104:14
**buckets**
97:1, 259:5
**budgetary**
29:2
**buffet**
236:2
**build**
35:11, 190:19, 249:18, 250:5
**building**
14:23, 15:11, 18:15, 22:18, 22:20, 35:4, 35:20, 35:24, 43:11, 61:3, 66:7, 66:22, 70:1, 75:2, 76:13, 83:17, 89:3, 92:9, 101:16, 105:7, 119:23, 120:1, 140:8, 140:15, 140:19, 141:17, 144:20, 145:21, 151:10, 153:1, 158:6, 158:13, 168:12, 186:4, 205:20, 214:13, 215:17, 235:13, 236:23, 238:22, 241:14
**buildings**
121:8, 121:11, 142:16
**built**
39:9, 42:7, 42:8, 49:2,

49:7, 65:9, 66:19, 135:2, 163:24, 164:4, 164:7, 189:3
**bulk**
14:16
**bulletins**
153:22, 191:25
**bump**
63:25, 210:22, 211:10
**bumping**
210:24
**bunch**
165:2, 194:6
**bundled**
57:9, 57:12, 57:14, 57:20, 83:7, 92:22, 93:2, 93:3, 93:6
**burden**
143:5, 143:7
**bureau**
15:23
**burlew**
104:1, 209:18
**burnt**
156:6
**business**
26:16, 104:16, 104:20, 128:20, 129:10, 141:22, 141:24, 141:25, 142:3, 145:19, 148:17, 153:9, 250:22
**bussone**
10:4
**busy**
42:9, 233:14
**busyness**
241:6, 241:8
**buy**
26:25, 53:1, 103:11

**C**

**c**
109:8, 109:9, 109:18
**cadence**
207:19, 208:2, 208:11, 209:10
**caf**
236:5
**cafeteria**
235:21, 236:13
**calculate**
3:33, 133:1
**calculation**
24:22, 86:21, 102:12, 134:8, 137:11, 257:21
**calculations**
85:21
**calendar**
89:17, 89:19, 119:21, 123:24, 124:1, 124:3, 130:15
**call**
5:8, 12:23, 15:13, 16:14, 21:9, 23:13, 27:4, 32:21, 39:17, 40:18, 44:16, 45:21, 45:24, 59:7, 63:24, 69:22, 69:25, 74:10, 85:6, 136:2, 164:25, 173:15, 193:7, 197:6, 210:22, 211:1, 211:3, 217:7, 246:24
**called**
5:2, 14:14, 23:5, 24:14, 30:22, 35:22, 36:9, 62:9, 77:25, 83:7, 84:16, 91:13, 104:11, 105:22, 193:11, 207:14, 217:24, 221:1, 221:2, 253:24
**caller**
193:4
**calling**
189:14, 217:6
**callouses**
103:11
**calls**
16:24, 16:25, 34:8, 66:14, 74:2, 128:22, 190:12
**came**
12:3, 22:14, 41:2, 85:15, 85:17, 113:20, 118:6, 127:25, 138:10, 138:20, 139:16, 142:5, 142:6, 142:7, 143:15, 148:11, 148:24, 156:4, 167:20, 170:1, 171:3, 173:20, 203:21, 203:25, 208:9, 209:20, 219:20, 227:25, 243:22, 244:10, 245:9, 259:5, 260:25
**can't**
23:21, 38:11, 40:24, 47:11, 57:10, 60:6, 84:3, 99:24, 101:1, 115:11, 122:18, 129:1, 133:9, 141:11, 142:8, 149:15, 149:16, 159:10, 168:12, 179:16, 180:8, 184:8, 189:4, 189:15, 197:5, 200:18, 201:15, 202:12, 203:10, 218:7, 222:4, 225:13, 231:9, 262:20
**cancel**
180:17
**candidates**
45:9
**candy**
193:18, 193:19, 193:21
**cannot**
79:8
**canopy**
64:22
**capacities**
57:13, 60:11
**capacity**
7:15, 7:17, 15:2, 15:3, 48:11, 49:12, 59:19, 60:7, 129:19, 135:2, 135:21, 136:5, 136:8, 136:10, 136:21, 136:22, 137:16, 148:11, 161:20, 161:21, 161:24, 162:5, 185:17, 185:20, 186:8, 186:9, 188:22, 188:24, 189:4, 224:5, 247:6
**capital**
107:9
**capture**
248:3, 248:4
**card**
102:20
**care**
1:3, 4:7, 4:10, 7:17, 12:7, 12:12, 12:13, 13:12, 23:12, 23:14, 23:19, 23:25, 24:18, 26:19, 31:2, 31:3, 31:4, 32:9, 32:13, 33:10, 36:10, 36:11, 36:20, 45:22, 45:23, 45:24, 46:18,

46:20, 47:1, 47:13, 54:6, 54:9, 54:11, 54:17, 62:20, 73:8, 85:11, 91:15, 93:5, 95:14, 96:13, 96:20, 96:21, 97:2, 97:3, 106:1, 109:10, 109:14, 113:13, 126:23, 141:20, 142:2, 150:6, 162:4, 162:13, 163:3, 199:16, 206:1, 206:2, 206:6, 206:10, 210:25, 220:10, 223:24, 229:11, 259:19, 259:25
**career**
106:22, 246:19
**caregiver**
209:1
**cares**
62:15, 96:15, 259:15, 259:23, 260:1, 260:2, 260:12
**carlson**
59:23, 158:19
**caroline**
29:8, 60:4
**carpal**
103:15
**carry**
51:19, 122:14, 145:16
**cars**
154:6, 216:11
**cart**
13:3, 70:17, 200:23
**cartwheels**
250:4
**carve**
57:18
**carved**
219:19
**case**
1:7, 4:8, 8:7, 47:24, 154:3, 158:13, 168:23, 173:22, 185:6, 189:7, 201:7, 208:8, 208:11, 209:10, 210:12, 255:10, 259:5, 260:24
**cases**
213:15
**cash**
102:14, 106:25, 107:2, 107:5, 107:7, 119:1, 119:13, 119:14, 119:22, 120:2, 120:5, 120:6, 120:7
**catastrophes**
174:24
**catch-all**
103:19
**categories**
61:8, 68:10, 126:14, 206:11
**category**
78:24
**cause**
190:9
**cba**
64:5
**cdc**
2:10, 2:11, 2:12, 149:12, 211:21, 211:24, 218:14, 218:20, 218:25, 220:2, 220:13, 220:15, 220:19
**census**
3:9, 45:8, 45:13, 48:22, 83:17, 83:22, 84:24, 85:7, 85:17, 85:19, 94:21, 120:11, 127:21, 128:12, 129:1, 129:2, 129:22, 130:11, 130:25, 131:11, 131:16, 133:3, 134:18, 157:5, 174:23, 180:23, 181:17, 188:3, 188:7, 189:21, 190:4, 190:19, 199:14, 247:22, 248:8, 249:18, 249:25, 250:18, 258:5
**center**
34:4, 34:5
**central**
44:17, 44:18, 67:3, 69:16
**cents**
109:13, 250:19, 252:22
**cer**
1:41, 264:14
**certain**
16:8, 23:1, 24:9, 35:19, 36:13, 64:22, 78:13, 82:4, 84:3, 92:9, 98:5, 105:24, 110:22, 115:11, 116:22, 116:23, 118:6, 118:9, 121:24, 123:14, 130:21, 138:12, 142:11, 144:23, 145:6, 147:16, 147:17, 160:1, 179:16, 182:1, 182:20, 184:9, 208:24
**certainty**
48:8, 64:19, 83:23, 98:14, 181:2, 185:25, 230:22, 230:24
**certificate**
34:21, 35:4, 35:6, 35:7, 39:11, 164:2, 164:4, 264:1
**certification**
38:21
**certified**
1:42, 15:16, 34:20, 62:2, 91:9, 96:7, 96:13, 96:20, 96:22, 97:7, 97:8, 264:2
**certify**
264:4, 264:7
**cetera**
58:2, 78:11, 78:18, 91:9, 99:10, 115:19, 119:23, 120:1, 127:4
**cfo**
112:6
**chair**
20:17, 20:25, 29:9
**chairperson**
20:21
**challenge**
35:1, 41:11, 201:11, 201:19, 203:12, 248:9
**challenges**
205:19, 235:11, 248:14, 248:16, 248:18
**challenging**
124:20
**change**
12:4, 14:1, 14:22, 14:23, 19:2, 19:3, 22:3, 24:23, 27:11, 29:2, 36:2, 39:12, 46:25, 50:25, 60:20, 66:14, 67:8, 83:17, 93:20, 121:4,

143:24, 147:8, 169:5, 181:4, 181:14, 182:2, 192:13, 195:16, 200:9, 201:20, 203:17, 219:9, 222:7, 223:15, 223:19, 232:9, 232:24, 237:5
**changed**
13:8, 14:17, 17:5, 20:19, 20:20, 22:14, 43:1, 60:6, 112:13, 138:9, 163:21, 181:15, 238:17, 253:4, 259:20
**changes**
3:35, 7:8, 33:7, 33:8, 35:3, 40:7, 198:14, 207:4, 207:5, 226:18, 233:8, 233:9
**changing**
28:19, 51:5, 63:7, 153:8
**channels**
138:2
**chaos**
155:4, 205:12
**characterize**
131:12
**charge**
12:10, 12:11, 13:10, 54:22, 55:7, 93:11, 113:3, 115:6, 115:9, 119:6, 124:3, 125:10, 127:21, 127:23
**charges**
104:2, 123:16, 123:19
**charging**
80:17
**chart**
3:15, 3:17, 253:17
**chat**
194:7
**chats**
194:5
**check**
57:21, 102:8, 113:20, 236:20
**checks**
115:11
**checkup**
54:3
**chief**
88:1
**child**
31:12
**choice**
52:22, 63:23, 70:5, 82:1, 147:14, 151:11, 152:1, 156:24, 158:1, 177:25, 236:4
**choices**
159:12
**choose**
64:2, 74:12, 97:1, 137:6, 141:14, 187:11, 218:15
**chooses**
74:11
**choosing**
26:24, 177:19
**chose**
51:22, 70:1, 71:24, 147:23, 151:24, 152:1, 154:5, 158:2, 171:4, 171:5, 179:6, 186:5, 218:20, 235:4
**chosen**
139:18, 170:19, 218:16
**christmas**
102:24, 103:1
**chronological**
117:12, 182:16, 184:12
**church**
74:4, 76:19, 237:6, 237:8, 237:11, 237:12
**cindy**
60:3
**circumstance**
50:18
**cited**
217:7
**city**
252:25
**civil**
5:23, 7:15
**claim**
113:9, 113:16, 219:25
**claimed**
4:12
**clarification**
143:11, 146:4, 149:13, 209:20, 213:13
**clarified**
176:18
**clarify**
15:21, 21:15, 78:19, 78:23, 79:7, 79:8, 79:16, 94:4, 95:3, 98:22, 105:21, 134:9, 158:4, 198:4, 200:1, 239:15, 244:6, 251:10
**clarifying**
87:20, 224:23
**class**
15:10, 15:18
**classic**
154:6, 216:11
**classified**
64:22, 104:14
**classify**
105:25
**clean**
66:13, 205:24, 205:25, 241:10
**cleaning**
65:17, 81:25
**clear**
4:17, 6:16, 22:6, 32:17, 45:4, 181:20, 190:14
**clearly**
212:23, 233:2, 250:21
**clerk**
24:10, 252:14
**clinical**
17:9, 17:14, 21:15, 21:20, 22:15, 22:17, 29:1
**clinically**
15:8
**clock**
9:13, 61:24, 89:1, 89:4, 153:6, 157:23
**clocks**
153:6
**close**
44:5, 135:9, 136:5, 141:15, 151:15, 165:15, 173:11, 174:8, 211:14
**closed**
119:19, 166:8, 166:11, 167:1, 184:10, 200:16, 205:13, 241:18, 241:24, 243:10, 243:11, 243:16, 248:17
**closer**
136:10, 147:20, 203:14, 245:22
**closest**
173:6, 245:21
**closet**
66:17
**closing**
181:20, 211:18,

242:10
**cloth**
218:8
**clothing**
53:5
**cms**
2:23, 2:24, 2:25, 34:4, 41:5, 74:2, 75:16, 148:21, 149:11, 192:1, 212:22, 217:8
**cna**
75:25, 76:5, 145:1, 145:2, 201:2
**cna's**
62:22, 62:23, 66:5, 105:24
**co-counsel**
4:6
**coast**
1:43, 264:15
**code**
77:17, 77:18, 77:24, 78:2, 81:7, 81:9, 187:5, 217:11, 235:14
**codes**
81:12
**coding**
77:25, 78:2
**cognitive**
36:15, 40:7, 46:14, 66:16
**cohort**
184:3
**coincidently**
247:11
**coke**
52:25, 53:1, 102:19
**cola**
53:1, 53:2, 102:19
**collected**
24:11, 99:2, 120:8, 247:22, 252:24
**collecting**
115:24, 216:10
**collective**
19:10, 27:9, 64:5, 211:5
**college**
10:7, 10:11
**coloring**
101:7
**column**
130:19, 251:13
**com**
1:25, 1:31, 1:40
**combined**
169:25, 196:19, 197:3
**combining**
260:10
**come**
21:3, 26:9, 26:19, 36:22, 48:2, 55:25, 56:18, 57:14, 57:18, 60:17, 65:8, 67:16, 68:5, 70:22, 76:17, 77:24, 82:24, 91:23, 92:23, 97:18, 104:5, 104:24, 109:1, 140:14, 143:18, 149:1, 150:23, 168:16, 169:23, 170:5, 170:7, 173:19, 195:11, 196:19, 201:2, 207:25, 209:1, 210:15, 210:22, 212:1, 217:24, 234:1, 237:14, 248:17
**comes**
14:3, 15:1, 25:5, 25:14, 31:10, 33:25, 38:10, 50:14, 62:6, 68:18, 85:23, 113:14
**comfortable**
21:12, 131:17
**comfortably**
136:15
**coming**
37:1, 37:2, 39:14, 44:11, 46:2, 47:2, 47:19, 47:20, 47:23, 122:21, 127:10, 167:24, 168:9, 169:1, 169:2, 169:6, 179:18, 186:4, 194:2, 199:18, 204:21, 237:6, 261:19
**comment**
30:4
**commission**
264:18
**commissioner**
19:25
**commissioners**
19:22, 19:24, 20:15, 25:15, 26:5, 28:10, 28:11, 253:9
**common**
12:18, 24:4, 75:10, 76:11, 200:14
**communal**
65:7, 69:8, 69:11, 71:4, 72:11, 74:21, 82:10, 142:23, 146:21, 146:22, 147:1, 147:2, 149:15, 161:6, 165:4, 202:6, 202:7, 202:13, 202:16, 202:24, 203:5, 215:18, 215:20, 229:24, 230:4, 230:10, 230:12, 230:19, 230:21, 234:21, 234:23, 235:3, 236:10, 237:20, 237:21, 237:22, 237:25, 238:3, 238:9, 238:11, 239:1, 239:6, 239:12, 242:2, 243:7
**communicable**
175:2
**communicate**
32:16
**communication**
33:4, 77:20, 149:21, 209:21
**community**
68:4, 194:19, 194:23, 207:18, 208:24
**community's**
157:7
**companies**
92:11, 97:5, 97:12, 144:15
**company**
56:21, 57:2, 101:23, 101:25, 144:18
**compare**
111:16
**compared**
148:7, 153:16, 232:9, 245:18
**comparison**
3:33
**comparisons**
78:11
**compassionate**
206:1, 206:2, 206:5, 206:10
**competing**
31:2
**competitive**
27:10
**complaint**
186:11, 199:8

**complete**
7:6, 46:16, 104:22, 236:12, 239:1, 247:21
**completed**
10:12, 215:24
**completely**
58:12, 87:22, 151:9, 170:5, 176:2, 184:10
**complex**
24:1
**compliance**
159:18, 221:1, 221:20
**complicated**
84:21, 103:24, 128:18
**complications**
38:8
**compromise**
199:25
**computer**
126:11, 126:12, 131:3
**concept**
151:3, 151:6, 242:17
**concern**
104:12
**concerned**
27:17, 28:1, 74:12, 74:14, 146:24, 199:20, 203:1, 233:17, 234:1
**concerns**
12:9, 19:5, 104:10
**conclude**
189:20
**conclusion**
128:23, 190:12
**concrete**
179:14
**concurred**
259:12
**condensed**
262:3
**condition**
22:5, 178:9
**conditions**
189:22, 190:9
**conduct**
199:9
**conducted**
199:6
**conducting**
232:1, 232:9
**conduit**
102:8
**conference**
105:3
**confident**
48:9, 130:2
**confidently**
48:8, 186:9, 187:18
**confirm**
60:22, 110:17, 134:17
**conflicted**
224:13, 224:15
**conflicting**
143:11
**confused**
35:20
**confusing**
30:4, 75:15
**congestive**
57:16
**congreg**
187:4
**congregal**
215:17
**congregate**
187:4, 190:17, 218:1
**congregating**
242:12
**connect**
193:8
**conservative**
150:3, 191:24, 248:2, 248:5, 249:9
**consider**
27:8, 129:13, 139:1, 144:1, 178:4, 226:10, 226:14, 226:18
**consideration**
88:6, 178:15, 178:16
**considerations**
82:2
**considered**
64:3, 73:4, 75:16, 129:10, 141:22, 152:20, 177:17, 177:18, 177:21, 210:16
**consistent**
34:1, 66:15, 100:19, 103:25, 209:5, 231:24, 249:23, 250:5
**consistently**
202:20
**consisting**
264:4
**constantly**
99:9, 198:14
**constraints**
235:13
**construction**
83:19, 83:25, 84:1, 121:18, 121:20, 121:21
**consultants**
103:22, 103:23, 103:24, 104:7
**consulting**
54:17, 188:15, 220:25
**consumer**
41:4
**consumers**
41:7
**contact**
140:22, 144:3, 150:5, 150:7, 173:18, 174:1, 195:25, 196:12, 207:22, 208:9, 208:25, 209:2, 209:5, 243:17
**contacts**
209:9, 209:20
**contagious**
173:10
**contain**
90:20
**contained**
155:12
**containment**
155:13
**contents**
2:1
**contingency**
168:17
**continue**
11:23, 46:4, 213:20
**continued**
219:23
**continuing**
45:7
**continuous**
88:23
**contract**
58:1, 58:17, 68:19, 94:14, 94:18, 95:16, 256:25, 257:1
**contracting**
56:23
**contractor**
101:21, 101:22
**contractors**
55:17, 68:11, 105:17
**contracts**
57:25, 92:25, 93:1, 93:2, 93:14, 255:18
**contractual**
93:13, 93:16, 93:22
**contrast**
39:7
**contributing**
188:10
**contributions**
26:3, 26:4

**contributor**
188:9
**control**
2:9, 143:9, 217:9, 217:19, 217:21, 217:22, 218:6, 219:1, 219:6, 220:17, 220:21, 222:11, 222:24, 223:2, 223:21, 246:18, 260:9
**conversation**
17:24, 50:20, 82:17, 129:24, 138:2, 138:5, 199:2, 206:20
**conversations**
129:20, 187:17, 187:19, 247:11
**convert**
47:4
**convoluted**
130:1
**coordinator**
14:15, 21:18, 59:7, 66:8, 247:1, 247:2
**copay**
50:22
**copy**
126:5, 263:3
**corner**
147:3, 149:18, 164:25
**coronavirus**
3:12, 220:11, 221:17
**correctly**
20:7, 106:6, 108:20, 110:11, 132:9, 221:10, 251:12
**corresponding**
132:16
**corridor**
44:17, 44:18, 69:16, 75:10, 76:11
**cory**
60:2
**cosmetologist**
102:1
**cost**
3:29, 25:11, 26:8, 52:20, 52:23, 53:17, 54:23, 55:13, 84:17, 85:1, 85:4, 85:8, 85:9, 85:17, 86:4, 86:16, 86:17, 86:24, 87:3, 97:23, 154:8, 155:23, 256:6, 257:7, 257:20, 257:22, 257:25, 258:15
**costs**
56:8, 86:20, 109:22, 125:5, 144:22
**coughed**
163:4
**could've**
96:14
**couldn't**
36:19, 36:22, 43:8, 63:24, 83:18, 98:14, 134:8, 135:4, 137:21, 142:16, 143:4, 143:12, 143:20, 148:6, 154:7, 156:3, 156:7, 170:22, 172:15, 178:4, 180:21, 186:9, 188:14, 188:23, 193:12, 211:7, 211:9, 228:13, 238:6, 240:1, 248:16, 255:7, 256:15
**council**
32:13, 68:3, 68:4
**counsel**
5:10, 7:23, 8:4, 8:6, 8:21, 9:23, 262:16
**count**
85:16, 85:18, 145:16, 255:22
**counterparts**
148:8
**counties**
23:6
**counts**
3:27, 255:2, 255:6
**county**
1:3, 4:7, 4:10, 4:14, 4:16, 4:17, 7:16, 19:22, 20:7, 20:15, 23:3, 23:4, 24:10, 24:11, 25:9, 25:12, 30:24, 31:4, 32:13, 50:14, 61:3, 98:25, 99:13, 106:20, 116:6, 116:11, 116:12, 116:16, 116:24, 117:6, 118:10, 122:13, 157:6, 220:10, 231:12, 252:14, 252:23, 252:24, 252:25, 253:7, 264:17
**county-operated**
30:23
**county-owned**
128:5
**county-run**
31:25, 156:17
**couple**
19:12, 99:12, 111:10, 132:6, 136:1, 137:5, 145:13, 170:10, 181:3, 215:7, 216:1, 231:22, 235:20
**couples**
132:8, 135:22
**course**
15:12, 17:8, 18:15, 19:19, 20:2, 30:5, 44:3, 46:9, 62:2, 108:9, 147:14, 148:12, 148:24, 164:1, 196:14, 200:11, 215:2, 239:3, 247:24, 248:5
**court**
1:1, 4:9, 6:15, 6:18, 6:20, 7:12
**courthouse**
104:18
**cover**
51:19, 98:9, 116:17, 116:24, 117:18, 118:2
**coverage**
41:4, 43:17, 47:24, 51:20, 51:21, 52:4, 52:11, 52:23, 125:2, 125:4, 200:6
**covered**
50:21, 52:19, 200:25, 216:16
**covering**
54:13
**covers**
91:24, 91:25
**covid-positive**
140:13, 150:20, 167:11, 168:19, 185:16, 216:3, 245:8
**covid-related**
50:11, 186:7, 248:13
**covid-specific**
246:8, 246:12

**cr**
154:22, 155:7, 156:11, 156:14, 156:18, 156:24, 156:25, 157:16, 159:22, 160:2, 160:10, 162:5, 162:8, 216:2
**create**
8:23, 162:8, 221:3
**created**
83:16, 83:25, 135:19, 176:25, 177:1, 219:12, 259:10
**creating**
119:6, 196:18
**creation**
9:4, 222:1, 223:25, 224:12
**creative**
135:8, 205:23
**credit**
64:18, 110:13, 129:4, 137:24
**credits**
4:13, 113:6, 113:7, 114:20, 116:2, 117:16
**crew**
66:12
**crf**
64:1, 85:15, 85:18, 85:22, 159:25, 160:14, 166:18, 167:4, 168:14, 175:6, 175:9, 176:5, 176:15, 180:15, 182:2, 182:6, 248:11, 248:15
**crf's**
176:11
**crf-designated**
185:8
**cribbage**
74:3, 76:17
**crisis**
144:14
**criteria**
157:20
**cross**
113:9, 113:10, 162:19, 262:8
**cross-contaminate**
163:3, 163:7, 163:8
**crowd**
76:18
**crucial**
17:23
**culturally**
180:10
**current**
17:19, 18:2, 60:7, 90:17, 90:23, 98:3, 99:13, 106:7, 119:4, 120:24, 132:15, 208:17, 251:13, 251:16
**currently**
10:3, 18:4, 44:5, 58:21, 59:14, 68:24, 98:4, 99:4, 112:10, 119:16, 219:25, 237:22, 253:4, 253:24
**curriculum**
15:20, 202:2
**customized**
53:15
**cut**
114:12, 117:9, 182:15, 183:4
**cutting**
158:12

**D**

**d'agostino**
60:3
**daily**
13:3, 26:15, 27:5, 36:16, 62:15, 86:18, 87:4, 87:6, 91:24, 93:15, 113:1, 130:11, 133:3, 257:21
**danielle**
59:20, 59:22
**data**
21:25
**dataset**
21:21, 21:23
**date**
18:7, 48:9, 81:2, 81:13, 119:21, 120:16, 153:23, 154:25, 155:3, 155:22, 155:25, 156:1, 156:2, 156:7, 184:9, 185:10, 185:11, 231:7, 232:22
**date's**
18:8
**dated**
212:22, 228:5
**dates**
130:15, 233:5
**day**
1:15, 12:25, 18:16, 20:3, 26:17, 26:18, 40:22, 45:10, 50:21, 51:6, 61:15, 61:20, 61:23, 62:19, 62:20, 62:21, 66:13, 85:8, 107:3, 120:11, 120:12, 128:25, 131:9, 132:4, 132:11, 132:13, 132:16, 132:19, 132:22, 134:10, 134:15, 152:7, 152:23, 162:24, 169:3, 169:7, 169:22, 173:9, 188:24, 196:6, 198:5, 204:21, 208:4, 208:5, 208:6, 208:12, 208:13, 209:11, 211:2, 219:23, 237:2, 239:21, 243:16, 249:21, 250:3, 253:21, 264:10
**day-to-day**
18:12, 20:4, 28:3, 28:5, 28:16, 34:11, 44:24, 45:5, 61:7, 61:10, 63:24, 65:3, 67:15, 69:1, 92:1, 250:17
**days**
15:1, 40:1, 40:19, 40:23, 41:12, 41:13, 41:14, 61:14, 61:20, 66:24, 84:23, 84:24, 85:8, 91:14, 96:11, 107:5, 107:7, 120:9, 120:11, 127:5, 128:4, 129:23, 130:13, 130:20, 131:16, 132:5, 134:1, 150:22, 152:5, 152:8, 168:2, 181:9, 181:12, 190:24, 190:25, 191:1, 208:7, 214:12, 214:15, 247:22, 248:3, 248:8, 248:13
**dc**
1:23, 1:29, 1:38
**dcw**
259:16, 260:12
**deal**
83:4, 106:25,

139:2
**dealing**
19:4
**death**
150:2
**debits**
113:24
**december**
155:5, 155:6, 156:1, 156:11, 227:25, 228:5, 229:9, 232:14, 233:3, 233:4, 233:5
**decide**
202:6
**decided**
48:20, 157:3, 168:22, 171:4, 235:24, 245:7
**deciding**
41:9, 187:13
**decision**
27:13, 28:25, 60:19, 85:18, 127:25, 157:11, 158:12, 158:14, 158:15, 158:17, 159:23, 191:20, 198:12, 199:1, 199:3, 210:10
**decision-making**
60:9
**decisions**
18:12, 18:17, 28:5, 29:4, 37:20, 60:17, 129:16, 159:8, 176:22, 198:10, 198:24, 218:18, 219:2
**decline**
22:5
**declines**
199:21
**decrease**
190:4, 197:10, 205:5
**dedicated**
39:10, 162:1, 210:23
**dee**
5:8
**deep**
156:9
**default**
89:24, 115:20
**defendant**
1:12, 1:15, 1:26, 5:2, 5:18
**defendant's**
2:5, 80:3, 80:24, 90:7, 110:5, 110:25, 112:1, 114:9, 118:15, 124:9, 125:14, 130:5, 160:18, 163:13, 171:16, 182:12, 212:12, 216:21, 220:5, 227:14, 228:25, 244:21, 245:25, 251:24, 253:10, 254:24, 256:3, 257:10, 258:19, 260:14
**deferred**
122:24
**define**
63:17
**defined**
24:5
**definitely**
45:5, 135:23, 144:9, 182:18, 182:24
**definition**
239:13, 244:9
**degree**
10:11, 10:15, 10:18, 11:10, 11:14, 11:20, 11:22
**degrees**
11:5
**delayed**
240:10
**delaying**
240:4
**deliver**
67:1
**delivered**
200:20, 200:21, 201:5
**delivering**
201:8, 201:9, 201:10
**demand**
88:17
**dementia**
34:25, 35:3, 35:21, 35:22, 38:13
**dementia-specific**
35:18
**denise**
1:14, 5:1, 5:6, 264:6
**dennis**
59:4
**denominator**
85:1
**dental**
52:23, 97:22, 97:24, 98:1, 98:4
**dentist**
56:7, 142:6, 255:19
**dentistry**
52:20
**departing**
187:12
**department**
1:27, 1:36, 15:4, 17:14, 17:16, 18:13, 18:20, 18:21, 19:14, 19:15, 19:17, 20:7, 21:5, 21:6, 21:8, 21:14, 21:20, 21:22, 27:16, 28:6, 44:8, 59:17, 60:10, 89:13, 91:5, 100:16, 100:18, 101:8, 143:19, 143:24, 149:10, 149:23, 150:1, 150:3, 156:21, 173:15, 173:22, 185:21, 185:25, 188:25, 189:18, 191:17, 191:24, 201:2, 210:4, 217:5, 223:24, 231:20, 232:16, 237:19, 239:14, 247:5
**departments**
21:6, 21:15, 21:16, 27:17, 59:15, 104:7
**depended**
147:14, 169:20
**dependent**
57:7
**depending**
14:19, 21:13, 22:2, 35:2, 37:13, 44:22, 45:6, 45:14, 46:13, 50:17, 51:18, 53:16, 60:18, 61:16, 62:19, 62:24, 66:22, 76:14, 102:12, 109:12, 238:6
**depends**
24:22, 50:22, 63:15, 94:17, 96:16, 214:8, 253:25
**depiction**
164:10
**deposed**
7:10, 9:12
**deposition**
1:14, 4:13, 5:22, 7:22, 8:15, 8:19,

8:24, 8:25, 9:22, 10:1, 107:25, 262:13, 262:16, 263:6
**deposits**
113:1
**depreciated**
119:24
**depreciating**
119:25
**depreciation**
27:2, 107:10, 119:2, 119:22, 119:23, 121:13, 121:14
**depression**
74:14
**derived**
184:2, 199:3, 200:2
**describe**
164:18, 164:19
**describes**
217:7
**description**
2:5, 79:1
**designate**
54:5, 54:6, 157:18, 171:5, 176:8, 182:7
**designated**
35:8, 42:15, 157:19, 167:15, 167:18, 167:19, 170:18, 171:8, 175:6, 182:2, 204:1, 204:5, 226:10
**designating**
176:3
**designations**
8:18
**designee**
7:15
**desk**
245:23
**detail**
130:11
**detailed**
133:3
**details**
139:4
**determination**
36:11, 87:14
**determine**
40:24, 79:9, 110:12, 139:5, 148:16
**determined**
41:22, 64:17, 108:19
**determining**
128:19, 129:10
**developed**
45:21, 46:19, 211:20
**developing**
14:20, 14:21, 23:6, 226:15
**development**
14:12, 14:13, 14:14, 15:6, 15:25, 16:3, 39:13, 220:23
**device**
81:14
**dhhs**
18:23, 19:13, 19:17, 19:18, 20:2, 31:9, 34:6, 158:21
**diabetic**
52:18
**diagnoses**
188:15
**diagnosis**
34:25, 253:25
**dictate**
207:18
**dictates**
46:20, 225:14
**die**
175:20
**died**
178:2
**diet**
47:2, 47:6, 52:25, 53:1, 102:18
**dietary**
15:4, 65:1, 65:19, 66:10, 67:10, 70:14, 70:24, 71:5, 201:7, 223:8
**dietitian**
46:22
**diff**
156:22
**difference**
19:16, 23:13, 28:13, 35:19, 38:17, 44:21, 61:25, 62:1, 64:2, 72:9, 95:12, 98:10, 98:11, 104:20, 123:25, 253:22, 254:13, 259:4
**differences**
23:14, 23:16, 23:17, 96:6, 146:2
**different**
4:18, 11:23, 11:24, 13:18, 17:7, 18:16, 21:5, 21:6, 22:1, 22:13, 30:6, 33:25, 35:25, 36:7, 42:15, 43:13, 48:4, 51:18, 57:2, 60:1, 60:8, 61:7, 61:8, 70:10, 71:21, 72:10, 73:20, 74:6, 82:9, 89:18, 90:21, 93:14, 93:18, 93:23, 95:20, 95:23, 97:2, 97:12, 100:4, 100:6, 102:5, 104:18, 108:4, 111:4, 111:19, 111:20, 111:21, 112:18, 118:5, 124:16, 126:4, 126:14, 128:17, 132:3, 143:10, 144:16, 146:7, 148:11, 151:7, 156:23, 163:25, 165:25, 179:8, 179:20, 184:4, 193:15, 196:11, 211:6, 215:3, 216:1, 220:13, 224:9, 227:5, 234:25, 242:24, 246:11, 246:13, 247:7, 254:10, 254:11, 254:12, 259:7
**differentiate**
131:23
**differentiating**
255:16
**differently**
204:23
**difficult**
135:13, 135:15, 149:5, 157:8
**digging**
218:25
**diluted**
85:5
**dimension**
240:22
**dining**
43:4, 43:14, 65:6, 65:7, 65:25, 67:17, 69:8, 69:11, 69:15, 69:18, 69:23, 69:24, 70:3, 70:6, 70:9, 70:22, 71:4, 71:8, 71:14, 71:15, 71:20, 71:21, 72:2, 72:5,

72:7, 72:11, 72:18, 72:22, 76:15, 76:21, 82:10, 142:23, 146:21, 146:22, 147:2, 149:15, 153:1, 157:22, 161:6, 164:20, 165:1, 165:4, 169:18, 170:1, 170:9, 170:10, 193:19, 195:21, 196:3, 200:8, 200:11, 200:12, 200:15, 201:23, 201:24, 202:1, 202:4, 202:5, 202:6, 202:8, 202:16, 202:25, 203:5, 215:18, 215:20, 229:24, 230:2, 230:4, 230:10, 230:12, 230:19, 230:22, 234:21, 234:23, 235:3, 235:8, 236:10, 237:20, 237:21, 237:22, 237:24, 238:3, 238:9, 239:1, 239:6, 239:8, 239:9, 242:1, 242:3, 242:5, 242:19, 242:20, 243:4, 243:8, 243:9, 243:12, 243:19, 245:14, 245:15, 245:19

