UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARQUETTE COUNTY MEDICAL CARE FACILITY,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.
______________________________________/

Case No. 2:25-cv-00135-JMB-SJB

Hon. Jane M. Beckering

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AS TO COUNT I**

# TABLE OF CONTENTS

Page

I. Summary of Undisputed Facts .....1

A. Plaintiff Was Subject to Numerous Governmental Orders ..... 1

i. Orders Pertaining to CRFs ..... 2

ii. Orders Pertaining to Visitation, Social Distancing, and Group Activities ..... 3

iii. Orders Pertaining to Quarantining and Infection Control ..... 3

B. Plaintiff's Operations Were Partially Suspended ..... 4

i. Use of 700 Wing ..... 5

ii. Therapy Services ..... 6

iii. Visitation and Communal Activities ..... 7

II. Legal Background .....7

A. The ERC ..... 7

B. The Partial Suspension Test ..... 8

i. Partial Suspension ..... 9

ii. More Than Nominal Effect ..... 10

iii. "Due to" ..... 12

iv. Interplay Between Suspension and "Due to" Prongs ..... 15

v. Safe Harbors ..... 17

III. Summary Judgment Standard .....18

IV. Argument .....18

A. Most Requirements for Plaintiff's Entitlement to the ERC Are Stipulated ..... 18

B. Plaintiff's Operations Were Partially Suspended ..... 20

i. Governmental Orders Limited Use of an Entire Wing ..... 21

a. Causation ..... 21

b. More Than Nominal Effect ........ 23

ii. Governmental Orders Constrained Therapy Services ........ 25

a. Causation ........ 25

b. More Than Nominal Effect ........ 26

iii. Orders Related to Visitation and Activities Effectuated a Partial Suspension ........ 28

a. Causation ........ 28

b. More Than Nominal Effect ........ 29

iv. Collectively, the Evidence Is Overwhelming ........ 30

C. All Other Requirements Are Satisfied ........ 30

V. Conclusion ........ 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bivens v. Zep, Inc.*,
147 F.4th 635 (6th Cir. 2025) ....................11

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) ....................12

*Bridge v. Phx. Bond & Indem. Co.*,
553 U.S. 639 (2008) ....................15

*Burrage v. United States*,
571 U.S. 204 (2014) ....................12, 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................18

*In re Charles*,
278 B.R. 216 (Bankr. D. Kan. 2002) ....................12

*Devonshire v. Johnston Grp. First Advisors*,
166 Fed. App'x 811 (6th Cir. 2006) ....................5, 15

*Hoffman Grp., Inc. v. EPA*,
902 F.2d 567 (7th Cir. 1990) ....................22

*JPM Rest., LLC v. United States*,
No. 1:24-CV-357, 2026 WL 561147 (E.D. Tenn. Feb. 27, 2026) .................... *passim*

*In re JSmith*,
674 B.R. 207 (Bankr. E.D.N.C. 2025) ....................9, 13

*In re KDT Indus., Inc.*,
30 B.R. 252 (Bankr. S.D.N.Y. 1983) ....................12, 27

*Kitchen v. TTX Co.*,
No. 97 C 5271, 2001 WL 40803 (N.D. Ill. Jan. 17, 2001) ....................12

*Lawrence Gen. Hosp. v. Cont'l Cas. Co.*,
90 F.4th 593 (1st Cir. 2024) ....................22

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ....................11

*Marshall v. The Rawlings Co. LLC*,
854 F.3d 368 (6th Cir. 2017) ....................................................................................18

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997)...................................................................................................11

*SEC v. Sanchez-Diaz*,
88 F.4th 81 (1st Cir. 2023).................................................................................12, 24, 27

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)...................................................................................................11

*Tcherepnin v. Knight*,
389 U.S. 332 (1967)...................................................................................................14

*Texas v. Equal Emp. Opportunity Comm'n*,
933 F.3d 433 (5th Cir. 2019) ..............................................................................18, 30

*The Carrolton of Dunn, LLC v. United States*,
No. 5:24-cv-00654-M-RN (E.D.N.C. Jan. 9, 2026) ............................................19, 20

*Titan Mutual Lending, Inc. v. United States*,
No. 8:25-cv-669-ADS (C.D. Cal. Aug. 3, 2026) ........................................... *passim*

*Tri-State Memorial Hospital v. United States*,
No. 2:25-cv-00181-TCR (Fed. Cl. May 28, 2026) ........................................ *passim*

*Trollinger v. Tyson Foods, Inc.*,
370 F.3d 602 (6th Cir. 2004) ....................................................................................14

*United States v. Parillo*,
972 F.2d 349 (6th Cir. 1992) ....................................................................................29

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
714 F.3d 414 (6th Cir. 2013) ....................................................................................15

**Statutes**

26 U.S.C. § 3134(a) .......................................................................................................8

26 U.S.C. § 3134(b)(1)(A).................................................................................................8

26 U.S.C. § 3134(c)(2)(A)(ii)(I) .........................................................................................8

26 U.S.C. § 3134(c)(2)(A)(ii)(I) .........................................................................................8

26 U.S.C. § 3134(f)(2)(B)(ii).............................................................................................8

**Rules**

42 C.F.R. § 483.10(a)....................................29

42 C.F.R. § 483.10(f)....................................29

F.R.C.P. 30(b)(6)....................................2, 7, 29

F.R.C.P. 56(c)....................................15, 16, 18

**Other Authorities**

166 Cong. Rec. S1897-02....................................7, 14

**Non-Periodical Publications**

Black's Law Dictionary....................................9, 11, 24

*Full*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/full (last visited Feb. 24, 2026)....................................9

*Nominal*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/nominal (last visited July 13, 2026)....................................11

Notice 2021-20....................................10

*Partial*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/partial (last visited Feb. 24, 2026)....................................9

Plaintiff Marquette County Medical Care Facility, a county-run skilled nursing facility, moves for summary judgment on Count I of its complaint. Because the undisputed facts reflect that its operations were partially suspended throughout the first quarter of 2021 due to numerous governmental orders, Plaintiff is entitled to the employee retention credit ("ERC") for that period. As a result, judgment should be entered in its favor in the amount of $1,460,043.78, plus interest as allowed by law. Plaintiff does not seek summary judgment on Count II or Count III, which relate to the second and third quarters of 2021. These additional counts should proceed to trial for the reasons that Plaintiff will address in its opposition to the United States' motion for summary judgment. The only ERC claim at issue in this motion relates to the time period of January 1, 2021 through March 31, 2021.

## I. Summary of Undisputed Facts

Plaintiff is a skilled nursing facility in Marquette County, Michigan. Statement of Undisputed Facts ("SUF") ¶ 1. It serves a rural and often vulnerable population, including the elderly and those covered by Medicaid. Perry Decl. ¶ 2. In part because of this, Plaintiff routinely operates at a significant yearly net operating loss. *See id.*; SUF ¶ 113. This case pertains to the significant impact that the COVID pandemic had on Plaintiff and its operations, including as a result of changes that Plaintiff needed to make to comply with governmental orders designed to limit the spread of the disease.

### A. Plaintiff Was Subject to Numerous Governmental Orders

Broadly speaking, Plaintiff was required to comply with at least three buckets of governmental orders during the first quarter of 2021. The first category related to the establishment of so-called COVID Relief Facilities ("CRFs"). The second imposed limitations on visitation and group activities. And the third pertained to quarantining and infection control.

