UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARQUETTE COUNTY MEDICAL CARE FACILITY,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.
_______________________________/

Case No. 2:25-cv-00135-JMB-SJB

Hon. Jane M. Beckering

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF'S OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Dated: September 25, 2026

/s/ Robert S. Silverblatt
Robert S. Silverblatt
DC Bar No. 1020748
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9132
Facsimile: (202) 778-9100
Rob.Silverblatt@klgates.com

*Counsel for Plaintiff Marquette County Medical Care Facility*

# TABLE OF CONTENTS

Page

Introduction ........ 1

I. Standards ........ 1

II. Argument ........ 1

A. The United States Misstates the Governing Standards ........ 2

i. A "complete stoppage" is not a requirement ........ 2

a. The cited cases do not impose a "complete stoppage" requirement ........ 2

b. IRS guidance and DOJ briefing confirm that a "complete stoppage" is not required ........ 4

c. The debate over general pandemic conditions is irrelevant ........ 5

d. Section headings and committee reports do not change the analysis ........ 6

ii. Proximate cause is not a requirement ........ 7

a. The "presumption out" argument is unpersuasive ........ 8

b. The existence of the gross receipts test is not relevant to causation ........ 9

c. Case law on deference does not require proximate causation ........ 10

B. There Is Substantial Evidence of a Partial Suspension Due to Governmental Orders ........ 11

i. CRF and quarantining requirements ........ 11

ii. Therapy services ........ 17

a. It is irrelevant that the work was performed by contractors ........ 17

b. No "stoppage" is required ........ 20

c. Plaintiff has produced evidence for all three quarters ........ 21

d. The United States' alternative explanation fails ........ 24

iii. Visitation and communal activities ........ 25

iv. Increased expenses ........ 28

v. Restriction on admissions ........ 28

Conclusion ........ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Dir., OWCP*,
886 F.2d 818 (6th Cir. 1989) ....................7

*Am. Car Rental Ass'n v. Humphreys*,
789 F. Supp. 3d 1043 ....................10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................1

*Audio Technica U.S., Inc. v. United States*,
963 F.3d 569 (6th Cir. 2020) ....................10

*Burrage v. United States*,
571 U.S. 204 (2014)....................7, 8

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002) ....................17

*JPM Restaurant, LLC v. United States*,
No. 1:24-CV-357, 2026 WL 561147 (E.D. Tenn. Feb. 27, 2026) (appeal filed) ....................2, 3

*In re JSmith Civ., LLC*,
674 B.R. 207 (Bankr. E.D.N.C. 2025) (appeal filed) ....................2, 3, 4, 8

*Kentucky v. United States Env't Prot. Agency*,
123 F.4th 447 (6th Cir. 2024) ....................5

*Lawrence Gen. Hosp. v. Cont'l Cas. Co.*,
90 F.4th 593 (1st Cir. 2024)....................12

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018)....................6

*Moshi v. Kia Am., Inc.*,
155 F.4th 652 (6th Cir. 2025) ....................16

*Ne. Health Servs., LLC v. United States*,
181 Fed. Cl. 566 (2026) ....................3, 4, 9

*Raam Constr. Inc v. United States*,
No. 2:25-CV-04681-SPG-AJR, 2026 WL 1864866 (C.D. Cal. June 23, 2026)....................4

*Stenson Tamaddon LLC v. United States Internal Revenue Serv.*, No. CV-24-01123-PHX-SPL, 2025 WL 1725942 (D. Ariz. June 20, 2025) (appeal filed) ....9

*Sundancer Pools, Inc. v. United States*, 182 Fed. Cl. 246 (2026) ....3, 4, 6, 20, 21

*Tapestry Senior Hous. Mgmt., LLC v. United States*, No. 25-CV-3419, 2026 WL 1831424 (D. Minn. June 25, 2026)....3, 4

*Tcherepnin v. Knight*, 389 U.S. 332 (1967)....11

*Titan Mutual Lending, Inc. v. United States*, No. 8:25-cv-669-ADS (C.D. Cal. Aug. 3, 2026) ....6, 11

*Tri-State Memorial Hospital*, No. 2:25-cv-00181-TOR (Fed. Cl. Jan. 20, 2026) ....5, 6, 11, 20

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004) ....16, 24, 27

*Weingarden v. Comm'r*, 825 F.2d 1027 (6th Cir. 1987) ....11

*Zettle v. Handy Mfg. Co.*, 998 F.2d 358 (6th Cir. 1993) ....1

**Statutes**

26 U.S.C. § 3134(c)(2)(A)(ii)(I) ....25

26 U.S.C. § 3134(c)(2)(A)(ii)(II)....6, 10

26 U.S.C. § 3134(c)(3)(A)(ii) ....19

26 U.S.C. § 3134(c)(3)(A)(ii)(I) ....28

**Rules**

42 C.F.R. § 483.10(a)....26

42 C.F.R. § 483.40(c)....18

42 C.F.R. § 483.470(f) ....18

Rule 30(b)(6)....13, 15, 16, 27

**Other Authorities**

166 Cong. Rec. S1897-02 .......................................................................................................7

## Introduction

Plaintiff Marquette County Medical Care Facility experienced severe disruption to its operations as a result of governmental orders. That disruption was sufficiently acute that it constituted a partial suspension as a matter of law in the first quarter of 2021, which entitles Plaintiff to summary judgment on its employee retention credit ("ERC") claim in Count I. Even if the Court disagrees, the evidence is at a minimum sufficiently strong to deny the United States' motion as to Count I. As to Counts II and III, which relate to the second and third quarters of 2021, genuine disputes about material facts preclude summary judgment.

### I. Standards

Summary judgment motions should be denied where the opposing party is entitled to summary judgment or where there are genuine disputes as to material facts. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nonetheless, caution is warranted when the parties present different interpretations of the record. *See Zettle v. Handy Mfg. Co.*, 998 F.2d 358, 360 (6th Cir. 1993) ("Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions and trial courts should, therefore, act with caution in granting summary judgment.").

### II. Argument

The United States' motion misstates the governing legal test in significant ways by attempting to impose hurdles that are not present in the ERC statute. It then attempts to apply that invented standard to a skewed recitation of the facts, omitting key evidence and often failing to distinguish between the relevant quarters at issue in this case. Under the appropriate legal framework, and taking account of the full factual record, the United States' motion should be denied.

**A. The United States Misstates the Governing Standards**

*i. A "complete stoppage" is not a requirement*

The core of the United States' motion is the inaccurate statement that the "majority of courts applying the suspension test have agreed that a complete stoppage of at least a portion of a business'[s] operations is required to meet the partial suspension test." ECF No. 48-1, PageID.1604. Although the United States cites a litany of cases for that proposition, not a single one of them supports it. Indeed, the term "complete stoppage" is nowhere to be found in any of them. And multiple other authorities contradict the United States' position.