**dinner**
65:4

**dipped**
107:5

**direct**
12:7, 12:13, 13:12, 19:23, 83:1, 106:1, 109:10, 109:14, 161:9, 162:13, 209:17, 214:19, 259:19, 259:25

**direction**
60:13, 143:10

**directive**
53:18, 83:1, 191:18, 200:19

**directly**
57:12, 65:18, 68:19, 109:15, 118:19, 168:11, 170:7, 174:7, 203:10, 253:2, 253:3, 253:21, 257:23

**director**
14:18, 16:5, 16:7, 16:12, 16:17, 16:18, 16:23, 17:2, 17:4, 17:8, 17:10, 17:11, 17:13, 17:21, 18:22, 19:7, 21:10, 21:11, 28:7, 28:8, 32:8, 32:9, 56:7, 56:9, 56:12, 59:12, 59:20, 59:24, 60:17, 60:18, 68:1, 139:17, 139:18, 149:13, 174:21, 187:15, 219:11, 223:6, 246:24, 247:1

**discharge**
3:7, 41:1, 125:18, 125:24, 126:20, 126:22, 127:1, 127:17, 129:21, 154:8, 154:10, 154:12

**discharged**
126:20, 126:21, 128:8

**discharges**
126:1, 129:24, 154:4

**disciplinary**
16:13

**discipline**
60:12

**discrepancy**
94:15

**discussed**
59:20, 234:22, 234:24, 237:5, 245:3

**discussing**
69:2, 233:2, 235:15

**discussion**
225:11, 245:2

**discussions**
230:23, 262:16

**disease**
218:15, 219:3

**dishes**
65:17

**disinfect**
81:25, 196:13, 204:12, 233:18

**disinfecting**
67:7, 81:25, 108:21

**disinfection**
196:14

**dismiss**
209:16

**displaced**
45:12

**disrupt**
8:20

**disruptive**
82:21

**distance**
76:4, 195:23, 202:14, 204:4, 230:8, 235:6, 235:7

**distanced**
147:4, 192:19

**distancing**
146:24, 196:24, 197:2, 197:4, 197:20, 198:2, 198:3, 199:13, 201:12, 203:2, 203:8, 203:15, 207:7, 216:2, 234:15, 235:9, 239:19, 240:6, 241:2, 242:14

**district**
1:1, 1:2, 4:9, 33:15, 33:16, 33:20, 225:1

**distrust**
186:25

**dive**
156:9

**diversion**
75:14, 76:12

**diversional**
59:6, 59:8, 73:4, 74:1, 75:15, 77:15

**divide**
93:3

**divided**
79:14, 90:21, 91:5, 254:3, 259:12

**dividers**
172:25

**divides**
66:7

**dividing**
133:20, 133:21

**division**
1:27, 1:36, 17:9, 66:10, 89:14, 209:24

**divisions**
61:8

**doctor**
54:2, 54:11, 54:13, 54:19, 58:5, 142:7

**doctors**
55:16, 57:5

**document**
77:3, 77:7,

77:12, 79:17, 79:19, 80:8, 81:1, 81:2, 82:8, 90:11, 90:19, 107:13, 108:4, 109:6, 109:9, 110:21, 111:3, 111:11, 112:4, 112:5, 118:18, 118:20, 118:24, 125:23, 145:8, 171:20, 176:25, 177:1, 182:17, 217:10, 220:9, 231:3, 233:9, 246:3, 247:10, 251:11, 252:3, 253:14, 255:3, 258:22, 258:24, 261:19, 261:20, 261:25

**documentation**
7:23, 7:24

**documents**
8:4, 8:6, 8:12, 8:23, 9:23, 9:25, 87:10, 88:3, 89:20, 111:9, 111:15, 177:3, 220:13, 225:23, 251:5, 258:6, 261:1, 262:12

**doff**
162:14, 162:25

**doffing**
171:8, 172:5, 172:8, 173:13

**doing**
13:11, 13:12, 13:22, 14:2, 16:2, 16:4, 17:2, 20:23, 26:24, 33:3, 58:16, 65:17, 73:18, 74:22, 75:24, 75:25, 78:25, 80:11, 80:12, 143:8, 148:17, 156:21, 168:4, 181:6, 196:17, 205:5, 222:3, 231:21, 232:18, 240:20, 241:3, 241:20, 258:10

**dollars**
24:21, 25:4, 25:7, 25:10, 25:11, 50:7, 57:17, 57:18, 99:5, 142:17, 151:24, 152:10, 250:19

**domino**
213:24

**dominos**
214:17

**don**
162:14, 162:25

**donations**
53:8

**done**
15:18, 26:1, 26:2, 32:18, 35:15, 40:4, 55:5, 76:9, 85:21, 88:9, 88:10, 107:12, 116:14, 153:12, 156:9, 196:10, 196:11, 197:14, 197:15, 237:2, 243:16, 243:17

**donning**
171:8, 172:5, 172:8, 173:13

**door**
35:24, 249:21

**doors**
36:13, 211:19

**dorm**
49:11

**double**
135:8

**double-check**
115:12, 123:13

**double-checking**
163:21

**doubt**
123:7

**down**
13:4, 42:11, 43:12, 43:16, 43:17, 45:6, 45:8, 45:11, 45:12, 63:10, 84:10, 103:2, 103:22, 109:7, 132:13, 133:10, 136:25, 141:15, 143:23, 153:6, 161:15, 166:16, 166:17, 170:4, 171:22, 173:2, 178:20, 181:23, 184:1, 184:15, 200:20, 201:9, 201:21, 220:21, 233:13, 238:1, 249:16

**downstate**
148:8, 157:13

**dr**
59:23, 158:19

**draft**
110:20, 115:13

**drafted**
254:17

**draw**
14:5, 55:6

**drawn**
76:18

**drilled**
86:9

**drive**
10:4, 37:19

**driven**
131:9

**driver**
68:6

**drives**
86:21

**driving**
250:12

**droplet**
151:14, 158:8

**drowning**
148:17

**dry**
66:25

**dual**
177:14, 177:17, 177:18, 177:21, 178:5, 178:23, 180:1, 180:16, 180:17, 180:19

**due**
4:12, 185:17, 185:20, 185:21, 186:13, 187:14, 188:21, 189:21, 190:5

**duly**
23:20, 34:20, 264:8

**duquette**
88:10

**durable**
83:1

**duration**
13:2, 38:3, 73:9, 73:12, 79:6, 147:15

**during**
12:5, 12:25, 33:1, 63:6, 63:24, 65:19, 67:5, 81:25, 83:19, 107:4, 127:22, 129:11, 136:9, 141:15, 158:22, 162:6, 162:24, 164:11, 165:2, 165:4, 166:1, 169:11, 175:2, 178:21, 181:17, 182:2, 185:22, 185:25, 189:1, 189:19, 190:5, 190:21, 191:6, 191:13, 192:14, 195:15,

197:20, 199:6, 200:9, 203:18, 204:15, 205:8, 206:1, 207:6, 208:14, 210:18, 211:11, 212:1, 213:5, 213:8, 214:21, 215:9, 215:11, 216:3, 216:5, 235:23, 242:9, 247:13, 249:5, 262:13
**duties**
18:10, 62:1
**duty**
207:2
**dying**
13:13, 13:21, 142:11, 142:12
**dynamic**
72:19, 83:2, 83:16, 83:25, 138:9
**dynamics**
99:25

**E**

**e-stim**
81:14, 81:23
**e-trans**
263:1
**each**
12:25, 33:1, 33:20, 34:3, 67:19, 71:20, 89:13, 95:8, 126:2, 126:7, 126:18, 128:9, 132:11, 134:2, 177:9, 192:21, 193:12, 221:20, 238:12, 238:18, 243:1, 258:3
**earlier**
45:18, 57:1, 59:20, 97:23, 98:24, 102:17, 116:5, 117:22, 139:25, 144:16, 179:21, 181:18, 231:3, 235:3, 237:8, 239:24, 244:9, 245:11, 250:8, 251:4, 251:11, 257:4, 262:11
**early**
11:3, 12:3, 84:2, 146:13, 155:2, 164:1, 169:1, 186:13, 200:19, 203:20, 247:24
**earn**
253:7
**earns**
25:13
**ease**
4:14
**easier**
6:18, 6:20, 121:3, 203:14
**easiest**
57:8, 84:7
**easily**
47:4, 64:24, 136:22, 172:24, 181:2, 236:1, 258:10
**eastern**
225:1
**easy**
64:20, 194:1
**easystands**
27:4
**eat**
69:22, 69:23, 70:1, 70:5, 70:6, 70:8, 70:20, 165:3, 240:24
**eating**
62:13, 62:22, 65:23, 69:17, 70:21, 70:22, 70:23, 71:4, 71:11, 72:7, 165:5, 201:14, 201:18, 201:22, 203:9, 203:13, 230:9, 238:21
**eats**
70:13
**ebb**
72:12
**economic**
138:8, 139:7, 141:12, 248:18
**educated**
222:11
**educating**
185:23
**education**
14:15, 23:11, 38:25, 57:23, 62:4, 82:22, 101:15, 105:3, 114:25, 247:2
**educational**
10:5, 33:13
**effect**
84:19, 213:25, 215:10, 229:15, 230:4
**effective**
55:13, 150:10, 203:2, 204:19
**effectiveness**
155:3
**effects**
139:9, 139:11, 146:1, 148:3
**effort**
24:15, 24:16, 25:2, 25:3, 25:11, 26:8, 32:19, 32:20, 253:2
**efforts**
229:24
**eight**
51:2, 63:20, 64:14, 133:16, 183:25, 184:10, 211:6, 225:19, 227:12, 234:21, 235:20, 236:17, 238:22, 241:12, 241:20
**either**
34:21, 40:24, 46:13, 80:5, 92:23, 100:2, 119:18, 133:7, 138:3, 139:1, 141:3, 146:7, 156:9, 184:22, 195:6, 210:12, 222:8, 223:2, 259:11
**elderly**
148:4
**elected**
20:17, 186:12, 186:13
**elective**
153:12, 188:11, 249:1
**elective-type**
53:13
**electric**
105:5
**electronic**
1:42, 13:7, 19:3, 96:23, 113:6, 113:24, 116:2, 126:10, 182:8, 264:2
**electronically**
156:4
**eligibility**
35:9, 40:19, 51:24, 87:10, 87:11, 96:22, 110:12, 129:3, 138:13, 139:6
**eligible**
23:20, 51:24, 87:12, 138:1, 138:19, 139:6
**eliminate**
141:14, 205:22

**eliminated**
141:11
**else**
8:23, 9:22, 52:12, 87:5, 104:13, 156:8, 162:9, 163:9, 174:14, 175:1, 192:11, 196:11, 243:18, 246:21, 248:12
**elsewhere**
22:21
**email**
3:27, 3:29, 3:31, 29:13, 159:13, 252:7, 252:15, 255:2, 256:6, 257:14
**emails**
33:19, 259:14
**embezzlement**
115:19
**emergencies**
28:23
**emergency**
41:20, 54:6, 137:9, 168:17
**emotional**
142:20, 143:7
**employed**
12:1, 68:12, 68:18
**employee**
3:27, 4:12, 64:18, 88:22, 101:18, 115:25, 116:1, 125:4, 128:21, 137:23, 145:16, 145:24, 208:3, 208:15, 255:2, 255:6, 255:12, 257:2
**employees**
55:17, 55:20, 55:21, 61:8, 63:1, 64:17, 68:10, 88:25, 89:14, 100:12, 100:13, 100:21, 102:20, 141:1, 236:15, 236:16, 255:16, 255:18
**employer**
19:10, 110:13, 129:3
**employment**
9:18, 11:21
**empty**
172:3
**encompasses**
246:21
**encompassing**
221:4
**encourage**
70:10, 204:1
**encouraging**
38:14
**end**
13:16, 77:2, 84:13, 99:16, 127:10, 138:5, 138:23, 155:2, 166:6, 169:22, 187:20, 206:7, 211:17, 213:22, 215:20, 228:22, 240:19, 242:7, 254:15
**ended**
63:6, 151:17, 151:18, 164:7, 202:17, 207:1
**endemic**
210:15, 210:16
**endgame**
138:24
**ending**
112:13, 117:14, 118:25
**ends**
44:1
**enforce**
198:19
**engaging**
156:19
**enjoyed**
69:13
**enough**
31:9, 34:4, 37:14, 72:8, 106:25, 127:22, 127:23, 174:23, 177:18, 177:21, 177:22, 185:14, 189:9, 191:8, 202:4, 219:1
**entail**
16:20
**enter**
5:12
**entertained**
141:21
**entertainer**
195:11
**entertainers**
194:2, 195:13, 195:14
**entertainment**
187:9, 195:2, 195:6, 195:9
**enthusiasm**
184:6
**entire**
59:24, 133:23, 134:6, 134:11, 134:12, 134:13, 135:3, 141:17, 147:4, 181:11, 182:9, 258:3
**entirety**
48:19, 97:25, 205:8, 220:18, 246:19
**entitlement**
4:12
**entity**
156:16
**entrance**
157:23, 162:18, 162:22, 165:11
**entrances**
162:16, 165:14
**entree**
236:3
**entries**
113:25, 116:3
**entry**
117:17
**environment**
145:23
**equal**
250:14
**equals**
180:20
**equipment**
26:25, 27:3, 28:17, 52:10, 53:11, 67:7, 81:15, 81:16, 81:22, 82:2, 103:14, 108:21, 119:23, 121:9, 121:10, 121:12, 162:3, 162:14, 163:2, 196:13, 197:17, 197:18
**er**
127:3
**erc**
2:28, 2:29, 3:1, 29:18, 29:20, 29:25, 30:8, 87:10, 87:16, 87:20, 111:8, 129:20, 250:9, 250:10
**escalate**
12:10
**escalating**
14:17
**escaped**
221:1
**escort**
204:11
**especially**
17:3, 33:25, 38:15, 41:3, 43:10, 49:6, 63:23, 63:25, 67:22, 123:11, 139:6, 150:25, 156:5, 157:20,

249:21
**ess**
88:18
**essential**
141:22, 141:24, 141:25
**essentially**
16:16, 24:1, 51:11, 88:1, 151:2
**essentials**
46:21
**established**
172:3, 174:18, 226:12
**estate**
252:23
**estimate**
10:20, 16:10
**estimated**
120:13, 120:17
**et**
58:2, 78:11, 78:18, 91:9, 99:10, 115:19, 119:23, 120:1, 127:4
**eval**
40:4
**evaluate**
18:19, 128:4, 129:3, 169:5, 198:13
**evaluating**
129:1
**evaluation**
16:14, 18:25, 46:3, 46:4, 250:9
**evaluations**
14:2
**even**
17:2, 21:8, 25:19, 26:25, 27:18, 29:1, 31:17, 32:7, 32:18, 35:10, 36:10, 37:20, 40:4, 46:1, 46:2, 49:18, 53:10, 58:11, 61:4, 66:12, 67:8, 76:2, 76:3, 81:18, 86:6, 106:2, 107:4, 114:3, 120:16, 133:16, 135:11, 140:7, 141:9, 141:11, 141:19, 141:21, 142:22, 143:1, 143:4, 143:22, 144:6, 146:20, 151:25, 152:13, 153:1, 153:2, 157:7, 158:9, 159:6, 164:1, 166:24, 167:7, 169:18, 169:19, 170:13, 170:25, 181:13, 183:19, 184:4, 185:23, 186:2, 186:3, 187:10, 187:15, 193:12, 194:25, 195:11, 195:23, 198:18, 198:23, 199:17, 200:20, 202:3, 203:3, 204:22, 207:9, 208:9, 211:15, 218:13, 218:24, 222:1, 222:14, 226:19, 235:23, 240:24, 241:1, 243:9, 245:3, 245:5, 247:2, 248:3, 248:16, 248:25, 249:5, 249:6, 249:18, 250:18, 259:6
**event**
17:14, 146:15, 150:25, 151:19, 172:23, 173:7, 173:14, 178:14, 195:24, 245:9
**events**
68:8
**eventually**
23:7, 248:12, 252:24, 253:1
**ever**
6:22, 7:8, 7:10, 7:12, 22:19, 31:24, 114:17, 141:15, 166:1, 178:4, 182:2, 185:12, 187:4, 189:8, 191:7
**every**
4:16, 6:25, 18:16, 20:17, 24:3, 24:11, 24:18, 24:23, 26:16, 26:17, 26:18, 31:11, 32:23, 45:10, 47:16, 47:19, 62:19, 62:20, 62:21, 68:17, 86:22, 120:11, 121:3, 128:25, 130:13, 130:19, 143:10, 150:20, 174:24, 175:6, 210:8, 219:2, 224:11, 252:11, 252:22, 261:23
**everybody**
33:2, 66:10, 102:14, 102:15, 142:25, 143:1, 166:7, 193:15, 205:20, 208:17, 234:8, 239:21, 239:25
**everybody's**
210:7, 210:9, 249:15
**everyday**
28:17
**everyone**
81:15, 89:2, 107:13, 147:23, 234:5
**everything**
36:7, 67:1, 70:9, 106:19, 124:6, 144:2, 150:4, 199:19, 200:18, 233:21, 246:21
**everything's**
214:6
**evolution**
207:8, 227:24
**evolve**
226:16
**evolved**
23:7
**exacerbation**
39:15, 57:15
**exact**
16:9, 23:1, 48:9, 63:10, 63:20, 78:13, 80:12, 88:3, 94:13, 99:25, 129:6, 129:16, 136:6, 136:19, 137:21, 154:25, 179:17, 182:23, 188:23, 200:18, 213:22
**exactly**
25:20, 68:9, 72:24, 116:8, 130:21, 137:11, 142:8, 158:25, 165:14, 189:5, 189:6, 192:16, 230:25, 260:21
**exaggerating**
193:23
**exam**
62:5
**examination**
2:3, 5:3
**example**
27:7, 42:7, 77:17, 77:19,

79:3, 79:12, 91:17, 104:4, 109:6, 121:10, 122:18, 130:16, 131:20, 132:20, 134:10, 146:21, 149:14, 179:14, 192:18, 193:17, 196:3, 201:25, 223:17
**examples** 25:16, 26:21, 194:2
**excel** 3:11, 171:20
**except** 76:2, 76:3, 137:9, 216:10, 246:13
**exceptional** 53:13
**excess** 25:10
**exchange** 57:7, 57:11, 97:20, 102:6
**exchanging** 58:16
**excited** 143:21, 194:17, 194:24, 242:21
**excitement** 184:2
**exciting** 43:9, 91:13
**exclude** 149:16
**excuse** 55:16, 118:13, 204:14, 233:10
**exempted** 206:11
**exemption** 148:18
**exemptions** 148:14
**exercise** 73:9, 73:19, 79:12, 80:12
**exercises** 75:21, 79:2
**exhausted** 96:3
**exhibits** 9:2, 227:9, 262:10
**exist** 64:8, 223:22, 248:19, 251:18
**existed** 252:10
**exit** 172:16
**exits** 153:5
**expect** 79:12, 101:12, 109:21, 109:22, 126:21, 206:7, 206:8, 243:14
**expectation** 146:22
**expectations** 146:4
**expected** 24:1, 97:16, 122:25, 126:22, 127:1, 127:17, 218:17
**expecting** 111:19, 126:24, 148:23
**expenditures** 145:9, 256:14
**expense** 25:3, 25:6, 27:2, 51:23, 52:1, 100:25, 101:1, 101:9, 101:14, 101:16, 103:2, 105:1, 109:20, 109:23
**expenses** 3:35, 90:23, 91:5, 91:6, 100:9, 100:15, 100:23, 101:10, 101:17, 103:5, 108:8, 109:7, 120:23, 120:24, 120:25, 256:22
**expensive** 24:1, 53:11, 63:22, 141:13, 145:1, 145:3
**experience** 17:17, 114:25, 173:22, 174:4, 174:10, 218:24, 250:24
**experienced** 207:24
**expired** 126:24
**expires** 264:18
**explain** 24:7, 24:25, 38:17, 40:15, 48:17, 57:9, 73:19, 84:19, 95:8, 99:24, 110:14, 126:18, 162:25, 184:18, 199:10, 206:5, 252:19, 253:17
**explained** 80:11
**explaining** 57:6, 86:8, 256:9
**explanation** 85:3, 86:2, 86:8, 87:1
**exponential** 250:23
**exposed** 78:9, 144:7, 144:8, 152:23, 173:21, 182:25, 205:21, 208:18, 208:19, 214:4
**exposure** 178:10, 178:14, 179:18, 208:12, 208:13, 209:8, 214:19
**exposures** 152:21, 195:25
**extent** 119:12, 128:22, 190:12
**extra** 38:20, 55:10, 67:7, 71:11, 96:4, 107:1, 117:2, 136:23, 137:1, 194:8, 196:14, 196:15
**extreme** 167:6, 175:18, 187:1, 201:11
**extremely** 40:13, 42:6
**eye** 142:25, 143:3, 143:4, 208:17, 208:22
**ez** 22:24

**F**

**f-tags** 217:7
**face** 194:9
**facebook** 222:16
**faced** 248:18
**facetime** 205:1
**facets** 188:14
**facilitate** 193:12, 194:8, 194:25, 201:18, 203:11, 204:7, 204:9, 204:12, 215:22, 230:7, 230:23, 233:19, 233:25, 238:5,

249:6
**facilitated**
202:5, 234:11, 240:2
**facilitating**
205:6
**facilities**
2:13, 2:16, 2:18, 2:21, 12:22, 23:12, 23:18, 23:19, 23:25, 24:18, 30:23, 31:25, 32:10, 32:13, 33:22, 86:24, 141:8, 156:5, 156:17, 156:18, 156:25, 229:11
**facility**
1:4, 4:7, 4:10, 4:15, 7:17, 12:14, 12:24, 14:8, 15:8, 18:8, 23:15, 23:21, 24:3, 31:2, 31:3, 31:5, 31:7, 31:8, 31:22, 34:11, 34:13, 35:11, 35:14, 48:12, 48:18, 52:20, 53:6, 55:17, 60:22, 84:15, 84:22, 102:25, 126:20, 127:15, 128:6, 128:9, 129:14, 133:23, 134:6, 134:11, 134:12, 134:13, 135:3, 140:5, 154:21, 154:22, 155:7, 155:18, 156:11, 156:14, 156:25, 157:6, 157:16, 159:23, 160:2, 160:10, 160:14, 161:20, 162:6, 162:8, 163:19, 163:20, 171:23, 184:4, 185:14, 185:17, 186:5, 216:2, 217:10, 218:14, 220:10, 223:4, 243:24, 248:25, 249:13
**facility-related**
16:23
**facility-reported**
16:25, 219:14
**facing**
235:11
**fact**
23:24, 33:15, 40:13, 98:7, 139:1, 140:18, 169:5
**factor**
67:21, 189:5
**factors**
188:10, 251:3
**faded**
71:18
**failure**
57:16
**fair**
21:5, 30:7, 228:15, 229:12, 229:14, 230:3, 231:25
**fairly**
19:4, 79:3, 86:6, 186:25, 216:8
**fall**
28:5, 29:10, 32:7, 34:20, 101:10, 121:11, 122:17
**fallen**
104:12
**falls**
38:15, 43:21, 101:14
**familiar**
90:18, 112:7, 112:20, 114:18, 118:22, 120:6, 123:18, 124:12, 124:14, 131:2, 131:7, 149:20, 205:1, 218:22, 260:18, 260:19
**familiarity**
66:17
**families**
68:5, 72:16, 82:14, 102:23, 142:10, 143:9, 186:16, 187:19
**family**
46:13, 69:22, 72:15, 82:21, 83:2, 128:5, 148:1, 187:1, 194:6, 194:7, 205:2, 238:23
**family's**
194:9
**far**
23:4, 23:19, 29:12, 33:23, 33:24, 36:18, 37:20, 44:24, 60:16, 63:20, 63:21, 63:23, 78:18, 94:1, 106:2, 158:22, 174:9, 191:19, 193:13, 195:14, 200:17, 215:21, 220:20
**farm**
23:5
**fashion**
85:22
**faster**
201:6
**fatiguing**
143:2
**fear**
139:15, 146:3, 148:5, 186:25, 188:4, 188:8, 190:9
**fearful**
140:6
**fears**
189:23
**february**
11:8, 139:12, 166:9, 204:8, 230:20, 231:4, 231:8, 251:18
**fed**
203:16
**federal**
4:11, 5:23, 7:15, 22:19, 101:1, 101:2, 109:2, 109:4, 110:1
**feds**
109:5, 260:3
**fee**
52:7, 83:7
**feed**
46:7
**feeding**
201:11
**feel**
18:13, 39:22, 48:9, 84:8, 151:6, 153:23, 157:6, 166:10, 188:17, 194:20, 202:17, 216:15, 216:17, 227:7, 228:7, 240:17, 240:23, 248:14
**feeling**
143:9
**fees**
57:11
**feet**
192:21, 201:16, 240:19
**fell**
12:12
**felt**
30:18, 35:4, 39:12, 72:18,

145:23, 156:23, 157:9, 157:20, 158:1, 158:12, 159:20, 168:5, 172:10, 222:15
**female** 180:8
**ferris** 10:13
**few** 11:21, 20:23, 22:11, 25:23, 49:1, 136:7, 140:7, 163:21, 207:4, 254:1, 260:4, 260:23
**fibbing** 224:10
**fica** 100:25, 101:2
**field** 47:2
**figure** 140:17, 146:15, 174:12, 188:15, 201:17, 244:8
**figures** 145:8
**file** 29:15
**files** 30:2, 30:7
**filibeck** 87:24, 112:6
**filing** 29:18
**fill** 68:13
**filling** 17:1
**fills** 116:15
**filter** 158:6
**filtrations** 108:22
**final** 110:20
**finally** 242:20, 249:25
**finance** 22:14
**finances** 86:13, 89:17
**financial** 18:16, 25:22, 26:15, 32:7, 33:7, 78:12, 84:13, 86:11, 86:15, 88:1, 96:24, 152:3, 153:18, 216:6, 260:21
**financially** 44:24, 45:2, 64:12, 84:12, 250:5
**financials** 259:6
**financing** 86:16
**find** 10:24, 82:20, 85:25, 140:14, 141:20, 153:24, 156:3, 182:4, 186:15, 198:3, 230:24, 242:25, 245:20, 255:7, 257:23, 258:5
**fine** 9:8, 9:11, 10:20, 44:15, 56:17, 80:5, 88:21, 110:23, 118:13, 262:25
**finish** 7:2, 73:23, 89:11
**finished** 11:14, 121:20, 262:7
**finite** 87:1
**fire** 18:20, 35:25
**fireplace** 43:15, 164:24, 165:7
**fires** 16:21
**firing** 16:13, 27:23, 59:22
**first** 1:28, 11:21, 15:1, 20:22, 46:17, 46:18, 46:19, 64:2, 78:20, 83:24, 93:19, 93:20, 97:6, 113:9, 118:9, 130:11, 130:14, 130:18, 131:18, 131:19, 135:16, 137:25, 139:10, 139:11, 140:7, 140:13, 140:15, 140:16, 155:22, 156:3, 159:20, 161:11, 166:4, 180:25, 181:3, 182:16, 185:12, 185:24, 190:5, 190:21, 192:13, 195:5, 195:7, 208:6, 209:4, 213:14, 214:5, 214:7, 214:21, 217:17, 237:20, 243:15, 243:17, 248:11, 251:13, 255:13, 255:15, 260:17, 261:4, 261:18
**fiscal** 119:15, 119:16, 119:19, 119:20, 120:2, 123:23
**five** 19:6, 31:16, 32:23, 35:11, 35:13, 40:1, 41:12, 41:14, 47:9, 49:20, 61:15, 79:13, 79:14, 154:15, 185:1, 196:7, 196:8, 226:5, 231:19, 233:14, 243:21, 252:11, 261:14
**fixed** 121:8, 121:10, 121:11
**flexibilities** 232:13
**flexibility** 135:25, 179:10, 188:8
**flip** 13:5, 81:4, 134:15, 134:16, 164:9, 228:23, 233:10, 233:13, 260:16, 261:18
**float** 67:3
**floor** 14:6, 167:8, 178:15, 226:10
**flop** 33:21
**flow** 72:12
**fluid** 170:24
**focus** 22:17, 26:10, 67:21, 191:2
**focused** 107:7, 194:22, 238:9, 246:20
**focusing** 33:9, 146:8
**fog** 143:4
**follow** 54:11, 121:16, 206:13, 210:18, 217:13, 218:14, 218:16, 218:20,

218:23, 223:12, 224:14, 225:5, 225:10, 228:11
**follow-up**
19:12
**followed**
202:10, 213:2, 218:25, 228:2, 228:16, 229:19, 230:5, 230:6
**following**
139:22, 191:25, 211:22, 230:7, 230:20, 234:14
**follows**
46:22, 241:13
**font**
229:23
**food**
21:20, 26:17, 28:16, 37:16, 59:9, 65:8, 65:9, 65:12, 70:18, 104:3, 104:4, 200:24, 201:1, 201:5, 243:13
**food-related**
223:7
**foot**
135:7, 142:7, 240:21, 240:22
**footage**
137:6, 137:10, 177:18, 177:21, 239:20
**footprint**
164:2
**forefront**
41:2
**foregoing**
264:4
**forever**
146:21
**forget**
163:5
**forgiveness**
158:22
**form**
41:5, 78:9, 78:13, 78:14, 78:16, 78:17, 95:5, 103:13, 116:15, 131:7, 155:20, 160:3, 160:4, 189:24, 190:11, 224:21, 228:17, 230:16, 232:2
**formal**
29:22, 224:5
**formally**
29:25
**format**
100:4, 100:6
**forms**
78:7, 261:2
**formula**
24:24
**forth**
114:3, 116:6, 116:11, 116:12, 117:3
**forward**
184:12
**foster**
31:13
**founded**
22:25, 29:7
**four**
12:23, 46:17, 49:10, 54:9, 61:15, 74:6, 97:2, 135:12, 136:6, 142:23, 166:22, 166:24, 177:10, 177:13, 183:14, 187:8, 190:23, 200:10, 213:4, 223:3, 230:5, 238:21, 241:19, 243:1
**fourth**
108:10, 155:24, 177:14, 229:21
**fred**
132:5
**free**
82:24, 216:17, 228:7, 235:24, 236:6
**frequencies**
56:4
**frequent**
13:17
**frequently**
36:23
**fresh**
200:24, 240:15
**fri's**
16:24, 16:25
**friday**
182:21, 232:25
**friends**
193:21
**frivolous**
222:5
**front**
260:20
**frozen**
65:13
**fruition**
148:24
**full**
63:3, 83:13, 83:15, 83:22, 83:24, 181:21, 237:12, 238:7, 258:10
**full-time**
42:10, 54:15, 63:1, 63:5, 64:17, 219:10, 219:21, 219:23, 255:17
**full-times**
64:1
**fully**
147:15, 147:19, 151:2, 166:7, 229:25, 239:18, 240:6
**function**
38:1, 39:17, 39:18, 40:2, 41:1, 46:14, 161:24
**functional**
14:22, 19:3, 37:8, 60:20, 72:9, 115:21
**functionally**
222:2, 222:3
**functioning**
181:6
**fund**
25:5, 25:9, 107:8, 107:10, 123:2
**funded**
50:1
**funding**
26:4, 26:9, 50:10, 50:11, 108:18, 259:16, 259:24, 260:1, 260:2, 260:12
**fundraisers**
53:25
**funds**
24:12, 24:14, 25:15, 26:7, 102:6, 110:1, 259:15, 260:4
**further**
103:22, 242:16, 262:17, 264:7
**furthest**
173:24
**fyi**
29:11, 54:13

G

**gain**
94:16, 121:22, 121:23, 251:6
**gains**
119:5, 147:6, 147:7
**gal**
66:15
**garage**
121:11

**garnish**
123:21, 206:25
**gasb**
121:14
**gasoline**
105:5, 105:8
**gates**
1:21, 5:14
**gathering**
43:14
**gave**
102:8, 149:14, 153:19, 155:25, 166:24, 188:11, 209:24, 232:13, 232:22, 240:22, 254:19, 259:3
**gears**
49:16, 58:19, 247:12
**general**
32:1, 32:2, 79:3, 82:13, 83:4, 90:15, 90:18, 92:4, 189:22, 190:9, 235:25, 252:19
**generalize**
36:7
**generally**
26:11
**generate**
98:19
**generated**
91:4, 95:6, 126:6, 126:7, 126:9, 131:3, 131:15, 133:8, 199:22, 255:24
**generates**
88:18, 126:11
**generation**
205:2
**generic**
79:3, 223:5
**generous**
122:13
**gentleman**
216:10
**gentlemen**
66:21
**geographic**
192:23
**getting**
35:24, 39:22, 51:11, 56:5, 69:14, 73:14, 96:1, 107:5, 144:10, 147:13, 149:3, 150:11, 170:13, 181:20, 239:21, 240:5, 249:2, 249:6, 250:2, 250:25, 259:19
**gi**
38:6, 38:7
**gift**
102:20, 102:23, 102:25
**girlie**
52:25
**give**
4:23, 6:16, 26:21, 41:12, 41:13, 42:5, 50:20, 68:5, 77:19, 86:2, 86:7, 87:1, 91:6, 93:23, 99:3, 102:20, 109:14, 130:1, 130:2, 136:19, 137:21, 145:8, 146:21, 148:6, 158:10, 168:10, 179:13, 190:13, 190:24, 190:25, 192:18, 193:17, 210:5, 219:1, 227:7, 231:7, 236:20, 240:1, 251:5, 261:22
**given**
26:8, 109:4, 172:25, 177:2, 188:24, 191:18, 202:15, 209:3, 224:7, 233:1
**gives**
28:24, 109:13, 135:25
**giving**
7:6, 27:21, 65:22, 139:23, 162:13, 200:19, 233:5, 236:6, 240:3, 249:9, 264:7
**gl**
123:7, 123:8, 123:9, 123:10, 123:13, 256:19
**glimmers**
143:17
**glory**
166:14
**glove**
103:9
**gloves**
103:11, 218:9
**glue**
52:17
**go**
5:7, 5:9, 5:21, 10:7, 15:11, 25:14, 25:18, 29:21, 29:24, 30:15, 41:10, 43:17, 50:9, 54:2, 54:3, 63:23, 66:22, 69:20, 76:24, 82:24, 87:19, 89:8, 91:16, 91:19, 92:2, 92:12, 100:23, 104:2, 104:17, 109:6, 126:23, 131:25, 132:13, 133:24, 136:19, 136:23, 137:11, 139:18, 139:21, 139:22, 139:25, 140:2, 144:12, 148:13, 151:3, 158:24, 161:13, 170:4, 170:6, 171:23, 172:19, 180:10, 181:10, 185:6, 186:5, 202:1, 207:10, 207:16, 209:6, 211:6, 213:12, 221:25, 224:7, 226:2, 226:17, 233:8, 233:13, 236:10, 242:22, 243:12, 246:15, 246:23, 247:8, 251:20, 252:14, 253:8, 256:17, 257:4, 261:11, 262:19
**goal**
36:1, 48:24, 48:25
**goes**
54:8, 98:24, 106:19, 119:1, 127:6, 181:12, 211:15, 247:24, 252:23
**gone**
32:8, 39:23, 101:15, 184:23, 242:1
**good**
68:24, 68:25, 70:18, 71:17, 71:25, 107:19, 113:20, 128:7, 153:4, 154:14, 176:18, 182:24, 194:17, 194:18, 200:19, 207:8, 214:6, 216:9, 225:10
**goodbye**
142:14
**goods**
142:1
**google**
86:6