*i. Orders Pertaining to CRFs*

The CRF orders stem from a bill passed by the Michigan legislature and signed by Governor Whitmer in October 2020 that provided that "[a]n individual shall not be admitted or retained for care in a nursing home" if the "individual has tested positive for coronavirus," subject to exceptions. SUF ¶¶ 12-13.[1] One of the exceptions allowed facilities to retain existing residents who became ill with COVID—on the condition that the facilities have "designated areas within the nursing homes for individuals who test positive for coronavirus." *Id.* ¶ 14.

To implement this legislative mandate, the Michigan Department of Health and Human Services ("MDHHS") established a process for facilities to apply to become CRFs. One of the "minimum participation criteria" for CRF approval was to have a "designated COVID-positive area (designated area can include a portion of a unit, wing, or separate building)." *Id.* ¶ 19. Facilities that did not obtain approval to operate as CRFs were required to "transfer any COVID-positive residents to an alternate location as soon as practicable." *Id.* ¶ 22.

Plaintiff applied for and obtained from MDHHS permission to operate as a CRF. *Id.* ¶ 134. Plaintiff's CRF status was in effect throughout the first quarter of 2021. *Id.* Forgoing CRF status was not feasible for Plaintiff, which would not have been able to discharge COVID-positive residents. Plaintiff's Administrator and Rule 30(b)(6) designee testified: "And honestly, we had to retain [COVID-positive residents] because nobody was willing to take them in the [Upper Peninsula], and there was no ambulance service willing to transport them downstate." Perry Tr. at 157:4-13.

[1] The various orders discussed in this memorandum refer to "nursing homes" and "residential care facilities." Plaintiff qualifies as both. *Id.* ¶¶ 15, 25.

*ii. Orders Pertaining to Visitation, Social Distancing, and Group Activities*

MDHHS separately issued orders imposing limitations on visitation and group activities. Any violations of these orders were punishable by fines or imprisonment. SUF ¶¶ 26, 36, 41. Between January 1, 2021 and March 2, 2021, MDHHS provided that, subject to exceptions, "facilities must prohibit visitors from entering their facilities." *Id.* ¶ 27. Outside of limited exceptions, visitation was only allowed when facilities met certain criteria, including no new COVID cases within the prior 14 days. *Id.* Based on this order, non-exempted indoor visitation was suspended at Plaintiff's facility between January 1, 2021 and February 16, 2021. *Id.* ¶ 167-68.

Between March 2, 2021 and March 31, 2021, visitation rules were relaxed somewhat, but visitation was prohibited during the entire time if there had been any facility-onset cases within the past 14 days. *Id.* ¶ 38. As one example, a staff member tested positive on a rapid test on March 15, 2021, prompting suspension of visitation and activities. *Id.* ¶ 75. There was also, for at least a portion of the quarter, a prohibition on residents in quarantine having indoor visitors. *Id.* ¶ 47.

Additionally, throughout the first quarter of 2021, MDHHS required facilities to follow restrictions published by the Centers for Medicare and Medicaid Services ("CMS") in a document entitled QSO-20-39-NH. *Id.* ¶¶ 30, 44. At all relevant times, QSO-20-39-NH mandated "[s]ocial distancing of at least six feet between persons" for communal activities. *Id.* ¶ 31. This required Plaintiff to suspend communal dining in its dining rooms and to restrict the number of people who could receive therapy services at any given time. *Id.* ¶¶ 112, 165.

*iii. Orders Pertaining to Quarantining and Infection Control*

The Michigan Department of Licensing and Regulatory Affairs ("MDLARA") required residential care facilities like Plaintiff to maintain an infection prevention and control program that "must be based on an accepted national standard." *Id.* ¶ 57. The "likely national standard" was the recommendations provided by the Centers for Disease Control and Prevention ("CDC"). *Id.* ¶ 58.

MDLARA stated that "[o]nce a provider adopts a national set of standards, these standards are viewed as required, and no longer just recommendations." *Id.* ¶ 59. Plaintiff followed the CDC's infection prevention and control program. *Id.* ¶ 60.

For all but the last three days of the first quarter of 2021, the CDC: (1) required a 14-day quarantine in a "single room" or "separate observation area" for new admissions or readmissions; (2) mandated consideration of suspending new admissions in the event of any COVID positivity in the facility; and (3) required exclusion from work of staff with COVID-related symptoms. *Id.* ¶¶ 62-63; ECF No. 26-1, PageID.154-155. The quarantine requirements were eased slightly between March 29, 2021 and March 31, 2021, but quarantining was still mandated for non-vaccinated new admissions or readmissions, with a possible exception for facilities that were in "areas with minimal to no community transmission." SUF ¶ 64. Additionally, the March 29 update provided that a "single new case" of COVID among employees or residents "should be evaluated as a potential outbreak," with residents "generally…restricted to their rooms." *Id.* ¶ 65. Pursuant to these restrictions, new admissions were suspended for a two-week period in January 2021. *Id.* ¶ 82.

**B. Plaintiff's Operations Were Partially Suspended**

These orders collectively had an enormous impact on Plaintiff's operations. Indeed, Plaintiff's census, which is a measure of its occupancy, declined by 14.6 percent in the first quarter of 2021, as compared to the first quarter of 2019, and the number of new admissions decreased by 30 percent in the first quarter of 2021, as compared to the first quarter of 2019. *Id.* ¶¶ 88, 97.[2]

[2] For the reasons discussed below, comparisons between 2019, which provides a pre-COVID baseline, and 2021 are relevant for purposes of the ERC.

Additionally, restrictions prevented Plaintiff from realizing significant amounts of revenue. The connection between the orders and these impacts is addressed below.

*i. Use of 700 Wing*

To comply with its quarantining and CRF obligations, Plaintiff set aside the entire 700 wing of its building for those purposes in the first quarter of 2021. *Id.* ¶ 135; Perry Decl. ¶ 3. This unit consisted of 12 private rooms, or 8.6 percent of Plaintiff's total capacity. SUF ¶ 140. Plaintiff's use of these rooms was severely restricted during the first quarter of 2021. Specifically, rooms on the 700 wing were kept empty unless occupied by residents in quarantine or residents who tested positive for COVID. Perry Decl. ¶ 3. Plaintiff chose the 700 wing because no other portion of the facility was a plausible candidate. *Id.* ¶ 4. Most other wings did not have enough private rooms. *Id.* ¶ 5. And the only other wing that had enough private rooms was too large—using that other wing for CRF and quarantining purposes would have restricted 12.1 percent of the facility's beds. *Id.* ¶¶ 6-7. The use of the 700 wing for CRF and quarantining purposes had two main effects.

**First**, Plaintiff was not able to use the 700 wing for its intended purpose. The wing opened in March 2019 as the facility's short-term rehabilitation unit. SUF ¶¶ 123, 129. Plaintiff invested substantial resources into the construction of the unit in an effort to attract new residents with short-term rehabilitation needs. *Id.* ¶ 130. Short-term rehabilitation is the most profitable type of stay that Plaintiff offers from a reimbursement perspective. *Id.* ¶ 132. In the second quarter of 2021, which was the first full quarter the 700 wing was open, short-term rehabilitation revenue constituted more than 10 percent of the facility's quarterly gross receipts. *See* Filibeck. Decl. ¶¶ 6-7.