*a. The cited cases do not impose a "complete stoppage" requirement*

First, *JPM Restaurant, LLC v. United States*, No. 1:24-CV-357, 2026 WL 561147 (E.D. Tenn. Feb. 27, 2026) (appeal filed), does not use the term "complete stoppage." To the contrary, it acknowledges that a "delay" or "interruption" of operations is sufficient. These words are meaningfully different than "stoppage." And it provides an example of a restaurant that would qualify because it was required to "reduc[e] hours," *id.* at *4, which again is not a "stoppage" of any distinct portion of business. Nor would there be any logic to the contention that a business that is forced to close for a couple of hours at a time is eligible, while a business that is required to operate at partial capacity all hours of every day is not. Indeed, when the United States proffered a test that used the words "stopped or closed," the court noted that the proposal lacked authority and used "different…language" than the statute. *Id.*

Next up is *In re JSmith Civ., LLC*, 674 B.R. 207 (Bankr. E.D.N.C. 2025) (appeal filed), which provided for a partial suspension if a business "stopped a meaningful portion of its operations during the relevant quarter." *Id.* at 215. That plainly does not require a "complete stoppage" of a distinct portion. Indeed, the only time the decision uses the word "complete" is to

distinguish a full suspension, which is not at issue here, from a partial one, which is at issue and is definitionally not a "complete" suspension. *Id.* at 214.

The third case, *Tapestry Senior Hous. Mgmt., LLC v. United States*, No. 25-CV-3419 (LMP/EMB), 2026 WL 1831424 (D. Minn. June 25, 2026), does use the phrase "cease operating some portion of its business," but it cites no authority for that proposition. *Id.* at *5. It refers to *JPM* on that point, but it cites to the part of that decision that requires proximate causation rather than the portion that discusses the meaning of a partial suspension. *Id.* And it acknowledges that, with proper pleading, the plaintiff might be able to establish a partial suspension through reference to orders to "block prospective tenants," even though prospective residents are not their own distinct business line. *Id.* Finally, the word "complete" does not appear at all in the decision.

The fourth case, *Sundancer Pools, Inc. v. United States*, 182 Fed. Cl. 246 (2026), defines a partial suspension as a "temporary interruption, postponement, or cessation of a more than nominal portion of a business's operations." *Id.* at 252. The disjunctive phrasing makes clear that a "cessation" is not required. Instead, an "interruption" or "postponement" will suffice. As with *JSmith*, the word "complete" is used only as an example of what is not required for a partial suspension. *Id.* at 251.

As for the fifth case, it is apparent that *Ne. Health Servs., LLC v. United States*, 181 Fed. Cl. 566 (2026), did not impose a requirement that a business be "forced by the government to shut their doors to the public." *Id.* at 578. Although this is certainly an example of a full suspension, the opinion never even attempted to define the term "partial suspension."

Even to the extent some of these cases use phrases that, taken out of context, appear to sweep broadly, not a single one of them turned on the distinction between a complete stoppage and an interruption. *See JPM*, 2026 WL 561147, at *9 (impacts due to "voluntary" decisions rather

than governmental orders); *JSmith*, 674 B.R. at 215-18 (no qualifying governmental orders); *Tapestry*, 2026 WL 1831424, at *5-*7 (failure to specify the orders at issue); *Sundancer*, 182 Fed. Cl. at 252-54 (allegations insufficient to survive motion to dismiss due to failure to establish nexus between governmental orders and suspension); *Ne. Health*, 181 Fed. Cl. at 581-84 (governmental orders either did not apply or did not require the plaintiff to undertake the relied-upon actions). None of these cases involved a litigant like Plaintiff that demonstrated a substantial interruption to its business as a clear result of governmental orders.[1]

*b. IRS guidance and DOJ briefing confirm that a "complete stoppage" is not required*

Apart from lacking any support in the cited cases, the United States' position in this case also contradicts the views of the IRS and statements the United States has made in other litigation. IRS guidance specifically cites the following examples of limitations that can give rise to a partial suspension if they have "more than a nominal effect on the employer's business operations": "limiting occupancy to provide for social distancing, requiring services to be performed only on an appointment basis (for businesses that previously offered walk-in service), changing the format of service (for example, restrictions on buffet or self-serve, but not prepackaged or carry-out), or requiring employees and customers to wear face coverings." IRS Notice 2021-20 at Q&A 18.[2]

[1] Later in its brief, the United States perplexingly adds *Raam Constr. Inc v. United States*, No. 2:25-CV-04681-SPG-AJR, 2026 WL 1864866 (C.D. Cal. June 23, 2026), to its string cite, purportedly for the proposition that a business that "*modifies* its operations—but does not *stop* any meaningful portion—has not experienced a 'partial suspension' of operations." ECF No. 48-1, PageID.1608-1609 (emphasis in original). But as the very passage quoted by the United States makes clear, that case says no such thing. To the contrary, it defines a partial suspension to include situations where "operations are temporarily interrupted or prevented from complete performance." *Raam*, 2026 WL 1864866, at *7. This would include modifications, and it by no means requires a stoppage.

[2] The IRS's notice is not entitled to deference, except to the extent that it is persuasive or creates reliance interests. *See, e.g.*, ECF No. 59, PageID.3001, 3008. Although Plaintiff disagrees with certain portions of Notice 2021-20, the notice is persuasive regarding the basic premise that a complete stoppage is not required, and it also creates reliance interests on that point.

None of these involve complete stoppages. The IRS then repeated that interpretation in September 2023 in a guidance document that remains available on its website. *See Frequently asked questions about the employee retention credit, Qualifying government orders*, Q&A 5, IRS (added Sept. 14, 2023), *available at* https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit ("If all parts of your business could operate but you had to modify how it operated, then we will consider you to be partially suspended if you can show that the order had more than a nominal effect on your business."). The United States should not be permitted to casually contradict that view. *Cf. Kentucky v. United States Env't Prot. Agency*, 123 F.4th 447, 470 (6th Cir. 2024) (cautioning against agencies that "'pull a surprise switcheroo' by issuing a final action that flatly contradicts prior guidance").

The United States' position is likewise irreconcilable with its own brief in another ERC case. Specifically, in *Tri-State Memorial Hospital v. United States*, the United States conceded that interruptions to certain medical procedures would constitute more than a nominal impact "if the gross revenue that these procedures would have generated in the same quarters in 2019 were at least 10% of Tri-State's total gross revenue in those quarters." *Tri-State Memorial Hospital*, No. 2:25-cv-00181-TOR (Fed. Cl. Jan. 20, 2026), ECF No. 28, PageID.143. This is so even though the relevant medical procedures were not entirely prohibited; they were only restricted "when surge limits were exceeded." *Id.*, ECF No. 38, PageID.420. Again, this is nothing resembling a complete stoppage.