**gordon**
65:11
**gosh**
47:6
**gotcha**
44:21, 54:23, 61:6, 80:18, 86:13, 94:1, 96:6, 105:2, 124:5
**gotten**
137:2
**governing**
28:4, 34:6
**government**
109:2, 113:16, 148:22, 175:10, 186:14, 187:14, 189:21, 190:6, 190:8, 203:6, 212:16, 224:13, 225:5, 227:18, 229:4
**government-owned**
30:5
**governmental**
109:3, 138:13
**governor**
19:21, 20:16, 28:11
**gown**
53:6
**graduate**
102:21
**graduated**
10:8, 12:2, 140:11
**grandchild**
102:21
**grant**
50:10
**gray**
34:2
**great**
4:19, 171:10, 210:1, 250:24, 260:20
**greater**
91:13, 96:7, 96:9, 96:11, 144:22, 146:6
**green**
217:15, 217:17
**grief**
155:23
**grievances**
27:24
**gross**
250:6, 250:19
**ground**
5:21, 84:2, 216:16
**group**
32:12, 33:1, 33:4, 33:17, 38:13, 53:22, 67:22, 67:24, 68:25, 71:16, 72:16, 72:25, 73:3, 74:8, 74:11, 74:18, 74:20, 75:24, 76:1, 76:9, 80:9, 80:11, 80:12, 80:14, 80:15, 80:19, 80:20, 82:9, 82:10, 96:15, 104:8, 113:12, 138:4, 143:20, 145:1, 145:2, 147:4, 149:7, 151:13, 157:10, 161:7, 170:8, 175:14, 192:13, 192:15, 192:18, 194:10, 194:25, 195:16, 195:21, 196:23, 197:11, 197:20, 198:7, 198:11, 198:12, 199:9, 199:23, 207:5, 207:9, 215:11, 229:24, 230:2, 230:4, 238:7, 238:9, 238:13, 239:8, 239:12, 254:14
**groups**
67:12, 76:14, 76:15, 76:16, 220:25
**grove**
115:16, 115:22, 115:23
**growing**
250:22
**guaranteed**
64:13
**guess**
10:22, 16:14, 28:7, 53:5, 73:19, 85:6, 95:2, 96:17, 115:1, 123:21, 129:9, 172:21, 173:2, 225:8, 228:12, 237:23, 238:12, 243:10
**guessing**
86:6, 86:7, 123:10, 130:22, 137:3, 177:16, 246:8, 259:12
**guest**
68:21
**guidance**
2:10, 2:11, 2:12, 158:10, 192:2, 210:6, 211:24, 212:25, 223:15, 243:22, 244:1, 244:2, 244:3, 244:12
**guide**
261:3
**guideline**
162:1, 209:4, 218:18, 234:22
**guidelines**
154:8, 159:18, 202:10, 202:11, 209:12, 218:14, 218:19, 220:2, 220:15, 220:19, 220:22, 234:15, 240:16
**guise**
148:25
**gumption**
71:19
**guys**
107:16
**gym**
42:10, 43:4, 43:16, 44:2, 44:4, 44:10, 44:11, 44:12, 44:18, 44:20, 73:24, 75:8, 75:10, 76:11, 105:23, 157:22, 165:8, 165:12, 169:8, 169:15, 169:23, 170:2, 170:7, 172:9, 196:17, 237:19, 239:15, 239:19
**gyms**
42:17, 105:22, 169:25, 196:20, 202:22

**H**

**hai**
3:21, 246:16
**haircut**
102:6
**hairdresser**
142:5, 143:13, 143:18, 143:20, 149:7, 195:1, 255:19
**half**
71:18, 145:16, 151:13, 153:17, 166:21
**hall**
13:4, 65:6, 76:5, 193:3, 200:15
**halls**
61:17, 192:19,

193:24, 238:1
**hallway**
170:5, 193:5
**halt**
249:19
**halted**
236:25
**hand**
4:20, 106:25, 107:2, 107:5, 107:8, 201:3, 264:9
**handful**
32:23, 83:23, 120:15, 140:7, 140:9, 148:5
**handing**
252:2, 253:12, 255:1, 256:5, 257:12, 258:21, 260:16
**handle**
18:12, 21:12, 62:8, 86:13, 86:15, 88:9, 114:4, 116:10
**handled**
137:18, 158:23
**handler**
108:24
**handles**
17:10, 17:11
**handling**
13:13, 13:15, 18:16, 33:3, 151:7, 151:9, 158:3, 158:4, 158:5, 158:12, 260:6
**hands**
63:10
**handwritten**
3:36, 261:4, 261:18
**hang**
242:21
**happen**
29:13, 29:14, 120:4, 146:15, 170:16, 200:22, 214:2, 214:21, 215:1, 215:2, 242:7
**happened**
84:5, 176:7, 183:24, 193:23, 206:3, 214:19, 214:20, 215:8, 225:8, 225:9, 225:12, 226:5, 242:6, 242:8, 246:10
**happening**
143:24, 197:12, 239:17, 242:10, 249:13, 249:14, 249:15
**happens**
43:8, 46:8, 86:18, 93:19, 95:16, 106:14, 106:23, 114:6, 116:8, 118:12, 168:15, 168:16
**hard**
36:6, 36:17, 92:25, 124:15, 126:5, 128:6, 129:15, 150:18, 164:19, 175:19, 178:17, 181:5, 188:17, 198:17, 212:8, 239:25
**hate**
16:21, 70:18
**hcam**
32:11, 198:15
**head**
6:7, 6:17, 42:6, 44:8, 89:13, 100:16, 169:17, 255:10
**headings**
91:8
**heads**
15:5, 17:14, 17:16, 18:13, 18:20, 18:21, 21:5, 21:6, 21:9, 21:14, 27:16, 28:6, 86:9, 223:24, 247:5
**healing**
52:19
**health**
3:6, 13:7, 19:3, 19:14, 19:17, 20:8, 36:22, 38:8, 41:14, 63:21, 71:11, 91:12, 92:25, 93:9, 95:15, 96:23, 124:22, 124:25, 125:2, 126:10, 143:19, 143:24, 147:7, 149:9, 149:23, 149:25, 150:2, 156:21, 161:4, 173:15, 173:22, 185:21, 185:25, 188:14, 188:25, 189:18, 191:17, 191:23, 210:3, 218:22, 231:20, 232:16, 254:9
**healthcare**
32:11, 58:7, 125:2, 156:22, 218:12, 246:17, 249:16
**healthcare-acqui-red**
246:16
**hear**
6:13, 193:11
**hearing**
137:25
**heart**
57:16
**heat**
105:5
**heavy**
12:23, 15:6, 145:7
**heikkinen**
59:13, 158:19, 220:1
**held**
17:19, 22:6, 29:5, 74:21, 74:25, 75:2, 75:24, 76:10, 76:13, 76:20, 83:20, 181:11, 218:2
**help**
32:15, 32:16, 32:24, 43:23, 70:19, 71:10, 71:11, 78:14, 104:5, 133:12, 171:9, 202:2, 209:14, 210:5, 241:5, 245:5, 261:3
**helped**
144:20, 151:19, 151:20, 198:16, 202:4, 221:2
**helpful**
70:11, 95:11
**helping**
34:3
**helps**
56:13
**hence**
120:22
**henson**
59:4
**here**
5:8, 7:14, 9:12, 9:18, 11:13, 11:25, 12:11, 20:19, 31:16, 31:20, 35:1, 36:14, 40:8, 40:12, 43:10, 43:11, 46:17, 48:2,

48:19, 54:3, 54:7, 54:9, 54:10, 54:13, 54:19, 55:16, 55:25, 59:10, 59:11, 59:13, 59:23, 59:24, 63:17, 70:8, 74:13, 83:24, 86:14, 88:10, 92:22, 94:24, 95:24, 98:21, 104:13, 106:17, 112:15, 124:21, 128:18, 130:24, 131:10, 140:12, 141:10, 142:2, 142:25, 144:11, 145:25, 148:25, 150:21, 152:22, 154:2, 164:15, 164:24, 179:5, 187:2, 187:13, 189:14, 217:23, 221:4, 223:2, 234:16, 237:1, 241:13, 246:19, 246:20
**here's**
42:7
**hereby**
264:3
**hereunto**
264:9
**hewitt**
207:3
**hey**
29:8, 33:2, 35:11, 130:25, 167:5, 236:6
**hiccups**
43:20, 46:23
**high**
10:6, 10:8, 84:9, 86:16, 96:25, 127:22, 127:23, 140:11, 175:2, 175:5, 241:10, 247:25, 249:2
**high-dollar**
27:3
**higher**
23:24, 51:6, 86:2, 137:12, 153:13, 200:6, 247:18, 250:18, 258:16
**highest**
51:7, 152:11, 153:18, 250:24, 254:7
**highlight**
225:25
**highlighted**
225:22, 226:8
**highlighting**
225:22
**highly**
158:17
**hips**
249:1
**hire**
14:15, 15:1, 18:20, 27:15, 27:16, 27:19, 42:10, 60:12
**hiring**
16:12, 27:23, 59:22
**historical**
23:10, 76:17
**history**
167:25, 181:7
**hit**
42:11, 86:11, 139:11, 248:24
**hold**
24:12, 24:14, 25:2, 68:4, 94:21, 114:2, 127:20, 127:23, 128:2, 150:23, 181:13, 262:16
**holding**
146:14, 150:18, 174:5, 248:12
**holds**
68:2, 112:11
**hole**
125:19, 133:18
**home**
10:13, 11:1, 23:14, 24:19, 36:22, 39:21, 39:24, 40:2, 40:4, 40:5, 41:8, 41:14, 47:23, 48:25, 49:1, 57:18, 68:17, 127:10, 127:12, 161:19, 186:16, 186:21, 186:24, 187:3, 187:7, 187:22, 210:8
**homes**
24:17, 31:3, 84:18, 156:20, 186:22
**hometown**
56:5
**hon**
1:9
**honest**
9:10, 27:11, 33:21, 87:22, 112:8, 115:23, 209:14, 219:21, 220:23, 256:16
**honestly**
58:3, 79:8, 84:22, 88:19, 116:22, 127:9, 143:25, 153:7, 155:19, 156:8, 157:11, 170:20, 195:8, 198:1, 198:2, 219:21, 247:9, 256:15
**hope**
98:4, 143:17, 225:6
**hoped**
205:7
**hopeful**
170:13
**hoping**
166:12, 166:13, 166:17, 166:22
**hospice**
97:15, 97:17, 254:14
**hospital**
46:5, 46:11, 46:23, 47:3, 53:6, 55:6, 57:15, 126:23, 126:25, 127:2, 127:4, 127:5, 127:6, 127:9, 127:18, 130:22, 130:23, 131:13, 153:11, 218:24
**hotel**
104:25
**hour**
6:25, 71:17, 71:20, 109:13, 148:2, 152:21, 219:17, 259:21
**hourly**
248:20
**hours**
37:14, 39:25, 46:17, 46:18, 46:20, 46:24, 62:3, 63:15, 64:6, 64:9, 64:10, 71:18, 82:19, 109:15, 109:16, 150:7, 178:13, 208:12, 211:2, 211:3, 211:6, 214:8, 219:18
**house**
42:23, 83:18
**housekeeper**
66:5, 67:3
**housekeepers**
67:2, 202:3
**housekeeping**
66:21, 233:18

**htp**
130:21
**hubbard**
22:10, 25:18, 30:20, 59:10, 158:18
**huge**
85:13, 140:8, 140:9, 143:5, 145:14, 205:4, 248:9, 250:19
**hugely**
135:14, 146:10, 247:7, 258:2
**human**
19:8, 19:14, 19:17, 20:8, 21:19, 59:21, 60:13, 60:15, 163:5, 231:20, 232:17
**humana**
41:10, 41:11, 96:14, 96:17
**hundred**
40:23, 43:7, 214:14
**hundreds**
142:16, 151:23
**hygiene**
36:20

**I**

**i's**
130:19
**ico**
91:12, 95:12, 95:14, 95:16, 95:22, 96:7, 254:6, 254:9
**idds**
47:5
**iddsi**
47:3
**idea**
205:11
**ideal**
49:5
**ideas**
33:5
**identify**
8:4, 80:16
**ignorance**
58:7
**ill**
13:13, 23:7
**illness**
39:15, 151:12, 157:9, 174:25, 190:18, 218:1, 218:3, 236:1
**illnesses**
246:14
**immediate**
41:7, 102:14, 146:17
**immediately**
166:20, 166:23, 200:16, 238:24
**immune**
178:17
**impact**
18:17, 45:2, 84:12, 84:13, 85:1, 139:7, 140:8, 140:21, 141:13, 144:5, 146:17, 147:5, 148:23, 152:3, 156:23, 206:9, 216:7, 216:9, 249:17, 250:19, 250:20
**impacted**
129:23, 142:19, 150:9, 153:11, 188:24, 199:9, 199:17, 223:19, 247:13, 249:10
**impactful**
135:14, 258:2
**impacting**
156:21, 167:5
**impacts**
141:9, 146:5, 153:18, 250:6
**impairment**
36:15, 66:16
**implementing**
204:15
**implying**
9:15
**important**
14:16, 17:21, 35:5, 38:5, 66:18, 67:5, 158:9, 178:12
**impossible**
225:12
**impressed**
120:6
**improper**
225:1
**improve**
37:8, 38:2, 43:23, 149:6
**improved**
151:21
**improvement**
22:4, 247:10
**improvements**
119:3, 121:7
**in-service**
14:14
**inability**
188:7, 199:8
**incentives**
64:12
**incident**
219:14
**incidents**
16:24, 16:25
**include**
52:8, 162:24, 259:23
**included**
53:3, 53:7, 53:8, 53:9, 53:19, 53:23, 54:1, 54:20, 112:15, 123:11, 123:21, 140:16, 167:9, 221:24
**includes**
90:21, 100:6, 106:3, 123:10
**including**
247:19
**inclusive**
52:9
**income**
4:11, 87:15, 88:4, 90:21, 91:7, 92:18, 94:20, 94:21, 98:13, 98:15, 98:20, 98:23, 99:11, 100:7, 101:1, 106:7, 108:8, 113:2, 251:6, 259:18
**incomes**
27:12
**inconsistency**
225:4
**incontinent**
26:17
**increase**
3:25, 25:18, 27:8, 170:23, 176:5, 249:23, 253:23, 254:5, 254:8, 254:16
**increased**
152:6, 250:16, 254:4
**increases**
248:22
**incurred**
256:22, 257:8
**independent**
69:18, 69:25, 71:17, 72:6, 72:11, 242:15
**independently**
54:21, 56:2, 57:4, 57:10, 58:4
**index**
2:4
**indicating**
94:24, 164:24, 193:9

**indigent**
23:7
**individual**
7:17, 74:17, 77:21, 80:9, 96:16, 101:25, 197:7, 197:18, 198:8
**individually**
99:8
**individuals**
58:20, 102:25, 172:4, 178:21, 178:22, 178:24, 179:25
**indoor**
161:6, 213:4, 241:6, 243:23
**industry**
14:22, 78:2, 85:5, 85:12
**infect**
178:18
**infected**
220:19
**infection**
2:9, 17:22, 59:13, 161:25, 174:21, 174:22, 209:25, 217:9, 217:19, 217:21, 217:22, 217:24, 218:5, 219:1, 219:6, 219:13, 219:20, 220:16, 220:20, 222:10, 222:24, 223:1, 223:6, 223:7, 223:21, 246:7, 246:17, 246:18, 260:9
**infections**
246:9, 246:16
**inflated**
144:24
**influenza**
218:8, 218:10, 219:4
**information**
64:20, 78:13, 78:16, 87:8, 87:13, 87:15, 87:21, 87:23, 90:19, 100:7, 110:17, 115:14, 129:7, 133:10, 156:9, 187:20, 219:2, 251:5, 254:19, 255:7, 255:20, 258:5, 260:22
**informational**
30:14, 30:17
**informed**
85:16, 159:4
**informing**
27:25
**inhouse**
55:24, 88:9, 88:21, 134:1
**initial**
223:14
**initially**
148:21, 158:7, 204:1, 204:4, 205:4, 206:2, 206:24, 212:22, 222:8, 256:16
**initiated**
73:20, 149:9
**initiation**
150:7
**injury**
193:22
**ink**
101:7
**input**
18:13, 26:6, 27:14, 27:17, 68:3, 68:5, 159:9
**inside**
241:9
**insignificant**
216:9
**installments**
99:18
**instance**
185:13
**instances**
186:12, 186:14
**instead**
74:18, 102:19, 121:4, 131:24, 153:5, 164:8, 184:12, 204:23, 208:11, 229:10, 261:25
**instituting**
229:10
**institutions**
23:6, 218:12
**insurance**
3:6, 63:22, 92:11, 92:15, 97:4, 97:12, 97:19, 105:12, 121:1, 124:22, 124:25, 253:21
**insurer**
91:25
**intensity**
38:3
**interact**
74:5
**interaction**
20:5, 188:1
**interdisciplinary**
246:24
**interest**
25:13, 98:13, 98:15, 98:19, 98:20, 98:23, 98:24, 99:1, 99:3, 99:6, 99:9, 99:11, 119:2, 121:23, 123:20, 205:4, 205:5, 207:1, 253:7
**interest-earning**
116:21
**interested**
224:12
**intermittently**
202:18
**internal**
28:19
**international**
47:4, 47:6, 77:25
**internet**
117:17
**interpretation**
209:12, 209:13
**interpreted**
161:23, 209:4
**interrupt**
216:17
**interruption**
55:14
**intervene**
17:16, 30:18
**interviewing**
27:18
**intimate**
111:14
**introduce**
5:17, 157:9
**introduced**
205:11
**invasive**
135:9
**investment**
85:6
**involuntary**
154:4, 154:7, 154:10, 154:11, 216:7
**involve**
14:13
**involved**
20:22, 26:23, 33:13, 56:16, 104:19, 158:18, 198:24
**involvement**
186:9
**ipad**
204:24
**ipads**
194:6
**iprat**
149:19, 149:20,

209:15, 209:22, 209:23, 210:4, 210:6
**irs**
88:11, 110:21, 115:2
**ishpeming**
1:16, 4:1, 10:4, 60:24
**isolated**
187:23, 213:21
**isolation**
146:9, 187:24, 187:25, 206:8, 230:1
**isolation-type**
146:14
**issue**
81:22, 171:22, 177:6
**issued**
164:3, 231:18, 232:8
**it'll**
11:8, 133:12, 139:2, 246:15
**item**
29:22, 29:25, 30:13, 30:14, 30:16, 30:17, 159:4
**items**
26:14, 26:22, 159:1
**itself**
18:8, 20:20, 26:8, 29:18, 61:3, 93:12, 105:3, 115:4, 141:13
**iv**
13:16
**iv's**
14:5

**J**

**jamie**
31:9
**jane**
1:9
**january**
132:20, 134:11, 134:21, 134:22, 163:24, 164:1, 166:4, 166:9, 168:20, 204:8, 205:17, 251:18
**japan**
47:8
**jerome**
22:10, 25:17, 30:20
**jerry**
22:10, 25:17, 59:10, 129:5, 137:25, 138:20, 158:18, 158:24, 159:8, 198:23, 233:24, 245:3
**joanie**
83:3, 150:6
**job**
6:20, 10:5, 12:6, 14:1, 18:19, 71:3, 138:22, 219:10
**joe**
59:3
**john**
159:10
**joint**
39:16
**joke**
170:14
**jolynn**
59:15
**jon**
86:3, 138:16
**jones**
132:5
**judd**
104:10
**july**
12:4, 77:10, 167:20, 264:10
**june**
1:15, 4:2, 4:4, 12:3, 166:7, 166:9, 167:1, 167:18, 168:21, 168:22, 169:14, 169:15, 170:1, 170:8, 174:15, 174:18, 176:1, 184:9, 184:12, 184:23, 215:6, 241:18, 241:25, 243:21, 255:8, 257:25, 264:6
**june-ish**
169:25
**justice**
1:27, 1:36

**K**

**k&l**
1:21, 5:14
**kangas**
59:5, 68:1, 206:24
**kathy**
210:3
**katie**
209:23
**katie's**
245:23
**katie-something**
210:2, 210:4
**keep**
25:12, 26:4, 42:14, 66:15, 75:21, 80:4, 83:20, 89:16, 99:4, 126:2, 126:3, 126:5, 127:15, 127:17, 127:18, 127:19, 157:21, 162:13, 168:12, 178:5, 186:16, 187:3, 189:6, 199:24, 200:24, 201:12, 203:20, 233:18, 234:14, 245:5, 245:6
**keeping**
14:23, 127:21, 127:24, 155:15, 211:19
**kept**
16:6, 65:20, 84:10, 119:8, 149:8, 170:13, 174:24, 176:19, 180:18, 205:5, 253:6, 256:19
**key**
42:7, 45:25, 46:9, 226:3
**kill**
188:1
**kim**
4:6, 5:16, 224:23
**kimberly**
1:35, 1:40, 5:18
**kind**
14:23, 15:5, 17:9, 21:7, 26:10, 26:12, 27:10, 27:22, 32:15, 32:16, 33:18, 33:19, 33:20, 34:11, 37:5, 37:25, 44:16, 50:5, 50:22, 51:19, 51:21, 52:10, 54:12, 55:7, 58:2, 58:25, 59:16, 60:20, 62:7, 66:3, 66:9, 66:10, 66:25, 69:25, 71:18, 72:19, 72:25, 73:3, 76:8, 78:11, 82:9, 82:10, 83:7, 85:4, 90:19, 96:25, 97:5, 97:20, 101:3, 101:14,

102:4, 105:22, 106:1, 106:19, 107:3, 107:7, 107:10, 114:6, 115:17, 115:19, 124:24, 125:23, 127:13, 128:17, 138:5, 139:13, 140:3, 155:15, 156:5, 164:15, 164:18, 164:21, 165:1, 165:11, 167:4, 170:25, 171:1, 174:12, 181:20, 183:19, 186:19, 193:15, 196:5, 196:16, 197:7, 198:16, 200:13, 212:8, 214:17, 223:12, 224:8, 235:2, 235:25, 236:1, 245:17, 246:9, 247:25, 250:1, 259:5
**kinds**
13:19, 33:6, 46:8, 67:23, 74:4, 97:4, 102:21, 121:15, 122:1
**kitchen**
165:1
**knee**
39:15
**knees**
249:1
**knew**
138:22, 145:21, 145:22, 159:12, 197:7, 233:20, 261:24
**knitting**
74:4
**knowing**
138:11, 150:23, 172:7, 181:9, 260:21
**knowledge**
30:18, 79:10, 79:15, 81:20, 111:14, 115:4, 130:3, 188:23
**knowledgeable**
110:9
**known**
154:22
**knows**
66:10
**krystal**
59:13, 59:14, 158:19, 174:21, 176:23, 198:23, 220:1, 221:8, 221:16, 221:18, 221:25, 222:8, 222:19, 223:11, 223:13
**kudos**
139:23

**L**

**l-shaped**
245:17
**lab**
55:5, 93:8, 93:11
**labeled**
124:22, 165:9
**labor**
17:9
**labor-related**
104:10, 104:12
**laceration**
12:17, 52:17
**lack**
185:17, 188:22, 199:21
**ladies**
89:10, 193:18
**lady**
193:19
**lake**
144:15, 144:18, 256:25
**lanczak**
86:3, 138:17
**land**
119:2, 121:7
**landscape**
27:11
**language**
77:20, 252:6, 252:13
**lara**
15:14, 15:21, 149:11, 159:15, 192:1, 217:6
**large**
14:25, 18:18, 26:3, 39:25, 50:3, 52:3, 52:5, 52:12, 53:11, 61:22, 67:22, 67:24, 70:2, 70:3, 72:16, 76:18, 85:19, 116:19, 137:7, 141:7, 165:12, 179:3, 180:23, 186:23, 218:12, 238:9, 247:4, 261:25
**larger**
239:12
**lasix**
125:5
**last**
8:16, 10:25, 17:19, 17:25, 19:6, 25:23, 27:7, 81:7, 106:5, 106:7, 120:15, 126:13, 134:17, 183:14, 190:23, 195:6, 220:12, 231:22, 249:23, 259:15, 260:23
**lasted**
71:17
**lasts**
79:13
**late**
11:3, 12:3, 84:2, 137:20, 146:12, 146:13, 147:14, 172:11, 181:20, 196:22, 200:19, 202:17, 203:4, 215:5, 238:16
**later**
26:10, 37:14, 43:2, 47:25, 54:11, 138:10, 185:24, 214:12, 214:19, 214:20, 216:17, 234:16
**laugh**
143:22
**laughable**
194:16
**laundry**
66:12, 66:13, 66:20, 66:24
**laverne**
1:14, 5:1, 5:6, 264:6
**law**
32:21, 87:8
**lawn**
140:21
**lawsuit**
29:15, 29:19, 30:1, 77:5, 77:6, 90:14
**lay**
140:25, 141:2
**layout**
3:8, 163:25, 205:20
**lead**
19:9, 196:16
**leadership**
18:15
**leaned**
209:14, 221:19
**leaning**
202:3
**learn**
137:23
**learning**
139:14

**least**
20:21, 37:11, 39:19, 47:1, 98:4, 130:11, 145:24, 152:2, 181:19, 181:21, 190:23, 223:14, 238:13, 252:24, 253:3, 258:16
**leave**
122:12, 126:25, 127:4, 127:6, 127:11, 127:12, 127:19, 128:13, 130:23, 131:13, 141:6, 173:23, 174:13, 186:13, 196:2, 210:21
**leaves**
131:11
**leaving**
22:11, 127:15, 128:9, 129:14
**lebenbom**
103:25, 104:8, 209:18
**led**
190:8
**left**
129:22, 164:22, 170:6, 183:15, 241:19
**left-hand**
77:18, 137:4, 164:6
**leg**
12:17
**legal**
128:23, 190:12
**legally**
5:9
**lemay**
31:9
**length**
96:10
**leniency**
28:24
**less**
25:19, 25:21, 41:22, 63:22, 64:3, 84:15, 84:25, 91:14, 96:8, 96:9, 96:11, 97:16, 145:2, 145:3, 206:16, 224:16, 241:10
**lesser**
51:8, 146:6, 187:10
**let's**
20:13, 27:19, 28:25, 35:9, 35:11, 49:20, 52:25, 53:10, 53:14, 58:22, 68:16, 70:20, 73:13, 93:9, 104:2, 109:12, 131:19, 139:10, 142:21, 165:22, 167:20, 191:2, 195:18, 201:24, 203:17, 213:18, 239:16, 243:20
**letter**
146:25, 155:9, 155:21, 155:25, 182:8, 202:9, 212:22
**letters**
182:6
**letting**
161:10
**level**
34:11, 36:10, 36:11, 36:20, 37:21, 39:17, 39:18, 40:2, 40:25, 46:14, 47:2, 60:19, 85:3, 86:2, 86:16, 194:23, 207:18, 208:24, 231:13
**levels**
60:21, 194:19, 228:12
**liabilities**
119:5, 121:25, 122:4, 122:16, 122:17
**liability**
52:4, 122:14, 122:23, 122:24
**liaison**
19:25
**lic**
159:15
**license**
10:13, 11:1, 11:3, 15:13, 15:15, 102:1
**licensed**
35:22, 135:24
**licensing**
15:22, 15:23, 18:8, 38:23, 38:25, 159:16, 217:5
**licensure**
12:3, 62:2
**lieu**
121:1
**life**
13:16, 37:3, 52:22, 67:21, 68:6, 106:25, 142:1, 142:18, 149:5, 151:21, 206:7, 234:2, 254:15
**lifts**
27:4
**light**
211:1, 211:3, 219:9
**liked**
69:14, 72:7, 195:13
**likely**
97:8, 103:23, 106:3, 112:5, 132:3, 138:3, 187:7, 225:24, 238:22, 255:25
**limit**
65:19, 84:17, 85:4, 162:19, 165:23, 239:18, 244:12
**limitations**
82:20
**limited**
22:16, 23:8, 60:11, 79:10, 79:15, 81:16, 81:18, 94:9, 97:25, 162:3, 190:18, 192:22, 196:25
**limiting**
195:25
**limits**
85:9
**line**
7:2, 91:21, 106:7, 113:9, 130:14, 130:18, 133:20, 133:21, 178:20, 200:24, 200:25
**lined**
249:20
**lines**
99:12, 119:12, 132:1
**link**
91:12
**liquid**
119:14
**list**
221:4, 259:12
**listed**
130:15, 132:3, 134:17, 177:5, 260:24
**listen**
261:15
**literally**
175:20, 249:11
**little**
17:6, 19:16,

21:3, 26:9, 26:12, 30:4, 32:14, 33:24, 38:20, 48:3, 48:14, 49:25, 50:6, 51:2, 58:19, 67:9, 72:4, 76:7, 76:25, 83:16, 83:20, 86:8, 92:4, 97:22, 99:20, 100:5, 107:6, 118:11, 120:24, 140:6, 141:9, 144:25, 145:2, 155:19, 171:11, 197:7, 197:8, 204:14, 205:6, 211:17, 222:7, 228:21, 234:8, 247:12, 250:18, 254:11

**live**
10:3, 43:10, 97:17, 142:21, 142:22

**lived**
140:17

**living**
36:16, 39:20, 39:23, 39:24, 49:11, 170:25, 171:1, 187:6

**llc**
1:43

**loans**
108:17, 138:6

**lobby**
32:22

**lobbying**
32:18

**lobster**
53:25, 101:12, 102:19

**local**
19:17, 19:20, 149:23, 149:25, 191:21, 191:22

**locally**
156:21

**located**
30:24

**location**
60:24

**locd**
36:11

**locked**
35:22, 35:24, 35:25

**log**
88:19

**long**
8:15, 14:9, 16:2, 36:14, 36:24, 37:2, 40:11, 50:20, 69:23, 71:13, 74:13, 128:2, 168:5, 186:16, 200:5, 201:15, 204:22, 211:2, 217:23, 252:10, 259:9, 260:8

**long-stay**
43:17, 43:25, 96:2

**long-term**
34:17, 36:4, 36:8, 36:9, 36:10, 39:7, 40:6, 40:11, 42:2, 42:3, 42:16, 44:22

**longer**
15:3, 15:11, 15:17, 59:10, 59:11, 59:23, 71:24, 96:18, 113:13, 142:5, 142:6, 142:7, 167:18

**longest**
236:2

**longevity**
120:25

**longstanding**
218:3

**look**
12:6, 15:14, 17:6, 18:15, 29:21, 32:4, 39:8, 47:7, 47:11, 63:18, 65:3, 67:15, 69:9, 79:1, 81:9, 81:17, 82:18, 84:10, 85:4, 86:20, 91:6, 95:5, 96:19, 97:21, 98:12, 107:9, 108:11, 111:4, 115:14, 117:22, 120:14, 121:15, 121:25, 122:10, 123:7, 123:9, 128:25, 129:14, 130:18, 134:1, 134:10, 138:18, 143:11, 144:24, 145:15, 149:10, 149:11, 149:12, 150:16, 151:12, 152:3, 152:4, 153:10, 153:15, 159:17, 161:10, 164:14, 170:15, 171:22, 178:11, 178:12, 180:12, 181:17, 184:15, 190:15, 194:20, 199:11, 204:18, 217:17, 220:12, 222:8, 225:21, 228:7, 231:19, 233:8, 234:21, 235:1, 235:4, 236:24, 237:10, 240:12, 247:15, 247:21, 248:2, 249:8, 250:11, 250:16, 251:2, 253:19, 255:9, 260:22, 261:9, 261:11, 261:12

**looked**
23:23, 35:17, 72:10, 87:9, 104:22, 111:12, 111:17, 124:13, 163:20, 163:25, 164:2, 164:11, 167:23, 181:18, 202:25, 229:15, 231:3, 231:18, 231:23, 232:22, 250:8, 251:4, 251:11, 258:6, 261:8, 262:12

**looking**
6:9, 6:13, 22:12, 37:7, 41:7, 85:12, 106:9, 107:24, 111:16, 112:9, 112:13, 112:17, 117:10, 129:17, 131:16, 131:18, 133:6, 133:7, 134:7, 134:9, 134:11, 134:21, 141:8, 151:23, 176:24, 217:25, 229:14, 233:10, 235:2, 250:10, 251:5, 256:18

**looks**
43:13, 61:10, 77:23, 81:19, 90:23, 91:3, 100:14, 112:14, 113:8, 113:11, 114:12, 115:5, 116:7, 120:5, 130:12, 130:17, 163:23, 173:12, 198:18, 222:9, 227:24, 228:22, 250:14

**lose**
94:17, 141:9, 160:14

**losing**
157:5

**loss**
3:33, 91:7, 106:12, 106:13, 106:20, 106:23, 106:24, 108:9, 250:17, 251:6, 259:3, 261:11, 261:13
**losses**
98:6, 119:5
**lost**
140:6, 152:8, 160:8
**lot**
14:15, 17:7, 19:19, 20:2, 24:22, 38:5, 38:7, 39:22, 41:16, 46:23, 53:25, 61:7, 63:5, 63:7, 64:10, 65:14, 67:23, 78:10, 82:13, 87:21, 88:3, 149:19, 153:13, 155:23, 156:4, 159:19, 174:10, 177:3, 187:2, 187:20, 198:25, 201:17, 204:19, 209:14, 209:20, 216:16, 221:21, 223:22
**lots**
47:9, 102:24, 106:24, 127:1, 173:1, 188:9, 259:18
**loved**
72:11, 186:16, 187:2
**low**
45:12, 85:3, 92:10, 99:5, 174:23
**lower**
51:9, 143:6, 250:18
**lowest**
152:9, 153:19, 248:6, 254:5
**lpn**
11:12, 11:13, 11:18, 11:23, 11:25, 12:5
**lpn's**
62:6, 144:25
**lucido**
161:23
**luckily**
140:20, 197:6
**lumped**
96:15
**lunch**
7:1, 65:4, 107:15, 107:17
**lunches**
236:6
**luxury**
162:21
**lying**
177:2, 242:21