**Second**, even setting aside the inability to use the 700 wing as a short-term rehabilitation unit, the CRF and quarantining requirements caused Plaintiff to have at least 12 empty beds at all times. SUF ¶ 141. Beds in the 700 wing needed to be set aside for CRF or quarantining purposes

even if there were no COVID-positive residents or residents who needed quarantining. *See, e.g.*, ECF No. 26-1, PageID.136. In such scenarios, they needed to be left open. Perry Decl. ¶ 3. And even if a bed on the 700 wing was occupied by a COVID-positive resident or someone in quarantine, another bed elsewhere in the facility needed to be held open so that the resident could be transferred at the end of isolation. SUF ¶ 142.

*ii. Therapy Services*

Physical, occupational, and speech therapy have historically been a significant source of revenue for Plaintiff, accounting for between 5.5 and 7.3 percent of patient-related revenue in the first three quarters of 2019. Filibeck Decl. ¶¶ 12, 16, 20. Due to the requirement to quarantine new admissions and readmissions and to observe social distancing, Plaintiff was severely restricted in the amount of therapy that it could conduct. Plaintiff has established this nexus through unrebutted testimony.

In particular, Brandon Lindeman, who currently oversees therapy at Plaintiff's facility and was in that same role in 2021, attested that the "ability to have multiple residents in a gym in physical proximity to one another is important to efficiently conduct therapy. By contrast, cycling isolated or socially distanced residents into and out of therapy meaningfully restricted the amount of therapy that could be conducted in a given day." Lindeman Decl. ¶ 5. Mr. Lindeman attested that the "quarantining and social distancing requirements materially impacted the volume of therapy services that could be performed at Marquette County Medical Care Facility during the first three quarters of 2021." *Id.* ¶ 6. And he added: "Even controlling for the decline in census, the quarantining and social distancing requirements were still material. Without the quarantining and social distancing requirements, we could have performed a meaningfully higher volume of therapy services at Marquette County Medical Care Facility in the first three quarters of 2021." *Id.* ¶ 7.

The impacts of these restrictions are meaningful. In the first quarter of 2019, Plaintiff had $208,715.46 in therapy revenue. Filibeck Decl. ¶ 9. By contrast, in the first quarter of 2021, Plaintiff's therapy revenue dropped to $164,909.71. *Id.* ¶ 10. That represents a 21 percent decrease. Relatedly, the number of minutes of therapy that Plaintiff conducted dipped from 87,833 in the first quarter of 2019 to 70,480 in the first quarter of 2021, a decline of 19.8 percent. SUF ¶¶ 114-16.

*iii. Visitation and Communal Activities*

Due to the restrictions on visitation and communal activities, Plaintiff lost actual and potential residents. Asked whether "potential residents or departing residents [told] you that they were deciding not to stay here due to government orders," Plaintiff's Administrator and Rule 30(b)(6) designee testified: "[C]ould I tell you confidently under oath that I had those conversations with families in 2021? Absolutely. Where they wanted a lot of information and in the end would say, [']I'm afraid of what this is going to do to my mom—you know—I was afraid to put her at a nursing home to begin with, and now she's going to be so isolated'—is the word they would use. … 'That's going to kill my mom,' you know, that's what they would say to you." Perry Tr. at 187:12-188:2.

## II. Legal Background

### A. The ERC

Congress established the ERC as part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act at the beginning of the pandemic. The broad, remedial nature of the legislation is apparent from the congressional record, which frames the ERC and related measures as a response to a "crisis unlike any other in our recent history." *See, e.g.*, 166 Cong. Rec. S1897-02, S1897 ("Our joint vision is to help small businesses and their employees make it through to the other side of this crisis by providing cashflow assistance quickly to employers who agree to

keep their workers on the payroll."). In the absence of such action, it was estimated that unemployment rates could have soared to as high as 20 percent, which would have constituted "economic devastation." *Id.* at S1898.

The ERC is a "credit against applicable employment taxes for each calendar quarter" in an "amount equal to 70 percent of the qualified wages with respect to each employee of such employer for such calendar quarter." 26 U.S.C. § 3134(a). For purposes of the ERC, the amount of qualified wages for each employee is capped at $10,000 per quarter. *Id.* § 3134(b)(1)(A). Businesses claiming the ERC must be "eligible employers." *Id.* § 3134(a). There are three pathways to being an eligible employer. Plaintiff's claims were based on the pathway available to businesses whose operations were "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." *Id.* § 3134(c)(2)(A)(ii)(I). Here, Plaintiff asserts that its operations were partially (rather than fully) suspended.[3] Although governmental entities like Plaintiff were originally exempted from the ERC, the statute was amended to allow such entities whose principal purpose is to provide medical care to apply for the ERC beginning in the first quarter of 2021. *Id.* § 3134(f)(2)(B)(ii).

**B. The Partial Suspension Test**

To prevail, Plaintiff must show that its operations in the first quarter of 2021 were "partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." *Id.* § 3134(c)(2)(A)(ii)(I). As described in more detail below, the proper interpretation of that test is that Plaintiff must demonstrate a delay,

[3] There is no difference in the credit amount for full versus partial suspensions.

interruption, or termination of some, but not all, of its operations. At most, that delay, interruption, or termination must have had more than a trifling or insignificant impact on the business. And an order from a governmental authority with provisions limiting commerce, travel, or group meetings must be the cause of that impact. The better understanding is that this requires only but-for causation, but Plaintiff is entitled to summary judgment even if proximate causation is needed. As described below, certain safe harbors are available for ensuring satisfaction of this test, but compliance with them is not mandatory.

*i. Partial Suspension*

A decision from a district court within the Sixth Circuit defined a partial suspension as follows:

> The statute also does not define a "full or partial suspension." A "suspension" is "'[t]he act of temporarily delaying, interrupting, or terminating something,' or '[t]he state of such delay, interruption, or termination.'" *In re JSmith*, 674 B.R. at 214 (quoting *Suspension*, *Black's Law Dictionary* (12th ed. 2024)) (alterations in original). The plain meaning of "full" is "complete especially in detail, number, or duration." *Full*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/full (last visited Feb. 24, 2026). The plain meaning of partial is "of or relating to part rather than the whole: not general or total." *Partial*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/partial (last visited Feb. 24, 2026). Therefore, taken together, a "full suspension" is a complete delay or interruption in operations, while a "partial suspension" is a suspension of at least some, but less than all operations. This would require a restaurant to shut down or close either completely or partially (such as reducing hours, shutting down one or multiple areas of the restaurant, or reducing services offered).

*JPM Rest., LLC v. United States*, No. 1:24-CV-357, 2026 WL 561147, at *4 (E.D. Tenn. Feb. 27, 2026) (appeal filed).