*c. The debate over general pandemic conditions is irrelevant*

At most, the authorities cited by the United States reflect split views about the degree of interruption needed for a partial suspension. This is not a debate about complete stoppages versus interruptions, but rather about whether general disruptions qualify. On the one hand, some cases have suggested that the disruption needs to be more acute than the general baseline impacts that

businesses across the country experienced during the pandemic. *See, e.g.*, *Sundancer*, 182 Fed. Cl. at 254. Other courts have disagreed. *See Tri-State Memorial Hospital*, No. 2:25-cv-00181-TOR, ECF No. 38, PageID.416-17 (concluding that there is no requirement that the impacts be "significant" or "surpass[] [the] basic economic impact that all employers faced during the pandemic"); *Titan Mutual Lending, Inc. v. United States*, No. 8:25-cv-669-ADS (C.D. Cal. Aug. 3, 2026), ECF No. 41, PageID.901 (rejecting the argument that a "'partial suspension' requires a business to suspend a 'meaningful portion' of its business operations," as such an interpretation is inconsistent with the "plain and ordinary meaning of 'partial'" as anything that is "'less than a whole'"). Although Plaintiff believes that *Tri-State Memorial Hospital* and *Titan Mutual Lending* present the better reading, there is likely no need to resolve the issue in order to decide the pending motions, as Plaintiff relies on particularized harms directly traceable to governmental orders.

*d. Section headings and committee reports do not change the analysis*

As a final effort, the United States seeks support in a congressional committee report and a section heading that refer to "closure." ECF No. 48-1, PageID.1609. At least one court has already rejected a similar argument. *See Tri-State Memorial Hospital*, No. 2:25-cv-00181-TOR, ECF No. 38, PageID.417. Additionally, the very case law the United States cites makes clear that "section headings cannot limit the plain meaning of a statutory text." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018). Here, it is clear that the ERC is not available only to businesses facing "closure." Such a requirement would, for instance, read the gross receipts test entirely out of the statute, as that test unquestionably does not require a closure. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II) (permitting the ERC for businesses with substantial declines in gross receipts). As discussed below, making the gross receipts test superfluous is the very result the United States agrees should not happen when it (wrongly) accuses Plaintiff of attempting to bring about such an outcome on the causation prong. To be sure, closure is one way to qualify for the

ERC, as a complete closure would be a full suspension. But given that it is apparent that closure is not always a prerequisite (see, for example, the gross receipts test), it is not clear why it would be a precondition to a partial suspension, particularly considering the natural meaning of the word "partial."[3]

In sum, the United States proffers a "complete stoppage" requirement that is invented from whole cloth. It is not in the cases that the United States cites. It has no place in the actual words of the partial suspension test. No canon of interpretation supports it. It is inconsistent with the IRS's guidance. And it contradicts the United States' briefing in another case.

*ii. Proximate cause is not a requirement*

Although Plaintiff believes that all of its arguments carry the day regardless of whether but-for or proximate causation is required, Plaintiff nonetheless pauses to address the United States' arguments on causation. The United States' view on causation amounts to a policy preference masquerading as a legal position. The United States does not deny that overwhelming authority supports the conclusion that "due to" implicates only but-for causation. Instead, the United States relegates that concession to a footnote. *See* ECF No. 48-1, PageID.1615-1616 n.2 (citing, among other authorities, *Burrage v. United States*, 571 U.S. 204 (2014)). Although the United States is correct that the Sixth Circuit has described "due to" as having "a broad variety of meanings," *Adams v. Dir., OWCP*, 886 F.2d 818, 821 (6th Cir. 1989), that decision predates not only *Burrage*, but also the four Supreme Court cases that *Burrage* cited as support for the "insistence on but-for

[3] On the subject of legislative intent, Plaintiff is troubled by the United States' statement that it is not entitled to the ERC in part because it "did not have to lay off employees." ECF No. 48-1, PageID.1611. The purpose of the ERC was to help prevent layoffs. *See, e.g.*, 166 Cong. Rec. S1897-02, S1897 ("Our joint vision is to help small businesses and their employees make it through to the other side of this crisis by providing cashflow assistance quickly to employers who agree to keep their workers on the payroll."). It is befuddling that the United States would induce businesses to retain their employees by promising a credit, delay the credit for several years, and then cite the businesses' survival as a reason they never really needed the credit in the first instance.

causality." *Burrage*, 571 U.S. at 213. With a heavy thumb on the scale in favor of but-for causation, the United States' counterarguments are unavailing.

*a. The "presumption out" argument is unpersuasive*

First, the United States repeatedly characterizes the ERC statute as a "presumption-out statute." The legal significance of this descriptor is dubious. As far as Plaintiff can tell, the term "presumption-out statute" never existed in case law prior to the ERC. But even setting that aside, the United States has attempted to transform a statement about default presumptions into a shorthand for "make the ERC as difficult as possible to obtain by taking the maximally restrictive view of every part of the test." This is not legal analysis; it is a policy preference.

The notion of a presumption-out statute means only that "everyone starts outside of eligibility for the stated relief, and claimants must show why they fit within and satisfy applicable statutory definitions to get 'in' and qualify for the relief." *JSmith*, 674 B.R. at 213. But that simply means that Plaintiff has the burden of proof, which is something that Plaintiff concedes. What it most assuredly *does not mean* is that Plaintiff's burden is magnified to the highest degree possible on every element, even if the resulting test stretches the statutory text past its breaking point. As Plaintiff has briefed in its motion for summary judgment, the ERC test as written is already difficult for businesses to satisfy; there is no need to impose an extratextual proximate cause standard to limit qualification. *See* ECF No. 59, PageID.3003-3004. In light of other hurdles, including the need to show qualifying governmental orders and to prove a partial suspension, it is simply not true that a proximate causation requirement is the only way to prevent "transform[ation]" into the "sort of 'presumption in' regime [Congress] declined to enact for the ERC." ECF No. 48-1, PageID.1606.

*b. The existence of the gross receipts test is not relevant to causation*

The United States wrongly asserts that the "existence of the Gross Receipts Test confirms a direct and proximate cause standard should be inferred from the term 'due to.'" *Id.*, PageID.1607. As an initial matter, it is not clear why the existence of an alternative pathway to obtain the ERC should make the partial suspension test more demanding. But even setting that aside, the two cases the United States cites are not persuasive.

The first case, *Stenson Tamaddon LLC v. United States Internal Revenue Serv.*, No. CV-24-01123-PHX-SPL, 2025 WL 1725942 (D. Ariz. June 20, 2025) (appeal filed), is irrelevant. The part of that decision the United States quotes does not even relate to proximate causation. Rather, the court was addressing what it characterized as an attack on the ERC's availability for a business that has "suspended operations of its own volition." *Id.* at *9. Against that backdrop, the court wrote: "And StenTam's argument that 'these rules eliminate ERC for employers suffering indirect but foreseeable effects on business operations' is belied by the fact that there is a second prong of the statute that allows businesses to qualify based on a decline in gross receipts, rather than suspension due to a government order." *Id.* (internal citation omitted). It is one thing to say that businesses that voluntarily suspend operations are disqualified from the ERC, as evidenced by the fact that there is another pathway available to them. It is something else entirely to suggest that this means that businesses that do suspend their operations due to a governmental order need to meet a higher standard.