**M**

**machine**
73:15, 73:16, 73:17, 196:7, 196:8
**made**
11:16, 26:2, 42:21, 44:10, 52:22, 60:20, 82:1, 85:18, 88:5, 106:8, 106:16, 106:17, 140:22, 157:25, 158:15, 165:19, 170:23, 170:24, 176:22, 184:10, 187:10, 189:20, 198:10, 203:15, 232:24
**main**
54:23, 65:15, 66:16, 69:25, 83:6, 151:10, 158:6, 165:11, 168:12, 237:19, 238:22, 239:15, 241:14, 245:4
**maintain**
35:23, 37:8
**maintained**
74:16, 177:9
**maintenance**
24:14, 24:16, 25:2, 25:3, 25:10, 26:8, 32:19, 32:20, 66:21, 105:5, 253:2
**maj**
127:17
**major**
223:19
**majority**
14:25, 15:8, 19:1, 26:14, 32:10, 36:9, 36:14, 37:9, 39:14, 39:21, 40:17, 42:23, 49:6, 50:3, 51:19, 52:3, 52:6, 53:11, 54:7, 54:14, 58:16, 60:5, 63:11, 63:13, 65:7, 65:8, 66:3, 68:1, 69:13, 74:7, 75:7, 76:19, 80:13, 83:9, 85:19, 88:2, 91:22, 98:6, 100:6, 102:16, 112:16, 113:8, 113:10, 122:8, 168:8, 168:9, 180:24, 185:20, 194:4, 194:5, 197:13, 203:20, 205:13, 218:12, 225:15, 238:8, 240:5, 247:4
**make**
4:17, 6:16, 6:20, 9:9, 11:16, 20:6, 26:23, 27:13, 28:24, 30:16, 35:18, 36:17, 38:4, 43:22, 44:21, 46:4, 48:21, 49:3, 69:6, 73:5, 75:18, 87:13, 100:2, 106:2, 106:6, 109:13, 115:17, 128:11, 129:17, 132:9, 142:10, 142:13, 144:5, 147:6, 158:11, 159:8, 163:22, 168:2, 168:20, 172:24, 180:5, 181:8, 195:17, 196:12, 198:16, 210:10, 218:18, 219:2, 221:10, 221:25, 222:11, 223:14, 223:20, 229:24, 233:22, 234:17, 235:24, 241:3, 251:12
**makers**
158:17
**makes**
35:19, 46:5, 106:1, 106:14, 107:17, 116:20, 123:19, 133:25, 209:7, 225:12
**making**
9:1, 12:17, 29:4, 60:16, 60:19, 73:15, 95:8, 122:9, 129:16, 193:24, 208:14, 218:8
**male**
180:9

**males**
135:11, 135:12
**manage**
186:18, 203:15
**managed**
59:16, 91:14, 95:14, 96:13, 96:15, 96:20, 96:21, 97:2, 97:3, 107:11, 113:13
**management**
32:7, 61:23, 63:12, 167:8, 175:18, 219:12, 219:19
**manager**
21:9, 21:17, 59:4, 89:5, 159:10, 159:14, 159:16, 223:8, 246:25
**managerial**
67:11
**managers**
100:21
**manages**
116:14
**managing**
17:7, 112:25, 203:8
**mandate**
148:12, 148:20, 148:22, 148:23, 179:21, 179:22
**mandation**
148:25
**manicures**
74:4
**manipulate**
197:8
**manner**
144:23, 150:10, 163:2, 259:7
**manually**
131:15
**many**
21:25, 35:9, 42:25, 44:25, 54:16, 63:3, 77:8, 78:18, 79:5, 79:14, 79:17, 86:24, 102:13, 122:16, 129:4, 129:13, 129:22, 130:13, 131:23, 135:7, 145:11, 155:19, 155:20, 175:12, 182:25, 185:8, 185:10, 190:21, 191:22, 199:15, 199:24, 203:13, 207:19, 209:1, 214:24, 238:6, 238:18, 238:20
**map**
155:18, 163:19, 164:19
**mar**
2:26, 2:27, 2:28, 2:29, 3:1, 3:2, 3:3, 3:4, 3:5, 3:6, 3:7, 3:9, 3:10, 3:11, 3:15, 3:17, 3:19, 3:21, 96:20, 97:7, 97:21, 100:9, 101:4, 105:4, 105:15, 106:6, 108:3, 108:11, 108:14, 110:8, 111:3, 112:4, 113:5, 118:18, 123:16, 124:12, 125:17, 126:13, 130:8, 132:18, 132:25, 134:16, 163:16, 164:10, 171:19, 183:10, 184:15, 220:8, 220:12, 223:9, 225:17, 225:18, 231:9, 244:24, 246:3
**march**
48:8, 72:2, 91:1, 91:4, 166:9, 204:8, 226:11, 229:10, 229:15, 230:20, 230:21, 231:17, 231:19, 231:22, 232:5, 232:8, 232:9, 232:14, 232:15, 232:22, 232:23, 233:3, 233:4, 233:5, 233:6, 233:13, 234:23, 235:1, 237:10, 251:14
**mark**
84:14, 84:18, 85:13, 86:10, 107:4, 239:21
**marked**
77:2, 80:3, 80:24, 90:7, 90:9, 90:10, 97:7, 105:15, 106:5, 107:25, 108:2, 110:5, 110:7, 110:25, 111:2, 112:1, 112:3, 113:5, 114:9, 114:11, 114:15, 118:15, 118:17, 124:9, 124:11, 125:14, 125:16, 130:5, 130:7, 160:18, 160:20, 163:13, 163:15, 171:16, 171:18, 182:12, 182:14, 212:12, 212:14, 212:23, 216:21, 216:23, 220:5, 220:7, 227:14, 227:16, 228:25, 229:2, 244:21, 244:23, 245:25, 246:2, 251:24, 252:2, 253:10, 253:12, 254:24, 255:1, 256:3, 256:5, 257:10, 258:19, 258:21, 260:14
**marker**
85:13, 176:9, 250:1
**market**
3:2, 35:12, 112:14, 117:21, 118:1
**marquette**
1:3, 3:12, 4:7, 4:10, 4:14, 4:15, 4:17, 7:16, 7:19, 11:7, 11:18, 13:8, 19:22, 20:7, 22:9, 22:25, 25:9, 25:12, 26:10, 30:2, 30:7, 30:23, 30:24, 31:1, 31:24, 34:10, 34:12, 49:25, 55:17, 55:20, 55:21, 56:1, 58:20, 60:25, 64:17, 69:2, 78:6, 80:23, 81:5, 82:11, 83:11, 88:22, 89:16, 90:10, 97:23, 101:18, 103:17, 105:13, 105:17, 106:8, 106:14, 112:21, 115:25, 137:23, 139:11, 141:22, 142:3, 145:5, 146:2, 147:10, 154:21, 154:24, 160:2, 160:10, 162:5, 165:18, 186:15, 204:15, 207:16, 213:1, 217:12,

220:10, 225:4, 228:2, 228:11, 229:19, 230:14, 231:12, 264:17
**marquette's**
31:22, 61:6, 83:6, 142:3, 186:11, 199:8, 216:5, 247:13
**married**
60:4
**mask**
163:5, 204:3, 208:14
**masks**
143:1, 143:2, 208:17, 208:21
**match**
135:11
**maternity**
196:1
**math**
16:4, 51:3, 106:2, 133:13, 137:11, 152:13, 245:16, 248:7, 258:11, 258:12
**mathematician**
85:2
**matrix**
96:23, 126:12
**matter**
4:7, 8:13, 34:8, 74:11, 115:20, 138:23, 203:7, 208:19, 210:20, 211:8, 233:21, 248:9, 264:6
**max**
136:8
**maximize**
248:8
**maximized**
43:3
**maximum**
84:23, 136:14
**may-ish**
169:24
**maybe**
9:14, 13:23, 29:17, 57:1, 61:8, 61:10, 68:19, 80:14, 84:9, 85:10, 100:2, 100:3, 117:23, 119:18, 123:11, 133:11, 133:16, 137:17, 138:4, 175:1, 178:15, 194:25, 199:2, 200:17, 206:15, 214:15, 218:22, 222:4, 236:25, 237:9, 241:23, 243:18, 252:25
**mbank**
112:7, 112:10, 124:17
**mcf**
23:12, 24:3, 30:22
**mcf's**
23:13, 24:4
**mcmcf**
3:23, 142:21, 142:22
**mcmcfc**
32:12, 33:17, 138:4, 198:16, 209:19
**mdhhs**
2:6, 2:7, 2:14, 2:17, 2:19, 2:22, 153:22, 192:1, 229:9, 234:22, 244:3
**mdlra**
2:9
**mds**
21:21, 21:24, 59:18, 247:4
**meal**
101:13, 236:14
**meals**
53:19, 65:4, 65:15, 70:14, 70:15, 71:13, 201:8, 201:9, 201:10, 235:24
**meaning**
13:3, 23:20, 34:16, 34:19, 35:23, 36:16, 37:21, 41:19, 46:10, 52:13, 63:14, 66:4, 86:18, 96:22, 125:4, 130:20, 137:5, 155:10, 155:13, 162:1, 184:20, 192:21, 207:19, 238:9, 253:22, 256:23
**means**
36:21, 78:23, 79:7, 79:8, 91:21, 117:20, 124:19, 126:18, 126:21, 126:24, 126:25, 127:4, 132:13, 134:12, 149:15, 150:8, 161:21, 183:22, 183:25, 187:25, 195:20, 199:10, 210:25, 231:13, 234:5, 239:15, 252:20, 253:18
**meant**
48:17, 140:24, 177:24, 184:19, 193:25, 202:24, 233:16, 234:24, 237:24
**measure**
120:14, 248:5
**measures**
24:22, 35:25, 36:17, 40:5, 167:6, 187:3
**mechanical**
27:4
**mechanism**
41:6, 114:4, 116:8, 117:4, 149:21, 187:25
**mechanisms**
24:19, 33:4
**med**
46:9, 199:17, 199:18, 199:25, 200:5, 201:20, 201:21
**media**
186:22
**medicaid**
23:21, 31:13, 34:5, 34:6, 36:12, 41:25, 47:24, 50:4, 50:23, 51:1, 51:6, 51:9, 51:10, 51:11, 51:12, 78:4, 86:18, 91:12, 91:13, 91:14, 94:2, 94:7, 94:9, 96:7, 113:19, 124:1, 152:6, 152:7, 153:22, 191:25, 248:22, 254:5, 254:6, 254:9, 254:11, 254:14
**medical**
1:3, 4:7, 4:10, 4:15, 7:5, 7:16, 23:12, 23:14, 23:19, 23:25, 24:18, 28:7, 28:17, 31:2, 31:3, 31:4, 32:9, 32:13, 56:7, 56:9, 56:12, 59:24, 60:18, 92:2, 92:5, 115:24, 125:2, 127:13, 149:13, 220:10, 246:24
**medicare**
21:24, 23:20,

23:21, 34:5, 37:13, 40:14, 40:18, 41:9, 41:23, 41:25, 43:18, 44:1, 47:19, 47:20, 47:21, 48:1, 48:2, 50:5, 50:21, 50:22, 51:19, 51:23, 52:3, 52:6, 52:16, 57:9, 77:16, 78:4, 91:8, 91:11, 91:12, 91:17, 93:10, 94:5, 94:8, 94:11, 95:12, 95:18, 95:19, 95:22, 95:23, 95:24, 96:1, 96:3, 96:5, 113:17, 113:18, 200:4, 248:23, 253:23, 253:25

**medication**
12:1, 12:12, 12:20, 13:3, 13:5, 13:11, 13:15, 13:17, 13:19, 46:10, 62:7, 62:9, 62:20

**medications**
12:8, 12:23, 13:6, 26:18, 37:10, 37:16, 46:10, 52:11, 52:13, 62:8, 62:16, 92:7

**meds**
211:4

**meet**
26:14, 31:24, 33:5, 36:18, 36:20, 40:20, 84:18, 85:13, 85:14, 85:20, 86:10, 88:6, 98:17, 166:18, 235:13

**meeting**
3:10, 27:8, 29:3, 33:11, 33:18, 104:18, 139:14, 157:7, 158:25, 168:6, 182:20, 183:3, 222:11, 223:21, 226:19, 231:3, 232:19, 234:4

**meetings**
18:25, 20:1, 29:7, 29:10, 29:12, 31:11, 32:5, 33:15, 33:20, 158:23, 183:2, 232:21, 232:25, 235:7, 246:23, 247:7

**mell**
210:3

**member**
144:7, 144:8, 173:25, 193:8, 193:10, 207:23, 213:24, 214:10, 214:11

**members**
54:16, 148:1, 187:1

**memo**
3:19, 245:2

**memorializing**
245:10

**memory**
109:5, 182:24, 259:8, 260:24, 261:14

**mentally**
23:7

**mention**
74:15

**mentioned**
20:10, 45:17, 46:25, 48:11, 56:8, 56:17, 66:2, 67:13, 69:24, 70:15, 92:13, 97:23, 98:24, 102:17, 103:14, 104:9, 116:5, 143:13, 144:12, 144:16, 147:10, 147:23, 148:20, 152:15, 153:20, 163:10, 173:4, 216:6, 230:6, 241:16

**mentioning**
138:1

**mentions**
115:3

**mers**
98:20, 99:11

**messages**
159:19

**met**
208:24, 234:18

**mexico**
139:19, 139:21

**mi**
91:12

**michigan**
1:2, 1:16, 4:1, 4:9, 10:4, 10:8, 10:12, 15:23, 16:24, 16:25, 19:15, 19:18, 20:2, 31:12, 31:17, 31:25, 32:10, 32:12, 32:13, 35:13, 36:12, 50:4, 60:24, 62:4, 62:10, 66:1, 84:17, 149:21, 156:15, 156:18, 209:24, 217:5, 225:2, 231:18, 231:20, 232:16, 264:3, 264:16

**michigan-required**
15:19

**michigan-specific**
110:2

**microphone**
193:5

**mid**
84:9, 164:22, 165:12, 200:17

**mid-march**
134:25

**mid-q2**
204:9

**middle**
177:6, 253:17

**midyear**
147:20

**might**
12:10, 14:20, 17:6, 29:11, 32:14, 39:20, 40:17, 43:18, 43:24, 45:21, 55:10, 57:1, 64:15, 65:12, 66:12, 66:14, 73:7, 73:13, 73:20, 80:16, 82:20, 86:6, 86:7, 86:21, 86:25, 92:13, 93:14, 94:15, 94:16, 100:3, 101:6, 101:13, 101:16, 103:9, 103:14, 115:5, 119:4, 120:25, 121:9, 121:11, 121:12, 122:19, 132:6, 136:6, 144:4, 145:8, 148:22, 166:10, 166:12, 166:16, 172:7, 186:18, 193:2, 198:25, 201:8, 202:19, 217:16, 218:23, 223:1, 223:2, 226:4, 226:19, 237:3, 239:23,

243:16, 250:13, 250:14, 259:13
**mileage**
104:16, 104:19, 104:20, 105:1
**milieu**
155:16
**millage**
3:23, 24:4, 24:7, 50:7, 50:13, 50:14, 99:2, 99:14, 99:15, 99:23, 100:8, 107:2, 117:2, 252:6, 252:9, 252:21
**millages**
24:5, 33:23
**million**
25:4, 25:6, 25:10, 25:11, 50:7, 50:14, 99:16, 152:10
**millions**
99:5
**mills**
24:8, 24:9, 24:10, 252:9, 252:22
**mind**
80:22, 226:6
**mine**
17:18, 31:14, 31:18
**minimal**
240:7
**minimizing**
141:10
**minimum**
15:1, 21:21, 21:23, 32:6, 56:25, 57:3, 59:25, 62:3, 63:15, 63:16, 64:13, 145:24, 188:6, 190:24
**minute**
171:13, 209:7, 228:7
**minutes**
3:10, 29:21, 29:24, 30:14, 30:16, 31:15, 31:16, 33:11, 33:14, 33:18, 73:10, 73:12, 73:21, 73:22, 77:8, 77:21, 77:23, 78:11, 78:18, 78:23, 78:25, 79:4, 79:13, 79:14, 79:21, 81:18, 81:19, 143:23, 153:15, 158:25, 159:25, 170:15, 182:21, 182:25, 183:3, 196:7, 196:9, 197:10, 198:25, 199:1, 199:2, 199:24, 209:2, 209:3, 209:5, 215:6, 222:18, 230:25, 231:3, 232:16, 235:23, 241:17, 245:4, 246:6, 246:12, 249:8, 249:12
**miscellaneous**
101:9, 101:10, 101:14, 101:16, 101:17, 120:20, 120:21
**miss**
237:2
**missed**
11:11, 11:12, 95:7, 207:12
**missing**
59:15, 67:12, 75:18
**misspeak**
174:22
**misspeaking**
69:7
**misspoke**
68:20, 238:10
**misunderstood**
137:12, 176:19
**mitigate**
174:12, 180:4
**mix**
58:15, 245:19
**mixed**
24:13, 114:6, 118:11, 159:19
**mixing**
144:10, 155:16
**mmkt**
117:18
**mna**
144:14, 144:17, 256:25
**mns**
113:12, 113:14, 144:16
**mobile**
38:5, 92:23, 92:24, 121:9, 121:10, 121:11
**mobility**
38:6, 38:8, 43:20, 199:22
**modality**
77:23, 78:25, 79:1, 79:11
**model**
187:11, 253:24
**mom**
142:13, 187:21, 188:1
**mom's**
164:25
**moment**
6:14
**momentum**
42:14
**monday**
8:16, 182:21, 193:2, 232:24, 232:25, 240:10, 255:8
**money**
3:2, 25:2, 26:2, 41:3, 41:4, 51:13, 57:8, 58:16, 92:16, 93:23, 94:11, 94:16, 94:17, 97:20, 98:18, 99:2, 99:3, 99:22, 102:3, 102:9, 102:12, 102:24, 102:25, 106:15, 106:19, 107:2, 109:1, 109:11, 109:15, 112:14, 114:6, 116:6, 116:17, 116:19, 116:24, 117:1, 117:2, 117:3, 117:21, 118:1, 118:11, 119:18, 121:2, 139:8, 249:10, 253:1, 253:6
**monitor**
71:10
**month**
31:11, 50:24, 55:19, 55:23, 63:15, 90:25, 91:2, 95:4, 102:17, 121:3, 121:5, 126:1, 126:2, 126:7, 128:9, 132:11, 215:6, 246:7, 246:10
**month-by-month**
258:9
**monthly**
18:24, 26:14, 32:4, 68:3, 95:5, 99:18, 99:20, 100:3, 100:7, 246:6, 246:9, 251:16
**months**
11:13, 11:21, 22:11, 52:18,

54:10, 82:5, 97:16, 135:16, 138:10, 140:7, 149:1, 170:10
**moran**
86:1, 86:4, 86:5, 86:13, 87:3, 88:13, 110:12, 110:16, 110:18, 129:5, 138:3, 138:4, 138:12, 138:17, 139:5, 257:22, 262:2
**more**
11:16, 13:12, 13:24, 14:6, 17:2, 18:8, 19:1, 22:17, 23:17, 24:1, 25:24, 26:11, 31:4, 34:11, 35:10, 35:14, 36:21, 36:23, 39:1, 40:25, 41:23, 42:2, 42:3, 44:4, 44:22, 45:15, 45:16, 53:13, 58:8, 58:10, 63:22, 65:11, 67:8, 76:3, 84:19, 93:18, 100:1, 120:24, 123:12, 135:20, 135:21, 141:12, 144:25, 146:5, 152:12, 156:20, 157:7, 159:20, 165:24, 166:22, 168:7, 174:7, 179:14, 186:14, 186:18, 187:2, 187:8, 193:2, 194:25, 195:8, 196:18, 196:23, 197:7, 205:2, 206:16, 206:25, 210:19, 211:3, 211:17, 222:7, 224:11, 224:15, 228:22, 232:13, 234:16, 234:18, 236:22, 237:20, 237:21, 238:11, 239:5, 239:18, 240:14, 241:7, 241:9, 242:6, 242:7, 245:19, 248:5, 248:20, 253:8
**morning**
243:12
**morris**
59:3
**most**
5:8, 12:22, 14:16, 19:3, 33:17, 94:9, 103:8, 112:12, 115:20, 158:9, 165:19, 173:16, 183:2, 202:13, 209:4
**motility**
38:6, 199:22
**motivated**
70:18
**move**
67:5, 67:20, 136:3, 140:20, 152:25, 166:20, 168:4, 173:17, 174:5, 174:14, 192:4, 211:16
**moved**
116:17, 116:20, 200:13
**movement**
172:10
**moving**
19:3, 39:2, 67:6, 75:23, 99:9, 100:9, 103:2, 103:22, 105:4, 159:12, 180:5
**mowed**
140:21
**msa**
2:6, 2:7
**much**
25:20, 38:1, 38:9, 41:17, 58:12, 76:1, 109:22, 111:4, 115:2, 122:14, 156:20, 158:24, 158:25, 164:16, 168:25, 172:10, 172:14, 187:16, 192:23, 194:1, 197:15, 200:6, 200:16, 208:20, 224:11, 226:5, 234:10, 234:12, 234:15, 248:20, 249:10, 254:10, 259:8, 261:3
**multiple**
69:11, 73:24, 73:25, 81:24, 82:3, 98:15, 131:22, 132:7, 165:14, 172:25, 179:3, 198:1, 198:3, 202:14, 221:16, 221:23, 223:25
**multiplied**
152:8
**multiply**
248:6
**multitude**
156:24, 157:2
**multitudes**
207:17
**mun**
117:18
**municipal**
117:21
**music**
76:20
**must**
6:1, 11:2, 35:17, 77:17, 91:2, 95:6, 96:13, 113:10, 116:20, 134:20, 138:2, 161:19, 172:12, 209:25, 217:20, 218:6, 226:16, 226:20, 228:20, 232:21, 242:1, 242:4, 242:6, 242:8, 242:10, 242:18
**myself**
22:24, 27:23, 28:6, 60:18, 99:19, 138:21, 140:16, 167:9, 198:23, 202:21, 221:24, 222:9, 240:17, 259:11

**N**

**naive**
118:11
**name**
4:5, 5:5, 64:23, 104:1, 159:11, 181:22, 209:23, 210:2
**names**
5:7, 20:12, 112:13
**national**
113:16, 148:21, 186:20, 217:20, 218:7, 218:10, 218:21
**nd**
130:17, 255:9, 257:25
**ne**
1:28
**near**
44:12, 170:6
**nearly**
51:25
**necessarily**
26:6, 38:2,

74:22, 86:5, 94:13, 115:13, 115:17, 142:12, 196:12, 215:23, 243:3
**necessary**
29:4, 41:15, 44:9, 44:10, 56:14
**necessities**
52:14
**need**
6:12, 7:1, 10:24, 12:10, 14:17, 18:13, 26:17, 26:18, 28:17, 28:19, 29:10, 29:14, 34:21, 35:4, 35:6, 35:7, 35:13, 36:21, 36:23, 37:17, 39:11, 40:20, 41:7, 41:22, 45:5, 46:25, 52:11, 52:15, 52:24, 62:3, 62:18, 62:20, 62:24, 65:20, 65:23, 69:17, 70:21, 71:11, 73:9, 75:21, 79:15, 79:16, 92:1, 95:3, 98:21, 107:6, 137:2, 151:15, 154:13, 162:23, 168:22, 172:7, 179:5, 181:9, 184:5, 184:18, 184:24, 185:4, 201:17, 201:24, 226:22, 227:7, 235:3, 235:5, 235:10, 238:6, 242:13, 257:4, 260:17
**needed**
37:10, 45:15, 45:16, 47:14, 52:17, 53:10, 53:14, 57:22, 62:17, 82:5, 82:6, 88:12, 103:9, 103:20, 112:6, 116:17, 119:17, 120:4, 150:23, 159:2, 165:15, 165:16, 165:23, 165:24, 166:20, 172:18, 172:23, 178:5, 178:7, 178:8, 182:1, 188:1, 197:16, 198:8, 203:13, 238:20, 242:13, 242:14, 242:23, 245:12, 245:19
**needing**
40:21
**needs**
12:13, 13:24, 21:18, 34:22, 34:24, 36:23, 50:25, 54:2, 69:21, 70:9, 70:12, 73:11, 82:5, 102:15, 103:13, 147:3, 157:7, 192:5, 200:12, 234:17, 234:19, 238:23
**neglect**
17:1
**neglectful**
139:7
**negotiator**
19:9
**nelson**
59:11, 158:19, 219:25
**nerves**
133:13
**net**
3:36, 91:7, 106:7, 108:9, 121:21, 122:23, 251:6, 259:2, 260:23
**networking**
33:14
**never**
8:25, 17:17, 23:22, 43:9, 48:25, 62:22, 70:8, 71:19, 128:3, 131:10, 137:8, 138:10, 141:21, 148:24, 166:22, 183:25, 184:10, 210:15, 210:21, 210:22, 211:8, 225:8, 226:15, 226:16
**new**
14:15, 14:25, 35:11, 39:9, 42:7, 42:8, 42:21, 43:9, 48:13, 69:10, 75:7, 83:17, 127:7, 152:20, 157:14, 158:5, 173:8, 192:4, 199:20, 224:12, 226:10, 234:22, 243:22
**news**
139:13, 186:20
**next**
10:18, 29:3, 73:14, 101:4, 105:4, 105:15, 113:5, 123:15, 178:20, 180:12, 205:24, 210:11, 223:21
**ngs**
113:15, 113:16
**nice**
202:4, 241:9
**nick**
59:5, 68:1, 68:7, 101:15, 206:24
**nicolet**
98:17, 112:10, 124:16, 124:20
**night**
141:11, 193:2, 193:3
**night's**
27:7
**nights**
66:24, 193:15
**nine**
133:16, 237:18, 238:22, 239:5
**nobody**
134:20, 142:20, 142:21, 156:8, 157:11, 211:10
**nod**
6:12
**nodding**
6:7, 6:8
**nods**
6:17
**noes**
6:16
**nominal**
55:12
**non**
168:24, 176:17, 177:10
**non-available**
258:17
**non-bargaining**
27:9
**non-benefited**
257:2
**non-covid**
166:2, 241:15
**non-direct**
257:2
**non-nursing**
15:3
**non-positive**
198:6
**non-skilled**
106:3
**nonclinical**
18:19, 18:21,

21:14, 21:16, 202:1
**none**
11:6
**nonmanaged**
113:18
**nonpayment**
154:4, 154:12, 216:8
**nonreimbursable**
103:5, 103:8
**nonunion**
100:11, 100:13, 100:16, 100:21
**norcross**
104:10
**normal**
93:15, 184:16, 184:20, 200:14, 205:2, 207:19, 213:21, 262:21, 262:24
**normally**
66:14, 72:15, 154:9, 178:3, 201:13
**north**
1:43, 125:7, 264:15
**northern**
10:8, 10:12
**notary**
264:3, 264:16
**note**
3:36, 261:19, 262:10
**notes**
3:21, 216:25, 234:5, 261:4
**nothing**
27:22, 39:12, 153:7, 219:15, 236:9, 259:22
**notification**
8:16
**notified**
29:22
**novel**
3:12, 221:16
**november**
153:23, 153:24, 161:16
**nowadays**
159:6
**number**
4:8, 15:15, 16:7, 16:22, 17:13, 18:20, 79:20, 90:10, 121:17, 123:9, 131:20, 135:15, 135:19, 136:6, 136:19, 145:14, 148:6, 157:5, 179:3, 180:13, 181:4, 181:14, 182:2, 183:14, 184:15, 193:7, 231:12, 231:19, 233:14, 234:21, 235:2, 235:9, 235:20, 236:17, 237:10, 237:18, 239:5, 240:9, 241:12, 242:1, 243:21
**numbers**
42:5, 63:10, 80:5, 82:21, 110:18, 117:9, 123:8, 124:15, 132:10, 138:19, 171:14, 176:5, 183:4, 188:3, 189:21, 190:5, 255:9, 258:12, 261:7
**numerous**
186:12
**nurse**
3:29, 12:7, 12:10, 12:11, 12:22, 13:10, 14:6, 15:10, 15:18, 16:12, 16:13, 16:16, 16:17, 17:11, 38:19, 38:20, 44:7, 45:10, 45:11, 61:11, 61:14, 61:16, 61:24, 61:25, 62:7, 62:13, 62:25, 64:11, 65:22, 66:8, 70:15, 70:22, 71:8, 100:17, 101:11, 101:12, 103:24, 106:1, 144:18, 144:19, 145:13, 145:17, 145:20, 145:21, 145:23, 210:25, 211:11, 218:24, 245:5, 256:6, 256:23, 257:3, 257:5
**nurse's**
62:3, 172:9, 173:6, 173:12, 174:8, 193:9
**nurses**
17:7, 17:10, 59:18, 61:18, 61:23, 61:24, 61:25, 62:5, 62:16, 62:21, 62:22, 62:23, 62:25, 64:11, 66:5, 104:24, 144:18, 144:19, 145:14, 201:20, 248:17, 256:23, 257:1, 257:3
**nursing**
10:12, 10:13, 11:1, 12:13, 12:19, 12:22, 13:9, 14:6, 14:7, 14:18, 15:2, 15:7, 16:8, 16:12, 16:18, 16:23, 17:2, 17:4, 17:10, 17:11, 17:13, 17:21, 18:22, 19:7, 21:10, 21:11, 21:21, 23:8, 23:14, 24:17, 24:19, 31:3, 31:8, 32:8, 32:9, 34:13, 34:18, 37:23, 38:22, 46:9, 47:23, 48:20, 48:25, 57:18, 59:12, 59:17, 59:20, 60:17, 61:11, 61:19, 61:21, 64:25, 67:10, 68:17, 84:18, 103:2, 103:5, 103:19, 103:23, 104:4, 104:21, 104:22, 104:25, 139:17, 139:18, 141:8, 144:15, 144:19, 156:20, 161:19, 167:8, 174:22, 186:21, 186:22, 186:23, 187:7, 187:15, 187:22, 199:9, 200:1, 200:2, 210:8, 218:13, 219:11, 219:22, 221:24, 223:2, 223:5, 223:6, 247:1, 247:2, 248:25, 249:13
**nursing's**
17:8
**nutrition**
21:20, 37:10, 37:16, 59:9, 70:19, 104:3, 104:4, 201:1, 201:5, 243:13
**nw**
1:22

**O**

**o'clock**
65:16, 73:21,

234:9, 234:10, 234:12
**oath**
5:23, 5:24, 7:12, 187:18
**object**
224:21
**objection**
7:25, 128:22, 160:3, 189:11, 189:24, 190:11, 191:9, 228:17, 230:16, 232:2
**objections**
160:4
**obligation**
152:2
**observation**
127:4
**obtained**
10:10, 11:3, 12:2, 164:5, 253:20
**obvious**
151:11, 208:1
**obviously**
19:11, 26:23, 33:9, 48:24, 66:14, 79:5, 118:7, 121:18, 121:25, 123:2, 138:9, 140:16, 144:6, 179:3, 194:2, 197:9, 198:6, 202:25, 208:14, 215:24, 222:15, 222:17, 247:17, 248:12, 253:22, 255:8
**occasion**
82:20, 98:17, 104:8
**occasionally**
175:17
**occupancy**
3:31, 84:7, 84:25, 132:19, 134:9, 136:8, 164:3, 164:5, 177:14, 177:18, 177:22, 177:23, 178:3, 178:23, 179:6, 180:1, 180:16, 180:17, 180:19, 257:13, 257:21, 258:1, 258:15, 258:16, 258:18
**occupational**
34:19, 38:23, 46:7, 77:9, 78:21, 92:18, 92:19, 195:19, 200:3
**occupied**
132:21, 134:13
**occupy**
178:24
**occur**
54:19, 212:1, 212:5, 215:11, 215:12, 229:25
**occurred**
82:11
**october**
195:7, 227:25, 228:1
**odd**
51:21
**offer**
74:12, 147:10
**offered**
37:11, 73:1, 147:13, 147:18, 147:21, 193:1, 235:20
**office**
1:37, 15:23, 26:22, 219:22, 221:24
**officer**
86:15, 88:2
**offices**
56:2
**official**
155:24
**offline**
175:25
**offsite**
55:5
**often**
14:6, 18:24, 24:22, 32:3, 71:3, 103:8, 103:10, 131:1, 227:23
**oftentimes**
27:18, 27:21, 27:25, 32:7, 33:6, 35:20, 37:22, 38:13, 40:3, 40:7, 46:1, 46:2, 113:1, 120:20, 143:11, 149:10, 209:18, 210:24, 223:20
**oh**
9:15, 9:20, 15:22, 38:19, 47:6, 75:4, 87:7, 94:6, 99:1, 104:22, 105:20, 126:17, 130:24, 134:22, 143:17, 157:15, 159:15, 163:1, 169:12, 176:18, 182:18, 211:23, 228:4, 232:19, 236:16, 256:9, 258:13, 259:17, 261:20
**old**
47:10, 185:1, 226:6, 238:25, 245:18
**old-fashioned**
113:20
**older**
142:21
**on-call**
63:14
**on-the-job**
22:9
**once**
6:25, 11:22, 12:1, 12:8, 28:13, 40:8, 55:18, 55:23, 66:25, 97:17, 111:10, 124:19, 131:11, 140:22, 146:12, 149:3, 151:2, 151:5, 151:17, 157:16, 166:6, 167:2, 167:9, 168:7, 168:15, 169:23, 170:23, 184:1, 199:15, 202:8, 203:21, 208:16, 218:17, 237:19, 238:25, 239:14, 240:12, 240:25, 243:15, 243:16, 245:7, 246:20, 248:14
**one-on-one**
67:23, 74:10
**one-on-ones**
204:23
**ones**
18:21, 30:24, 87:9, 87:11, 92:12, 97:11, 147:16, 147:17, 165:15, 182:23, 186:16, 216:15, 235:1, 246:9, 258:8, 259:13
**online**
155:20
**only**
8:20, 13:14, 14:3, 23:21, 27:15, 31:1, 31:2, 31:6, 31:8, 31:21, 34:21, 35:3, 43:16, 46:4, 47:10, 50:24, 53:23, 54:8,