Plaintiff largely agrees with the *JPM* court's definition of "partial suspension" and takes issue only with the final sentence in the passage above. As the *JPM* court's own definition makes clear, there are many scenarios involving "delaying, interrupting, or terminating" operations or services that do not involve "shut[ting] down or clos[ing]." Although Plaintiff agrees that

"reducing hours, shutting down one or multiple areas of the restaurant, or reducing services offered" are all examples of partial suspensions, the test should not be read to require that a business "shut down or close." Indeed, the IRS's own examples of partial suspension make that clear. *See* IRS Notice 2021-20 at Q&A 12 (partial suspension where "business's suppliers are unable to make deliveries of critical goods or materials"); *id.* at Q&A 17 ("If all, or all but a nominal portion, of an employer's business operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances."); *id.* at Q&A 18 (noting that examples of relevant limitations for purposes of suspension include orders "limiting occupancy to provide for social distancing, requiring services to be performed only on an appointment basis (for businesses that previously offered walk-in service), changing the format of service (for example, restrictions on buffet or self-serve, but not prepackaged or carry-out), or requiring employees and customers to wear face coverings").[4]

In summary, Plaintiff agrees with the *JPM* court that a "'partial suspension' is a suspension of at least some, but less than all operations." This involves "delaying, interrupting, or terminating" operations or services, but is not limited to circumstances where a business has had to "shut down or close." Instead, a partial suspension can also occur through government-imposed modifications.

*ii. More Than Nominal Effect*

Under the plain language of the statute, any delay, interruption, or termination of any services is sufficient. The IRS has attempted, through a document that has not undergone notice-

[4] Notice 2021-20 is available at https://www.irs.gov/irb/2021-11_IRB#NOT-2021-20.

and-comment rulemaking, to impose a requirement that impacts must have had "more than a nominal effect on the business operations under the facts and circumstances." IRS Notice 2021-20 at Q&A 17. In light of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the "respect" owed to the "agency's interpretation extends at most only so far as we find that reading 'persua[sive].'" *Bivens v. Zep, Inc.*, 147 F.4th 635, 646 (6th Cir. 2025) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Here, it is not appropriate to credit the agency's interpretation because it exceeds the plain language of the statute. *See, e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."). Although Plaintiff respectfully requests that the Court apply the partial suspension test without regard to the "more than a nominal effect" portion, the rest of this brief nonetheless presents the argument under the assumption that the requirement exists.

In this context, "nominal" means "trifling" or "insignificant." *Nominal*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/nominal (last visited July 13, 2026); *see also* Black's Law Dictionary (12th ed. 2024) (defining "nominal" as "trifling, esp. as compared to what would be expected"). There is no requirement that the impacts be "significant" or "surpass[] [the] basic economic impact that all employers faced during the pandemic." *See Tri-State Memorial Hospital v. United States*, No. 2:25-cv-00181-TCR (Fed. Cl. May 28, 2026), ECF No. 38, PageID.416–17; *see also Titan Mutual Lending, Inc. v. United States*, No. 8:25-cv-669-ADS (C.D. Cal. Aug. 3, 2026), ECF No. 41, PageID.901 (rejecting the argument that a "'partial suspension' requires a business to suspend a 'meaningful portion' of its business operations," as such an interpretation is inconsistent with the "plain and ordinary meaning of 'partial'" as anything that is "'less than a whole'").

Courts can, and frequently do, make determinations as a matter of law about whether particular amounts or impacts are more than nominal. *See, e.g.*, *SEC v. Sanchez-Diaz*, 88 F.4th 81, 95 (1st Cir. 2023) ("The value she provided was more than nominal and therefore satisfies our legal standard."); *In re Charles*, 278 B.R. 216, 224 (Bankr. D. Kan. 2002) ("Under any theory, the amount required to be paid by the lessee under the Lease is simply not 'nominal.'"); *Kitchen v. TTX Co.*, No. 97 C 5271, 2001 WL 40803, at *3 (N.D. Ill. Jan. 17, 2001) ("The plaintiffs here received more than a nominal recovery."); *In re KDT Indus., Inc.*, 30 B.R. 252, 255 (Bankr. S.D.N.Y. 1983) ("These amounts are not nominal, even if in these days of hyperinflation it is not as meaningful a dollar amount as it was in 1969 when the lease was signed. A nominal rent is the modern-day equivalent of a peppercorn.").

*iii. "Due to"*

The most contested part of the test is the requirement that a partial suspension be "due to" a governmental order. Under standard principles of interpretation, the default presumption is that the term implicates but-for causation. The Supreme Court has gone so far as to describe an "insistence on but-for causality" when interpreting synonyms of "due to," such as "because of," "based on," and "by reason of." *Burrage v. United States*, 571 U.S. 204, 213 (2014). This reading is consistent with "ordinary meaning." *Id.* at 212. There is no meaningful difference between the term "due to" in the ERC statute and other terms like "because of." *See JPM*, 2026 WL 561147, at *5 ("'Due to' typically means 'because of.'"); *Titan Mutual Lending*, ECF No. 29, PageID.561 (government agrees that "due to" and "because of" are synonyms). To the extent Congress wanted to signal something other than but-for causation, "it could have written 'primarily because of'" or some other formulation to depart from the default rule, but it did not. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020).

Nonetheless, the *JPM* court found that the term "due to" in the ERC statute requires proximate, rather than only but-for, causation. *JPM*, 2026 WL 561147, at *5.[5] The court reached that result based on its assessment that the "intent of Congress was to limit eligibility rather than paint with a broad brush." *Id.* ("Lengthy causal chains that could arise from a but-for test without a proximate causation requirement would risk turning the ERC into a presumption-in statute."). Although it is true that the meaning of terms can change based on "contextual indication[s]," *Burrage*, 571 U.S. at 212, no such indications support a proximate cause requirement here.

The *JPM* court did not provide any "contextual indication[s]" that expressly bear on the interpretation of "due to." There is, for instance, no citation to legislative history reflecting an intention to make the term restrictive. And even assuming that Congress intended for the ERC to be a "presumption out" statute, reading a proximate cause requirement into the statute is an overcorrection. It is simply not the case that but-for causation would open the floodgates to ERC claims in a way that Congress did not intend. Litigated cases to date reflect that other parts of the ERC test apart from the "due to" prong can be quite hard to satisfy. Indeed, courts have routinely found that particular guidance did not constitute an order or that orders did not apply to particular litigants. *See, e.g.*, *JPM*, 2026 WL 561147, at *6 ("[T]he Tennessee Pledge, standing alone, as a matter of law, does not constitute an order."); *In re JSmith Civ., LLC*, 674 B.R. 207, 216 (Bankr. E.D.N.C. 2025) ("As a matter of statutory construction from the exact wording of Section 2301, and by way of admission, as a matter of law Executive Order 121 did not require suspension of Plaintiff's operations as a construction company. The entire category of construction work was specifically exempted.").

[5] Certain other courts have reached the same conclusion, but as noted below, at least two courts have found that only but-for causation is required.

Additionally, if the purpose of the statute does constitute relevant context, it points the other way. Congress passed the ERC as a remedial statute to help businesses survive a "crisis unlike any other in our recent history" and to allow them to "make it through to the other side of this crisis by providing cashflow assistance quickly to employers who agree to keep their workers on the payroll." 166 Cong. Rec. S1897-02, S1897. Imposing hurdles beyond the statutory text undermines this legislative purpose. *See Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[W]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.").