The second case, *Northeast Health Services*, wrongly asserts that but-for causation would "effectively render[] the decline-in-receipts prong superfluous." 181 Fed. Cl. at 579. There are many businesses that were not subject to qualifying governmental orders. Of those that were, not all of them experienced a partial suspension of operations due to those orders. It is evident that there are still overwhelming numbers of businesses that would be eligible for the gross receipts

test but not the partial suspension test, even if only but-for causation is required. Likewise, any number of businesses were partially suspended but did not experience a significant decline in gross receipts. For instance, although a 20 percent decline in gross receipts is required under 26 U.S.C. § 3134(c)(2)(A)(ii)(II), the IRS and the United States concede that a 10 percent interruption is sufficient to demonstrate a partial suspension.

The anti-superfluity canon was never meant to be read as broadly as the United States urges here. *See, e.g.*, *Am. Car Rental Ass'n v. Humphreys*, 789 F. Supp. 3d 1043, 1049 ("[T]he canon against superfluity only requires what its name implies; it does not require that each provision have entirely distinct coverage—just that total superfluity be avoided."). Whether but-for or proximate causation is required, there will be some businesses that qualify under both the gross receipt and partial suspension pathways, and others that qualify under one but not the other. This is unremarkable, and it certainly is not an indication of superfluity.

*c. Case law on deference does not require proximate causation*

Relatedly, the United States overreads the deference afforded to it in cases involving tax credits. The United States focuses on the statement that statutes granting credits are "strictly construed in favor of the government," ECF No. 48-1, PageID.1603 (quoting *Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 578 (6th Cir. 2020)), but that snippet omits important context. The full quote is as follows: "Federal statutes that grant tax deductions [and credits] are matters of legislative grace and are strictly construed in favor of the government. Therefore, taxpayers carry the burden of proving that they are entitled to tax deductions and credits." *Audio Technica*, 963 F.3d at 578 (internal quotation marks omitted) (alteration in original). In other words, the consequence of the strict construction is that Plaintiff bears the burden of proof, not that courts must strain to impose hurdles where none exist.

The United States also ignores the canon that "remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). This applies with full force to the ERC. *See* ECF No. 59, PageID.2998-2999, 3004 (describing the relevant legislative history). The United States' omission of this canon is meaningful because it trumps the canon of strict construction of tax credits and deductions. Specifically, where credits or deductions are "an expression of 'public policy' rather than legislative grace," the presumption flips, and any ambiguity "created by the statutory scheme" gets construed "in favor of the taxpayer." *Weingarden v. Comm'r*, 825 F.2d 1027, 1029 (6th Cir. 1987).

Given that there is a default presumption in favor of but-for causation and no reason to depart from it here, the Court should reject the United States' attempt to impose additional requirements and should follow the opinions of two other courts that have held that only but-for causation is required. *See Titan Mutual Lending*, No. 8:25-cv-669-ADS, ECF No. 41, PageID.904; *Tri-State Memorial Hospital*, No. 2:25-cv-00181-TOR, ECF No. 38, PageID.425.

### B. There Is Substantial Evidence of a Partial Suspension Due to Governmental Orders

Plaintiff has put forth compelling evidence of a partial suspension due to governmental orders. Each of the categories below is sufficient by itself to defeat summary judgment. And when considered collectively, they overwhelmingly support Plaintiff's position.

#### *i. CRF and quarantining requirements*

Governmental orders required Plaintiff to constrain its capacity throughout the first three quarters of 2021. As a COVID Relief Facility ("CRF"), Plaintiff was obligated to leave beds open for COVID-positive residents, even if there were no such residents in the building. *See* ECF No. 59, PageID.2992. This requirement was in effect throughout the relevant timeframe. *See* Statement of Undisputed Facts ("SUF") ¶ 134. Additionally, Plaintiff had varying degrees of quarantining

requirements for new admissions and readmissions. As described below, these changed over time. Plaintiff used its 700 wing to satisfy the CRF and quarantining obligations. *See, e.g.*, ECF No. 59, PageID.2995-2996. The resulting capacity constraints are exactly the types of restrictions envisioned by the ERC statute. The United States' arguments to the contrary all fail.

The United States' primary argument regarding capacity constraints is that Plaintiff made a voluntary choice to set aside beds for COVID-related purposes. Plaintiff anticipated this argument and addressed it extensively in its summary judgment motion. *See* ECF No. 59, PageID.3011-3013; *Lawrence Gen. Hosp. v. Cont'l Cas. Co.*, 90 F.4th 593, 605 (1st Cir. 2024) (rejecting similar argument in insurance context). For the reasons addressed in Plaintiff's motion, the so-called "choice" is legally irrelevant. Several other points, however, bear emphasizing.

**First**, the United States, in focusing exclusively on CRF beds, ignores the separate quarantining requirements for new admissions and readmissions. For all but the last three days of the first quarter of 2021, those applied to all new residents. SUF ¶ 62. Thereafter, they applied to unvaccinated residents. *Id.* ¶¶ 64, 67. Especially in the first quarter of 2021, Plaintiff had to set aside two beds for new admissions: one in the quarantine wing and a separate one elsewhere in the facility for after the isolation period ended. *Id.* ¶¶ 141-42. As Plaintiff argued in its summary judgment motion, "the quarantining requirements independently prevented normal use of the 700 wing and would have done so even in the absence of Plaintiff's CRF status." ECF No. 59, PageID.3011. By overlooking this significant fact, which was thoroughly addressed throughout the litigation, the United States forfeits any entitlement to summary judgment.[4]

[4] The United States' lone argument about quarantine beds relates to beds outside of the 700 wing. *See* ECF No. 48-1, PageID.1617. These are beds that were set aside for "catastrophes," whether COVID-related or not. ECF No. 56, PageID.2739-2740, at 174:15-175:3. These are not the quarantine beds for new admissions or readmissions that were heavily discussed during discovery and that are at issue in Plaintiff's motion for summary judgment.

**<u>Second</u>**, the United States does not address the fact that there is unrebutted testimony that Plaintiff had to become a CRF. This is so given the implausibility, as applied to Plaintiff, of the requirement for non-CRFs to discharge COVID-positive residents. Plaintiff's Administrator and Rule 30(b)(6) designee testified: "And honestly, we had to retain [COVID-positive residents] because nobody was willing to take them in the [Upper Peninsula], and there was no ambulance service willing to transport them downstate." ECF No. 56, PageID.2722, at 157:4-13. For the reasons previously addressed, any "choice" is not relevant. But even if it were, Plaintiff has presented unchallenged testimony that there was no choice. Although this should be treated as conclusive, at a minimum it creates a factual issue for trial.