54:9, 55:18, 55:23, 56:6, 60:24, 65:22, 68:12, 73:4, 77:14, 81:16, 82:15, 84:15, 89:3, 93:5, 99:23, 109:17, 112:15, 129:14, 129:17, 135:7, 135:24, 136:6, 141:10, 157:3, 159:9, 164:12, 165:20, 167:4, 177:20, 177:23, 177:25, 192:21, 192:23, 193:21, 193:24, 194:6, 194:9, 199:14, 199:15, 199:23, 207:9, 208:18, 213:16, 214:25, 228:20, 234:10, 234:12, 234:15, 235:6, 237:5, 238:5, 239:1, 240:4, 241:23, 243:16, 243:22, 245:8
**oops**
244:20
**open**
22:25, 23:3, 29:7, 29:10, 29:12, 69:10, 76:22, 82:19, 83:23, 85:7, 128:15, 134:19, 135:16, 136:10, 142:3, 168:18, 170:9, 170:10, 181:11, 181:14, 183:15, 183:16, 202:25, 210:21, 214:18, 231:13, 234:16, 242:5, 245:6, 245:14, 262:16
**opened**
23:4, 35:15, 42:8, 42:24, 48:5, 49:12, 72:2, 72:22, 75:9, 84:3, 137:16, 200:14, 240:14
**opening**
26:22, 205:16
**operate**
33:22
**operated**
69:2
**operates**
14:23, 26:11
**operating**
3:33, 24:3, 24:5, 24:7, 25:5, 25:6, 33:23, 50:7, 50:13, 90:21, 90:22, 94:19, 94:21, 99:7, 100:15, 106:20, 106:23, 108:8, 109:7, 112:11, 116:9, 148:25, 252:21, 259:3, 261:11, 261:13
**operation**
61:7
**operational**
28:5, 161:19, 161:21, 161:24, 162:5
**operationalize**
225:13
**operations**
2:26, 2:27, 20:4, 28:16, 44:21, 44:24, 45:6, 63:24, 69:1, 90:15, 90:18, 108:7, 149:4, 216:5, 250:8, 251:4, 251:17
**opportunities**
33:13
**opportunity**
71:23, 194:9, 224:8
**opposed**
142:17, 190:9
**opposite**
58:9
**opt**
74:18
**opt-in**
161:7
**option**
138:18, 236:14
**options**
34:21
**order**
11:4, 29:15, 37:22, 76:25, 113:11, 117:12, 175:10, 182:16, 183:5, 184:12, 191:13, 191:19, 191:21, 197:23, 197:25, 203:6, 203:10, 212:16, 213:1, 213:7, 216:1, 216:14, 224:14, 225:5, 225:10, 225:12, 225:14, 229:4, 229:9, 229:13, 230:3, 231:18, 231:20, 231:23, 231:25, 232:8, 232:17, 234:14, 235:11, 238:17
**order's**
203:11
**ordered**
13:6, 46:11
**orders**
37:20, 46:22, 66:22, 143:10, 146:13, 152:19, 153:20, 153:21, 154:10, 154:11, 156:22, 186:14, 187:14, 188:5, 189:21, 190:6, 190:8, 191:15, 191:20, 191:22, 192:1, 198:1, 198:3, 198:13, 198:17, 202:14, 216:4, 228:1, 240:25, 262:20
**organization**
97:15, 122:13, 218:23
**organize**
104:3
**original**
166:13, 181:24, 183:21, 227:24
**originally**
208:8, 208:9
**orphaned**
23:6
**orthotic**
53:15
**ot**
38:24, 78:21
**others**
187:10
**otherwise**
7:5, 53:16, 105:8, 154:22, 262:17
**ourselves**
23:13, 104:19
**out**
15:18, 16:21, 25:4, 25:9, 35:24, 41:14, 51:13, 54:16, 55:12, 57:14, 57:18, 64:23, 65:20, 66:13, 66:17, 66:18, 69:14, 72:9, 76:25, 79:15, 85:15, 92:6, 93:3, 102:3, 102:6, 102:7,

105:22, 105:25, 116:15, 121:6, 121:15, 122:11, 122:15, 124:20, 126:23, 128:5, 138:12, 139:16, 140:12, 140:14, 140:17, 142:12, 144:14, 146:15, 149:19, 149:23, 149:25, 155:16, 159:17, 163:22, 174:12, 177:15, 178:24, 180:13, 180:17, 180:21, 187:3, 188:15, 192:17, 192:19, 193:7, 197:6, 198:16, 201:17, 202:2, 202:5, 204:24, 207:23, 208:8, 209:15, 210:15, 218:21, 219:19, 242:16, 242:21, 243:22, 244:8, 245:3, 259:4

**out-of-state**
245:5, 248:17

**outbreak**
143:19, 144:1, 144:2, 149:9, 170:17, 171:2, 186:23, 189:18, 194:21, 195:3, 207:13, 207:16, 208:20, 208:23, 210:13, 210:16, 210:18, 211:8, 211:9, 211:11, 211:13, 211:18, 211:20, 212:2, 213:5, 213:8, 213:14, 213:18, 213:19, 213:21, 215:9, 215:11, 215:24, 216:3, 236:24, 243:6

**outbreaks**
149:8, 170:11, 185:22, 186:1, 189:1, 189:19, 190:16, 190:21, 190:23, 191:2, 191:3, 191:14, 202:19, 203:23, 204:13, 208:16, 242:9

**outcome**
138:23

**outcomes**
18:18, 22:17, 29:1, 29:2, 41:19, 254:20

**outdoor**
161:6, 240:9, 240:12, 240:14, 240:15, 241:5, 243:23

**outing**
101:11

**outings**
53:24

**outside**
18:22, 26:7, 27:9, 27:13, 27:21, 27:23, 63:12, 65:6, 66:4, 66:5, 66:10, 68:16, 99:3, 99:23, 100:8, 101:15, 104:8, 113:2, 114:20, 117:2, 140:22, 144:5, 144:6, 173:12, 175:17, 186:15, 191:23, 194:2, 195:1, 195:6, 203:23, 241:9, 241:11, 241:14

**outside's**
205:3

**oven**
65:13

**over**
6:19, 15:5, 21:7, 25:10, 26:15, 27:5, 42:22, 49:2, 59:25, 66:22, 69:19, 70:11, 70:13, 76:13, 84:14, 111:9, 119:1, 120:15, 136:23, 167:23, 168:1, 171:23, 180:10, 181:7, 190:25, 191:1, 196:17, 207:10, 210:3, 216:11, 227:23, 246:15, 247:8, 248:22, 249:23

**over-the-counter**
52:13

**overall**
42:17, 91:6, 92:1, 148:7

**overflow**
42:25, 43:3

**overlapping**
72:8

**overnight**
127:12

**oversaw**
125:7

**overseas**
21:20

**oversee**
18:19, 21:10, 21:17, 31:9, 73:24, 113:12

**overseeing**
16:16, 21:7

**overseen**
74:23

**oversees**
17:13, 31:6, 56:13, 66:20

**oversight**
19:23, 20:3, 31:11, 37:19, 159:15

**overtime**
143:6, 210:24

**overwhelmed**
143:12

**owe**
122:1

**owed**
216:11

**own**
31:15, 42:10, 43:4, 55:6, 60:10, 60:12, 60:13, 61:5, 61:14, 65:17, 70:21, 86:24, 101:13, 107:9, 144:22, 200:12

**owned**
61:3

**oxygen**
92:7, 92:8, 92:14, 103:2, 103:3, 103:6

**P**

**pace**
201:10

**package**
63:21

**packet**
261:23

**page**
2:2, 2:5, 81:4, 97:6, 101:4, 105:4, 105:15, 106:5, 108:10, 108:13, 113:5, 117:16, 123:15, 126:13, 130:12, 131:18, 132:18, 132:24, 133:6, 133:10, 133:12, 133:24, 134:15, 161:13, 164:9, 164:22, 165:12, 177:7, 183:13, 213:4, 220:12, 225:16, 228:4, 228:6, 228:8, 228:9, 229:21,

236:17, 261:4, 261:10, 261:12, 261:18, 261:23
**pages**
257:24, 264:5
**paid**
56:5, 65:25, 70:22, 109:16, 122:13, 122:15, 125:6
**paige**
1:26, 1:31, 4:5, 89:11
**paired**
145:24
**pam**
196:8
**pam's**
89:10
**pamela**
1:41, 264:2, 264:14
**pandemic**
141:16, 146:1, 180:1, 190:10, 192:14, 200:9, 203:18, 205:9, 210:14, 210:16
**paper**
13:4, 254:17
**paragraph**
246:15
**parke**
1:35, 4:6, 5:18, 90:5, 107:15, 107:19, 224:17, 224:21, 224:24, 225:1, 226:23, 262:21, 262:24, 263:2
**parke@usdoj**
1:40
**parking**
153:5
**part**
13:20, 17:21, 19:6, 28:4, 35:16, 37:13, 52:11, 52:21, 53:10, 53:18, 63:13, 84:17, 96:3, 102:14, 110:11, 117:1, 129:13, 161:8, 198:2, 205:16, 220:16, 220:20, 222:5, 226:8, 245:21, 245:22, 246:17, 247:8, 257:21
**part-time**
63:3, 63:7, 63:12, 63:17, 64:4, 255:17
**partial**
171:22, 177:6
**participate**
38:11, 38:12, 60:14, 74:11, 96:18, 113:13
**participating**
47:25, 239:3
**particular**
13:11, 13:14, 37:7, 42:18, 101:8, 131:8, 139:15, 150:3, 161:5, 161:8
**particularly**
22:14, 24:18, 85:15, 100:14, 139:16
**parts**
198:24, 219:22
**party**
15:19
**pass**
12:1, 12:12, 12:20, 13:5, 13:11, 32:23, 62:4, 62:7, 201:20, 201:21, 211:4
**pass-through**
109:25
**passed**
12:7, 60:2, 126:24
**passing**
136:2, 175:19
**passthrough**
109:10
**past**
26:2, 32:8, 38:16, 104:2, 111:9
**patient**
50:17, 214:9
**patients**
42:2, 42:3, 44:22, 44:23, 56:10, 172:5, 241:15
**pause**
127:19
**pay**
47:23, 50:6, 50:17, 51:1, 51:2, 51:4, 51:6, 51:9, 51:22, 51:25, 56:6, 57:16, 63:18, 63:20, 64:10, 68:18, 93:9, 97:8, 101:12, 121:2, 122:10, 122:12, 138:8, 139:5, 144:25, 151:24, 154:6, 195:9, 195:10, 248:20, 253:1, 253:2, 253:3, 253:20
**payable**
96:24, 122:7, 122:9, 123:5, 256:17
**payables**
122:1
**payer**
3:25, 50:3, 50:23, 51:18, 53:16, 57:7, 90:22, 93:18, 94:17, 96:2, 96:16, 96:21, 97:25, 144:17, 152:7, 248:6, 253:19, 254:6
**payers**
91:11, 96:25, 97:3, 98:3, 252:21
**paying**
9:11, 50:16, 55:7, 56:1, 57:12, 93:2, 94:3, 94:7, 94:8, 94:13, 95:24, 97:9, 102:22, 103:17, 105:17, 121:5, 122:8, 144:21, 195:8, 195:10, 253:21
**payment**
50:5, 55:12, 57:9, 57:12, 57:14, 57:20, 86:19, 91:9, 92:22, 93:2, 93:4, 93:6, 95:21, 97:18, 98:7, 113:16, 115:24
**payments**
98:4, 113:9, 113:17, 113:18
**payout**
122:20
**payroll**
3:3, 64:21, 87:15, 87:23, 88:4, 88:9, 88:10, 88:15, 88:16, 88:18, 88:24, 99:24, 101:2, 114:20, 114:21, 115:1, 115:3, 116:6, 116:10, 116:12, 116:17, 116:19, 116:25, 117:20,

118:2, 255:8, 255:21, 255:22, 255:23, 255:25
**payroll-related**
115:6
**pays**
51:1, 200:4
**pcr**
168:4
**pdpm**
253:24
**pedal**
75:25
**pedaling**
73:13
**pending**
262:16
**peninsula**
95:15, 114:1, 254:9
**penmanship**
260:20
**pension**
26:2, 26:3, 50:25, 51:2, 98:20, 99:11, 121:21, 121:22, 122:23, 122:24
**percent**
35:1, 44:2, 84:11, 84:13, 84:14, 84:16, 84:18, 84:20, 84:25, 85:10, 85:13, 85:20, 85:23, 86:10, 87:2, 109:23, 132:20, 132:21, 134:13, 136:11, 136:12, 144:21, 181:22, 210:2, 249:11, 258:1
**percentage**
3:31, 26:4, 120:14, 132:19, 133:22, 134:10, 257:14
**percentage-wise**
145:17
**percentages**
52:5
**perfect**
240:21
**perform**
55:25, 79:11
**performance**
16:13, 16:14
**performer**
68:21
**performing**
247:9
**peri**
36:20
**period**
10:9, 14:4, 63:18, 64:10, 71:24, 89:16, 106:9, 108:5, 108:9, 111:18, 112:8, 113:19, 116:23, 118:21, 118:25, 125:24, 127:22, 128:14, 143:14, 173:3, 173:13, 175:3, 205:11, 207:6, 213:16, 252:8
**periodically**
224:8
**periods**
107:4, 191:6
**permanent**
32:21, 164:16
**permanently**
178:1
**permitted**
191:3, 196:23, 205:17, 228:15
**perry**
1:14, 4:19, 4:24, 5:1, 5:6, 264:6, 264:8
**person**
14:12, 15:2, 19:20, 27:15, 30:19, 46:17, 60:4, 66:12, 66:24, 73:8, 73:11, 73:14, 73:22, 73:23, 74:9, 74:23, 89:3, 92:7, 101:24, 111:12, 111:14, 113:3, 131:5, 147:3, 147:5, 151:1, 159:17, 173:24, 173:25, 174:13, 177:23, 178:13, 179:15, 181:6, 181:12, 184:22, 197:6, 201:5, 203:25, 208:3, 208:5, 208:18, 213:22, 223:25, 239:2, 240:2, 248:13
**person's**
73:22
**personal**
67:7, 108:21, 162:2, 162:14, 163:1, 174:4
**personality**
22:13
**personnel**
22:1
**persons**
19:21, 20:14
**perspective**
142:4
**pharmacist**
240:3
**pharmacy**
41:3, 41:8, 92:6, 125:1, 125:3, 125:4
**phases**
195:15
**phenomenal**
49:19
**phenomenon**
23:5, 186:19, 186:20, 199:12
**phlebotomy**
55:7
**phone**
34:8, 205:14
**physical**
21:17, 34:18, 38:23, 42:8, 42:11, 59:4, 66:2, 66:20, 67:10, 73:2, 73:7, 74:17, 74:20, 77:8, 78:21, 92:16, 92:17, 105:16, 195:17, 195:18, 195:19, 196:12, 196:17, 200:2, 230:8, 246:25
**physically**
195:5
**physician**
13:6, 37:19, 37:22, 54:6, 54:21, 55:24, 56:6, 58:9, 58:10, 93:5
**physician's**
41:17
**physicians**
12:9, 56:4, 56:5
**pick**
64:11, 83:3, 155:3
**pictures**
47:9
**piece**
26:25, 81:16, 82:2, 197:17, 197:18, 254:17
**pieces**
27:3
**piped**
92:9
**pivot**
107:10
**pivoting**
198:15
**place**
21:13, 24:17,

24:19, 36:3, 98:18, 114:4, 163:6, 182:10, 235:6, 250:3
**placed**
250:22
**placement**
31:13, 34:17, 40:3
**placements**
39:23
**places**
104:19, 171:13, 184:5, 199:15
**placing**
187:2
**plaintiff**
1:6, 1:20, 5:15
**plan**
41:9, 41:18, 41:23, 45:21, 45:22, 45:23, 45:24, 46:18, 47:13, 67:9, 95:15, 98:21, 99:11, 168:16, 168:17, 172:19, 174:11, 254:10, 258:17
**planning**
67:25, 68:2, 138:11
**plans**
40:14, 41:2, 68:7
**plant**
21:17, 59:4, 66:2, 66:20, 67:10, 105:4, 246:25
**plante**
86:1, 86:3, 86:5, 86:13, 87:3, 88:13, 110:12, 110:16, 110:18, 129:5, 138:3, 138:4, 138:12, 138:17, 139:5, 257:22, 262:2
**plastic**
164:13, 172:15, 172:19
**plate**
65:22, 201:3, 201:4
**plateaued**
40:24
**plating**
201:8
**play**
74:3, 192:20, 192:22
**played**
189:5
**playing**
47:2
**plays**
96:5
**please**
4:21, 5:5, 5:12, 6:22, 89:23, 110:3, 110:24, 111:24, 114:8, 118:14, 122:5, 124:7, 125:13, 130:4, 160:16, 163:12, 182:11, 183:3, 216:20, 220:3, 224:21, 227:10, 231:2, 231:17, 233:13, 235:18, 236:17, 240:8, 241:25, 243:21, 244:19, 245:24, 251:11
**pleased**
82:24
**plenty**
53:8, 141:6
**plof**
39:18
**plus**
219:21
**pod**
69:22
**podiatrist**
142:7
**point**
8:18, 14:1, 14:11, 15:5, 15:15, 45:20, 54:15, 58:1, 84:10, 91:7, 92:18, 121:2, 138:1, 138:20, 141:15, 142:8, 144:1, 145:13, 151:5, 156:19, 158:11, 168:14, 169:1, 169:18, 170:20, 170:23, 172:8, 173:17, 173:18, 176:4, 179:4, 179:16, 182:1, 182:21, 192:15, 192:16, 194:4, 198:23, 208:20, 212:3, 212:4, 213:19, 226:12, 230:12, 232:21, 232:24, 235:15, 236:19, 236:21, 240:18, 240:20, 240:21, 241:4, 241:15, 242:2, 242:11, 243:9, 243:13, 244:5, 244:9, 249:4, 255:7, 259:21
**points**
128:16, 142:11, 164:12, 182:20, 195:12, 224:9, 226:3
**poke**
93:11
**policies**
29:5, 220:24, 221:3, 221:7, 221:12, 221:16, 221:17, 222:24, 223:4, 223:8, 223:22, 224:2, 224:7, 224:9, 224:11, 224:13, 225:5
**policy**
3:13, 14:20, 14:21, 18:24, 18:25, 19:1, 19:4, 28:3, 28:19, 28:25, 29:2, 31:18, 31:21, 56:13, 60:16, 127:24, 128:3, 161:4, 220:11, 221:23, 222:2, 222:5, 222:13, 222:17, 223:1, 223:11, 223:14, 223:17, 223:23, 223:24, 224:12, 225:7, 226:15, 226:17, 228:11, 228:16, 252:12, 252:13
**polly**
78:9
**pool**
249:5
**poor**
23:5, 41:19, 49:11
**population**
69:20, 72:20, 148:4, 204:25
**portable**
65:5, 70:17, 200:22, 200:23, 260:5
**portion**
18:19, 134:5, 142:3, 207:8
**posed**
226:2
**position**
3:36, 22:7, 141:10, 141:14, 190:4, 219:12, 219:19, 219:23

**positions**
260:23
**positive**
98:2, 146:5, 150:25, 166:24, 167:4, 167:20, 167:21, 167:25, 168:3, 172:4, 173:14, 173:19, 173:20, 173:21, 173:23, 174:1, 174:3, 178:18, 186:4, 202:23, 207:21, 208:2, 208:4, 208:5, 210:2, 210:12, 214:12, 214:19
**possible**
152:9, 157:21, 173:24, 174:9, 185:4, 200:24, 235:15
**possibly**
84:24, 173:10, 186:17, 211:14
**post**
1:37, 107:4, 119:21
**post-covid**
27:12, 63:4, 138:8, 218:16
**post-employment**
122:19
**posted**
222:18
**posting**
64:6
**postings**
63:7
**postretirement**
138:23
**pot**
51:12
**potential**
74:14, 138:14, 148:12, 163:2, 165:20, 174:2, 179:21, 185:13, 187:12, 188:21, 190:17
**potentially**
150:20, 183:23, 194:25, 195:1
**power**
20:1, 20:4, 20:10, 20:11, 20:16, 20:24, 26:12, 60:9, 83:1, 158:9
**ppe**
164:14, 260:7
**ppp**
108:17, 138:6
**practical**
62:5
**pre**
65:12
**pre-covid**
10:21
**preadmission**
130:25, 131:1
**preference**
53:3
**preferences**
53:20
**preferred**
63:25
**premarked**
76:24
**premium**
3:2, 112:14, 117:18, 117:19, 117:21
**prep**
86:4
**prepaid**
120:23, 120:25
**prepar**
111:7
**preparation**
8:24, 86:17, 86:25, 87:3, 90:14, 191:16
**prepare**
7:22, 8:15, 9:22, 65:8, 70:14, 83:19, 226:1, 262:12
**prepared**
7:21, 9:4, 87:9, 87:10, 88:13, 90:14, 110:15, 110:16, 111:12, 111:13
**preparedness**
168:17
**preparer**
22:19
**prepares**
262:1
**preparing**
8:17
**prescription**
92:7, 125:5
**present**
13:20, 17:6, 19:25, 22:7, 76:17
**presentation**
23:10, 120:17, 261:22
**presented**
30:12
**pressure**
35:23
**pretty**
34:1, 36:17, 39:5, 45:2, 66:18, 81:24, 84:21, 101:7, 101:17, 103:25, 131:7, 131:16, 139:4, 148:2, 155:24, 200:16, 201:19, 208:20, 216:9, 240:23, 248:21, 260:8
**prevaccination**
153:21
**prevent**
218:8, 218:10
**prevented**
191:13, 203:5
**prevention**
3:12, 161:25, 209:25, 216:3, 217:9, 217:19, 217:21, 217:22, 218:2, 218:6, 218:11, 219:6, 220:11, 221:17
**preventionist**
17:23, 59:14, 174:23, 219:13, 223:7
**prevents**
7:5
**previous**
13:23, 22:10, 25:18, 48:20, 111:4, 124:19, 131:12, 229:13, 241:17
**previously**
33:16, 105:21, 237:5
**primarily**
9:3, 12:11, 31:11, 66:6, 67:2, 69:12, 69:16, 207:2, 223:3, 247:17, 256:25
**primary**
13:20, 18:14, 36:24, 50:12, 50:23, 54:11, 54:17, 62:16, 158:8, 207:2, 215:4
**principles**
119:9, 121:15
**print**
261:10
**printed**
134:8, 257:24
**printer**
101:7
**prior**
23:11, 39:17, 39:18, 40:1, 40:25, 44:10, 49:6, 77:4,

83:22, 88:23, 146:9, 146:11, 152:17, 152:18, 152:22, 156:2, 164:5, 178:13, 181:20, 187:4, 202:7, 218:16, 219:7, 223:22, 232:4, 237:25, 245:20, 248:19, 250:22, 253:5, 264:7
**private**
23:14, 31:3, 42:9, 42:21, 47:23, 49:1, 49:4, 50:6, 51:4, 51:6, 51:9, 51:25, 91:9, 97:7, 97:8, 97:9, 132:2, 137:5, 148:10, 156:20, 164:8, 165:21, 171:25, 173:16, 175:13, 175:14, 177:14, 177:19, 177:20, 177:25, 178:6, 179:14, 180:18, 180:19, 253:20
**probably**
10:21, 12:3, 14:3, 14:16, 33:8, 45:25, 57:21, 58:7, 58:9, 84:7, 86:1, 87:22, 96:11, 104:25, 105:3, 107:17, 113:11, 121:19, 125:1, 135:9, 135:13, 136:4, 136:24, 139:24, 141:20, 152:1, 158:21, 162:21, 179:4, 185:24, 186:3, 198:3, 204:8, 220:18, 221:23, 232:24, 237:25, 238:16, 239:16
**problem**
21:11, 21:12, 53:9, 107:3, 143:25, 200:17, 242:20
**problems**
27:24, 151:20, 195:14, 242:12
**procedural**
77:18
**procedure**
5:23, 7:16
**procedures**
14:17
**proceeding**
5:10
**process**
26:24, 57:24, 155:7, 176:8
**processed**
88:21
**processing**
77:21, 93:8, 93:11
**produced**
8:6, 256:20
**product**
7:25, 262:14
**products**
26:17, 65:12, 108:21
**profit**
106:8, 106:14, 106:16, 106:17, 108:9
**program**
62:10, 66:1, 217:9, 217:19, 217:21, 217:22, 218:6, 219:6, 220:17, 220:21, 246:19
**programs**
161:25
**progress**
121:18, 121:21
**prohibitions**
206:12
**project**
78:12
**projects**
107:9
**promise**
47:11
**propel**
103:10
**properly**
235:6
**property**
24:8, 61:5
**prospective**
86:19
**protect**
150:20
**protection**
143:1, 143:3, 143:5, 208:17, 208:23
**protective**
31:12, 67:7, 108:21, 162:2, 162:14, 163:2
**protocols**
210:17, 211:20
**provide**
18:17, 24:20, 25:3, 25:4, 36:20, 36:23, 52:20, 53:2, 53:12, 54:6, 54:9, 54:12, 54:14, 61:23, 62:6, 65:15, 81:17, 82:22, 87:8, 92:11, 92:22, 95:11, 97:18, 98:1, 101:19, 102:4, 103:16, 142:1, 145:22, 155:18, 156:8, 160:13, 161:25, 162:4, 199:12, 199:15, 199:23, 224:6, 237:16, 257:1
**provided**
7:23, 8:4, 8:9, 8:13, 9:1, 9:5, 13:3, 23:11, 37:9, 38:19, 38:22, 50:2, 54:7, 55:4, 57:19, 65:15, 79:23, 82:14, 87:13, 87:24, 99:18, 111:7, 112:5, 118:19, 123:20, 145:7, 153:16, 159:9, 160:23, 169:21, 200:4, 235:13, 259:6, 261:1, 262:11, 262:13
**provident**
97:4
**provider**
97:19, 217:19
**provider's**
218:5
**providers**
54:9, 93:14
**provides**
25:9, 31:15, 34:8, 45:4, 47:9, 47:10, 98:4, 221:21
**providing**
37:10, 55:10, 62:15, 62:16, 67:6, 67:23, 80:19, 94:12, 103:12, 120:10, 204:22
**prudent**
210:10
**psych**
70:12
**psychosocial**
29:1, 147:5, 149:17, 206:9

**pt**
38:24, 78:20, 78:21
**pt's**
196:3
**public**
147:7, 264:3, 264:16
**pull**
72:17, 172:18, 172:19, 221:2, 257:25
**pulled**
255:25
**punch**
89:1, 89:4
**punched**
125:20, 133:18
**purchase**
108:23
**purchasing**
28:16
**pure**
82:21, 153:15
**purifies**
260:5
**purpose**
10:1, 112:23, 114:23, 119:8, 175:25, 176:2, 181:24, 183:22
**purposes**
48:4, 64:18, 78:4, 88:5, 124:4, 126:4, 128:20, 157:19, 160:5, 166:2, 166:17, 260:5
**pursuant**
5:22
**pursue**
29:25, 30:1, 138:7
**pursued**
10:11, 154:9
**push**
65:5
**pushing**
72:8
**put**
24:25, 36:3, 108:23, 135:4, 135:6, 149:16, 150:22, 156:1, 160:4, 163:1, 168:1, 168:11, 170:15, 173:11, 173:23, 174:8, 178:8, 179:10, 179:11, 180:8, 180:22, 181:7, 181:8, 187:22, 192:19, 193:3, 202:21, 217:15, 217:16, 219:17, 235:8, 243:18, 245:3, 255:10, 259:7, 259:25, 260:24, 261:14
**puts**
121:15
**putting**
16:21, 251:3
**puzzles**
101:6

**Q**

**q1**
147:14, 150:16, 167:24, 194:14, 206:3, 215:1, 215:3, 228:21, 238:16
**q2**
140:24, 146:13, 150:16, 167:24, 194:14, 200:19, 206:17, 215:4, 215:5, 242:8
**q3**
3:15, 3:17, 146:13, 166:6, 166:7, 200:17, 200:19, 202:17, 202:20, 203:4, 211:17, 215:5, 215:20, 230:22, 242:8, 249:11
**q4**
143:15, 202:18
**qapi**
56:13
**qso**
2:23, 2:24, 2:25, 212:22
**qso's**
192:1
**qso---nh**
212:24
**quad**
49:7, 135:12, 180:6
**qualification**
250:9
**qualified**
129:20
**qualifies**
80:19
**quality**
24:23, 67:21, 68:6, 142:18, 149:5, 151:21, 234:2, 247:9
**quantifier**
129:25
**quarantine**
144:4, 146:9, 150:17, 151:25, 152:23, 152:24, 165:3, 166:18, 167:3, 167:10, 167:23, 168:23, 168:25, 169:3, 172:4, 173:10, 173:21, 174:13, 175:24, 176:3, 176:14, 176:17, 176:22, 177:9, 177:10, 178:10, 181:4, 183:15, 184:4, 184:17, 184:18, 184:22, 184:25, 185:4, 185:6, 198:6, 199:13, 245:7, 248:11
**quarantined**
150:8, 174:3, 174:8, 174:17, 198:5, 208:8, 208:10, 241:13
**quarantining**
140:16, 140:23, 150:12, 152:15, 152:18, 153:20, 168:8, 168:21, 173:4, 175:8, 178:9, 210:17, 234:6
**quarter**
79:21, 90:24, 91:1, 91:3, 153:17, 178:21, 178:22, 230:20, 248:11, 249:10, 251:14, 255:12, 255:14, 255:15
**quarterly**
3:27, 22:3, 68:5, 255:2
**quarters**
4:11, 138:19, 166:1, 166:3, 166:4, 181:1, 181:3, 182:9, 185:12, 188:20, 190:5, 190:22, 207:4, 214:21, 247:14, 255:22, 259:23
**question**
6:5, 6:22, 8:8, 24:10, 58:5, 63:4, 64:7, 84:8, 87:20, 104:11, 112:24, 137:13, 139:4, 154:1, 160:7, 161:17, 174:7, 176:19, 182:9, 188:17, 188:20, 189:14, 190:2, 210:8, 221:5,

221:10, 222:13, 224:19, 224:23, 237:21, 246:11, 259:5, 260:25, 262:11
**questioning**
7:2, 99:19, 202:20, 240:17
**questions**
10:6, 19:12, 24:13, 31:10, 47:25, 77:11, 89:11, 131:5, 155:12, 155:19, 155:20, 177:5, 209:17, 210:9, 222:14, 222:15, 226:2, 237:24, 255:11, 262:9, 262:17
**quick**
86:6, 133:13, 255:9, 256:13, 256:20, 261:24
**quicker**
34:9, 257:23
**quickly**
29:13, 29:14, 159:2, 219:16
**quite**
103:7, 170:12, 207:4, 254:1, 260:4
**quote**
179:16, 194:21
**quoted**
152:13

**R**

**rae**
1:35
**railroad**
51:20
**raise**
4:20
**ran**
14:11
**range**
77:10, 81:13, 155:25
**ranges**
81:2
**rankinen**
1:41, 264:2, 264:14
**rap**
186:22
**rapid**
168:3
**rare**
70:12, 80:16
**rarity**
13:11
**rate**
3:25, 23:24, 44:25, 51:4, 51:6, 51:7, 51:9, 51:10, 63:20, 84:17, 86:18, 87:4, 87:6, 91:24, 93:15, 93:19, 93:20, 93:23, 97:19, 124:1, 144:24, 152:6, 194:18, 198:14, 248:21, 253:20, 254:2, 254:11, 254:15, 257:22
**rates**
58:2, 58:17, 84:7, 93:18, 94:14, 95:20, 124:2, 200:6, 248:23, 250:17, 258:1
**rather**
53:11
**rd**
1:15, 4:4
**reach**
128:5, 149:23, 149:25, 209:15
**reached**
138:12, 144:14, 149:19
**read**
77:12, 133:20, 161:5, 161:14, 177:3, 191:20, 213:9, 221:25, 224:10, 261:15
**reading**
106:6, 134:5, 198:14, 244:2
**readmitted**
41:20
**ready**
135:6
**real**
84:12, 91:13, 128:7, 153:4, 252:22
**realize**
9:14
**realized**
80:1
**realizing**
107:2
**really**
13:17, 15:6, 17:16, 17:17, 17:23, 31:19, 35:13, 35:19, 38:3, 39:16, 40:19, 41:15, 42:7, 43:3, 43:19, 50:20, 53:17, 59:18, 60:16, 63:10, 71:19, 71:23, 72:7, 85:1, 85:8, 86:9, 122:12, 124:20, 135:4, 136:5, 137:1, 138:18, 140:4, 140:8, 140:21, 141:9, 144:24, 145:1, 145:2, 145:18, 146:16, 146:18, 147:6, 147:8, 147:19, 149:6, 151:6, 155:3, 167:5, 168:25, 171:3, 175:2, 175:19, 188:17, 193:1, 193:23, 194:24, 199:20, 200:19, 201:16, 202:3, 203:22, 208:19, 211:1, 215:19, 222:10, 236:3, 242:21, 248:1, 252:13, 255:9, 256:20, 261:24
**reason**
6:19, 7:5, 28:2, 60:11, 63:8, 66:16, 69:18, 70:5, 71:17, 72:6, 72:17, 80:15, 92:13, 122:22, 127:8, 127:19, 128:7, 132:2, 142:13, 154:5, 176:20, 179:6, 181:11, 200:11, 225:10, 225:13, 226:14
**reasonable**
144:25, 204:7, 204:9
**reasons**
24:6, 36:15, 36:24, 38:5, 38:12, 41:21, 116:5, 116:21, 156:5, 156:24, 157:2, 158:2, 158:3, 186:7, 199:14, 207:18, 208:1
**rebecca**
115:16, 115:22, 115:23
**rebuilding**
83:21
**rec**
15:14, 180:2
**recall**
92:24, 108:20,