For similar reasons, at least two courts have appropriately concluded that the ERC statute requires only but-for causation. *See Titan Mutual Lending*, ECF No. 41, PageID.904 ("[T]he Court interprets the phrase 'due to' as it would 'because of,' as requiring but-for causation."); *Tri-State Memorial Hospital*, ECF No. 38, PageID.425 ("Accordingly, the Court recognizes that 'due to' requires 'but-for' causation."). As the *Tri-State Memorial Hospital* court recognized in the analogous context of rejecting the government's arguments about the required scope of a partial suspension, the United States should not be permitted to depart from the ordinary meaning of terms by applying alarmist views to isolated parts of the statute. *Cf. Tri-State Memorial Hospital*, ECF No. 38, PageID.417 ("[T]his interpretation relies on assumptions that most employers would be eligible if the statute is not interpreted this way. However, the statute specifies multiple requirements to be eligible for the ERC. Therefore, this argument is unpersuasive.").

Even if proximate cause is required, there is a well-recognized distinction between proximate cause and sole cause. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 620 (6th Cir. 2004) (favorably quoting Eleventh Circuit case for the proposition that a "proximate cause is not [ ] the same thing as a sole cause" and that "a factor is a proximate cause if it is a substantial factor

in the sequence of responsible causation") (alteration in original). As always, whether the "injury was a foreseeable consequence of the conduct alleged" is a touchstone of proximate cause. *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013). Because "proximate cause is a 'flexible concept,'" this requires assessment on a "case-by-case basis." *Id.* (quoting *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)). In appropriate circumstances, proximate cause is susceptible to resolution at the summary judgment stage. *See, e.g.*, *Devonshire v. Johnston Grp. First Advisors*, 166 Fed. App'x 811, 814 (6th Cir. 2006) ("[F]ederal courts must obey Federal Rule of Civil Procedure 56(c), which instructs federal courts to grant summary judgment on substantive legal issues, proximate cause included, when there are no genuinely disputed issues of material fact and the moving party is entitled to judgment as a matter of law.").

As is the case with the "more than a nominal effect" test, this brief continues under the assumption that the more stringent requirement (in this case proximate cause) applies, even though it respectfully urges the Court to conclude that but-for causation is the appropriate requirement (or to determine that resolution of the issue is unnecessary because Plaintiff would prevail either way).

*iv. Interplay Between Suspension and "Due to" Prongs*

Regardless of the type of causation that is required, the burden under the causation prong is to prove the existence of a suspension connected to governmental orders rather than to establish the degree of loss or financial impact. Put differently, Plaintiff must demonstrate that the orders caused (whether under a proximate or but-for standard) a delay, interruption, or termination of some, but not all, of its operations.

Separately, courts and the IRS have interpreted the partial suspension test to require that the suspension have had "more than a nominal effect on the business operations under the facts and circumstances." IRS Notice 2021-20 at Q&A 17. As evidence, a business can offer various



1615814659.1

metrics, including drops in census and decreased revenue in certain categories, to demonstrate that particular parts of the business are more than nominal.

To give a concrete example, Plaintiff argues below that the restrictions on certain of its beds effectuated a partial suspension. Plaintiff's burden under the causation prong in this example is to prove that the orders restricted Plaintiff's capacity, not to affirmatively prove a precise level of bed utilization that would have occurred counterfactually in a world in which the orders never existed. And its burden under the "more than a nominal effect" test (to the extent such a test is even part of the statute) is to show that these beds are ordinarily a non-trivial part of its business. Metrics about drops in bed usage can help Plaintiff demonstrate the non-trivial nature, but they are not a mandated element of proof. Meanwhile, it is simply not relevant whether there would have been sufficient demand to fill the beds if they were not subject to government-imposed restrictions.

The IRS's own guidance acknowledges this. It provides the example of a restaurant that is "permitted to offer sit-down service in its outdoor space, but its indoor dining service continues to be closed." *Id.* That restaurant is partially suspended as long as indoor dining service is typically "more than a nominal portion of [its] business operations." *Id.* There is no requirement that the restaurant provide proof that it was turning away would-be diners who wanted to eat inside. Nor does the restaurant need to demonstrate that it lacked enough space outside to meet the needs of all intended diners. Instead, the question is whether the affected part of the business is, during normal times, more than a nominal portion of the overall business. Likewise, an "essential business that is permitted to continue its operations may, nonetheless, be considered to have a partial suspension of its operations if a governmental order requires the business to close for a period of time during normal working hours." *Id.* at Q&A 11. There is no need to prove that these hours of

the day are typically busy times for the business, or indeed that anyone was turned away due to closure during particular hours.

This aligns with the structure and purpose of the ERC. Unlike in traditional tort cases involving causation, ERC plaintiffs do not need to prove that governmental orders caused them particular quantities of damages. The ERC is not measured on lost revenue. A business that was partially suspended a hair's breadth over a nominal amount is entitled to the same amount of ERC as a business that was fully suspended. The calculation is based on wages paid, not damages incurred. This outcome is also consistent with even the most stringent decisions on causation. *See, e.g.*, *JPM*, 2026 WL 561147, at *5 (requiring only that the that the "order must have been the…cause of the full or partial shutdown," not that particular losses be proven through proximate causation).

*v. Safe Harbors*

Finally, the IRS has provided safe harbors that require the agency to find a partial suspension under certain circumstances. As relevant here, a "governmental order that results in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations." IRS Notice 2021-20 at Q&A 18. Additionally, "a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if…the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019)." *Id.* at Q&A 11. The relevant comparator would typically be the first quarter of 2019 here, as the ERC claim relates to the first quarter of 2021. However, for purposes of Plaintiff's argument below about use of the 700 wing, the appropriate quarter for comparison is

the second quarter of 2019. *Cf. id.* at Q&A 27. That is because the wing was under construction in the first quarter of 2019 and did not have any residents that quarter until March 18. SUF ¶ 129.

As the United States has admitted in its Answer, these safe harbors work only to the benefit of taxpayers by requiring a finding of partial suspension under certain circumstances. ECF No. 15, PageID.68. These safe harbors are not an "eligibility requirement" or a "basis for denying ERC claims." *Id.* Because the safe harbors bind the IRS, as acknowledged in the United States' Answer, they create a legal entitlement on which Plaintiff can rely. *See, e.g.*, *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 442 (5th Cir. 2019) ("Another indication that an agency's action binds it and thus has legal consequences or determines rights and obligations is whether the document creates safe harbors protecting private parties from adverse action.").

## III. Summary Judgment Standard

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). Summary judgment motions involve a familiar burden-shifting framework. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 381 (6th Cir. 2017) ("The party moving for summary judgment carries the initial burden of showing the absence of a genuine dispute of material fact; if it satisfies that burden, the nonmoving party must show specific facts that reveal a genuine issue for trial.") (internal quotation marks omitted).

## IV. Argument

### A. Most Requirements for Plaintiff's Entitlement to the ERC Are Stipulated

There can be no dispute that the first three elements of the partial suspension test—the existence of (1) "orders from an appropriate governmental authority" that (2) "limit[] commerce,

travel, or group meetings" and (3) impose those limitations "due to the coronavirus disease 2019"—are satisfied. Plaintiff has identified 11 orders that bear on partial suspension for the first quarter of 2021. For all of them, the United States has largely conceded that these three criteria are satisfied. SUF ¶¶ 71-73.