**<u>Third</u>**, the United States has already admitted that the CRF-related orders contain provisions that "limit[] commerce, travel, or group meetings" and that they impose those limitations "due to COVID." SUF ¶¶ 72-73. It did so in response to requests for admission and again in the joint statement of facts. The Michigan Department of Health and Human Services ("MDHHS") orders that implement the CRF requirements contain no limitations on travel or group meetings, and they contain only one limitation on commerce: the requirement to become a CRF and set beds aside for COVID-positive residents, or else to discharge COVID-positive residents. If the United States truly believed that this whole regulatory regime was optional, it should not have made those admissions. But it has made them, and it is bound by them.

**<u>Fourth</u>**, as Plaintiff has argued, its capacity would have been constrained regardless of whether it became a CRF. Specifically, CRFs have to set beds aside for COVID-positive residents, and non-CRFs have to keep beds away from COVID-positive residents. In response, the United States contends that Plaintiff's capacity would not have actually been constrained had it not become a CRF, as only one resident tested positive for COVID during the relevant timeframe. ECF

No. 48-1, PageID.1614. Although the United States has attempted to impose upon ERC litigants any number of requirements beyond what Congress included in the statutory text, this is the first time that the United States has insisted on clairvoyance as a criterion for entitlement. Plaintiff made the decision to become a CRF in 2020, at a time when it could not possibly have known the volume of COVID that would be in the building in 2021. Indeed, numerous staff members contracted COVID in 2021, SUF ¶¶ 74-75, and it was simply a matter of chance and a good infection control program that the disease was not more prevalent among residents. Even in the light most favorable to the United States and least favorable to Plaintiff, there was a choice between two capacity-constraining outcomes, either one of which would have created binding obligations throughout the first three quarters of 2021. The United States cannot seriously contend that the mere happenstance of low COVID rates precludes Plaintiff from obtaining the ERC based on the beds that it was required as a CRF to leave open.

Additionally, as described in Plaintiff's motion, it suffices for purposes of the ERC that non-CRFs have capacity constraints. Evidence of the number of residents that Plaintiff actually would have had to discharge is legally irrelevant. *See* ECF No. 59, PageID.3005-3007, 3015.

**<u>Fifth</u>**, it is not relevant that the CRF-related orders did not specify the precise number of beds that facilities needed to set aside for COVID-positive residents. MDHHS stated that facilities could use "a portion of a unit, wing, or separate building." SUF ¶ 19. Even if Plaintiff had selected a smaller CRF space, any "portion" or a unit or wing is more than nominal in nature.[5] Moreover, Plaintiff has provided unrebutted testimony about how the 700 wing was the only plausible choice

[5] As Plaintiff has previously argued, the "more than a nominal effect" test is not actually part of the statute. *See* ECF No. 59, PageID.3000-3001.

for the CRF unit. This should be considered conclusive, or at least enough to create a triable dispute of fact.

**<u>Sixth</u>**, whereas CRF and quarantining orders entitle Plaintiff to summary judgment as to the first quarter of 2021, Plaintiff acknowledges that there are genuine disputes as to the same issues in the second and third quarters of 2021. In arguing otherwise, the United States overlooks key evidence. First, as the United States acknowledges, Plaintiff's contemplated change regarding the use of the 700 wing in the second quarter of 2021 still involved retaining four beds for CRF purposes. Indeed, the United States' misleading statement that the 700 wing was "back to normal" as of June 9, 2021 ignores the statement two sentences later that "[t]here are rooms saved on the wing if a resident will need to quarantine." *Compare* ECF No. 48-1, PageID.1618, with Ex. 28 at 17. This by itself is sufficient to defeat summary judgment. But there is more. Although Plaintiff did, for a brief period of time, admit a limited number of short-term rehabilitation patients into the 700 wing in the second quarter of 2021, while still reserving beds for CRF purposes, the plan to return eight beds to non-COVID use never came to any meaningful fruition. Indeed, the 700 wing maintained occupancy at least 24 percentage points below the building average each month for the second quarter of 2021. SUF ¶¶ 156-158.

And then there is the third quarter of 2021, where the most significant factual dispute arises. That quarter, the 700 wing had no occupancy. *Id.* ¶¶ 159-61. It sat empty, with the understanding that the beds were available for CRF purposes and that the unit could be staffed in the event a resident tested positive for COVID. *Id.* ¶ 139. The United States portrays this decision as solely related to staffing. *See* ECF No. 48-1, PageID.1618. However, the reality is more nuanced, as the decision to unstaff the unit (subject to restaffing in the event of COVID positivity) was inextricably tied to the CRF requirements. As Plaintiff's Rule 30(b)(6) witness explained, "we ended up

unstaffing our 700 unit to use it in the event of COVID." ECF No. 56, PageID.2716, at 151:17-19. Once unvaccinated residents no longer needed to quarantine upon admission, the census in the 700 wing grew so low that the facility was losing money by paying for expensive travel nurses to partially staff a capacity-constrained unit (while still leaving beds open). *Id.* at 167:2-12. In other words, the decision on staffing was a direct result of Plaintiff's obligation to comply with CRF requirements.

Moreover, even setting that aside, any staffing issues Plaintiff had were also attributable to governmental orders. Plaintiff's spending on travel nurses increased by 81.5 percent in 2021, as compared to 2019. SUF ¶ 177. Plaintiff's Rule 30(b)(6) witness testified that "[w]e had to start using agency staffing because we couldn't staff our building[]." ECF No. 56, PageID.2707, at 142:15-16. Specifically, compliance with governmental orders, including extensive requirements surrounding personal protective equipment, caused nursing staff to leave the job. This included eye protection mandated by the Centers for Disease Control and Prevention ("CDC"). SUF ¶ 176; *see also* ECF No. 56, PageID.2708, at 143:2-4 ("For my staff, I don't think it was the masks. We got used to that. It was the eye protection where you breathe and they fog up and you couldn't even see.").

In sum, issues pertaining to CRF requirements in the second and third quarters of 2021 are heavily nuanced. Even if proximate causation is required, there can be more than one proximate cause of a particular effect. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 620 (6th Cir. 2004). Under these circumstances, the CRF issues in the second and third quarters of 2021 do not lend themselves to summary judgment in either party's favor. *See Moshi v. Kia Am., Inc.*, 155 F.4th 652, 656 (6th Cir. 2025) ("Because of its fact-intensive nature, foreseeability rarely lends itself to

categorical rules."); *James v. Meow Media, Inc.,* 300 F.3d 683, 691 n.1 (6th Cir. 2002) (noting, in the context of state law, that proximate cause is often "a question of fact for the jury").