109:3, 110:11, 113:19, 129:20, 133:9, 137:25, 139:12, 139:14, 172:21, 173:3, 175:11, 177:2, 177:4, 205:19, 206:13, 209:23, 244:2, 252:10, 254:20, 259:9
**recalled**
183:20
**receipts**
250:7
**receivable**
120:7, 120:9, 120:20, 120:22
**receive**
24:21, 37:10, 37:15, 47:16, 50:6, 50:7, 98:20, 99:22, 108:17, 123:1
**received**
8:16, 22:9, 50:10, 77:10, 92:7, 92:17, 92:19, 94:12, 108:18, 119:18, 126:23, 138:3, 155:9
**receives**
47:19, 54:22
**receiving**
37:6, 44:1, 79:18, 94:2
**recent**
26:21, 41:10
**recently**
254:22, 254:23
**recertify**
41:13
**recipe**
65:9
**recognize**
40:7, 77:3, 77:6, 81:1, 90:11, 90:13, 90:15, 108:3, 108:6, 110:8, 110:10, 111:3, 111:6, 112:4, 114:16, 118:18, 118:20, 121:3, 125:17, 130:8, 130:10, 163:16, 163:18, 171:20, 182:17, 182:19, 220:7, 220:8, 225:6, 225:9, 227:22, 244:24, 245:1, 246:3, 246:5, 250:15, 252:3, 252:5, 257:17, 257:18, 258:24
**recognized**
77:4, 167:2, 248:16
**recognizing**
14:16, 14:21, 172:17
**recollection**
172:6, 180:3, 185:2, 206:14, 230:18, 230:19, 230:21
**recommendation**
170:12
**reconcil**
46:9
**reconcile**
46:12
**reconciled**
46:11
**reconciliation**
46:10
**record**
4:3, 5:5, 13:5, 13:7, 19:3, 44:13, 49:21, 49:22, 49:23, 55:14, 79:25, 96:23, 107:21, 107:22, 126:10, 154:17, 154:18, 154:19, 156:3, 160:4, 160:22, 206:5, 206:23, 226:25, 227:1, 227:2, 251:20, 251:22, 251:23, 251:25, 262:10, 262:19, 264:5
**records**
189:6
**recoup**
139:8
**recouping**
25:19
**recovered**
229:25
**recovering**
151:4
**recreate**
221:20
**red**
53:24, 101:12, 102:19, 202:9, 212:24
**redacted**
132:4
**redone**
88:12
**reduce**
208:22
**reduced**
241:7, 249:7
**reduction**
45:8, 170:23, 188:3, 188:7, 189:21, 199:14
**redundant**
162:15, 190:14
**reevaluated**
138:14
**refer**
4:14, 153:24, 159:25, 171:9, 227:9, 240:24
**reference**
22:12, 63:11, 84:10, 105:23, 218:18, 227:7, 231:22, 232:23, 234:25
**referenced**
117:22, 221:5, 241:19
**references**
220:13, 221:2, 221:25, 222:1, 237:1, 242:9
**referencing**
64:14, 228:13
**referred**
21:1, 21:4, 21:14, 227:23
**referring**
4:16, 4:17, 20:6, 25:8, 99:14, 99:15, 185:2, 203:20, 209:13, 218:11, 235:3, 239:6, 239:8, 243:3, 255:13, 257:5
**refinishing**
121:20
**reflect**
90:23, 90:25, 156:7, 256:22, 257:7, 257:20, 258:15
**reflected**
98:21, 118:7, 155:5, 164:14, 199:1, 199:2, 237:1, 250:7
**reflecting**
172:13, 237:4
**reflects**
125:25, 130:2, 255:11
**refresher**
199:18
**refund**
4:11, 30:8
**regain**
166:13
**regarding**
176:22, 198:10,

227:4, 231:21, 232:17
**regardless**
30:17, 62:12, 157:5, 211:13
**regards**
238:10
**regular**
103:3, 113:21, 123:24, 166:17, 263:4
**regulation**
226:18, 226:19
**regulations**
17:5, 55:9, 58:13, 58:14, 235:14
**regulatory**
15:22, 15:23, 19:2, 19:19, 32:15, 33:7, 34:1, 159:16, 217:6, 249:15
**regulatory-wise**
20:2, 31:17
**rehab**
39:10, 42:22, 45:4, 48:5, 49:12, 56:22, 57:22, 78:10, 79:24, 94:3, 183:16, 183:23, 184:16, 199:6, 241:13, 247:19, 255:19
**reim**
102:4
**reimbursable**
92:14, 103:12
**reimbursed**
51:7, 51:8, 51:12, 53:17, 58:12, 93:10, 103:16, 109:14, 109:19, 109:21, 109:22, 259:19
**reimbursement**
23:25, 36:2, 44:25, 50:2, 55:10, 83:10, 91:23, 92:10, 92:11, 94:2, 98:9, 108:12, 108:16, 152:9, 152:12, 153:13, 153:18, 153:19, 200:6, 247:18, 249:3, 250:17, 250:24, 253:25, 254:2, 259:16, 259:19, 260:1
**reimbursement-dr-iven**
24:20
**reimbursement-re-lated**
23:17
**reimbursements**
83:7, 113:22
**reinforcements**
233:25
**reinitiating**
208:20
**reinterpretation**
209:6
**related**
24:23, 87:20, 93:17, 219:15, 260:9
**relationship**
31:19, 161:4, 177:16
**relative**
67:17, 67:18, 82:16
**relatively**
48:9, 64:23, 138:11, 144:23, 145:6
**reliable**
145:2, 145:3
**relief**
154:21, 171:23
**relieve**
241:5
**religious**
148:18, 237:17
**relive**
153:7
**rely**
128:19
**remain**
245:14
**remainder**
37:2
**remained**
42:20, 172:3, 178:21
**remaining**
184:21
**remains**
120:18
**remediation**
16:14
**remember**
25:17, 47:12, 56:25, 58:24, 74:13, 78:1, 134:8, 140:3, 143:14, 143:16, 156:10, 156:15, 159:11, 171:10, 174:10, 180:2, 181:22, 182:23, 191:21, 192:2, 200:18, 202:12, 226:4, 226:5, 228:13, 233:2, 237:8, 240:20, 243:11, 244:4, 245:2, 253:4, 256:15
**remotely**
158:24, 186:18
**renee**
209:18
**renew**
176:11
**renewal**
3:23, 252:6, 252:9
**renewed**
252:10
**renews**
58:1
**reopen**
169:8
**rep**
33:16
**repairs**
105:12
**repeat**
27:19, 58:25, 160:7, 190:1
**repeating**
41:16
**rephrase**
6:23, 126:7, 129:9
**replacement**
39:15, 39:16
**report**
3:7, 3:9, 16:23, 18:23, 19:18, 27:21, 85:17, 86:4, 86:17, 86:25, 87:3, 123:18, 125:18, 125:24, 128:25, 129:6, 131:9, 131:11, 131:14, 133:8, 133:9, 134:8, 181:17, 219:15, 257:20, 257:22, 257:25, 258:16
**reported**
1:41
**reporter**
1:42, 4:3, 4:20, 6:15, 6:18, 49:21, 49:23, 80:2, 107:22, 154:17, 154:19, 226:25, 227:2, 251:22, 251:25, 262:23, 263:1, 263:5, 264:2
**reporter's**
6:20
**reporting**
1:43, 88:11,

264:15
**reports**
64:21, 96:12, 128:19, 128:25, 129:2
**represent**
4:6
**representation**
247:3
**represented**
5:10
**repurposed**
48:15
**request**
138:15, 160:24
**require**
34:24, 37:22, 44:25, 72:21, 81:24, 119:9, 153:20, 160:11, 176:10
**required**
23:19, 29:16, 36:11, 37:18, 40:20, 53:12, 55:9, 58:15, 60:14, 81:21, 87:10, 102:11, 102:15, 108:22, 151:24, 152:15, 152:18, 160:2, 160:10, 162:8, 162:9, 162:18, 165:17, 168:25, 169:3, 175:9, 196:15, 197:23, 204:3, 210:24, 217:12, 217:23, 222:4, 241:2, 241:4, 241:8, 257:20
**requirement**
21:25, 46:19, 47:20, 54:5, 85:20, 88:7, 135:8, 136:4, 151:18, 160:12, 166:19, 168:8, 169:7, 197:22, 198:4, 199:13, 203:2, 208:24, 218:4, 240:7, 246:18
**requirements**
2:13, 2:16, 2:18, 2:21, 26:16, 34:1, 40:21, 149:11, 149:12, 150:12, 155:10, 161:25, 164:14, 168:6, 198:15, 203:8, 203:12, 217:8, 219:14, 229:10, 230:2, 230:5, 234:18, 234:19, 235:14, 249:15
**requires**
13:17, 52:12, 54:15, 217:10
**requiring**
34:18
**rescinded**
227:25
**rescinding**
229:9
**rescission**
233:3
**reserve**
108:18
**reserved**
128:15, 174:9
**resident**
13:14, 22:4, 26:20, 33:10, 41:22, 43:19, 44:19, 44:20, 46:6, 46:13, 47:1, 47:16, 47:19, 50:2, 50:12, 51:11, 54:2, 54:22, 54:23, 67:4, 68:2, 72:13, 72:20, 79:20, 82:5, 83:9, 91:23, 96:2, 101:11, 102:3, 102:10, 102:11, 103:9, 103:13, 113:21, 127:15, 129:9, 131:10, 144:8, 144:9, 144:10, 149:16, 154:4, 154:6, 154:9, 162:4, 163:3, 171:2, 173:20, 173:21, 174:3, 178:1, 179:8, 179:9, 181:16, 181:23, 184:18, 184:24, 185:13, 185:17, 185:19, 187:12, 189:8, 194:18, 197:14, 201:3, 201:4, 201:21, 204:25, 205:25, 208:3, 210:12, 211:1, 234:3, 242:15, 243:24, 243:25, 250:11, 259:2
**resident's**
102:23, 181:22, 197:16, 205:3, 234:18
**residential**
2:13, 2:16, 2:18, 2:21, 229:11
**resignation**
68:12
**resigned**
14:12, 122:20
**resolve**
146:18
**resolved**
175:22
**resolving**
106:19, 112:25
**resounding**
84:4, 148:6
**resource**
23:23, 86:1, 209:24, 210:6, 219:4
**resources**
19:8, 21:19, 50:12, 59:21, 60:13, 60:15, 221:21, 230:13
**respond**
203:15
**response**
3:13, 210:9, 220:10, 220:11, 221:17, 262:11
**responsibilities**
16:19, 18:10, 22:13
**responsibility**
15:7, 17:18, 18:14, 28:4
**responsible**
68:8, 150:2
**rest**
17:24, 51:1, 105:10, 153:3, 158:13, 177:22, 183:15, 214:5, 253:6
**restarted**
142:9, 194:11
**restorative**
21:20, 37:11, 37:15, 37:24, 37:25, 38:18, 38:19, 39:1, 44:4, 44:5, 44:7, 44:12, 44:17, 55:2, 59:17, 66:8, 75:10, 75:11, 75:13, 75:20, 76:6, 76:11, 77:16, 105:24, 170:2
**restore**
38:1
**restricted**
120:2, 188:5, 216:4

**restriction**
82:23, 215:22
**restrictions**
185:21, 188:25, 189:4, 190:17, 215:2, 216:2, 232:4, 250:22
**restrictive**
39:19, 224:16
**restroom**
49:19
**resulted**
178:23
**resume**
198:11, 198:12, 202:16, 206:16, 213:14
**resumed**
227:6, 236:18
**resuming**
203:5
**retain**
153:4, 157:1, 157:3, 157:4, 157:5, 157:11, 261:3
**retained**
178:22
**retention**
4:12, 64:18, 110:13, 128:21, 137:23
**retirees**
51:20
**retirement**
119:2, 120:5
**retiring**
138:11
**retrofitted**
42:21, 48:16, 135:5, 137:4, 137:15, 137:19
**return**
22:19, 30:4, 39:19, 40:2, 40:5, 85:6, 126:21, 126:22, 126:24, 127:1, 127:7, 127:25
**returned**
40:25, 127:8, 238:23
**returning**
39:16, 41:19
**returns**
30:2
**revealing**
58:7
**revenue**
3:33, 3:35, 50:13, 83:6, 83:9, 90:22, 91:23, 98:13, 102:2, 108:11, 122:25, 123:18, 199:9, 200:1, 200:2, 247:13, 247:15, 247:17, 250:6, 250:10, 250:11, 250:12, 250:14, 251:2, 259:2, 259:3, 259:5
**revenues**
123:20
**reverse**
183:5
**review**
8:6, 9:23, 19:1, 28:3, 29:3, 30:3, 30:8, 30:15, 77:6, 191:15, 221:22, 221:23, 224:8
**reviewed**
7:23, 8:12, 90:16, 95:7, 108:4, 111:9, 112:8
**reviewing**
18:25, 30:14, 191:16, 215:6
**revise**
29:3, 226:17
**revision**
19:2, 56:13, 212:23, 223:18, 223:23
**revisions**
212:24
**rewrite**
165:24
**rid**
163:7
**ride**
32:15
**riding**
247:25
**right**
4:3, 4:20, 6:9, 7:14, 8:10, 9:19, 11:9, 11:21, 24:8, 30:19, 32:19, 33:2, 33:6, 34:3, 34:10, 39:4, 44:19, 45:20, 51:5, 54:8, 59:5, 65:18, 67:20, 68:22, 73:9, 75:22, 94:24, 95:15, 95:17, 98:12, 98:25, 103:6, 103:21, 107:12, 108:23, 111:19, 120:15, 127:11, 128:11, 135:18, 135:19, 136:25, 154:22, 158:1, 165:2, 165:13, 167:25, 181:19, 185:19, 186:22, 188:6, 188:16, 189:15, 201:15, 210:13, 215:15, 224:25, 230:11, 232:5, 232:6, 232:8, 233:5, 233:19, 233:20, 235:9, 237:16, 238:1, 239:17, 240:3, 245:16, 262:8, 262:18
**right-hand**
137:8
**risk**
174:12, 179:18, 194:23, 207:18, 208:24, 209:25, 219:12, 219:19, 228:12, 231:13, 243:18
**rn**
10:11, 11:14, 11:25, 12:1, 12:5, 12:8, 13:9, 14:5, 16:2, 44:8, 46:9, 141:11, 201:13, 201:23
**rn's**
62:6, 144:24
**rn-specific**
14:7
**road**
157:8
**rob**
1:25, 5:14, 8:22, 9:1, 76:1, 147:2, 147:3, 190:25, 196:7, 212:15, 216:24, 224:17, 224:24, 253:13, 257:13, 262:8
**robert**
1:20
**role**
7:19, 11:4, 11:23, 11:24, 11:25, 12:4, 13:8, 13:12, 13:20, 13:23, 14:4, 14:7, 14:9, 14:10, 14:12, 14:16, 15:25, 16:5, 16:6, 16:11, 16:23, 17:6, 17:19, 17:20,

17:22, 17:25, 18:2, 19:7, 21:4, 22:16, 25:21, 27:16, 31:14, 57:1, 59:1, 62:6, 62:16, 64:16, 77:5, 90:17, 219:24
**roles**
14:4, 20:12, 20:13, 58:20, 58:25, 59:2, 59:3, 59:15, 60:5
**rolling**
146:17, 192:17
**rolls**
13:4
**roommate**
175:21
**rooms**
42:9, 49:2, 49:3, 49:4, 49:6, 70:2, 71:14, 71:15, 71:22, 72:2, 132:2, 132:8, 135:21, 135:22, 135:23, 135:24, 136:23, 137:1, 137:4, 148:10, 164:8, 165:4, 165:5, 166:20, 172:3, 172:5, 172:7, 172:17, 172:23, 173:4, 173:5, 173:6, 173:12, 174:5, 174:9, 174:17, 175:8, 175:24, 176:3, 177:13, 177:19, 178:23, 180:1, 180:6, 180:16, 180:23, 183:14, 183:15, 183:23, 184:17, 184:24, 185:2, 202:5, 204:2, 241:19, 242:5, 242:19
**rosemary**
59:9
**rotation**
257:2
**rothman**
103:25, 104:8, 209:18
**rough**
262:21
**roughly**
10:20, 175:24
**round**
213:14, 214:5, 214:7, 236:25, 237:2, 240:3, 243:15, 243:17
**rounded**
165:1
**rounds**
239:16
**routine**
54:3, 54:7, 88:11, 144:3
**routinely**
27:1, 104:9, 180:23, 202:18, 242:10
**row**
180:13, 259:15, 260:10
**rowing**
73:15, 73:16, 196:8
**rule**
7:15, 19:19, 83:4, 87:2
**rules**
5:21, 5:23, 58:13, 58:14, 177:23, 179:7, 179:8, 179:19, 194:22, 206:13, 225:2, 228:16
**run**
55:6, 124:3, 126:4, 138:19, 234:8, 251:15
**running**
120:10, 170:14, 204:24, 241:9
**rural**
92:25, 156:22, 239:24, 249:22
**rush**
193:18

S

**s**
23:1, 84:9, 214:17, 214:18, 247:22, 247:23, 247:24
**sacrificed**
180:23
**sacrificing**
179:9
**safe**
83:3, 83:20, 141:20
**safest**
145:23
**safety**
35:25, 40:5, 46:6
**saginaw**
1:16, 60:23
**said**
15:16, 18:6, 35:11, 44:12, 48:14, 109:24, 116:4, 117:2, 138:12, 139:2, 155:9, 155:21, 170:13, 175:17, 176:4, 176:7, 181:2, 181:19, 183:19, 183:20, 204:5, 206:15, 207:7, 209:6, 218:20, 220:2, 224:1, 224:10, 228:21, 235:11, 241:19, 242:22, 244:6, 255:23
**salad**
235:20, 235:25, 236:8, 236:10
**salaried**
89:3
**salary**
27:13, 100:11, 100:12, 105:17
**same**
6:19, 13:22, 34:8, 57:4, 59:18, 60:3, 62:6, 63:20, 73:19, 74:1, 74:23, 75:12, 80:12, 80:13, 92:18, 95:22, 101:23, 101:24, 111:12, 111:14, 111:19, 114:3, 129:25, 136:1, 164:17, 171:4, 176:20, 178:9, 178:10, 178:14, 178:15, 195:22, 195:24, 197:1, 211:4, 223:12, 231:3, 231:21, 232:17, 237:9, 241:8, 241:21, 244:12, 252:12, 252:15, 252:17, 259:17
**sanitize**
163:6
**sat**
184:1
**save**
248:15
**saved**
173:16, 184:17, 184:24
**savings**
41:3, 41:5
**saw**
146:17, 147:8, 197:9, 199:14,

205:5, 237:8, 248:21, 249:15, 249:22
**saying**
6:19, 29:8, 29:18, 82:1, 86:3, 94:11, 136:20, 138:12, 147:2, 161:23, 171:11, 185:21, 185:25, 186:7, 189:14, 190:15, 215:23, 218:5, 225:8, 236:5, 243:10
**says**
77:19, 88:18, 91:8, 92:12, 92:21, 94:19, 94:21, 95:1, 97:6, 97:7, 97:10, 100:15, 105:5, 106:7, 108:12, 109:8, 109:18, 113:6, 113:16, 117:14, 117:17, 130:14, 130:19, 130:24, 131:19, 131:24, 132:13, 132:19, 132:20, 133:3, 133:7, 134:12, 142:21, 143:1, 161:19, 164:6, 164:21, 165:11, 171:23, 171:24, 177:9, 177:13, 178:21, 180:13, 183:14, 184:16, 215:7, 217:19, 226:10, 229:23, 230:21, 231:12, 231:19, 233:14, 233:24, 234:21, 235:20, 236:17, 237:10, 237:18, 241:12, 242:1, 242:18, 243:22, 245:14, 251:13, 253:19, 255:13, 259:15
**scarlet**
146:25, 202:9
**scary**
178:11
**scenario**
207:16, 210:13, 210:18, 212:2, 213:8, 213:19, 213:22, 214:3, 214:21, 214:25, 215:2, 215:9, 239:4, 243:6
**scenarios**
2:9, 127:14, 152:16, 207:13, 215:5
**schedule**
121:14, 121:17, 203:24, 207:2, 233:22, 234:17
**scheduled**
64:10, 64:13, 203:22, 204:6, 206:17, 206:22, 206:24, 231:14, 232:5, 233:19, 241:2
**scheduling**
88:16, 194:8
**school**
10:6, 10:9, 10:10, 140:11
**scifits**
76:7
**scratch**
65:10
**screaming**
151:15
**screened**
203:25
**screening**
241:3
**sealed**
26:24
**search**
86:6
**seasonal**
140:13
**second**
81:4, 132:18, 161:13, 178:4, 178:25, 183:13, 213:9, 225:16, 228:4, 228:5, 236:4, 239:16, 239:21, 240:3, 251:21, 255:15
**secondarily**
186:2
**seconds**
35:23
**secretary**
207:1, 247:4
**section**
193:25
**sections**
22:1
**see**
6:8, 29:24, 36:24, 37:8, 38:13, 40:6, 46:24, 56:9, 74:6, 79:19, 80:10, 80:21, 81:7, 93:6, 96:9, 96:12, 98:1, 98:6, 99:2, 99:6, 99:8, 99:20, 100:3, 100:15, 104:13, 111:17, 112:15, 113:2, 113:15, 114:20, 117:16, 119:20, 123:10, 126:14, 130:14, 132:4, 132:6, 133:2, 133:4, 133:20, 134:18, 134:25, 138:19, 142:23, 143:4, 158:25, 164:12, 183:13, 183:17, 187:8, 187:9, 191:17, 193:12, 194:7, 194:9, 194:15, 223:15, 231:9, 236:24, 236:25, 239:16, 243:20, 245:3, 246:14, 248:25, 250:19, 250:21, 254:20, 255:23, 256:14
**seeing**
41:18, 112:16, 146:5, 153:13, 203:22, 233:2, 250:15
**seek**
30:13
**seeking**
4:10
**seemed**
151:11
**seems**
47:1, 99:21
**seen**
27:11, 52:4, 110:9, 114:17, 118:21, 119:4, 161:1, 171:13, 212:19, 217:2, 227:20, 229:6, 237:1, 250:13, 255:2, 256:10
**segregated**
195:20
**self-funded**
3:6, 124:22, 124:25, 125:3, 125:6
**sell**
128:6, 154:5, 216:10
**sells**
147:25
**semi-private**
49:3
**semiprivate**
164:8
**senate**
2:8

**senator**
161:22
**sends**
78:10, 159:17
**seniority**
63:23
**sense**
11:16, 29:5, 35:18, 43:22, 46:5, 48:22, 88:5, 100:2, 106:1, 107:18, 116:20, 123:19, 129:17, 133:25, 180:5, 221:25, 242:5
**senses**
261:15
**sent**
182:8, 252:14, 257:22
**separate**
54:24, 58:12, 101:25, 125:8, 132:1, 151:9, 152:24, 152:25, 153:1, 153:2, 153:4, 153:5, 155:11, 155:14, 157:21, 157:22, 157:23, 158:5, 162:9, 162:11, 162:12, 162:16, 162:18, 162:22, 162:23, 164:13, 170:5, 173:5, 174:18, 174:24, 175:8, 175:9, 185:3, 185:5, 196:4, 197:13, 199:25
**separated**
51:13, 105:22
**separately**
55:2, 236:12
**separation**
48:3, 158:3
**september**
11:2, 18:7, 77:10, 166:5, 195:5, 195:7, 212:22
**sequencing**
93:17, 93:21
**serenity**
136:2, 166:19
**series**
147:17, 147:18
**seriously**
9:10
**serve**
65:4, 65:6, 65:18, 70:19, 70:20, 72:20
**served**
69:16, 69:19, 70:3, 70:15, 159:21, 205:1
**serves**
109:5
**service**
45:5, 55:4, 55:10, 57:11, 65:12, 93:3, 94:12, 120:11, 157:13, 160:13, 177:15, 178:24, 180:14, 180:21, 259:2
**services**
19:14, 19:18, 20:8, 31:12, 34:5, 54:22, 55:25, 56:6, 56:22, 57:17, 57:19, 58:3, 58:4, 58:10, 58:13, 58:17, 74:5, 76:19, 76:20, 78:14, 78:17, 79:22, 82:4, 86:24, 92:23, 94:3, 97:22, 97:24, 98:8, 101:19, 102:2, 123:16, 123:17, 123:19, 123:20, 138:13, 142:1, 162:1, 188:15, 199:6, 200:4, 231:20, 232:17, 237:11, 237:17, 247:18
**serving**
65:21, 70:25
**set**
33:14, 40:4, 51:8, 78:2, 85:9, 87:4, 93:19, 98:16, 116:7, 119:22, 121:2, 124:1, 125:8, 147:1, 147:2, 157:24, 157:25, 172:7, 172:8, 172:24, 175:12, 176:17, 204:11, 234:22, 264:9
**sets**
19:19, 31:17, 31:18, 58:2, 85:4, 87:6, 223:4, 224:9
**setting**
13:14, 17:9, 31:21, 39:19, 70:10, 76:2, 76:9, 80:12, 84:17, 86:18, 127:10, 127:13, 155:11, 187:4, 190:17, 198:7, 215:17, 218:1, 225:12, 237:25, 238:7, 239:24, 240:18, 248:9
**settings**
75:24, 192:18, 202:13
**setup**
49:5, 49:6
**setups**
236:1
**seven**
43:7, 61:12, 61:13, 68:24, 184:16, 235:2, 237:10, 238:21, 240:9
**seventy-two**
64:9
**several**
10:10, 11:13, 23:13, 24:17, 24:19, 24:22, 138:10, 213:23, 221:11
**severe**
13:24
**severely**
150:3, 151:22
**sewer**
105:6
**shakes**
6:17
**shall**
4:23
**shape**
41:5
**share**
33:5, 49:10, 132:8
**sharing**
180:6, 260:21
**shasta**
53:1, 53:2, 102:19
**she'll**
98:16
**sheet**
3:4, 3:5, 3:11, 118:25, 119:6, 119:8, 119:10, 119:16, 121:5, 171:20, 262:4
**sheets**
153:5, 250:7, 251:4
**sheri**
207:3
**shield**
113:9, 113:10
**shift**
12:25, 13:1,

17:24, 61:15, 61:20, 61:21, 61:23, 141:11, 203:22
**shifted**
241:7
**shifting**
99:10, 200:8, 247:12
**shifts**
13:1, 63:18, 63:19, 63:20, 64:3, 64:14, 67:16
**shingles**
219:4
**shocking**
145:18
**shopping**
53:25
**short**
10:9, 42:15, 50:20, 54:8, 68:14, 127:10, 153:13, 166:10, 205:10, 210:23, 213:16
**short-term**
36:4, 39:8, 39:9, 39:10, 39:14, 39:23, 40:3, 40:6, 42:2, 42:22, 44:3, 44:23, 45:1, 45:8, 45:15, 45:16, 48:5, 48:21, 49:12, 188:11, 247:19, 249:2
**shorter**
15:4, 41:18
**should**
22:12, 28:7, 45:3, 74:15, 76:2, 99:15, 102:24, 134:25, 145:24, 149:22, 198:4, 222:3, 246:7, 251:15, 251:16, 252:15
**shouldn't**
6:19, 20:22, 39:21, 83:3, 105:19, 135:23, 185:22, 196:14, 246:13
**show**
108:7
**showed**
132:4, 215:7
**showing**
89:25, 90:9, 108:2, 110:7, 111:2, 112:3, 114:11, 114:15, 118:17, 124:11, 125:16, 130:7, 160:20, 163:15, 171:18, 182:14, 212:14, 216:23, 220:7, 227:16, 229:2, 244:23, 246:2
**shut**
200:20
**side**
15:7, 19:10, 25:5, 49:8, 49:9, 77:18, 86:5, 109:20, 137:4, 137:8, 142:20, 148:2, 164:6, 178:5, 180:9, 180:17, 205:14, 205:15, 236:22
**sign**
89:5
**signature-bi6ds**
264:12
**signed**
223:5, 223:6, 223:7, 223:8, 223:11, 223:16
**signer**
115:16, 115:19
**significant**
18:9, 22:3, 22:4, 27:24, 45:2, 52:4, 64:2, 81:25, 84:13, 86:11, 143:7, 146:10, 147:6, 148:2, 197:9, 206:8, 237:4, 248:21, 249:17, 250:16
**significantly**
25:21, 142:19, 196:5, 246:13, 249:7, 250:4
**signing**
222:19
**signs**
89:13, 168:3, 223:13
**silverblatt**
1:20, 5:14, 7:25, 8:3, 9:17, 49:20, 80:4, 87:16, 87:19, 89:10, 89:24, 90:3, 94:24, 107:14, 107:20, 108:13, 108:15, 114:12, 117:24, 122:3, 122:6, 125:19, 128:22, 132:23, 133:24, 134:21, 136:13, 136:17, 154:15, 160:3, 161:8, 169:11, 176:12, 183:6, 183:11, 185:15, 189:11, 189:24, 190:11, 191:9, 192:6, 192:9, 192:11, 212:17, 216:24, 221:11, 224:15, 224:18, 224:23, 225:18, 228:17, 230:16, 231:7, 231:10, 232:2, 253:15, 257:15, 262:9, 262:18, 263:3
**silverblatt@klga-tes**
1:25
**similar**
31:24, 81:2, 108:4, 128:25, 129:7, 178:9, 196:18, 254:10
**similarly**
33:22, 114:17, 124:13, 193:14
**simple**
29:8, 153:10, 180:7, 190:14, 255:22
**simplest**
247:16
**simplistic**
16:21, 213:25
**simply**
152:4
**since**
16:5, 43:4, 43:11, 59:12, 60:2, 60:4, 68:24, 106:21, 108:19, 208:20, 235:4, 239:1, 261:3
**sing**
68:18
**single**
128:25, 130:19, 178:3, 179:5, 210:12
**sings**
68:17
**singular**
154:9
**sit**
39:5, 147:3, 193:21, 201:21, 238:4, 238:14, 240:19
**site**
54:4, 55:16

**sits**
76:7, 106:16
**sitting**
116:19, 117:6, 149:17
**situation**
13:15, 14:19, 21:13, 28:1, 30:6, 32:20, 37:13, 40:3, 64:8, 72:12, 92:3, 101:3, 114:6, 115:18, 120:24, 126:22, 128:3, 128:4, 138:8, 142:2, 144:16, 146:14, 147:1, 147:2, 149:6, 149:22, 149:24, 169:21, 173:7, 178:6, 178:11, 181:21, 202:9, 207:25, 208:18
**situations**
57:21, 78:12, 93:6, 94:16, 94:17, 103:24, 159:1, 178:3, 180:4
**six**
34:7, 63:19, 64:14, 97:16, 135:13, 137:3, 147:18, 192:21, 201:16, 225:19, 238:21, 240:18, 240:21, 240:22
**size-wise**
177:17
**skilled**
12:13, 12:19, 12:22, 15:7, 23:8, 31:8, 34:13, 34:18, 37:12, 38:2, 38:3, 38:18, 38:21, 39:16, 39:24, 40:19, 42:14, 43:16, 43:17, 43:23, 44:1, 44:2, 44:6, 44:19, 46:2, 48:1, 48:20, 52:2, 52:6, 54:24, 56:18, 75:7, 75:11, 77:14, 77:17, 94:1, 94:7, 94:8, 94:9, 94:10, 95:25, 96:4, 96:22, 105:16, 123:6, 127:5, 141:7, 169:18, 169:19, 169:25, 170:8, 196:17, 199:5, 199:9, 199:19, 200:1, 200:2, 218:13, 247:19, 248:24, 249:13
**skin**
12:17, 46:15, 52:17
**slides**
261:25
**slightly**
95:19, 95:20
**slowed**
201:9
**slowly**
192:17
**small**
27:14, 52:5, 71:16, 75:21, 76:15, 76:16, 99:8, 147:7, 161:7, 177:22, 192:18, 194:10, 207:7, 207:9, 223:20, 238:2, 238:4, 238:13, 254:14
**smaller**
243:8
**smartest**
158:14
**smell**
261:17
**smith**
131:10, 132:5
**smoking**
153:2
**snacks**
65:16
**social**
21:18, 66:6, 70:12, 146:24, 147:4, 197:2, 197:4, 197:20, 198:2, 198:3, 199:13, 201:12, 202:2, 202:13, 203:1, 203:8, 203:15, 204:4, 207:7, 216:2, 234:15, 235:6, 235:8, 239:19, 240:6, 241:2, 242:14
**socialization**
187:9
**socially**
192:19, 195:23
**software**
88:14, 126:12, 131:3, 255:25
**solarium**
72:4, 72:14, 72:15, 76:15, 76:20, 200:13, 235:4
**solemnly**
4:22
**solution**
149:2
**somebody**
12:12, 12:16, 13:17, 13:21, 22:17, 34:18, 34:25, 36:19, 36:24, 38:15, 52:10, 66:4, 70:12, 74:10, 77:9, 86:1, 87:1, 97:8, 101:24, 104:5, 122:19, 126:19, 127:7, 128:13, 128:14, 129:15, 130:13, 130:16, 130:18, 131:8, 167:21, 173:14, 175:20, 186:3, 195:5, 202:1, 204:11, 204:21, 204:24, 206:7, 209:5, 237:13, 253:20
**somebody's**
46:2, 66:17, 175:19
**somehow**
15:9
**someone**
37:21, 46:1, 66:14, 74:17, 132:14, 136:2, 249:6
**something**
4:18, 25:14, 27:17, 28:2, 30:7, 32:14, 33:9, 35:7, 35:21, 36:9, 41:15, 43:11, 48:15, 51:21, 52:12, 62:9, 68:13, 74:6, 75:18, 78:1, 81:23, 84:16, 86:9, 88:12, 92:3, 101:13, 103:12, 114:21, 118:5, 119:19, 120:3, 121:19, 122:21, 122:25, 123:6, 127:12, 129:9, 131:15, 131:16, 138:25, 139:19, 143:23,

159:7, 163:8, 168:10, 170:16, 175:1, 196:10, 196:18, 210:1, 217:12, 218:9, 227:7, 227:23, 228:2, 228:10, 229:18, 235:3, 236:20, 244:6, 245:17, 251:10

**sometime**
206:3

**sometimes**
12:11, 28:6, 28:7, 32:18, 34:2, 34:3, 34:7, 35:2, 38:11, 41:20, 62:23, 70:17, 81:12, 92:25, 93:1, 102:23, 132:7, 175:18, 207:20, 208:21, 208:22, 210:10, 238:13

**somewhat**
113:11, 250:23

**somewhere**
48:23, 137:16, 174:14, 181:10, 206:23, 220:21, 237:8, 247:22, 247:23, 248:12

**son**
140:11, 140:17

**soon**
170:15, 175:21, 200:17, 238:3, 238:14, 240:23

**sooner**
7:1, 203:16, 214:18

**sores**
103:11

**sorry**
8:21, 12:15, 12:16, 15:22, 25:9, 25:13, 38:19, 44:14, 45:17, 48:21, 50:9, 51:17, 58:25, 75:1, 75:2, 75:4, 75:13, 79:25, 87:7, 87:18, 89:8, 94:6, 94:23, 95:2, 104:22, 105:19, 108:13, 108:14, 112:17, 112:24, 115:22, 122:3, 125:19, 126:7, 126:17, 135:17, 136:13, 144:10, 157:15, 159:22, 163:1, 164:18, 167:14, 169:12, 169:14, 169:16, 174:15, 175:15, 176:1, 176:12, 176:18, 182:16, 190:1, 190:2, 198:21, 199:5, 202:21, 213:10, 220:7, 220:20, 226:24, 228:4, 228:9, 229:13, 231:7, 233:4, 236:10, 236:18, 244:14, 244:16, 244:17, 244:20, 253:13, 256:9, 259:11, 259:17