The only component of the test not expressly captured by the United States' admissions is whether the documents constitute "orders" for purposes of the ERC test. The United States has previously conceded that this requirement is satisfied as long as compulsion is present. *See The Carrolton of Dunn, LLC v. United States*, No. 5:24-cv-00654-M-RN (E.D.N.C. Jan. 9, 2026), ECF No. 44 at 13. Seven of the orders were issued by Michigan officials and unquestionably compel compliance. *See* SUF ¶¶ 12, 18, 20, 24, 35, 40, 57.

The remaining four orders are the December 8, 2020 and March 10, 2021 versions of QSO-20-39-NH from CMS, the April 30, 2020 CDC document entitled "Responding to Coronavirus (COVID-19) in Nursing Homes," and the March 29, 2021 CDC updated guidance. These documents, though styled as guidance, are compulsory orders as to Plaintiff because Michigan regulators mandated compliance with them.

MDHHS consistently provided that residential care facilities like Plaintiff "shall" comply with QSO-20-39-NH. *Id.* ¶¶ 30, 44. The relevant MDHHS orders provide for fines and criminal penalties in the event of noncompliance. *Id.* ¶¶ 26, 36, 41. And MDLARA directed facilities to adopt an infection prevention and control program that "must be based on an accepted national standard." *Id.* ¶ 57. The "likely national standard" was the recommendations provided by the CDC. *Id.* ¶ 58. MDLARA stated that "[o]nce a provider adopts a national set of standards, these standards are viewed as required, and no longer just recommendations." *Id.* ¶ 59.

As the United States has conceded in an analogous context, voluntary federal guidance can be transformed into binding orders for purposes of the ERC if state officials mandate compliance with the guidance. *See The Carrolton of Dunn,* ECF No. 44 at 19 ("Thus, as of September 28, 2020, the CMS Memorandum became a governmental order as to [Plaintiff] by virtue of being incorporated into a mandated state order."). The same is true here. State officials unambiguously mandated compliance with federal guidance. At that point, by operation of state law, the federal guidance became a requirement.[6]

### B. Plaintiff's Operations Were Partially Suspended

That leaves primarily the question of partial suspension. The undisputed facts demonstrate that Plaintiff's operations were partially suspended in numerous ways during the first quarter of 2021. First, CRF and quarantining obligations restricted the use of an entire wing and meaningfully interfered with Plaintiff's ability to operate its short-term rehabilitation business, which is a major revenue source. Second, social distancing and quarantining requirements constrained Plaintiff's ability to conduct therapy services, which constitute a material portion of its operations. Third, orders limiting visitation and communal dining imposed a form of lockdown and led to a reduction in Plaintiff's census.

Each of these three impacts is sufficient by itself to constitute a partial suspension. As a result, if the Court agrees with just one of the three, summary judgment is proper. But taken collectively, the evidence is overwhelming.

Although Plaintiff believes that only but-for causation is required and that the "more than a nominal effect" test does not apply, that should not have a bearing on the outcome of the case.

---

[6] Plaintiff maintains that the federal guidance constituted an order irrespective of state law due to the adverse consequences regulated entities can face if they ignore federal standards, but it is not necessary to reach that issue.

As described below, all of the impacts addressed in this motion separately meet the proximate causation standard and are more than nominal in nature.

*i. Governmental Orders Limited Use of an Entire Wing*

*a. Causation*

Governmental orders suspended the operation of Plaintiff's short-term rehabilitation business during the first quarter of 2021. In order for Plaintiff to be permitted to retain residents who tested positive for COVID, MDHHS required it to have a "designated COVID-positive area (designated area can include a portion of a unit, wing, or separate building)." SUF ¶ 19, 21. Separately, Plaintiff was required to quarantine new residents upon admission or readmission. *Id.* ¶ 62. The only feasible location for this COVID wing and quarantining space in Plaintiff's facility was its 700 unit, a 12-bed, all-private-room wing with its own air handling system. Perry Decl. ¶ 4. The 700 unit opened in March 2019 to attract short-term rehabilitation patients, but Plaintiff was required to use it exclusively for CRF and quarantining purposes throughout the first quarter of 2021. SUF ¶¶ 129, 135; Perry Decl. ¶ 3. Even assuming proximate causation is required, it was unquestionably foreseeable that the requirement to dedicate a separate space to CRF requirements and to arrange for quarantining would deprive businesses of the normal uses of those rooms, which is precisely what happened here. *Cf. Tri-State Memorial Hospital*, ECF No. 38, PageID.420 (finding, in context of ruling on motion to dismiss, that plaintiff met burden by alleging that it "reduced patient beds and visits" and "was required to isolate and examine individuals in single closed rooms instead of allowing an additional patient to co-habitat[e] the room as normal").

Plaintiff expects that the United States will argue that causation is broken because facilities were not technically required to become CRFs. As an initial matter, the quarantining requirements independently prevented normal use of the 700 wing and would have done so even in the absence of Plaintiff's CRF status. But even setting that aside, the argument is a red herring.

For the CRF beds, it is true but irrelevant that facilities technically had a choice about how to constrain capacity. Specifically, residential care facilities like Plaintiff could become CRFs, which required them to set beds aside for COVID-positive residents even if there were none at the facility, and by extension to keep those beds away from COVID-negative putative residents even if they wanted to occupy the beds. Or they could forgo CRF status, which obligated them to discharge residents if they became ill with COVID. In reality, this was no choice at all, as there were no facilities in geographic proximity that could accept COVID-positive residents, meaning that it would not have been possible to comply with the requirement for non-CRF facilities to discharge COVID-positive residents. *See* Perry Tr. at 157:4-13. And even if that were not the case, a "choice" that requires a medical care facility to forgo caring for its residents by discharging them is not legally relevant. Indeed, as a court has held in the context of evaluating COVID-related restrictions in the insurance context, a facility's "choice" to perform services that are "necessary care to its community" and integral to its "bottom line and ability to operate" on the one hand, or to "forgo" such care on the other hand, "is no choice at all." *Lawrence Gen. Hosp. v. Cont'l Cas. Co.*, 90 F.4th 593, 605 (1st Cir. 2024).

Finally, given that not becoming a CRF also would have constrained capacity by forcing the discharge of residents, the existence of options has no bearing on the partial suspension test. Put differently, if either choice a facility made pursuant to governmental orders would effectuate a partial suspension, then there is a partial suspension due to those orders. Indeed, governmental orders frequently provide for alternative methods of compliance, but that does not make them any less mandatory. *See, e.g.*, *Hoffman Grp., Inc. v. EPA*, 902 F.2d 567, 569 (7th Cir. 1990) ("As the statutory language shows, Congress gave the EPA two options [for compliance] under this provision ...."). The United States already tacitly conceded this point when it acknowledged that

the Michigan orders regarding CRF requirements "contain[] provisions limiting commerce, travel, or group meetings (for commercial, social religious, or other purposes)." SUF ¶ 72.