**<u>Seventh</u>**, it is inconsequential that Plaintiff's "facility has not had a full census…since before 2017." ECF No. 48-1, PageID.1616. As previewed in Plaintiff's summary judgment motion, there is no requirement to demonstrate that residents were turned away due to capacity constraints. *See* ECF No. 59, PageID.3005-3007. It is the constraints themselves that are relevant for ERC purposes. *Id.* Additionally, governmental orders impacted Plaintiff in many ways, not just in the CRF and quarantining context. Even if the existence of demand in excess of supply were relevant, the myriad governmental orders and their impacts on census would need to be considered holistically. For instance, Plaintiff has offered evidence that restrictions on visitation and group activity decreased census. *Id.*, PageID.3018-3019. Whether Plaintiff's census would have been sufficiently high without those other restrictions, such that Plaintiff would have needed to turn away residents due to the CRF and quarantining requirements, is a fact question that has not been resolved.

**<u>Finally</u>**, it is not clear why the United States has focused on the fact that two of the beds that Plaintiff gave up for CRF purposes were used by staff for donning and doffing. Plaintiff was required to have such separate space for staff as part of being a CRF. *See* ECF No. 26-1, PageID.136 (requiring "[d]edicated donning/doffing at the entrance and exit of the area, with separate areas for clean and used PPE"). And the use of such space directly reduced the number of beds available to residents, thereby contributing to the partial suspension.

*ii. Therapy services*

*a. It is irrelevant that the work was performed by contractors*

Plaintiff experienced a partial suspension due to restrictions on its ability to conduct therapy services. The United States' main argument to the contrary—that Plaintiff cannot rely on

impacts to therapy services because they were provided by a contractor—is based on an invented standard found nowhere in the ERC statute. The United States cites no legal authority that states that a taxpayer's revenue-generating activities are treated differently depending on whether they are performed by employees or contractors, and no such limitation exists. Instead, the United States depends almost entirely on the requirement that the at-issue services be part of the taxpayer's "trade or business." ECF No. 48-1, PageID.1619. But even under that standard, Plaintiff's therapy services qualify.

Federal law requires Plaintiff to provide therapy services to its residents. Specifically, if therapy is part of the plan of care, Plaintiff "must…[p]rovide the required services" or "[o]btain the required services from an outside resource." 42 C.F.R. § 483.40(c). Thus, federal law expressly contemplates a contracting arrangement like Plaintiff's in order for a skilled nursing facility to meet its obligations. When a facility uses a contractor, the facility "assumes responsibility for…[o]btaining services that meet professional standards and principles that apply to professionals providing services in such a facility" and for the "timeliness of the services." *Id.* § 483.470(f).

All of the revenue from therapy is paid directly to Plaintiff and is recorded as income on Plaintiff's income statements. *See, e.g.*, ECF No. 55, PageID.2563-2564, ¶¶ 9-21. From an income perspective, it is treated no differently than other skilled nursing services that are provided by Plaintiff's employees. A portion of the revenue is then paid to the contractor, and it is reflected as an expense on Plaintiff's income statements. *See, e.g.*, *id.*, PageID.2564, ¶ 21. This is similar to the manner in which wages constitute an offsetting expense for income derived from services performed by employees.

As the United States concedes, "Plaintiff's income-generating business is residents." ECF No. 48-1, PageID.1624. Under federal law, Plaintiff cannot have residents unless it offers therapy services. It offers those services as part and parcel of its trade or business, and it does so at a profit after expenses are netted out. It is not conceivable that an interruption to Plaintiff's federally required, profit-generating therapy program must be ignored simply because Plaintiff, in accordance with federal regulations, hired a contractor.

The issue is also moot in light of the IRS's guidance. The IRS has acknowledged that the suspension of operations of a business's supplier can, in turn, cause a downstream partial suspension of the business. *See* IRS Notice 2021-20 at Q&A 12. Even if the United States is correct that it was the contractor who suffered a partial suspension, that does not matter, as its impact on Plaintiff would still be enough.

Finally, although the United States is correct that the ERC is calculated based on wages, it is incorrect in its assessment that it would therefore be "illogical for Plaintiff to receive a credit calculated using employee wages, related to services for which Plaintiff has no employees." ECF No. 48-1, PageID.1620. The United States' assumption that there must be a direct nexus between the wages and the suspension is simply inaccurate. For instance, for employers like Plaintiff with fewer than 500 full-time employees, if one part of a business is partially suspended, the credit can be based on all of the business's wages, even those paid to personnel who have nothing to do with the suspended portion of the operations. *See* 26 U.S.C. § 3134(c)(3)(A)(ii). And for employees who work in the area of the business that is partially suspended, their wages can be used whether they were performing relevant functions or not. *Id.* For instance, a business that is partially suspended due to a requirement to close for certain hours can use wages paid to employees during the hours the business was open as normal and during those when it was closed. Using employees'

wages to calculate a credit that relates to work performed by contractors is no more incongruous than any of the other outcomes clearly permitted by the statute. It is also relevant here that the ERC calculation is not a direct measure of damages based on wages paid, but rather a proxy for the disruption caused by a suspension. That proxy does not cease to be relevant when a business uses contractors.

*b. No "stoppage" is required*

The United States' next argument—that the ERC statute requires a "*stoppage* of therapy services," ECF No. 48-1, PageID.1621 (emphasis in original)—misstates the law and represents a dramatic departure from the IRS's guidance, for the reasons described above. Under the proper standard, it is apparent that the disruptions to therapy are sufficient to deny the United States' motion. Specifically, governmental orders regarding social distancing and quarantining directly limited the amount of therapy that Plaintiff could provide. As explained by Plaintiff's contract therapy provider, these orders "materially impacted the volume of therapy services that could be performed at Marquette County Medical Care Facility." ECF No. 53, PageID.2548, ¶ 6.

The United States does not deny the material impacts to the quantity of therapy or the associated effects on revenue. Instead, it incorrectly treats the issue as a binary, focusing only on the fact that Plaintiff could provide some therapy throughout 2021 and describing the severe impacts of the governmental orders as a mere "decrease in efficiency and timeliness that occurred because of COVID-related social distancing requirements." ECF No. 48-1, PageID.1621 (quoting *Sundancer*, 182 Fed. Cl. at 253). This argument fails.

First, reductions in capacity unquestionably qualify under the partial suspension test. The IRS has admitted this in the context of restaurants that need to socially distance their tables. *See* IRS Notice 2021-20 at Q&A 17. And the United States has conceded it in the context of a hospital that experienced a periodic inability to conduct surgeries. *See Tri-State Memorial Hospital*, No.

2:25-cv-00181-TOR, ECF No. 28, PageID.143. And second, *Sundancer* is inapposite. That case involved a company that alleged that social distancing requirements impeded its ability to provide adequate staffing for construction sites. 182 Fed. Cl. at 253. Here, by contrast, social distancing impacted the number of customers (residents) who were permitted to be in a business's space (therapy gym) at a particular time. This is no different than the many examples the IRS and the United States have already conceded to be qualifying impacts for purposes of the partial suspension test.