**sort**
13:22, 51:12, 61:9, 64:23, 69:2, 86:21, 103:15, 112:20, 165:8, 177:6, 198:16, 259:4

**sorts**
163:19, 174:25

**sound**
145:14

**sounded**
234:20

**sounds**
18:14, 37:25, 84:1, 107:19, 155:3

**source**
50:3, 50:4, 51:18, 83:6, 91:10, 96:3, 248:6

**sources**
90:22, 98:1, 102:24

**space**
17:3, 23:9, 29:23, 34:2, 43:5, 43:7, 43:8, 43:9, 44:7, 63:6, 63:23, 64:1, 65:17, 65:20, 65:21, 66:11, 66:18, 67:9, 68:13, 69:13, 69:15, 69:24, 70:25, 72:5, 72:8, 72:16, 74:21, 75:12, 81:19, 82:3, 96:17, 136:4, 137:21, 142:24, 145:9, 146:23, 157:18, 157:24, 158:15, 162:13, 165:17, 165:19, 166:12, 169:25, 181:14, 183:20, 184:4, 192:23, 196:15, 196:18, 200:12, 202:22, 205:24, 211:16, 233:19, 234:10, 234:12, 234:15, 239:19, 240:14, 241:18, 242:2, 242:16, 242:19, 245:19

**spaced**
165:18

**spaces**
26:22, 65:7, 69:11, 83:20, 146:15, 162:12, 162:16, 162:23, 166:19, 172:16, 200:11, 204:5

**span**
242:16

**speak**
8:19, 8:21, 129:6, 129:15, 188:23, 188:24, 189:4, 205:15, 209:19, 225:7

**speaking**
150:10, 161:22, 163:22

**special**
21:18, 34:22, 34:24, 38:21, 38:22, 38:25, 69:21, 70:9, 200:12, 238:23

**specialized**
260:7

**specially-trained**
240:2

**specialty**
54:17

**specific**
8:17, 14:19, 19:20, 24:6, 35:3, 48:12, 73:20, 75:19, 77:22, 78:16, 78:25, 79:18, 79:19, 81:17, 95:5, 98:23, 112:5, 112:8, 112:23, 114:17, 114:23, 115:4, 115:15, 118:2, 118:21, 120:3, 121:19, 122:18, 123:9, 128:24, 153:25, 156:16, 165:17, 172:21,

173:3, 185:7, 185:10, 185:11, 189:13, 191:15, 197:17, 205:24, 223:6, 225:11, 225:25, 228:10, 256:19
**specifically**
35:8, 39:10, 51:15, 57:20, 57:23, 77:14, 78:8, 78:9, 79:9, 91:1, 94:5, 95:3, 95:6, 95:8, 97:6, 97:10, 100:2, 100:4, 104:11, 118:6, 119:17, 129:2, 129:21, 129:24, 132:23, 158:20, 159:6, 186:8, 189:22, 191:12, 191:13, 191:18, 192:2, 202:12, 211:23, 220:22, 223:1, 230:10, 237:24, 240:18, 244:3, 249:13, 250:11
**specifics**
57:23, 98:22, 217:11
**speech**
34:19, 38:24, 77:9, 77:20, 77:22, 78:22, 92:19, 200:3
**spend**
15:1, 22:11, 41:16, 102:18
**spending**
142:16
**spent**
77:21, 78:25, 79:4
**spin**
193:6
**spoke**
12:9, 155:13
**spoken**
129:18
**spread**
151:12, 213:24, 214:2, 215:1
**spreading**
190:18, 203:3
**spring**
32:6
**square**
135:7, 137:6, 137:10, 177:18, 177:21, 239:20
**squishy**
75:12
**st**
78:21, 91:4, 227:25, 228:1, 235:18
**stable**
62:18, 157:10
**stack**
255:7
**staffed**
245:11
**staffing**
27:22, 33:6, 45:10, 65:14, 67:9, 71:6, 142:15, 142:17, 144:13, 144:14, 144:18, 145:9, 151:5, 151:20, 162:1, 167:5, 167:6, 167:12, 168:11, 168:16, 168:17, 169:5, 174:16, 182:1, 203:12, 204:10, 210:24, 248:16, 257:4
**staffing-related**
210:19
**stage**
38:10
**stagger**
71:21
**staging**
172:9
**stagnant**
19:4
**stam**
193:22
**stamp**
81:4
**stamped**
80:23, 96:19, 97:21, 108:3, 108:10, 110:8, 111:2, 112:4, 118:17, 123:15, 124:12, 125:16, 126:13, 130:8, 133:17, 133:18, 163:16, 164:9, 171:19, 183:10, 184:15, 220:8, 244:23, 246:2
**stampede**
193:23
**stamps**
160:21, 182:15
**stand**
193:4, 226:19
**standard**
47:4, 52:10, 85:5, 127:20, 217:20, 218:2, 218:7, 218:11, 218:17, 218:20, 219:1, 220:19
**standards**
218:21, 218:23
**stands**
39:5, 51:4, 76:7, 130:21, 132:10, 139:16, 246:17
**start**
11:7, 14:5, 20:13, 56:23, 58:22, 61:10, 70:21, 73:13, 134:25, 139:9, 139:10, 140:4, 140:16, 142:15, 142:22, 145:4, 145:5, 147:13, 156:1, 156:11, 166:7, 170:12, 193:24, 195:8, 195:10, 195:18, 196:6, 196:8, 230:22, 237:20, 238:15, 240:9, 246:15, 249:20, 256:9, 256:17
**started**
5:22, 8:17, 11:13, 15:24, 73:12, 73:21, 73:22, 84:1, 105:19, 145:7, 146:5, 146:16, 149:3, 153:8, 172:16, 174:16, 186:19, 186:21, 192:17, 194:12, 194:14, 194:15, 196:6, 200:19, 203:22, 211:12, 213:7, 214:16, 215:19, 228:19, 230:25, 240:12, 256:15
**starting**
10:6, 10:15, 74:20, 119:12, 140:5, 192:13, 195:16, 231:15, 237:11, 239:5, 240:9
**starts**
73:14, 117:13, 125:20, 190:25, 191:1, 208:2, 208:4, 208:6
**state**
5:5, 10:13, 15:22, 16:24, 19:15, 25:3, 31:12, 31:17, 32:10, 32:17,

35:8, 35:12, 35:17, 62:3, 62:4, 62:10, 66:1, 85:4, 85:11, 85:18, 85:23, 87:6, 94:14, 109:2, 109:4, 109:5, 109:11, 109:13, 109:24, 127:20, 137:9, 149:17, 149:21, 154:11, 155:1, 156:6, 156:15, 176:7, 191:21, 191:23, 197:25, 199:8, 209:16, 209:24, 210:6, 211:6, 216:13, 216:14, 244:3, 253:2, 259:20, 260:3, 264:3, 264:16
**stated**
148:21, 148:22
**statement**
2:26, 2:27, 3:35, 87:15, 90:15, 90:18, 108:7, 112:13, 114:17, 115:4, 117:14, 250:8, 251:3, 251:17
**statements**
3:3, 88:4, 112:7, 112:18, 112:20, 113:2, 114:18, 124:13, 259:18
**states**
1:1, 1:10, 4:7, 4:8, 5:2, 5:19, 8:7, 8:13, 39:11, 64:5, 94:18, 121:8, 128:4
**station**
172:9, 173:7, 173:12, 174:8, 193:9
**status**
46:5, 126:14, 126:15, 203:1, 210:14, 210:15
**stay**
36:8, 36:25, 37:2, 39:7, 39:8, 39:9, 41:22, 54:8, 84:14, 92:1, 93:10, 95:25, 96:10, 96:22, 104:24, 113:11, 120:18, 127:6, 168:2, 180:25, 187:13, 188:12, 199:19, 211:3, 234:16, 245:21, 245:22
**stayed**
178:1
**staying**
52:8, 181:16, 241:15
**stays**
19:4, 36:4, 36:9, 36:10, 36:14, 41:17, 67:2, 127:10, 247:20
**steam**
65:5, 200:23
**steel**
226:7
**stepped**
59:12
**sticking**
221:7, 237:18
**sticks**
139:24, 140:12
**still**
13:12, 21:10, 59:4, 71:21, 89:4, 113:20, 115:6, 117:10, 122:20, 122:21, 128:17, 129:21, 129:25, 131:18, 135:3, 137:1, 140:23, 148:5, 148:9, 148:17, 149:5, 149:8, 150:11, 151:4, 151:12, 151:20, 151:22, 157:9, 160:6, 165:15, 166:18, 167:19, 169:2, 169:15, 169:16, 170:10, 170:11, 170:25, 171:1, 172:10, 172:17, 176:20, 188:10, 195:20, 196:23, 197:2, 197:4, 197:9, 198:17, 199:4, 199:5, 203:15, 204:22, 205:5, 207:21, 209:7, 212:1, 214:14, 214:16, 215:11, 215:12, 226:18, 230:8, 232:4, 232:5, 232:20, 233:10, 234:22, 234:23, 239:3, 240:17, 241:8, 242:13, 243:7, 243:9, 243:19
**stipend**
259:20
**stock**
52:12
**stop**
143:13, 201:20
**stopped**
72:22, 140:1, 142:4, 142:9, 167:11, 174:16, 175:25, 176:1, 176:2, 176:3, 181:25, 200:21, 213:16, 227:5
**store**
221:1, 221:21
**story**
138:24, 165:25
**straight**
40:18, 91:12, 113:17, 227:4
**streamline**
104:6
**street**
1:16, 1:22, 1:28, 60:23
**stretch**
167:8
**stretched**
204:10
**stretching**
168:12
**strong**
17:16, 32:25, 33:3, 34:4
**strongly**
145:23, 157:6, 159:20
**structure**
33:25, 164:16
**structuring**
33:7
**struggled**
104:2, 136:7, 230:7
**struggles**
25:23
**struggling**
230:23
**stuck**
211:12
**study**
35:12, 261:3
**stuff**
39:6, 53:16, 56:4, 139:13
**style**
49:7, 69:22, 180:6, 236:2, 238:23
**subcontracted**
45:3
**subcontractors**
56:19

**subject**
34:8
**subjectivity**
198:18
**submission**
182:8
**submit**
156:6
**submits**
116:16
**submitted**
9:2, 110:21, 156:7, 255:6
**subpart**
161:17
**subsection**
161:14
**subsided**
146:3
**subtractions**
16:4
**success**
84:4, 104:6, 147:24, 148:6
**successful**
241:23, 248:1
**successfully**
202:19
**succinctly**
154:2
**sudden**
39:22, 43:20, 173:8
**sufficient**
160:5
**sum**
26:3
**summarize**
254:19
**summarizing**
246:10
**summary**
261:2
**sunset**
32:19
**sunsets**
32:22
**super**
16:6, 67:5, 144:24
**superficial**
139:4
**superhuman**
225:8
**superior**
144:15, 144:19, 257:1
**supervis**
247:5
**supervising**
16:16
**supervisor**
13:9, 14:6, 14:7, 16:2, 89:5, 141:11
**supervisors**
60:21, 61:19, 61:20, 61:22
**supervisory**
58:20, 59:2, 59:3, 59:19, 60:11, 247:5
**supplied**
129:4, 144:19
**supplies**
92:2, 92:5, 101:5, 103:19, 109:11, 123:12
**supply**
21:24, 144:18, 162:2
**supporting**
33:20
**supports**
33:1
**suppose**
216:4
**supposed**
9:14, 47:7, 139:21, 140:2
**sure**
6:13, 6:16, 9:1, 9:9, 12:17, 20:6, 30:16, 36:1, 36:6, 36:7, 38:4, 43:1, 46:4, 61:12, 69:6, 73:5, 80:6, 86:25, 90:6, 95:8, 98:16, 106:2, 106:6, 107:14, 114:3, 118:8, 122:9, 126:4, 128:11, 130:24, 132:9, 138:7, 144:5, 145:6, 154:16, 154:25, 158:7, 163:22, 168:2, 168:20, 170:14, 181:22, 195:17, 206:23, 208:14, 211:2, 221:10, 222:11, 228:13, 233:22, 234:17, 241:3, 251:12, 251:22
**surfaces**
241:11
**surgeries**
153:12, 188:11, 249:3, 249:5
**surgery**
249:1
**surgical**
208:22
**surprised**
235:23
**surrounding**
26:15, 189:23, 190:10
**surveillance**
217:25
**survey**
159:10, 159:14, 159:16, 192:1, 217:8, 217:24
**surveyor**
198:18
**surveyors**
159:17
**surveys**
33:1
**suspend**
202:6
**suspended**
128:20, 129:11
**suspension**
3:11, 171:22, 177:6
**sustain**
142:1
**suzie**
83:2, 131:10, 132:5, 150:6
**suzyq**
200:22
**swear**
4:22
**swing**
237:13
**switch**
11:23, 11:24, 49:16, 196:10
**switched**
59:15
**switching**
58:19
**sworn**
5:2, 264:8
**symptomatic**
208:5, 214:8
**symptoms**
150:7, 168:3, 178:13, 207:21, 207:24, 208:1, 208:6
**system**
36:12, 47:10, 50:5, 57:9, 57:12, 58:8, 64:22, 66:19, 86:19, 92:8, 96:24, 97:17, 114:5, 143:12, 155:4, 178:17, 250:25
**systems**
24:17, 88:16, 93:9, 95:20, 108:23, 113:13, 115:12, 260:6

**T**

**tab**
77:2

**table**
2:1, 193:18, 193:20, 200:23, 239:2, 242:13, 242:15, 242:22
**tables**
65:5, 69:23, 165:2, 238:2, 238:4, 238:13, 238:18, 240:18, 240:22, 242:24, 242:25, 243:3, 243:8
**take**
6:25, 7:1, 7:3, 9:9, 15:5, 24:1, 27:17, 46:20, 46:25, 49:3, 49:17, 49:20, 53:24, 54:10, 61:9, 68:16, 79:13, 102:3, 102:6, 102:7, 107:13, 118:8, 151:22, 154:15, 157:12, 162:17, 181:6, 185:22, 186:1, 187:16, 189:1, 189:2, 189:15, 189:19, 190:16, 190:18, 191:18, 192:5, 196:4, 222:7, 222:8, 223:24, 226:24, 228:6, 236:6, 243:10
**taken**
1:15, 5:22, 30:20, 62:20, 152:8, 152:11, 175:25, 177:15, 178:24, 180:13, 180:21, 264:6
**takes**
101:11, 249:18
**taking**
4:13, 12:12, 16:18, 26:19, 73:8, 85:11, 150:6, 151:2, 210:25, 249:20
**talk**
6:19, 9:23, 27:2, 39:17, 49:25, 61:9, 82:12, 82:13, 124:1, 131:6, 146:20, 149:12, 186:14, 187:1, 203:17, 207:6, 207:13
**talked**
26:11, 48:3, 64:25, 67:11, 68:10, 70:14, 82:8, 97:22, 129:21, 138:6, 179:21, 180:12, 181:25, 198:25, 207:4, 216:1, 241:17, 243:1, 243:20, 245:10, 246:12, 254:18, 257:4
**talking**
31:6, 39:7, 51:15, 52:5, 52:7, 59:22, 67:18, 67:19, 73:2, 73:5, 73:6, 77:15, 94:10, 113:22, 118:5, 128:14, 129:22, 171:25, 172:11, 176:13, 177:11, 185:15, 185:16, 194:10, 195:17, 209:12, 210:8, 210:9, 214:1, 215:9, 223:23, 254:21
**talks**
213:4
**taseris**
59:21, 59:22
**taught**
15:10
**tax**
1:27, 1:36, 22:19, 30:2, 30:4, 30:5, 30:7, 101:3, 110:13, 115:2, 129:4, 252:21
**taxable**
252:22
**taxes**
4:11, 24:9
**teach**
15:17, 15:19
**team**
8:20, 21:21, 66:10, 198:12, 198:20, 209:25, 222:18, 246:25, 247:4
**teamsters**
19:5
**technical**
11:5
**technically**
53:8, 53:9
**tell**
6:1, 64:21, 79:4, 79:17, 79:19, 80:1, 80:8, 91:19, 91:20, 112:9, 114:19, 115:1, 124:17, 128:6, 141:12, 142:8, 170:22, 173:23, 174:5, 186:3, 187:13, 187:17, 187:18, 226:6, 230:19, 235:21, 258:10, 261:12, 264:8
**telling**
77:8, 132:21, 133:22, 151:13, 151:14, 187:7, 188:25
**tells**
23:23, 79:2, 130:15
**ten**
57:1, 57:3, 63:18, 64:3, 73:10, 73:12, 73:21, 73:22, 83:24, 85:10, 128:4, 172:4, 183:14, 242:25, 249:23
**term**
68:14, 79:3, 97:5, 153:14, 168:5
**termination**
60:14
**terms**
161:20, 252:19
**test**
15:18, 62:4, 140:14, 195:12, 207:17, 207:20, 208:1, 208:4, 214:4, 214:12
**tested**
208:5, 214:13
**testified**
7:12
**testify**
7:14
**testifying**
7:16, 224:22
**testimony**
4:22, 7:6, 264:5, 264:7
**testing**
144:3, 149:9, 162:2, 194:21, 195:15, 204:1, 207:19, 207:20, 208:11, 209:10, 210:17, 213:14, 214:5, 214:7, 215:24, 236:25, 237:2, 243:15, 243:17
**tests**
55:5

**textures**
47:10
**th**
18:7, 77:10, 117:17, 130:17, 161:16, 184:1, 212:22, 231:4, 231:8, 231:17, 232:15, 232:22, 233:13, 234:23, 235:1, 236:17, 237:9, 237:10, 237:18, 240:8, 243:21
**thank**
5:16, 15:24, 45:17, 77:11, 78:23, 80:2, 192:7, 244:18, 262:15, 262:18, 263:5
**theirs**
240:24
**themselves**
24:11, 34:6, 36:19, 46:7, 114:18, 116:16, 253:7
**theoretical**
174:11
**theory**
173:25
**therapeutic**
79:2, 79:12, 127:11, 127:19, 130:22, 130:23, 131:13
**therapies**
75:20, 82:9
**therapist**
40:24, 42:8, 46:3, 73:7, 196:17
**therapists**
38:23, 38:24, 39:25, 42:11, 44:6, 44:25, 45:3, 45:16, 46:1, 56:18, 79:9, 81:16, 105:16, 197:6
**therefore**
15:8, 23:24, 154:6, 177:14, 179:11
**they'd**
27:20, 36:20, 144:2, 149:22, 185:6, 193:5, 193:7, 193:14, 196:11
**thin**
168:13, 204:10
**thing**
6:8, 12:18, 14:3, 33:2, 53:14, 62:10, 80:16, 82:15, 99:23, 100:1, 110:2, 121:23, 131:1, 131:12, 133:9, 134:16, 150:18, 153:25, 155:1, 164:12, 176:18, 188:16, 197:5, 234:2, 237:6, 237:23, 240:4, 241:10, 244:4, 259:17
**things**
13:23, 16:22, 25:25, 26:12, 26:19, 29:13, 32:17, 33:6, 35:9, 46:8, 46:24, 52:13, 52:24, 53:3, 57:8, 74:4, 76:18, 88:4, 101:10, 102:21, 103:16, 103:20, 104:6, 107:11, 108:22, 119:24, 120:25, 121:15, 121:19, 122:1, 122:16, 128:16, 143:24, 153:10, 158:23, 159:2, 162:4, 163:19, 163:21, 175:17, 175:21, 198:2, 205:12, 221:4, 225:15, 225:25, 226:16, 232:6, 235:5, 235:7, 235:12, 236:23, 247:8, 249:2, 250:20, 254:1, 259:7
**think**
9:17, 12:4, 15:12, 32:9, 32:23, 36:18, 45:17, 52:24, 55:8, 55:11, 56:5, 57:6, 59:3, 60:6, 69:6, 70:11, 77:25, 82:15, 84:2, 85:9, 90:4, 91:12, 93:6, 99:23, 103:7, 104:23, 105:23, 105:24, 113:8, 116:4, 116:18, 120:3, 121:9, 122:18, 123:8, 125:7, 138:16, 138:22, 142:6, 143:2, 143:7, 143:22, 145:7, 145:13, 146:3, 148:3, 155:4, 156:4, 159:1, 159:3, 162:17, 166:6, 166:8, 170:21, 174:2, 183:19, 184:1, 184:6, 186:15, 195:4, 195:5, 197:13, 198:1, 204:25, 206:15, 206:19, 207:12, 215:4, 215:19, 215:21, 216:15, 216:17, 218:9, 220:23, 220:25, 225:14, 226:3, 228:21, 236:20, 237:4, 237:6, 237:12, 238:10, 238:17, 238:19, 240:24, 240:25, 241:7, 241:17, 241:20, 241:23, 242:8, 242:23, 244:4, 245:3, 247:16, 249:14, 253:5
**thinking**
29:17, 104:23, 123:12, 149:1, 232:19, 239:12, 242:6, 242:7
**thinner**
203:3
**third**
15:19, 72:2, 179:4, 180:13
**third-party**
113:12, 144:17
**thirdly**
46:14
**thirty**
34:23, 220:4
**thompson**
86:5
**thought**
96:10, 136:20, 184:1, 244:9, 250:3, 256:9
**thoughts**
157:4
**thousand**
51:3
**thousands**
142:17, 151:23
**three**
4:11, 20:14, 20:25, 23:18, 33:8, 41:12, 41:13, 42:10,

43:21, 45:25, 46:24, 47:10, 52:18, 54:15, 65:4, 65:15, 66:23, 132:3, 135:16, 166:4, 175:16, 177:13, 178:22, 179:4, 180:25, 182:9, 182:22, 185:12, 188:20, 190:5, 190:21, 200:10, 207:5, 214:11, 214:14, 214:21, 214:25, 215:8, 228:8, 228:9, 231:12, 232:20, 238:2, 238:5, 238:11, 238:13, 238:20, 242:19, 243:1, 247:14, 249:24, 259:23
**through**
5:21, 10:13, 12:3, 13:5, 22:7, 79:6, 82:14, 91:16, 91:19, 100:23, 103:25, 116:6, 119:11, 125:20, 125:25, 126:10, 128:15, 130:17, 132:10, 134:16, 138:2, 142:14, 148:13, 161:15, 166:1, 166:4, 178:22, 188:20, 194:7, 207:5, 247:14, 252:21, 260:16, 260:22
**throughout**
109:6, 109:9, 180:25, 221:17, 225:21
**throw**
65:13
**tier**
23:18, 171:25
**tiers**
156:25
**timecards**
89:1
**timeframe**
20:18, 29:11, 166:9, 172:22, 176:20, 206:2, 231:14, 241:21
**timeline**
11:16, 169:17, 227:4, 227:8, 228:21, 263:4
**times**
12:23, 25:13, 50:10, 56:3, 70:24, 71:16, 73:20, 84:23, 106:24, 127:1, 132:3, 135:22, 167:8, 182:22, 182:25, 195:12, 196:11, 201:21, 207:20, 208:23, 209:7, 211:3, 213:23, 214:24, 214:25, 215:7, 215:8, 234:16, 235:21
**timesheets**
89:6, 89:14
**timing**
40:16, 200:18
**tina**
59:11, 59:14, 139:25, 158:18, 198:23, 219:25, 222:8
**tiny**
135:25
**title**
87:25
**today**
4:13, 6:1, 7:6, 7:22, 8:15, 9:12, 9:22, 9:25, 30:13, 51:4, 60:8, 67:17, 114:4, 116:5, 136:11, 191:16, 250:2
**today's**
17:6
**toddlers**
82:21
**together**
66:25, 72:17, 74:22, 145:21, 196:20, 202:22, 212:8, 219:18, 221:3, 223:13, 238:5, 242:21, 254:18, 259:25
**toilet**
36:19
**toileting**
62:14
**told**
23:22, 63:9, 100:24, 138:21, 148:19, 185:3, 189:18, 190:16, 208:16
**tomorrow**
39:12
**tone**
19:19
**took**
12:7, 94:14, 107:23, 146:21, 150:3, 163:3, 187:2, 191:24, 219:22, 222:15, 233:22, 237:13, 254:2
**top**
21:7, 42:5, 78:19, 85:10, 94:19, 111:18, 117:14, 119:13, 130:15, 130:24, 132:10, 133:4, 154:1, 177:6, 193:4
**topic**
22:2, 144:11, 188:18, 192:5
**topics**
33:8
**total**
48:12, 79:20, 81:19, 91:6, 95:1, 99:16, 99:20, 100:3, 106:2, 130:20, 134:1, 145:15, 180:15, 250:10, 259:2, 259:15
**totally**
224:10
**totals**
94:20, 123:3, 255:12
**touch**
131:11, 163:5, 241:11
**touched**
48:14, 82:16, 204:14
**touching**
163:8
**tough**
57:6, 147:25, 187:17
**tougher**
63:4
**towards**
149:1, 155:2, 166:6, 211:17, 213:22, 215:20, 229:23, 231:4, 242:6, 242:7
**township**
252:25
**trace**
144:3, 195:25
**tracing**
150:5, 173:18, 207:22, 208:25, 243:17
**track**
14:23, 42:4, 42:5, 89:17, 206:21, 206:22

**tracked**
88:24
**tractor**
121:12
**traditional**
125:1
**traditionally**
39:24, 40:16, 45:1, 74:9, 76:9
**traffic**
172:14
**train**
22:16
**train-the-trainer**
15:12, 15:16
**trained**
201:22, 202:4
**training**
11:5, 15:5, 22:9, 38:21, 201:24
**transactional**
115:18
**transcribe**
6:18
**transcribing**
6:16
**transcript**
90:3, 262:24, 262:25, 264:4
**transfer**
37:21, 46:5, 62:21, 99:12, 99:21, 99:24, 114:2, 116:5, 116:11, 116:15, 117:18, 118:1, 118:4, 118:10, 216:7
**transferred**
116:24, 117:7
**transferring**
117:3
**transfers**
36:21, 62:15, 114:5, 116:12
**transmissible**
218:15, 219:2, 236:1
**transmission**
151:14, 158:8, 158:11, 194:19, 211:14, 218:1, 218:3
**transmits**
178:12
**transmitted**
178:13
**transparent**
159:20
**transport**
157:13
**transportation**
54:12, 54:14
**transporting**
104:17
**trap**
226:7
**travel**
3:29, 104:20, 104:22, 104:23, 104:24, 104:25, 144:17, 145:9, 145:20, 145:23, 245:5, 248:19, 256:5, 256:14, 256:22, 256:24
**traveled**
170:3
**traveling**
105:1
**tray**
200:24, 200:25
**treat**
152:22
**treated**
150:19
**treating**
12:14, 12:16, 173:8
**treatment**
21:22, 37:5, 45:20, 52:14, 77:20, 92:3
**treats**
97:16
**trickled**
249:16
**tried**
42:23, 71:23, 72:17, 84:14, 85:14, 165:22, 170:24, 172:7, 172:8, 173:6, 178:16, 186:16, 202:17, 202:24, 204:23
**triggers**
219:16
**trouble**
17:15
**true**
52:2, 60:19, 80:11, 171:2, 187:24, 222:23, 258:15, 258:17, 264:5
**truly**
27:15, 35:25, 53:13, 70:24, 89:3, 125:6, 125:9, 126:25, 127:2, 128:12, 179:4
**trust**
102:7, 102:10, 102:11, 102:13, 102:14, 102:15, 102:18, 112:11, 124:14, 124:18, 159:7
**trusted**
157:10
**trusts**
102:3, 157:10
**truth**
4:23, 6:1, 138:21, 208:16, 264:8
**truthful**
7:6
**truthfully**
17:16
**try**
6:23, 40:4, 41:11, 46:12, 66:15, 67:20, 84:21, 104:5, 183:21, 187:1, 200:23, 203:3, 205:22, 226:15, 226:17, 235:4, 235:16, 245:5, 249:6, 260:24, 261:14
**trying**
18:17, 38:1, 38:4, 38:8, 39:1, 41:17, 52:24, 65:19, 68:13, 73:19, 75:17, 75:18, 103:7, 105:25, 121:9, 128:18, 130:1, 130:2, 133:1, 133:2, 135:11, 139:8, 141:7, 142:19, 146:15, 148:18, 149:13, 154:1, 157:21, 162:19, 166:8, 169:17, 171:11, 172:22, 180:4, 201:17, 201:20, 202:21, 205:10, 211:14, 216:15, 220:25, 226:1, 230:24, 236:22, 236:23, 240:20, 244:8, 245:4, 247:16, 248:8, 250:5, 254:19, 259:4, 261:2
**tuesday**
4:2, 193:2, 243:22
**tunnel**
103:15
**tuomikoski**
59:16
**turn**
40:6, 40:11,

77:2, 89:22, 105:15, 107:24, 108:10, 110:3, 110:24, 111:24, 113:5, 114:7, 117:10, 117:12, 117:13, 118:14, 123:15, 124:7, 125:12, 126:13, 127:17, 130:4, 132:18, 133:11, 133:15, 160:15, 161:13, 163:12, 163:22, 170:6, 171:14, 171:15, 182:11, 182:16, 183:3, 183:13, 184:11, 185:13, 188:21, 191:7, 193:16, 212:10, 213:4, 216:20, 220:3, 223:9, 225:16, 227:10, 228:4, 228:5, 229:21, 231:2, 231:4, 231:17, 235:18, 236:16, 240:8, 241:25, 243:21, 244:19, 245:24, 251:10

**turned**
128:3, 233:15, 233:16, 234:5

**turning**
80:22, 101:4, 106:5, 140:1, 140:2, 184:11, 229:18

**turns**
73:11

**twenty**
117:24

**twenty-two's**
247:23

**twice**
111:10, 182:22

**two**
4:11, 6:25, 14:10, 14:11, 15:1, 19:21, 20:14, 20:18, 26:22, 28:9, 28:14, 32:6, 32:11, 36:15, 40:22, 45:11, 49:8, 49:9, 51:8, 54:10, 58:15, 65:6, 66:23, 69:23, 71:15, 71:18, 72:1, 100:24, 131:25, 135:21, 136:23, 137:1, 137:9, 144:15, 145:20, 147:17, 150:18, 151:2, 156:25, 166:11, 166:16, 169:25, 171:7, 172:5, 172:17, 178:8, 178:21, 178:23, 179:25, 180:16, 181:23, 185:4, 185:5, 196:19, 201:14, 210:7, 219:19, 238:2, 238:5, 238:11, 238:13, 238:19, 238:21, 241:16, 241:24, 243:22, 243:23, 243:25, 244:12, 244:13, 246:15, 248:22, 261:12

**two-bed**
151:3, 151:6

**two-hour**
219:16

**tying**
39:12

**tylenol**
52:13

**type**
24:10, 72:13, 79:18, 81:17, 88:14, 89:18, 97:3, 118:4, 118:20, 213:1, 253:19

**typed**
254:21

**types**
40:22, 78:6, 90:21, 91:11, 97:13, 216:1, 216:4, 218:14

**typical**
36:6, 36:8, 49:5, 83:15, 200:25

**typically**
13:15, 18:21, 28:2, 33:12, 34:18, 37:1, 37:2, 37:5, 38:14, 39:8, 40:1, 40:12, 41:8, 42:2, 42:3, 43:2, 44:9, 45:11, 45:12, 46:12, 46:17, 46:22, 50:5, 53:24, 54:16, 61:15, 61:20, 71:8, 71:13, 74:25, 75:2, 75:24, 76:5, 76:10, 77:5, 77:13, 77:16, 86:3, 93:9, 94:7, 94:8, 95:4, 96:2, 96:9, 96:22, 101:5, 102:18, 115:21, 119:15, 119:19, 120:8, 123:5, 124:2, 124:3, 127:13, 174:24, 186:5, 196:16, 199:19, 200:10, 209:9, 216:8, 238:5, 240:2, 246:13, 257:2

**U**

**uh-huh**
6:17, 164:23

**uh-huh-huh**
233:7

**ultimately**
18:12

**umbrella**
97:5

**unable**
235:12, 245:6

**unaffected**
243:7

**unallowable**
56:3

**unaware**
9:5, 20:23, 29:23, 41:6, 189:13

**uncertain**
8:8, 88:3, 121:22, 123:22, 156:8, 166:15, 177:1

**uncollectible**
120:13, 120:17

**uncomfortable**
222:16

**uncover**
201:1

**under**
5:23, 5:24, 7:12, 7:15, 8:25, 16:25, 26:1, 29:10, 29:12, 30:11, 34:21, 43:17, 43:25, 47:21, 47:23, 52:3, 52:16, 53:12, 53:18, 55:8, 57:11, 57:20, 75:16, 83:1, 84:12, 84:19, 91:16, 91:23, 91:24, 92:14, 92:18, 93:7,

93:10, 95:25, 97:21, 98:2, 98:12, 100:14, 101:6, 101:10, 101:14, 103:2, 103:6, 103:23, 104:4, 104:14, 105:4, 105:16, 107:3, 108:11, 110:16, 113:6, 113:24, 116:2, 117:16, 120:19, 121:11, 121:16, 122:17, 123:18, 124:16, 125:3, 126:14, 127:6, 132:19, 137:17, 148:25, 154:8, 154:10, 156:5, 171:22, 177:6, 177:22, 187:18, 199:18, 200:5, 203:11, 225:1, 226:8, 230:2, 230:7, 240:16, 244:10, 253:7, 253:24, 256:18, 256:19
**undergoing**
148:4
**underneath**
123:14, 217:8
**understand**
5:24, 6:1, 6:15, 6:22, 7:14, 8:8, 9:1, 23:19, 26:1, 31:19, 47:8, 77:12, 116:8, 117:4, 136:17, 221:10
**understandably**
150:1
**understanding**
23:8, 110:16, 111:13, 128:11, 132:9, 141:25, 152:19, 168:20, 171:7
**understood**
6:6, 46:11, 251:2, 251:12
**undesignated**
176:7
**undesignating**
176:9, 176:13
**undone**
170:17
**unfortunately**
38:10, 41:19, 51:22, 85:17, 92:4, 92:10, 95:9, 114:1, 140:1, 146:8, 151:4, 155:22, 165:23, 167:2, 186:22, 201:10, 213:23, 214:9, 214:10, 239:23, 249:16
**unh-unh**
6:17
**unheard**
51:25
**union**
63:6, 63:15, 100:12, 100:13, 100:17, 100:21, 105:17, 139:15, 247:2
**unions**
19:5, 27:25, 148:13
**unique**
14:3, 83:16, 92:3, 250:25
**unit**
12:25, 21:18, 34:22, 34:23, 34:24, 35:15, 35:21, 35:22, 39:9, 42:7, 42:8, 42:20, 42:21, 42:22, 42:23, 42:24, 44:19, 44:20, 45:7, 48:5, 48:13, 48:20, 48:21, 63:25, 67:2, 67:6, 67:20, 69:10, 69:21, 70:9, 75:9, 83:17, 130:12, 133:3, 133:10, 150:22, 150:24, 151:16, 151:18, 152:24, 155:16, 157:20, 158:2, 158:5, 158:6, 162:19, 162:20, 164:6, 167:10, 167:22, 168:5, 170:3, 170:4, 170:6, 170:20, 171:23, 172:3, 174:24, 175:6, 184:10, 195:22, 200:12, 207:8, 207:10, 207:11, 210:20, 210:21, 211:6, 211:7, 215:14, 215:24, 226:10, 226:12, 238:12, 238:23, 239:2, 239:10, 241:24, 248:11, 248:17
**united**
1:1, 1:10, 4:6, 4:8, 5:2, 5:19, 8:7, 8:13
**units**
12:24, 35:24, 35:25, 61:12, 61:13, 61:16, 66:3, 75:7, 77:8, 79:7, 79:8, 79:10, 79:14, 83:18, 133:3, 133:7, 133:9, 173:16, 177:10, 195:24, 211:19, 238:2
**university**
10:7, 10:8, 10:12, 10:14
**unknown**
152:20, 171:1
**unlabeled**
165:12
**unless**
19:2, 52:11, 53:12, 53:20, 90:25, 97:6, 97:10, 131:11, 168:23, 178:10, 178:18, 197:16, 245:12, 249:4
**unlikely**
80:10
**unscheduled**
206:19, 206:20
**unstaffing**
151:17, 151:18
**unsure**
110:1, 158:7, 223:17
**until**
12:4, 17:23, 18:2, 29:2, 33:16, 102:1, 102:4, 117:6, 136:7, 146:18, 147:6, 147:20, 165:23, 178:2, 195:4, 196:2, 203:6, 215:20, 229:15, 230:22
**unu**
92:3
**unusual**
99:21, 155:1
**unvaccinated**
146:25, 147:3, 147:5, 148:10, 149:16, 151:1, 173:9, 178:1, 178:21, 179:10, 179:12, 179:17, 179:19, 184:5, 197:6, 202:10, 203:7
**unwinding**
147:8