*b. More Than Nominal Effect*

The 700 wing was designed to consolidate Plaintiff's short-term rehabilitation operations in one place and to attract new residents with short-term needs. *Id.* ¶ 130; Perry Decl. ¶ 9. Because short-term rehabilitation constitutes more than 10 percent of Plaintiff's gross receipts, *see* Filibeck Decl. ¶¶ 6-7, Plaintiff satisfies the IRS's safe harbor, which compels the conclusion that the impact is more than nominal. As described above, the second quarter of 2019 is the appropriate datapoint given that the 700 wing was not operational for the overwhelming majority of the first quarter of 2019. *See* IRS Notice 2021-20 at Q&A 27. In the second quarter of 2019, which was the first quarter that year in which the 700 wing was fully operational, Plaintiff's short-term rehabilitation income exceeded $575,000. Filibeck Decl. ¶ 6. This was more than 10 percent of its gross receipts for that quarter, which amounted to $4,499,868.39. *Id.* ¶ 7.[7] In *Tri-State Memorial Hospital*, the United States conceded that interruptions to certain medical procedures would constitute more than a nominal impact "if the gross revenue that these procedures would have generated in the

[7] Because this metric is only based on short-term rehabilitation where the resident was covered by Medicare A, ICO Medicare A, and Managed Care Certified insurance, this undercounts Plaintiff's short-term rehabilitation revenue, as short-term residents can also be covered by other types of insurance or can pay privately. *Id.* ¶ 5. For clarity, however, Plaintiff notes that not all short-term rehabilitation revenue included in this calculation is from the 700 wing. Plaintiff's revenue from the 700 wing in the second quarter of 2019 was $437,203.61, which is 9.7 percent of Plaintiff's gross revenue from that quarter. *Id.* ¶¶ 7-8. The parties disagree over whether Plaintiff was required to produce the calculation for the 700 wing revenue during discovery. To avoid the issue for purposes of the motion, Plaintiff does not seek to make affirmative use of the $437,203.61 metric and instead presents it only to acknowledge in candor that the revenue from the 700 wing standing alone did not reach the 10 percent threshold in the second quarter of 2019. However, given that the purpose of the 700 wing was to consolidate Plaintiff's short-term rehabilitation activities and that those activities are intended to be overwhelmingly concentrated in that unit, Plaintiff submits that the appropriate metric for purposes of the safe harbor is total short-term rehabilitation revenue. *See* Perry Decl. ¶ 9.

same quarters in 2019 were at least 10% of Tri-State's total gross revenue in those quarters." *Tri-State Memorial Hospital*, ECF No. 28, PageID.143. The same principle governs here.

In this context, it is immaterial that some short-term rehabilitation was permitted to occur outside of the 700 wing. For instance, in *Tri-State Memorial Hospital*, the relevant medical procedures were not entirely prohibited; they were only restricted "when surge limits were exceeded." *Id.*, ECF No. 38, PageID.420. This was enough to demonstrate "an interruption and stoppage of Plaintiff's business of conducting specific procedures." *Id.* At a minimum, deprivation of the ability to conduct short-term rehabilitation in the unit specifically designed for that purpose constitutes a significant "modification" and is therefore sufficient. *See* IRS Notice 2021-20 at Q&A 17.

Even without the safe harbor, it is clear that the impact to the wing had more than a nominal effect on operations. The inability to use the 700 wing as intended had an enormous effect on Plaintiff's operations, especially given that short-term rehabilitation stays are the most profitable type of service that Plaintiff offers. Indeed, the short-term rehabilitation reimbursement rates typically exceed long-term rates by more than $100 per resident per day. *See* Ex. 36. Given that Plaintiff is a business that year after year incurs a net operating loss, these numbers cannot plausibly be viewed as nominal. *Cf. Titan Mutual Lending*, ECF No. 41, PageID.901 (citing with approval the Black's Law Dictionary definition of "nominal," which looks at whether something is "trifling, esp. as compared to what would be expected"); *Sanchez-Diaz*, 88 F.4th at 92 n.7 ("In so holding, we emphasize that 'more than nominal' is not an absolute number. Rather, courts should determine in the context of a particular case whether the value that a relief defendant provided is more than nominal in relation to the funds received.").

Even if the 700 wing were not a distinct profit center for Plaintiff, the result would be the same, as the CRF and quarantining requirements caused Plaintiff to have at least 12 empty beds at all times. That is because even when one of the 700 wing beds was in use, another bed had to be left open elsewhere in the facility for when the resident on the 700 wing finished isolation. *See* SUF ¶ 141. The 12 beds constitute 8.6 percent of Plaintiff's capacity. *Id.* ¶ 140. Put differently, due to governmental orders, Plaintiff was prevented from ever operating above 91.4 percent occupancy during the first quarter of 2021. And although these 12 rooms constitute 8.6 percent of total beds, they also comprise 12.8 percent of total rooms from 2021. Perry Decl. ¶ 8. That is because they are single rooms, whereas many of Plaintiff's rooms hold two residents. *Id.* ¶¶ 4, 8. It is indisputable that a restriction of this magnitude affected operations in a more-than-nominal fashion.

Finally, as noted above, it is not relevant whether there would have been demand for the 700 wing beds in the first quarter of 2021 had they not been subject to restrictions. Just as a restaurant that cannot offer indoor dining does not need to show that it was turning away would-be diners, Plaintiff does not need to prove that it rejected potential short-term rehabilitation residents (or anyone else) due to governmental orders. *See* IRS Notice 2021-20 at Q&A 17. The ERC test looks to restrictions on capacity to offer services and is agnostic to demand for those services.

*ii. Governmental Orders Constrained Therapy Services*

*a. Causation*

Governmental orders materially limited Plaintiff's therapy services in the first quarter of 2021. Orders from MDHHS, MDLARA, the CDC, and CMS required Plaintiff to observe social distancing and to quarantine new admissions and readmissions, thereby limiting the number of residents who could be receiving therapy at any given time. These restrictions are directly traceable to governmental orders, which "meaningfully restricted the amount of therapy that could be

conducted in a given day." Lindeman Decl. ¶ 5. Additionally, Plaintiff has provided unrebutted testimony from its contract therapy provider that the governmental orders "materially impacted the volume of therapy services that could be performed at Marquette County Medical Care Facility during the first three quarters of 2021." *Id.* ¶ 6. This uncontroverted testimony also establishes that, "[e]ven controlling for the decline in census, the quarantining and social distancing requirements were still material." *Id.* ¶ 7. Specifically, without those orders, Plaintiff "could have performed a meaningfully higher volume of therapy services…in the first three quarters of 2021." *Id.* As a matter of law, it is foreseeable that restrictions on the ability to congregate in groups would impact the ability to conduct therapy.

*b. More Than Nominal Effect*

This suspension impacted Plaintiff in a way that was neither trifling nor insignificant. Therapy is a substantial part of Plaintiff's revenue. In the first three quarters of 2019, therapy revenue accounted for between 5.5 and 7.3 percent of Plaintiff's patient-related revenue in each quarter. Filibeck Decl. ¶¶ 16, 20, 24. And in first quarter of 2021, Plaintiff's therapy metrics suffered substantially. Plaintiff conducted 19.8 percent fewer minutes of therapy in the first quarter of 2021, as compared to the first quarter of 2019, and its therapy revenue fell by 21 percent over the same period. *Id.* ¶ 15; SUF ¶ 116; *cf. Tri-State Memorial Hospital*, ECF No. 38, PageID.420 (finding, in context of ruling on motion to dismiss, that plaintiff "demonstrates an interruption and stoppage of Plaintiff's business of conducting specific procedures" after considering drop in revenue from canceling non-urgent procedures when surge limits were exceeded).