*c. Plaintiff has produced evidence for all three quarters*

Although the United States largely lumps all three quarters of 2021 together in its motion, the analysis must be conducted in a more granular fashion. The specific orders in effect, as well as the ways in which those orders effectuated a partial suspension, are outlined below.

In the first quarter of 2021, social distancing was required for therapy for the entire timeframe. And for all but the last three days of the quarter, residents needed to be quarantined for 14 days upon admission or readmission. The relevant orders are: MDHHS's December 8, 2020 order entitled "Emergency Order Under MCL 333.2253—Requirements for Residential Care Facilities—Recission of October 21, 2020 Order"; MDHHS's March 2, 2021 order entitled "March 2, 2021 Requirements for Residential Care Facilities—Rescission of December 8, 2020 Order"; MDHHS's March 17, 2021 order entitled "March 17—Requirements for Residential Care Facilities—Rescission of March 2, 2021 Order"; the September 17, 2020 and March 10, 2021 versions of QSO-20-39-NH from the Centers for Medicare and Medicaid Services ("CMS"); the order from the Michigan Department of Licensing and Regulatory Affairs ("MDLARA") regarding infection prevention and control programs; the CDC's April 30, 2020 document entitled "Responding to Coronavirus (COVID-19) in Nursing Homes"; and the March 29, 2021 CDC updated guidance. SUF ¶¶ 24, 30, 35, 40, 45, 57, 61, 64. Broadly speaking, the MDHHS orders

imposed social distancing requirements for group activities and separately required compliance with QSO-20-39-NH, which also had its own social distancing obligations. *Id.* ¶¶ 40-56. And MDLARA made obligatory the CDC's guidance, which in turn imposed quarantining requirements for new admissions and readmissions. *Id.* ¶¶ 57-69.

The impacts on therapy in the first quarter of 2021 are extensively addressed in Plaintiff's motion for summary judgment. For the reasons addressed there, the interruption to therapy that quarter is sufficiently extensive and clear-cut that Plaintiff is entitled to summary judgment. *See* ECF No. 59, PageID.3015-3018. But even if the Court disagrees, Plaintiff at a minimum has provided sufficient evidence of causation and impact to create a jury issue as to whether the limitations on therapy effectuated a partial suspension.

In the second and third quarters of 2021, certain restrictions still remained. Until April 27, CMS required social distancing for group activities, including therapy. SUF ¶¶ 31, 45, 49-50. And the requirement under Michigan law remained even longer, as MDHHS mandated compliance with the older version of QSO-20-39-NH until May 21, 2021. *Id.* ¶ 54. Starting on May 21, 2021, social distancing was still required when unvaccinated residents were present, and Plaintiff at all times had at least some unvaccinated residents. *Id.* ¶¶ 53, 103-07. Additionally, during the entirety of the second and third quarters of 2021, and subject to carve-outs not at issue here, unvaccinated new admissions needed to quarantine, which impacted their ability to be in physical proximity with other residents. *See id.* ¶¶ 64, 69.

Finally, throughout the second and third quarters of 2021, Plaintiff was required to treat a single new resident or staff case as a "potential outbreak." *Id.* ¶¶ 65, 67. Until September 10, 2021, that meant restricting residents to their rooms, which limited their ability to participate in therapy. *Id.* ¶ 65. Starting September 10, the room restriction no longer applied to fully vaccinated residents

without symptoms. *Id.* ¶ 67. Over the course of the second and third quarters of 2021, Plaintiff had numerous staff members test positive for COVID. *Id.* ¶¶ 74-75.

The evidence supports a conclusion that governmental orders sufficiently restricted therapy in the second and third quarters of 2021 so as to qualify Plaintiff for the ERC. As an initial matter, Mr. Lindeman has attested to the impacts during these quarters, stating: "Even controlling for the decline in census, the quarantining and social distancing requirements were still material. Without the quarantining and social distancing requirements, we could have performed a meaningfully higher volume of therapy services at Marquette County Medical Care Facility in the first three quarters of 2021." ECF No. 53, PageID.2548, ¶ 7. Additionally, Plaintiff's therapy metrics declined substantially in the second and third quarters of 2021 versus the same quarters in 2019. In the second quarter of 2021, therapy minutes were down by 29.5 percent, and therapy revenue was down by 30.9 percent. SUF ¶ 119; ECF No. 55, PageID.2563, ¶ 15. In the third quarter of 2021, therapy minutes were down by 46.6 percent, and therapy revenue was down by 46.2 percent. SUF ¶ 122; ECF No. 55, PageID.2564, ¶ 19. As evidence of the importance of therapy to Plaintiff's overall finances, therapy revenue constituted 6.6 percent of Plaintiff's patient-related income for the second quarter of 2019 and 7.3 percent in the third quarter of 2019. ECF No. 55, PageID.2564, ¶¶ 16, 20. Although impacts to business lines that constitute 10 percent of gross receipts qualify for a safe harbor, the United States has consistently conceded that effects on smaller revenue lines still must be considered under a facts and circumstances test. In other words, the safe harbor is not mandatory. *See, e.g.*, ECF No. 15, PageID.68, ¶ 15.

Given the government-imposed restrictions and the resulting declines in therapy, Plaintiff has at a minimum established a triable factual dispute as to whether the orders caused the significant interruptions to therapy and, in turn, to Plaintiff's operations. Plaintiff acknowledges

that the link between the orders and the impacts is strongest in the first quarter of 2021, which is why it moved for summary judgment that quarter. But the record for the second and third quarters is still comfortably sufficient to preclude summary judgment.

*d. The United States' alternative explanation fails*

The United States briefly posits another potential cause for the decline in therapy revenue, but its argument is unpersuasive. Specifically, the United States alleges that "Plaintiff's potential short-term resident pool *includes* individuals recovering from elective surgery" and that a "decline in elective procedures created a decline in Plaintiff's short-term resident pool." ECF No. 48-1, PageID.1622 (emphasis added). As an initial matter, even assuming that a decline in surgeries had an impact on therapy, and even further assuming that proximate rather than just but-for causation is required, the argument is irrelevant. There can be more than one proximate cause of a particular effect. *See Trollinger*, 370 F.3d at 620.

Additionally, it is clear that at least a significant portion of the decline in therapy had nothing to do with the elective surgery issue. Although Plaintiff's contract therapy provider acknowledged that census was lower in 2021, he nonetheless attested that the governmental orders separately impacted therapy metrics. *See* ECF No. 53, PageID.2548, ¶ 7 ("Even controlling for the decline in census, the quarantining and social distancing requirements were still material. Without the quarantining and social distancing requirements, we could have performed a meaningfully higher volume of therapy services at Marquette County Medical Care Facility in the first three quarters of 2021."). The impacts attributable to governmental orders are sufficient to trigger a partial suspension even if other factors also contributed to the downward trajectory.