**updates**
159:9
**upfront**
187:7
**uphp**
95:17, 98:3
**upkeep**
61:4
**upper**
95:15, 254:9
**upsidedown**
171:14
**ure**
75:18
**urgency**
29:5
**use**
19:9, 20:12, 25:6, 26:25, 27:5, 42:24, 43:8, 43:13, 43:15, 45:7, 47:3, 49:19, 62:11, 66:1, 70:17, 71:25, 76:8, 78:3, 78:6, 79:2, 79:12, 81:16, 82:2, 82:3, 85:22, 86:23, 88:5, 91:16, 103:3, 103:9, 103:24, 104:7, 104:9, 108:19, 109:25, 114:19, 115:3, 115:21, 119:9, 119:24, 120:23, 131:1, 151:11, 151:18, 158:15, 163:19, 165:17, 167:3, 172:7, 173:6, 178:7, 183:22, 187:23, 197:18, 214:3, 220:24, 223:16, 226:15, 226:17, 235:5, 242:23, 245:8, 247:10, 248:10, 248:14, 260:4, 260:8, 261:14
**uses**
89:16, 105:13, 108:20, 180:8, 180:9
**using**
65:11, 72:22, 77:18, 127:5, 136:23, 142:15, 150:17, 167:7, 169:18, 172:17, 174:16, 175:25, 176:2, 178:4, 205:23, 208:11, 219:3, 242:2, 242:5, 242:18, 243:3, 256:16
**usual**
153:9
**usually**
31:16, 33:11, 37:14, 38:10, 44:10, 54:12, 101:23, 222:6, 223:25
**utilities**
105:9, 105:10
**utility**
105:6
**utilize**
157:24
**utilized**
172:4

**V**

**vac**
52:15
**vacant**
180:25
**vacation**
122:20, 139:19
**vaccinated**
146:23, 147:16, 147:19, 147:23, 149:14, 150:18, 151:3, 166:7, 168:7, 168:9, 169:1, 169:2, 169:6, 169:24, 179:7, 179:8, 179:9, 179:14, 179:15, 179:23, 184:3, 184:22, 184:23, 197:4, 203:7, 238:4, 239:18, 240:6, 241:1
**vaccination**
146:9, 146:11, 146:18, 146:20, 147:11, 147:15, 148:3, 152:17, 152:18, 181:21, 194:17, 194:18, 198:14, 202:7, 202:8, 203:1
**vaccinations**
147:10, 147:19, 147:24, 148:1, 148:7, 149:3, 150:10, 150:12, 153:8, 166:6, 184:7, 203:21, 215:4, 239:17, 240:1
**vaccine**
148:12, 148:20, 148:22, 148:23, 179:21
**vaccines**
194:15, 239:23
**vague**
224:18, 244:6
**vagueness**
244:10
**value**
121:8, 252:22
**values**
111:20, 111:21
**variability**
25:1
**variable**
40:13, 42:6, 84:16, 85:4, 85:9, 101:8, 101:17, 109:11
**various**
104:7
**vast**
63:12, 63:13
**vehicle**
105:12, 119:25
**vehicles**
105:8, 105:13
**vendor**
88:20
**vendors**
122:2, 122:8, 123:12, 195:14, 256:18
**verified**
110:18
**version**
50:21, 85:3, 213:25, 214:1, 262:3
**versus**
4:8, 42:15, 44:22, 47:9, 63:3, 80:9, 134:1, 146:2, 178:17, 236:23, 239:9, 259:2
**via**
113:20, 159:13
**vickie**
104:1, 209:18
**victoria**
86:4
**video**
194:5, 194:7
**view**
248:3
**viewed**
156:23
**virtual**
204:15
**visit**
54:7, 55:18, 55:23, 179:19, 206:6, 207:11, 233:23, 234:6,

234:7, 234:8, 241:14, 243:23, 244:11
**visitation**
3:13, 82:18, 140:23, 142:8, 142:9, 161:6, 179:13, 179:19, 194:22, 203:17, 203:19, 203:23, 203:24, 204:2, 204:8, 204:10, 204:15, 206:12, 206:16, 206:17, 206:21, 212:24, 213:4, 213:7, 213:14, 213:16, 213:20, 214:6, 214:14, 214:15, 214:16, 214:18, 215:11, 215:13, 223:11, 228:6, 228:8, 228:11, 228:15, 231:14, 231:21, 232:17, 240:9, 240:12, 240:14, 240:15, 241:5, 241:6, 241:12
**visitations**
231:15, 232:1, 232:3, 232:5, 233:14
**visiting**
57:5, 82:19, 82:20, 215:2
**visitor**
204:2
**visitor's**
234:18
**visitors**
195:13
**visits**
54:14, 54:17, 54:18, 54:19, 56:2, 56:3, 58:15, 82:14, 142:10, 142:13, 161:6, 179:16, 205:8, 205:12, 205:13, 205:18, 206:1, 206:2, 206:10, 206:11, 206:23, 212:1, 228:19, 232:6, 232:9, 233:19, 243:23
**visqueen**
166:21, 172:15, 173:1
**visqueened**
157:25
**visually**
173:1
**voice**
34:4, 34:7, 77:20
**volatile**
28:1
**volume**
45:6, 96:25, 116:19, 153:17, 196:25, 252:15, 254:7
**volunteer**
68:25
**volunteers**
68:23
**vote**
26:13
**voting**
20:1, 20:4, 20:10, 20:11, 20:16, 20:24, 26:12

**W**

**wage**
27:8, 109:10, 109:25
**wages**
100:12, 105:17, 109:8, 109:9, 109:18, 122:8, 122:10
**wait**
128:13, 239:20
**waiver**
262:14
**walk**
43:12, 119:11, 201:4
**walked**
238:1
**walking**
201:4
**wall**
92:8
**walls**
74:6, 142:23, 187:8
**want**
5:16, 9:9, 10:17, 20:6, 20:17, 26:5, 26:10, 26:25, 34:10, 38:12, 41:9, 41:14, 49:17, 51:20, 52:25, 53:1, 53:5, 53:20, 54:10, 61:10, 63:5, 69:20, 73:5, 75:16, 76:3, 84:11, 89:25, 106:21, 107:16, 109:4, 122:4, 128:11, 129:5, 136:1, 138:18, 144:2, 144:9, 146:6, 150:1, 150:19, 151:25, 152:6, 152:14, 153:7, 154:15, 161:9, 161:14, 166:15, 170:21, 173:15, 177:5, 192:6, 192:11, 195:17, 203:4, 203:19, 207:13, 212:10, 214:25, 215:1, 215:5, 215:7, 216:10, 218:7, 218:8, 219:3, 220:16, 227:4, 228:6, 234:6, 234:19, 234:25, 235:5, 237:9, 240:17, 244:3, 244:7, 249:10, 262:8
**wanted**
51:17, 69:6, 74:17, 177:20, 181:16, 187:20, 189:8, 193:20, 226:2, 233:22, 239:25, 242:22, 245:19, 251:2, 251:10, 251:12, 253:8, 255:10, 256:9, 262:10
**wanting**
22:16, 39:19, 138:7
**wants**
107:13, 142:20, 234:6, 234:8
**warner**
104:9
**wash**
66:25
**washington**
1:23, 1:29, 1:38
**washy**
18:14
**wasilewski**
78:10
**watch**
143:7, 143:8, 175:19, 175:20, 196:7, 196:8, 211:14
**water**
49:18, 105:6, 192:9
**waves**
32:16
**wax**
139:2
**way**
14:1, 41:5,

50:24, 57:5, 57:8, 80:5, 80:15, 84:7, 97:17, 153:4, 156:6, 168:6, 192:20, 194:6, 200:20, 238:12, 247:16, 254:12, 256:13, 261:14
**wayne**
59:23
**ways**
13:18, 64:22
**we'll**
6:25, 7:2, 24:12, 43:1, 51:7, 91:16, 104:5, 167:11, 168:18, 235:3, 263:3
**we're**
6:18, 7:3, 15:7, 27:10, 30:5, 31:6, 33:9, 34:1, 34:2, 34:13, 34:20, 38:1, 38:4, 38:8, 39:1, 39:7, 41:1, 41:18, 42:11, 44:18, 47:1, 52:5, 52:7, 53:12, 53:17, 55:7, 55:9, 58:9, 58:16, 60:22, 67:18, 68:13, 73:6, 76:24, 77:15, 80:4, 80:11, 80:12, 80:19, 92:17, 93:2, 93:22, 93:23, 93:24, 103:12, 105:25, 106:9, 111:16, 112:9, 112:17, 117:10, 120:21, 121:1, 128:14, 133:7, 134:9, 134:10, 134:21, 136:11, 139:6, 143:17, 151:23, 167:10, 168:10, 168:15, 173:8, 174:5, 183:11, 184:7, 211:8, 211:18, 213:19, 215:9, 216:9, 227:2, 229:13, 236:6, 259:19
**we've**
27:11, 43:3, 45:8, 52:22, 68:12, 68:24, 76:17, 83:7, 92:24, 93:1, 106:20, 107:7, 107:10, 107:11, 113:22, 120:15, 120:18, 128:3, 156:9, 177:11, 200:14, 207:4, 216:1, 216:16, 237:5, 245:10
**wear**
53:6, 142:25, 204:3, 218:8
**wearing**
208:14, 208:17
**weather**
240:10, 240:11
**website**
15:15
**wednesday**
182:21, 232:25
**weeds**
75:17
**week**
8:17, 40:1, 43:21, 139:22, 139:25, 140:2, 182:22, 182:23, 195:7, 207:20, 232:20, 235:21, 257:2
**week's**
205:11
**weekdays**
61:21, 61:22, 61:23
**weekly**
159:8, 182:23, 198:25, 222:18, 232:20, 232:21, 246:6, 247:7
**weeks**
147:17, 147:18, 231:22, 237:25
**weird**
117:1
**welcome**
43:13, 43:15
**wellbeing**
206:9
**went**
10:8, 27:12, 107:1, 125:4, 127:3, 139:25, 182:22, 202:22, 233:20, 238:24, 238:25, 244:20, 254:4, 254:7, 254:12, 260:22, 261:8, 261:10, 261:24
**weren't**
27:9, 33:18, 42:14, 73:5, 74:21, 138:1, 144:8, 146:6, 146:23, 146:24, 150:17, 151:4, 152:25, 153:2, 153:12, 154:3, 169:2, 185:14, 187:25, 188:10, 188:13, 191:2, 191:3, 191:8, 191:23, 196:11, 202:7, 215:23, 230:13, 232:3, 249:3, 249:4, 258:9
**western**
1:2, 4:9
**whatever**
28:1, 32:21, 43:24, 45:21, 50:2, 51:3, 69:18, 70:4, 73:9, 73:13, 84:22, 91:24, 93:19, 95:25, 97:1, 116:20, 119:9, 122:21, 131:14, 142:12, 154:5, 162:23, 168:4, 168:5, 179:6, 208:8, 237:3, 252:25
**whatsoever**
62:8, 198:7
**wheel**
193:6, 221:20
**wheelchair**
38:7, 103:10
**wheelchairs**
76:8
**whenever**
262:21
**whereof**
264:9
**whether**
14:5, 88:6, 104:17, 109:25, 116:21, 119:25, 122:1, 128:20, 129:10, 131:12, 131:13, 158:7, 207:22, 207:23, 208:3, 211:8, 235:15
**white**
218:8
**whoever**
93:19, 97:19, 162:13, 179:18, 209:9
**whole**
4:23, 134:16, 140:15, 141:17, 170:20, 177:3, 185:16, 197:5,

202:8, 214:13, 218:1, 236:23, 243:24, 258:7, 261:20
**wholly**
184:3
**whomever**
112:6, 138:17
**willing**
157:12, 157:13, 173:17, 237:14
**window**
142:10, 142:13, 142:14, 205:8, 205:12, 205:13, 205:16, 205:20, 205:24, 205:25, 219:16, 219:17
**wing**
3:8, 3:19, 44:15, 49:4, 49:7, 69:12, 72:3, 131:19, 132:2, 132:21, 133:8, 133:22, 134:2, 134:17, 134:18, 135:2, 135:16, 135:17, 136:9, 137:15, 137:16, 137:19, 158:16, 163:10, 163:24, 164:11, 164:20, 165:3, 165:8, 165:11, 166:1, 167:13, 167:14, 167:16, 168:1, 168:21, 168:22, 169:9, 170:19, 171:5, 171:9, 174:16, 174:18, 176:17, 177:11, 178:2, 181:8, 181:17, 181:25, 183:14, 183:15, 184:16, 184:17, 184:20, 184:24, 185:7, 185:9, 210:23, 210:25, 213:18, 214:3, 214:4, 214:11, 214:12, 226:10, 238:18, 241:15, 242:16, 245:6, 245:11, 245:15, 245:21, 247:25
**wings**
48:4, 67:4, 168:24, 185:3, 185:5, 213:20, 214:2, 214:5, 214:6, 243:7, 243:11, 243:12
**wish**
25:16, 25:17, 136:5, 225:7, 226:6
**wishy**
18:14
**within**
11:21, 25:23, 27:24, 28:6, 33:4, 35:4, 40:20, 46:16, 46:18, 46:19, 46:24, 60:9, 64:9, 64:22, 77:22, 100:17, 150:7, 155:1, 161:24, 162:11, 188:8, 207:11, 210:6, 215:14, 215:16, 215:17, 215:22, 217:11, 223:4, 225:12, 232:4, 235:12, 238:2, 238:22
**without**
27:14, 29:11, 30:14, 48:8, 147:2, 230:24, 250:20, 258:10, 258:18, 262:13
**witness**
8:3, 9:20, 49:18, 87:18, 87:21, 107:17, 108:16, 117:25, 122:7, 128:24, 133:1, 133:25, 134:22, 136:18, 154:16, 160:7, 160:17, 169:12, 176:15, 183:8, 189:13, 190:1, 190:13, 192:7, 212:11, 220:4, 221:14, 227:12, 228:19, 230:18, 232:3, 244:20, 262:12, 262:19, 264:9
**woodcox**
159:10
**word**
19:9, 37:25, 187:23, 244:7
**worded**
226:14
**words**
152:1, 226:17
**wore**
208:21
**work**
5:8, 7:25, 9:13, 14:25, 26:25, 39:25, 61:20, 63:5, 63:14, 63:19, 63:22, 66:22, 88:2, 105:24, 109:17, 116:13, 145:21, 149:1, 202:2, 207:23, 208:8, 214:17, 262:14
**worked**
13:1, 48:19, 83:24, 109:15, 142:25, 165:14, 165:18, 165:19, 210:20, 214:10, 217:23
**worker**
21:19, 66:6, 109:14, 140:13, 259:19, 259:25
**workers**
109:10
**working**
11:7, 68:8, 140:12, 162:19, 162:20, 167:8, 172:13, 186:17
**works**
58:8, 64:3, 66:6, 97:17, 249:22
**worksheet**
2:28, 2:29, 3:1, 110:11
**world**
140:1, 140:22, 218:22, 248:24
**worst**
152:7
**worth**
55:13
**would've**
59:13, 136:24, 213:7, 238:25
**would-be**
186:12
**wouldn't**
15:13, 27:12, 29:9, 29:23, 33:12, 47:20, 62:11, 80:8, 90:16, 90:17, 94:7, 100:2, 114:19, 121:23, 127:23, 137:2, 175:14, 176:6, 180:10, 201:24, 225:10, 239:3
**wound**
52:14, 52:15, 92:4
**wounds**
12:14, 12:16, 21:22
**wrap**
171:11

**write**
57:21, 98:11, 115:11, 143:23, 221:16, 261:15
**writing**
93:25, 170:15, 198:13, 261:5
**written**
62:5, 220:21, 221:18
**wrong**
19:9, 20:18, 60:23, 72:1, 104:23, 133:21, 220:16, 233:5, 261:10
**wrote**
221:7

X

**x-ray**
92:21, 92:22, 92:23, 92:24, 93:4

Y

**yeah**
6:15, 9:7, 20:24, 34:16, 39:3, 40:16, 42:1, 48:17, 55:8, 67:14, 74:19, 87:21, 91:11, 100:20, 103:7, 109:25, 111:21, 112:17, 113:8, 114:13, 117:19, 117:21, 133:19, 134:22, 136:11, 160:6, 160:10, 161:10, 165:9, 169:4, 184:6, 184:11, 190:4, 192:10, 196:25, 207:7, 213:10, 215:16, 215:19, 216:17, 228:11, 239:3, 239:7, 239:11, 240:11, 261:21, 262:24, 263:2
**year**
11:12, 23:2, 24:23, 25:4, 25:17, 32:6, 33:16, 50:8, 61:20, 75:1, 75:3, 83:19, 86:22, 89:17, 89:19, 109:12, 119:15, 119:17, 119:19, 119:20, 120:2, 120:15, 122:24, 123:23, 123:24, 124:1, 124:3, 140:11, 141:12, 146:7, 154:7, 159:20, 170:25, 185:1, 216:11, 224:11, 243:2, 250:1, 253:3, 253:4, 258:3, 258:7, 258:10, 261:23, 262:4
**year-end**
106:17, 106:18
**year-to-date**
90:24, 90:25, 91:2, 99:13, 106:11, 251:15
**years**
10:10, 11:8, 14:10, 14:11, 16:7, 16:9, 19:6, 20:18, 20:19, 20:23, 25:23, 32:23, 32:24, 40:17, 50:25, 57:1, 57:3, 59:25, 68:24, 69:19, 83:24, 93:1, 111:10, 120:16, 226:5, 226:6, 248:22, 249:24, 252:11, 260:23
**yep**
16:1, 126:17, 165:9, 207:15
**yeses**
6:16
**young's**
193:20
**yourself**
53:2, 137:7

Z

**zero**
82:23, 92:12, 94:20, 94:22, 95:4, 95:7, 102:1, 120:5, 120:22, 208:4, 208:5, 214:9, 214:10, 215:1

$

**$1,000,000**
253:3
**$100,000**
154:8, 216:11
**$1000**
24:11, 252:22
**$11,794.40**
106:11
**$12**
102:6
**$13**
102:7
**$150**
152:12
**$16**
125:5, 125:6
**$180**
93:15
**$1940**
51:1
**$20**
253:23
**$200**
93:15
**$2000**
51:1
**$2249**
98:2
**$25**
102:8, 152:6
**$3.40**
259:21
**$330**
253:21
**$350**
253:22
**$44,100.32**
106:8
**$450**
51:5
**$5**
109:13
**$50**
195:9
**$5000**
26:15
**$55,011**
261:11
**$551.89**
254:4
**$60**
50:24, 51:2, 102:17
**$700**
53:15
**$75**
195:10
**$9000**
51:2
**$945,000**
248:7

.

**.55**
24:9, 24:10, 252:9, 252:22
**.6**
63:19
**.8**
63:19

0

**0.55**
24:8

**00**
65:16, 73:21, 234:9, 234:10, 234:12
**00135**
1:7
**02**
264:18
**0283**
81:7
**0300**
1:39
**05**
73:22, 263:6
**0563**
124:19
**07**
11:8, 11:14, 264:18
**0873**
117:25

**1**

**1**
66:7, 66:8, 193:14
**1.913846**
261:13
**10**
2:8, 2:9, 2:12, 2:18, 2:24, 65:16, 124:1, 124:3, 212:23, 214:15, 231:4, 231:8, 231:17, 232:15, 232:22, 235:1, 237:9, 237:10, 242:1
**100**
40:18, 42:21, 42:24, 43:2, 49:4, 61:12, 66:6, 69:12, 70:1, 107:3, 107:7, 109:22, 131:19, 132:2, 132:21, 133:8, 135:5, 137:4, 137:15, 137:19, 150:20, 165:22, 170:5, 175:13, 175:15, 210:25, 211:11, 213:18, 213:20, 214:3, 214:4, 214:13, 214:17, 238:19, 245:17, 245:20, 245:21
**1002**
3:4, 118:18
**1003**
123:16
**101**
130:14, 130:19, 131:20, 131:24, 131:25
**103**
130:17, 131:24
**1040**
22:24
**106**
3:21, 246:3
**107**
2:27, 132:2
**109**
249:24
**1094**
2:8
**1099**
68:12
**11**
2:6, 2:7, 2:9, 2:21
**110**
2:28, 2:29
**112**
3:2
**114**
3:3
**116**
164:7
**117**
164:7
**118**
3:4
**119**
249:25
**12**
2:23, 42:21, 43:3, 48:12, 49:2, 102:6, 135:17, 136:14, 136:25, 165:20, 165:21, 165:24, 167:15, 167:18, 170:18, 170:19, 171:5, 171:24, 171:25, 172:7, 172:18, 172:23, 180:15, 181:3, 182:10, 183:23, 240:8, 242:23
**120**
141:20
**1208**
3:6, 124:12
**124**
3:6
**125**
3:7
**1275**
1:28
**128**
136:10, 136:21, 136:22, 137:1, 137:12
**129**
249:25, 250:2
**13**
2:24, 145:13, 212:10, 212:12, 212:14, 215:10, 244:10, 257:2
**130**
3:9, 136:11, 137:2, 137:17, 250:2
**135**
4:8
**136**
250:3
**14**
2:25, 18:7, 150:22, 152:23, 168:2, 169:3, 169:7, 173:9, 181:9, 181:12, 190:24, 190:25, 191:1, 198:5, 208:7, 214:15, 239:21, 248:13
**140**
12:24, 34:20, 34:23, 35:10, 42:20, 48:11, 48:18, 49:12, 62:18, 83:11, 83:22, 84:22, 84:23, 128:12, 135:3, 135:19, 135:20, 135:24, 137:17
**1416**
124:17
**142**
135:22, 135:23
**1446**
77:23
**15**
2:26, 35:23, 89:22, 90:7, 90:9, 107:24, 161:16, 180:14, 180:20, 180:23, 180:25, 188:6, 209:2, 209:3, 209:5, 209:7, 239:1, 239:2, 248:9, 249:20, 251:11
**152**
3:19, 244:24
**16**
2:6, 2:27, 107:24, 107:25, 108:2, 108:14, 211:2, 211:3, 211:12, 243:21
**160**
2:8
**1601**
1:22
**163**
3:8

**17**
2:19, 2:23, 2:28, 110:4, 110:5, 110:7, 111:11, 111:17, 165:22, 212:22, 234:23
**171**
3:11
**18**
2:29, 110:24, 110:25, 111:2, 111:11, 111:16, 137:20, 211:3
**182**
3:10
**19**
3:1, 109:8, 109:9, 109:18, 118:25, 141:16, 146:1, 147:11, 161:5, 190:10, 210:15, 230:1, 249:11, 253:5, 259:18
**1950**
23:1
**1980**
43:11
**1994**
10:9
**1995**
3:9
**1st**
77:10, 132:20, 134:11, 155:5, 155:6, 167:20, 232:10

**2**

**2**
65:16, 66:7, 66:8, 196:4, 214:16, 243:18
**2/8/2020**
2:14
**20**
2:6, 2:7, 2:22, 2:23, 2:24, 2:25, 3:2, 3:3, 11:8, 20:19, 34:24, 40:17, 50:21, 59:25, 111:25, 112:1, 112:3, 112:17, 117:23, 137:20, 139:12, 174:15, 197:13, 212:24, 235:18, 248:5, 253:5
**200**
1:15, 60:23, 61:12, 70:1, 175:15, 175:16, 193:14, 238:19
**200,000**
120:18
**2000**
35:15
**20002**
1:29
**20006**
1:23
**2001**
35:16
**20044**
1:38
**2006**
11:13
**2007**
10:17, 12:2, 12:4, 134:16
**2008**
12:4, 12:6, 13:8, 13:18, 13:22, 133:17
**2010**
15:25
**2016**
83:22
**2017**
16:6, 16:7, 83:19, 84:1, 84:2
**2018**
3:36, 10:22, 72:1, 72:4, 72:6, 72:10, 84:2, 137:20, 164:4, 193:17, 261:8, 261:9
**2019**
2:26, 3:4, 3:17, 3:25, 3:27, 3:29, 3:31, 17:23, 39:9, 42:20, 42:24, 48:5, 48:7, 48:8, 58:22, 58:23, 59:23, 60:1, 60:3, 60:6, 63:9, 69:2, 69:8, 69:10, 69:19, 70:2, 70:6, 71:1, 71:5, 71:15, 72:2, 72:25, 75:4, 75:5, 76:10, 81:3, 82:11, 82:18, 82:25, 83:11, 83:21, 84:4, 84:9, 88:23, 90:16, 92:24, 98:5, 101:24, 106:21, 119:17, 121:18, 124:14, 124:19, 125:1, 125:8, 132:20, 134:11, 134:19, 136:9, 136:15, 148:19, 152:5, 153:16, 163:24, 164:1, 164:5, 219:11, 219:12, 247:15, 247:21, 248:4, 251:14, 251:18, 252:17, 253:5, 253:21, 254:2, 254:7, 254:12, 254:15, 255:11, 256:21, 259:22, 261:8, 261:12
**202**
1:24, 1:30, 1:39
**2020**
2:6, 2:7, 2:8, 2:9, 2:10, 2:23, 11:3, 107:4, 139:10, 139:15, 140:24, 140:25, 143:15, 145:5, 145:7, 146:1, 146:11, 146:12, 153:23, 153:24, 155:2, 155:5, 155:6, 156:1, 172:11, 183:7, 192:13, 192:15, 194:4, 197:11, 197:14, 200:17, 203:20, 212:23, 219:7, 228:5, 228:22, 229:9, 244:10, 247:24, 249:19, 255:12, 256:21, 261:8
**2022**
3:29, 3:31, 3:36, 11:2, 16:5, 18:6, 18:7, 22:7, 107:4, 165:23, 170:21, 185:24, 206:19, 256:21, 261:8
**2024**
252:9
**2026**
1:15, 4:2, 4:4, 102:1, 102:4, 264:6, 264:10
**2031**
264:18
**2036**
3:7, 125:17, 125:21
**2038**
126:13

**2095**
130:8
**2096**
132:18, 132:25
**21**
2:22, 2:24, 2:25, 3:3, 22:24, 81:5, 112:14, 114:7, 114:9, 114:11, 114:15, 116:2, 117:10, 166:12, 174:15, 176:1, 223:16, 223:20, 227:25, 228:1, 235:18, 248:6, 249:11
**210**
10:4
**212**
2:24
**216**
2:9
**2192**
3:17, 80:23
**2193**
81:5, 81:18
**2198**
3:15
**22**
2:8, 3:4, 118:14, 118:15, 118:17, 130:17, 147:8, 171:3, 176:4, 176:5, 186:3, 255:9, 257:25, 258:16
**220**
3:12
**227**
2:13
**228**
2:16
**23**
1:15, 3:5, 4:2, 4:4, 8:17, 176:6, 176:21, 186:3, 264:6
**24**
3:6, 46:18, 46:20, 46:24, 82:19, 124:8, 124:9, 124:11, 208:12, 219:17, 219:18, 233:13
**24,856**
79:4
**24.97**
254:16
**244**
3:19
**245**
3:21
**25**
1:7, 3:7, 4:8, 125:12, 125:14, 125:16, 223:16
**25,000**
99:13, 99:18, 100:2
**25.86**
254:8
**250**
145:16
**251**
3:23
**253**
3:25
**254**
3:27
**256**
3:29
**257**
3:31
**258**
3:33
**26**
3:8, 163:12, 163:13, 163:15, 183:4, 183:7, 184:1
**260**
3:35
**264**
264:5
**27**
2:25, 3:9, 130:4, 130:5, 130:7, 152:8
**2700**
248:3
**2750**
152:5, 152:8
**28**
3:10, 12:25, 13:2, 117:17, 182:11, 182:12, 182:14, 231:2, 233:11, 236:17, 237:18
**29**
2:11, 3:11, 112:14, 171:15, 171:16, 171:18, 176:24, 178:20
**2:-cv**
1:7, 4:8
**2nd**
229:16, 231:19, 231:23, 232:5, 232:8, 232:23, 233:5, 233:6, 241:25

**3**

**3**
174:6, 193:8, 193:12
**3/2/2021**
2:17
**30**
1:16, 2:7, 2:10, 3:12, 7:16, 8:16, 34:22, 34:24, 69:21, 77:10, 79:6, 81:3, 117:14, 120:9, 130:17, 220:3, 220:5, 220:8, 221:7
**30,000**
247:22, 247:24
**300**
61:12, 66:13, 66:15, 70:1, 150:23, 173:17, 175:16, 196:4, 207:11, 214:11, 214:12, 214:18, 243:19
**307**
1:30
**308**
2:26, 90:10, 97:7
**309**
96:20
**31**
2:26, 2:27, 3:15, 77:2, 80:1, 80:3, 81:9, 81:10, 91:4, 118:25, 128:15, 130:20, 132:10, 251:15, 251:16
**31.21**
125:25
**310**
97:21, 100:9
**311**
101:4
**312**
105:4, 181:11, 181:12, 181:13
**313**
105:16
**314**
106:6
**317.99**
254:7
**32**
3:17, 80:22, 80:24
**323.41**
254:12
**329**
2:27, 108:3
**33**
3:19, 244:19, 244:21, 244:23
**331**
108:11, 108:14

**34**
3:21, 4:2, 4:4, 32:9, 244:20, 245:24, 245:25, 246:2
**343.85**
254:7
**349**
2:28, 110:8
**35**
3:23, 81:19, 251:24, 252:2, 262:10
**350**
2:29, 111:3
**351**
3:1
**353**
1:39
**36**
3:25, 253:10, 253:12
**360**
1:44
**365**
61:20, 84:23
**367.51**
254:15
**37**
3:27, 254:24, 255:1
**38**
3:29, 256:3, 256:5
**39**
2:23, 2:24, 2:25, 3:31, 212:24, 257:10, 257:12
**392.48**
254:16
**3923**
134:3

**4**

**4**
214:16, 234:9, 234:10, 234:12
**40**
3:33, 50:25, 150:7, 258:19, 258:21
**40,000**
247:23
**400**
51:5, 61:13, 70:1, 173:17, 174:6, 175:16, 177:25, 178:2, 193:8, 193:12, 207:11, 238:20
**407.56**
254:12
**41**
3:35, 260:14, 260:16, 262:10
**417**
177:16
**424**
3:11
**44**
125:7, 171:19
**4532**
1:41, 264:14
**459**
134:2
**47**
257:24, 261:23
**48**
148:2, 152:21, 178:13

**5**

**5**
263:6
**50**
35:1, 144:21, 152:8, 226:6, 249:11
**500**
61:13, 66:7, 66:8
**55**
1:37, 252:22
**5d**
226:8

**6**

**6/9/2021**
3:19
**600**
61:13, 134:17
**62**
3:10
**64**
132:20, 132:21
**64.52**
254:5
**6588**
1:30
**6625**
1:44
**667**
220:8
**668**
225:17
**673**
220:12
**674**
223:9
**6th**
264:10

**7**

**7**
164:6
**7/1/21**
125:24
**70**
35:2
**700**
3:19, 42:20, 42:22, 43:6, 44:20, 45:7, 49:2, 49:7, 69:12, 72:3, 72:22, 75:8, 75:9, 134:18, 135:2, 135:16, 135:17, 136:8, 136:9, 137:16, 151:18, 157:19, 158:15, 163:10, 163:24, 164:3, 164:20, 165:2, 165:11, 166:1, 167:13, 167:14, 167:16, 168:21, 168:24, 169:9, 169:15, 170:1, 170:19, 171:5, 171:9, 173:23, 174:16, 174:18, 176:17, 177:10, 181:8, 181:16, 181:25, 183:14, 184:16, 184:20, 185:8, 195:21, 200:14, 210:20, 210:21, 210:23, 211:7, 239:3, 241:12, 241:15, 245:11, 245:15, 245:22, 247:25, 248:14
**701**
164:16
**702**
164:16, 165:13
**704**
181:8, 181:9, 181:13
**72**
64:5, 64:6
**73**
2:6
**743**
3:3
**75**
62:3
**75,000**
99:14
**77**
184:15
**778**
1:24
**78**
2:7
**791**
3:2, 112:4
**792**
113:5

8

**8**
65:16, 73:21, 73:22
**80**
3:15, 3:17, 84:9, 84:11, 183:10
**838**
217:9
**84.15**
254:13
**85**
44:2, 84:13, 84:14, 84:16, 84:18, 84:20, 84:25, 85:13, 85:20, 85:23, 86:10, 87:2, 109:13, 258:1
**880**
217:8
**89**
107:5
**8th**
227:25, 228:5, 229:9, 233:3, 233:5

9

**9**
1:16, 4:2, 4:4
**90**
2:26, 44:2, 91:13, 91:14, 96:7, 96:8, 96:9, 96:10, 96:11
**90.71**
134:12, 134:13
**906**
1:44
**9132**
1:24
**914**
88:11
**92**
136:11
**92507**
77:19
**93**
81:5
**941**
88:11
**943**
3:5
**95**
208:14, 208:17, 208:22
**96**
231:9
**9715**
1:28
**99**
181:21, 210:1
**9th**
184:13, 184:23