Additionally, Plaintiff's overall financial position is relevant to the determination of whether an impact is more than nominal. Therapy typically brings in hundreds of thousands of dollars of revenue each quarter. For a business like Plaintiff, which had net operating losses of between $1.9 million and $2.9 million each year between 2019 and 2021, this type of revenue is

extremely significant. *Cf. Titan Mutual Lending*, ECF No. 41, PageID.901; *Sanchez-Diaz*, 88 F.4th at 92 n.7. In sum, it is clear that Plaintiff's operations were impacted by far more than the "modern-day equivalent of a peppercorn," *KDT Indus.*, 30 B.R. at 255, and that the impacts were quite significant in the overall context of Plaintiff's operations.

The non-nominal nature of the suspension is confirmed by the IRS's own guidance, which addresses a physical therapy company that was not permitted to operate out of its normal building but was nonetheless able to "move[] to an online format." IRS Notice 2021-20 at Q&A 15. It was therefore able to "serve some of its clients remotely," albeit without the "specific equipment or tools that they typically use." *Id.* The IRS concludes that this business was partially suspended because its "workplace, including access to physical therapy equipment, is central to its operations, and the business cannot continue in a comparable manner." *Id.* Likewise, although Plaintiff did not have to move to online therapy, it did lose access to normal use of its space, and that is sufficient.

The main factual difference between Plaintiff and the business identified in the IRS's guidance is that Plaintiff's business is not limited to therapy. But that is immaterial given that therapy constitutes an appreciable portion of Plaintiff's operations. Indeed, the IRS's guidance separately confirms that social distancing requirements can form the basis of a partial suspension. *See id.* at Q&A 17 ("If all, or all but a nominal portion, of an employer's business operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances."). That is precisely what happened here.

Finally, although Plaintiff expects the United States to note that Plaintiff's therapy revenue is offset by expenses it pays to its contract therapy provider, that is irrelevant to the question of whether therapy is a meaningful portion of Plaintiff's business. Plaintiff provides therapy services at a profit. Filibeck Decl. ¶ 21. It pays a percentage of the fees it receives to its contract therapy provider and retains the rest. *Id.* This is no different than other skilled nursing services Plaintiff offers, except that the therapy expenses are to a contractor, whereas the other services are typically performed by employees who have their own offsetting expenses, most notably their wages. In a business that otherwise operates at loss, therapy is one area of profit given that Plaintiff incurs no expenses other than the payments to the contractor, which contractually are only a portion of the overall revenue. *Id.*

*iii. Orders Related to Visitation and Activities Effectuated a Partial Suspension*

*a. Causation*

The restrictions on visitation and communal activities also led to a partial suspension in the first quarter of 2021. The impacts came in two forms. First, on occasions during the first quarter of 2021, Plaintiff was required by government orders to suspend communal dining and visitation. *See, e.g.*, SUF ¶¶ 76, 79-80, 162, 165-66. This was in addition to at least one two-week ban on admissions due to a COVID outbreak, which independently effectuated a suspension. *Id.* ¶ 81. Second, actual and putative residents and family members expressed fear about potential future lockdowns that would be required under governmental orders in the event of COVID positivity within the facility. Perry Tr. at 187:12-188:2.

As an initial matter, restrictions on the ability of family members to enter the building and of residents to engage in communal activities clearly constitute a suspension. That a building is partially locked down is sufficient to demonstrate a partial suspension under ordinary construction

of the term. But beyond that, the uncontroverted evidence demonstrates that the restrictions impacted Plaintiff's census. Plaintiff's Administrator and Rule 30(b)(6) designee testified that people "[a]bsolutely" declined to become residents or left the facility prematurely "due to government orders." *Id.* She testified to her personal knowledge of conversations where family members talked about the "isolat[ion]" imposed by the governmental orders as a basis for declining to be admitted or for early discharge and about their fear that their loved ones would not survive without social contact. *Id.*[8] The United States has offered no evidence to rebut this.

It is also foreseeable that such restrictions would effectuate a partial suspension. There is an entire federal regulatory regime pertaining to residential care facilities that recognizes the fundamental importance of visitation and group activities, which are deemed to be essential to residents' "right to a dignified existence" and "self-determination." 42 C.F.R. § 483.10(a). Outside of public health emergencies, each resident has a federally protected "right to receive visitors of his or her choosing at the time of his or her choosing" and a "right to participate in other activities, including social, religious, and community activities." *Id.* § 483.10(f). It is therefore no mystery that severe curtailment of these rights would result in a census decline.

b. *More Than Nominal Effect*

The impact is more than nominal for at least two reasons. First, because care for residents who occupy its beds is Plaintiff's primary source of revenue, orders that cause individuals to leave the facility or not enter it necessarily have a significant impact on Plaintiff's operations. Second,

[8] This testimony is not inadmissible hearsay because it is not being offered for the truth of the matter. Plaintiff is not attempting through this testimony to prove that isolation could result in adverse health consequences. Rather, Plaintiff offers this testimony to demonstrate a course of conduct, which is that people declined to enter into or stay at the facility due to concerns over the governmental orders. *See, e.g.*, *United States v. Parillo*, 972 F.2d 349, at *4 (6th Cir. 1992).

restrictions that relate to core rights, including the "right to a dignified existence," are definitionally beyond nominal.

*iv. Collectively, the Evidence Is Overwhelming*

Although the Court can grant summary judgment on the basis of any of the above impacts standing alone, the collective record paints a picture that is overwhelming and that is sufficient to satisfy the IRS's ERC safe-harbor test. In particular, Plaintiff experienced a 14.6 percent decline in its census and a 30 percent decrease in new admissions in the first quarter of 2021, each as compared to the same quarter in 2019. SUF ¶¶ 88, 97.[9] These impacts to core metrics both exceed the 10 percent threshold outlined in the IRS's safe-harbor test. And, as described above, the declines to these metrics are direct and foreseeable consequences of governmental orders. As a result, Plaintiff is entitled to summary judgment under the binding safe harbor created by the IRS. *See, e.g.*, ECF No. 15, PageID.68; *Equal Emp. Opportunity Comm'n*, 933 F.3d at 442.

**C. All Other Requirements Are Satisfied**

Finally, Plaintiff meets all the other criteria for the ERC. It properly calculated the credit based on the formula set forth in the statute. Filibeck Decl. ¶ 22-23. It timely filed an amended return claiming a refund of $1,460,043.78 for the first quarter of 2021. SUF ¶ 9. And it timely filed this lawsuit after the IRS denied its claim. *Id.* ¶ 11.

[9] The actual impact to census is even higher given that Plaintiff's 700 wing was under construction for most of the first quarter of 2019 and was therefore not housing residents. *Id.* ¶¶ 125, 128-29. Had those beds been available, Plaintiff's baseline 2019 census would have been higher.

## V. Conclusion

Plaintiff has established entitlement to the ERC as a matter of law based on the undisputed facts. As a result, the Court should enter judgment in Plaintiff's favor on Count I in the amount of $1,460,043.78, plus interest as allowed by law.

Dated: August 28, 2026

*/s/ Robert S. Silverblatt*
Robert S. Silverblatt
DC Bar No. 1020748
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9132
Facsimile: (202) 778-9100
Rob.Silverblatt@klgates.com

*Counsel for Plaintiff Marquette County Medical Care Facility*