The United States also has no competent evidence that its proposed cause had any effects. The United States' brief cites testimony that relates to a slowdown in surgeries "when COVID hit the world," *i.e.*, in 2020. ECF No. 56, PageID.2813, at 248:24. The passage then goes on to discuss

a point in time when "they weren't even allowing those surgeries during COVID." *Id.*, PageID.2814, at 249:4-5. Those restrictions were only in place in 2020, not in 2021.

*iii. Visitation and communal activities*

Throughout the first three quarters of 2021, governmental orders required Plaintiff to impose numerous restrictions on visitation and communal activities. The United States argues that these limitations cannot possibly be relevant to the ERC test because Plaintiff earns income from caring for residents, not from providing visitation or group activities. But that answers the wrong question. The ERC is available when the "operation of the trade or business" is suspended. 26 U.S.C. § 3134(c)(2)(A)(ii)(I). To the extent that government-imposed restrictions result in significant numbers of people declining to engage in commerce with a business, that business has been partially suspended. Indeed, the ERC statute is agnostic to whether the particular activities that are identified in governmental orders are themselves revenue-generating, as evidenced by the fact that Congress specifically allowed for qualification based on orders that limit group meetings, without regard to whether those meetings directly produce revenue. Qualifying orders can restrict "commerce, travel, or group meetings," *id.*, and the disjunctive demonstrates that government-imposed limitations on commerce are not required.

As an example, the United States would surely concede that a hypothetical order to suspend short-term rehabilitation would be relevant for purposes of the ERC. What, then, about an order that stated that anyone engaging in short-term rehabilitation must wear a hazmat suit at all times, including when doing therapy? To the extent that the order predictably results in nobody being willing to do short-term rehabilitation stays, it effectuates a partial suspension just as surely as an order banning short-term rehabilitation would. It does not matter that the order is not specifically directed to a particular piece of commerce (*i.e.*, short-term rehabilitation), so long as it partially suspends operations.

Here, Plaintiff has provided unrebutted testimony that the restrictions caused it to lose actual or potential residents. *See* ECF No. 59, PageID.3019 (quoting testimony). Plaintiff has also described an entire federal regulatory regime that enshrines the right to visitation and group activities as essential to residents' "right to a dignified existence and self-determination." *Id.* (quoting 42 C.F.R. § 483.10(a)). In response, the United States has offered nothing at all. There is no testimony or documentation contesting the clear link between the limitations and the drop in census.

The disruptions were most acute in the first quarter of 2021. For instance, outside of very limited exemptions, no indoor visitation as allowed between January 1 and February 16. *See* ECF No. 59, PageID.2993. Additionally, for all of the first quarter of 2021 and a portion of the second quarter, social distancing was required for communal activities. *See id.* These are the same social distancing requirements described above in the context of therapy. The United States also admits that there were restrictions to visitation and group activities in both the second and third quarters of 2021 due to COVID positivity. *See* SUF ¶¶ 76-80.

Additionally, the United States' motion overlooks the impact that the orders had even during times when the facility was not in a form of lockdown. Even a "single new case" of COVID among residents or staff was enough for restrictions to spring into place. *See, e.g.*, *id.* ¶ 65. Putative residents, current residents, and their families understood this. Because nobody could know what the future held, residing at the facility meant accepting that additional lockdowns could be imminent. This was a reality that many were not prepared to accept, which in turn prevented Plaintiff from admitting certain residents or caused others to leave early. *See* ECF No. 59, PageID.3019.

Plaintiff believes that the record is sufficiently strong as to the first quarter of 2021 that it is entitled to summary judgment. At a minimum, though, the evidence is sufficient to deny the United States' motion as to all periods. Plaintiff has provided testimony linking governmental orders to actual or potential residents declining to be admitted into or to stay at the facility. Plaintiff has also established that its census did, in fact, drop each quarter in 2021, as compared to the same quarter in 2019. *See* SUF ¶¶ 88, 91 94. This is more than sufficient to create a triable issue as to causation.

As it does elsewhere, the United States' attempt to create an alternative narrative fails. Specifically, the United States cites a portion of testimony where Plaintiff's Rule 30(b)(6) witness referred to the fact that "nursing homes got the bad rap right from the beginning with the large COVID outbreak in a nursing home." ECF No. 48-1, PageID.1611. The United States posits that this, rather than any restrictions imposed by governmental orders, led to a lack of demand. But the testimony was in the context of explaining the impact of the governmental orders on a population that was already reticent. Just lines later, the witness testified: "And then, you know, the adjustment to living in a nursing home where we are telling you upfront you will likely see a four — your four walls of your room more than you'll see any activity-based entertainment or socialization with others, was just, you know, made it even a lesser attractive model to choose." ECF No. 56, PageID.2752, at 187:6-11. And in response to the very next question, she expressly tied the governmental orders to people deciding not to be admitted or to leave early. *Id.* at 187:12-188:2. Put differently, the testimony was that there was a population for whom the governmental orders were the final straw that drove their decisions. Even if proximate cause is required, something that is the final, foreseeable cause of a decision certainly qualifies, even if predicate forces also contributed. *See Trollinger*, 370 F.3d at 620. And if nothing else, it creates a factual issue for trial.

*iv. Increased expenses*

Another impact of the governmental orders is that Plaintiff had to invest significant sums in personal protective equipment, COVID tests, and contract nurses, among other expenses. For many of these expenses, the United States has acknowledged the nexus to governmental orders. *See* SUF ¶¶ 174-79.[6] Plaintiff submits that there is a triable issue as to whether the multitude of governmental orders, which imposed voluminous requirements on Plaintiff as a condition of its continuing operations, was sufficient to cause a partial suspension.

Apart from suspensions, there is also a pathway to the ERC that is available for businesses with a substantial decline in gross receipts. Although the United States will likely contend that this separate pathway forecloses an expense-based suspension argument, Plaintiff's argument does not render any portion of the test superfluous. The gross receipts pathway focuses only on gross income and is agnostic toward increased expenses. A business whose gross income was flat but whose net income was down substantially is not eligible under the gross receipts test. Plaintiff submits that a reasonable jury could find that expensive preconditions to keeping the doors open could amount to a partial suspension.

*v. Restriction on admissions*

The United States admits that a governmental order barred Plaintiff from admitting new residents for a 14-day period beginning January 11, 2021. *Id.* ¶¶ 81-82. It is possible for businesses to be partially suspended for part, but not all, of a quarter. *See* 26 U.S.C. § 3134(c)(3)(A)(ii)(I). If nothing else, Plaintiff was partially suspended during that period, when there was a complete stoppage of its ability to admit new residents.

[6] Although some of these amounts were offset by government grants, the extent of this is not established.

## Conclusion

The United States' motion for summary judgment should be denied.

Dated: September 25, 2026

*/s/ Robert S. Silverblatt*
Robert S. Silverblatt
DC Bar No. 1020748
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9132
Facsimile: (202) 778-9100
Rob.Silverblatt@klgates.com

*Counsel for Plaintiff Marquette County Medical Care Facility*